**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CASE NO. 21-cr-35 (EGS)** |
| | **:** | |
| **RONALD COLTON MCABEE,** | **:** | |
| **Defendant.** | **:** | |

**MOTION FOR EMERGENCY STAY AND**
**FOR REVIEW AND APPEAL OF RELEASE ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court to, first, stay defendant Ronald Colton McAbee's release pending trial, and second, review the decision by Magistrate Judge Jeffrey S. Frensley from the Middle District of Tennessee to deny the government's motion for pre-trial detention. In support thereof, the government states the following:

I.  **BACKGROUND**

A.  **Procedural Posture**

On August 17, 2021, defendant Ronald Colton McAbee was arrested in his home state of Tennessee on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Robin M. Meriweather in connection with an Indictment[1] charging the defendant with one count of  Inflicting Bodily Injury on Certain Officers or Employees and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1) and (b) and 2; one count of Assaulting, Resisting, or Impeding Certain Officers or Employees, in violation of 18 U.S.C. § 111(a)(1); two

---

[1] The defendant is one of seven co-defendants in *U.S. v. Sabol et al*.  Three of his co-defendants, Jeffrey Sabol, Peter Stager, and Jack "Wade" Whitton are currently detained.

counts of Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), one count of Knowingly Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), one count of Disorderly and Disruptive Conduct in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A), one count of Engaging in Physical Violence any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A), and one count of Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

On August 17, 2021, during the defendant's initial appearance in the Eastern District of Tennessee, the government made a motion to detain the defendant without bond pending trial pursuant to 18 U.S.C. §§ 3142(e), (f)(1)(A), and (f)(1)(E).   A detention hearing was held on August 26, 2021, and resumed on September 8, 2021, during which the Magistrate Judge Jeffrey S. Frensley denied the government's detention motion and issued an order releasing the defendant with certain conditions. Following this, the government orally moved to stay the defendant's release pending an appeal by the government. Magistrate Judge Frensley granted that request, and absent further action, the release will be effectuated at approximately 5:00 pm CST on September 10, 2021.

The government hereby appeals that release order. We also ask this Court to stay the Defendant's release pending a hearing on this appeal. Jurisdiction over this review and appeal lies in this Court, rather than to a judge in the Middle District of Tennessee, pursuant to 18 U.S.C. § 3145(a)(1) (when defendant is released by person other than judge of court having original jurisdiction over offense, government's appeal lies to court of original jurisdiction).

**B.**     **Statement of Facts**

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking

3

windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

### The Defendant's Assault of Metropolitan Police Department Officers

MPD Officers A.W., B.M., and C.M. were amongst those MPD officers who were directed to report to the U.S. Capitol to assist the USCP in their duties to maintain the security of the U.S. Capitol on January 6, 2021.  By 4:27 p.m., they had assumed posts in an archway (the "Archway") that provided access to the interior Capitol building from the Lower West Terrace of the building. A.W., B.M., and C.M. were each wearing full MPD-issued uniforms; A.W. was also wearing an MPD-issued neon jacket. The officers' approximate location is denoted below by the red circle.



By that time, hundreds of individuals had gathered outside of the Archway, some of whom were throwing and swinging various objects at the group of law enforcement officers.

In a 90 second time period, from approximately 4:27:00 to 4:28:30, Officers A.W., B.M., and C.M. were brutally assaulted by the rioters, including the defendant.[2]  Specifically, Officer A.W. was knocked to the archway ground by an assailant, and then had his baton snatched out of his hands by another rioter – codefendant Jeffrey Sabol.  While Officer A.W. was laying on the ground of the archway, another rioter – codefendant Jack Wade Whitton – began striking at B.M. with a crutch, kicked at A.W., and, assisted by Sabol and another rioter, pulled Officer B.M. out of the Archway, over Officer A.W., and into the crowd where another rioter – codefendant Peter Stager – began beating B.M. with a flagpole.

The defendant, Ronald Colton McAbee, then joined the attack, which was captured by officers' body-worn cameras ("BWCs") from the inside of the Archway, and by other individuals outside of the archway, including video posted on Storyful's YouTube page (the "Storyful

---

[2] Right before the assault began, the crowd of rioters had crushed against the line of police officers protecting the Archway and several rioters were trampled by the mob.  Seconds before these assaults of Officers A.W., B.M, and C.M., at least two rioters were in medical distress and a member of the crowd was pleading with Officer A.W. and others for help, as his friend was dying after being trampled by the mob.  That individual was attempting to bring his friend's body forward to law enforcement when the assaults of Officers A.W., B.M., and C.M. began.

Video").[3]   McAbee grabbed at A.W.'s torso, while codefendant Clayton Ray Mullins grabbed A.W.'s leg and engaged in a tug-of-war with officers who were trying to pull A.W. back in to the Archway, as depicted in the images below.



*Government Exhibit 1.1*

[3] *Available at* https://youtu.be/aEGthdTzedk.



*Government Exhibit 2.1*

Officer C.M. stepped out of the Archway in an attempt to come to the aid of A.W. and

B.M.  McAbee then stood upright and began swinging his arms at C.M., as depicted in the images

below:



*Government Exhibit 2.2*



*Government Exhibit 3.1[4]*

When C.M. attempted to push McAbee aside with a baton, codefendant Michael Lopatic emerged from the crowd, climbed over a handrail, charged at C.M and repeatedly punched C.M. At that point, McAbee turned back to A.W. and grabbed A.W.'s torso, pulling him out of the Archway.  The two slid down a set of stairs and into the crowd together, with McAbee on top of A.W. and pinning A.W. down for approximately 25 seconds, as depicted in the images below:

---

[4] Government Exhibit 3 is an excerpt of the Storyful Video.



*Government Exhibit 4.1*[5]



*Government Exhibit 3.2*

---

[5] Exhibit 4.1 is a still image from the BWC video of Officer A.W., who at this point was supine.

Officer A.W. recalled having his helmet ripped off his head and being stripped of his baton, gas mask (which was later recovered), and MPD-issued cellular phone. As he was dragged into the mob, Officer A.W. was kicked, struck with poles, and stomped on by several individuals. Additionally, Officer A.W. recalled being maced once his mask was ripped off.  At some point during the assault, Officer A.W. was able to retrieve his gas mask and one individual prevented the rioters from further assaulting him, allowing him to get on his feet and back to the Archway area.  Once A.W. was back in passageway that connected to the Archway, another officer realized A.W. was bleeding from his head. A.W. was subsequently escorted to the east side of the Capitol building before being taken to the hospital.  At the hospital, A.W. was treated for a laceration on his head which required two staples to close.

### The Defendant's Procurement and Possession of Deadly or Dangerous Weapons

During the assaults described above, the defendant was wearing gloves with reinforced knuckles.  And, immediately prior to the assaults described above, McAbee was carrying what appeared to be a baton or a black stick.  These weapons are apparent in the images below:



*Government Exhibit 4.2*



*Government Exhibit 5*

McAbee procured these reinforced "brass knuckle gloves" specifically for use on January 6, 2021.  Following his arrest on August 17, 2021, McAbee consented to a search of his cellphone, which revealed that, at the end of December 2020 and beginning of January 2021, McAbee and an associate ("Associate-1") made arrangements to travel to Washington, D.C. on January 6, 2021. On December 31, 2020, Associate-1 texted a picture of a knife, brass knuckles[6], and a magazine to McAbee, along with the comment "That's what I'll carry in my pocket."   The following exchange ensued:

| | |
|---|---|
| **MCABEE:** | How can I get some knuckles |
| **ASSOCIATE-1:** | Amazon is quick. |
| **MCABEE:** | So I've got a tire repair kit and the t handle tire puncture is a great tool |
| **ASSOCIATE-1:** | Lol this is true! |

---

[6] Notably, brass knuckles, such as those seen in Associate-1's photograph, are a prohibited weapon in the District of Columbia.  *See* 22 D.C. Code § 4514(a).

Associate-1 then sent a link to an Amazon listing for "Steel Outdoor Reinforced Brass Knuckle Motorcycle Motorbike Powersports Racing Textile Safety Gloves," along with the comment "Just ordered these."  Approximately 24 minutes later, McAbee texted Associate-1, asking "could you buy those gloves in a medium and I pay you back?" to which Associate-1 responded that he could.

*Identification of the Defendant*

In photographs and videos of McAbee during the assaults and at other times on January 6, 2021, he is wearing a black tactical vest emblazoned with the Roman numeral III encircled in stars[7] and a patch that read "SHERIFF,"[8] a red "Make America Great Again" baseball hat, a red face scarf / bandana, white sunglasses with polarized lenses, a black shirt with white lettering that read, in part, "DIFFERENT GENERATION," and black gloves with hard, metal-colored knuckles.[9]

On or about January 19, 2021, the FBI posted to the internet a "Be on the Lookout" ("BOLO") for the individual depicted below (who, at the time, was referred to as "BOLO #134"):

---

[7] Individuals and militia extremists sometimes call themselves three percenters ("III%ers" or "threepers") based on the myth that only three percent of American colonists took up arms against the British during the American Revolution. Some III%ers regard the present-day US Government as analogous to British authorities during the Revolution in terms of infringements on civil liberties. While many independent or multi-state militia groups incorporate III% in their unit names, the term is less indicative of membership in a single overarching group than it is representative of a common belief in the notion that a small force with a just cause can overthrow the government if armed and prepared.  Some Three Percenters or Three Percenter groups utilize a Roman numeral three (III), surrounded by a circle of stars – similar to the one displayed on McAbee's vest.

[8] Based on this insignia, social media and other internet users used the nickname "#threepercentsheriff" to refer to McAbee and to compile images of him in the vicinity of the Capitol building on January 6, 2021.

[9] During a search of the defendant's residence on August 17, 2021, FBI agents recovered a black tactical vest, a red "Make America Great Again" baseball hat, a red bandana, red and white sunglasses, a black shirt with white lettering that read "SAME BLOODLINE DIFFERENT GENERATION" "WE WILL NOT COMPLY, WE WILL NOT DISARM," and black and silver motorcycle gloves with hard knuckles.



On or about May 19, 2021, the FBI posted additional photos and BWC video footage depicting BOLO #134 on January 6, 2021.

On or about May 26, 2021, a tipster responded to the FBI's BOLO #134 post identifying the subject as "Cole or Colton Mcabee" of Roane County, Tennessee. The tipster provided a name for McAbee's spouse, advised that McAbee worked as a sheriff's deputy at the Cherokee County, Georgia Sheriff's Office ("CSO") around the time of January 6, 2021, but had quit and relocated to Tennessee, and had deleted his Facebook account following the events of January 6, 2021.

A representative of CSO confirmed an individual named Ronald Colton McAbee – the Defendant – had been employed by CSO and had left the agency in approximately November 2020 to take a position with the Williamson County Sheriff's Office ("WSO") in Tennessee. FBI agents subsequently interviewed two members of CSO who had worked with and/or supervised McAbee. During the interview, an FBI agent showed one of the CSO employees ("CSO-1") three pictures of BOLO #134, but did not provide any context for the pictures. CSO-1 indicated that s/he was pretty sure that the person depicted in those photographs was McAbee and noted that the stance of

the person in the photographs was consistent with McAbee's.  The second CSO employee ("CSO-2") then joined the interview and the FBI agent showed him/her the same three photographs.  CSO-2 stated that the individual in the photographs was "absolutely" McAbee.

A representative of the WSO confirmed that McAbee had been employed by WSO from November 9, 2020 to March 23, 2021.  FBI agents interviewed a WSO employee who had worked with McAbee  and showed that employee the following picture of BOLO #134, but did not provide any context for the picture:



The WSO employee identified the picture as McAbee.

Postings to a Facebook account in the name of McAbee's spouse also confirm his identity. Those posts include:

1.      A photograph of a black tactical vest with a "Sheriff" patch:



2.      A photograph posted on January 9, 2021, depicting McAbee wearing a CSO hooded sweatshirt and a hat displaying a Roman numeral three encircled in stars – similar to the emblem displayed on his tactical vest on January 6, 2021 --  with his right arm in a sling:



3.      Additional posts that detail a car accident in which McAbee was involved in on December 27, 2020.

A Tennessee Electronic Traffic Crash Report confirms that McAbee was involved in a single-car accident on December 27, 2020 and was transferred by EMS (*i.e.,* by ground) to the hospital.[10]   McAbee subsequently submitted a request to WSO to be placed in the temporary disability program, and stated that he had injured his right shoulder and right hip in a car accident on December 27, 2020 and had been instructed to wear a sling.  That request included information from a physician assistant who treated McAbee, which indicated that McAbee had been examined by a medical professional on December 30, 2020 for injuries related to the accident and that as a result of the exam, McAbee was excused from work from December 30, 2020 to January 14, 2021. McAbee also signed a medical records release form on January 5, 2021.  MCABEE was cleared to return to work on January 14, 2021 with one limitation, no use of his right shoulder for four weeks.

### *The Defendant's Invocation of His Status as a Law Enforcement Officer*

A few minutes after the assaults of Officers A.W. and C.M. described above, at approximately 4:30 p.m., McAbee returned to the Archway and was part of a group of rioters who attempted to render aid to another rioter who was in medical distress, and helped to carry/drag that rioter to the entrance of the Archway.  After that rioter was taken through the Archway, McAbee remained at the south side of the Archway, bent over and appears to be in pain.  As rioters continued to throw objects at the police line, the officers sprayed crowd control spray at the crowd, McAbee gestured towards the passageway behind the officers, indicating that he wanted to enter

---

[10] A Tennessee State Trooper who responded to the accident (the "Trooper") recalled that McAbee was up and walking after the accident and did not believe that McAbee sustained major injuries.  The Trooper recalled that McAbee had injured his left arm.

the passageway, and exclaimed, "Don't spray me man, I'm not freaking hurting anybody."  As another rioter yelled that the person in distress was McAbee's wife,[11] the crowed surged at the police line, slamming it with riot shields, and pushing McAbee against the side of the Archway.  As McAbee's right side was pressed against the side of the Archway, he exclaimed "I think I just broke my fucking shoulder," – consistent with him aggravating injuries sustained in the December 27, 2020 car accident –  and asked one of the officers in the police line, "Can I get in?" (*i.e.*, through the line of officers in the Archway).  McAbee then pointed at the lettering on his vest, which read "SHERIFF," and stated, "I can't go back that way, man."

### *The Defendant's Association with Anti-Government Ideology*

Despite himself having served as a sheriff's deputy,[12] and attempting to use this status to his advantage on January 6, 2021 (as well as wearing what appears to be government-issued gear), the defendant repeatedly displays symbols of anti-government ideology.  As discussed above, on January 6, 2021 and on other occasions, the defendant has worn insignia associated with Three Percenters, some of whom liken the current United States government to British authorities at the time of the American Revolution.  During his post-arrest interview, the defendant told agents that he did not recall wearing a three percent patch on a hat and that he only purchased one three percent patch.  However, in texts, the defendant told Associate-1, "You a three per now," and when Associate-1 showed the defendant a t-shirt he had designed which displayed a Roman numeral "III" circled by thirteen stars, the defendant responded, "I'll take an XL" and "I lost my patches in my wreck."[13]

---

[11] This individual who was in need of medical assistance has been identified and is not McAbee's spouse.

[12] The Government believe that McAbee is no longer employed by any law enforcement agency.

[13] During the defendant's post-arrest interview, he stated that when he learned that Three Percenters were listed as an "anti-American organization," he no longer associated himself with the ideology.

The defendant's anti-government sentiments have remained strong since January 6, 2021. On January 10, 2021, in a text message conversation with Associate-1, the defendant had a conversation with Associate-1 regarding whether Associate-1 was going to attend the inauguration. During that text message conversation, Associate-1 stated, "Trump will be the one inaugurated." The defendant responded, "I call for secession!"

More recently, FBI agents recovered a black American flag from the defendant's residence, which had been displayed on the front porch. During the Civil War, Confederate soldiers flew the black American flag to symbolize the opposite of the white flag of surrender, *i.e.*, that the unit would neither give in nor surrender and it would not show clemency or mercy to a surrendering opponent. *See* Hate Watch Report, *Flags and Banners*, *available at https://www.hatewatchreport.com/flags-symbols*.

### C.   Order for Release

On August 17, 2021, during the defendant's initial appearance in the Middle District of Tennessee, the government orally moved for the defendant to be detained pending trial. The defendant is eligible for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(A) [Crime of Violence] and 3142(f)(1)(E) [Dangerous Weapon]. This is based on a combination of the facts underlying the instant offense, including his assaults on federal officers, his possession of weapons (and tactical gear) on the Capitol Grounds, his obstructive and disruptive conduct at the U.S. Capitol, and the defendant's personal characteristics.

Following a detention hearing conducted on August 26, 2021, and September 8, 2021 Magistrate Judge Jeffrey S. Frensley denied the government's detention motion. The magistrate judge granted a stay of the defendant's release, until 5pm CST on September 10, 2021 pending the government's appeal. The government hereby appeals and seeks review of that release order and

also asks this Court to interpose its own stay of the order until a hearing on this motion can be held.

### III.  **ARGUMENT**

Title 18, U.S.C. § 3145(a) states:

**(a) Review of a release order –** If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release
> . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[14]

---

[14] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

Here, McAbee is subject to detention pursuant to 18 U.S.C. §§ 3142(f)(1)(A) [Crime of Violence] and 3142(f)(1)(E) [Dangerous Weapon].  The evidence clearly shows that the defendant is a danger to the community and poses a serious risk of obstruction of justice.  There are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community.

During the course of the January 6, 2021, siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol. Additionally, the violent crowd encouraged others in the crowd to work together to overwhelm law enforcement and gain unlawful entry into the U.S. Capitol.

What is extremely troubling about the defendant's conduct is the severity of his actions and his anticipation of and preparation for violence.  As noted above, the defendant purposefully approached a line of police officers who were guarding the Capitol building, grabbed Officer A.W. who had been thrown to the ground, and, in coordination with others, began to pull A.W. towards the violent mob where Officer B.M. was already being attacked.  When another officer, C.M.,

---

Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

attempted to come to A.W. and B.M.'s aid, the defendant attacked him as well, punching at him while wearing metal-knuckled gloves.  The defendant then returned to A.W., dragging him into the mob, pinning him down, and contributing to the significant injuries that A.W. sustained and for which A.W. had to seek medical treatment.

This was not a momentary lapse in judgement.  The defendant dressed in a manner that indicates that he anticipated violence at the Capitol.  In addition to purchasing the metal-knuckled gloves specifically for January 6, 2021, he wore a tactical vest.  And he armed himself by acquiring a baton or a stick.

In addition to this physical violence, the defendant also attempted to use his status as a law enforcement officer to breach the police line and gain entry to the Capitol building, potentially endangering the officers further.  The defendant's conduct contributed to the escalation of violence on the Capitol grounds on the afternoon of January 6, 2021, and, contributed to the ability of the large mob of individuals to successfully breach the U.S. Capitol, putting additional law enforcement officers and members and staff of Congress at grave risk.

Moreover, the defendant also poses a serious risk of obstruction of justice.  The defendant attacked police officers charged with protecting the Capitol building inside of which Congress was carrying out its duty to certify the 2020 election.  His conduct on January 6, 2021 was in and of itself is obstructive, as it was aimed at stopping the functioning of the United States government by derailing the certification of the electoral process, a cornerstone of our democracy.  And it was made all the more so by the fact that, at the time, he was himself a law enforcement officer.  The defendant's ready participation in these violent assaults on police officers, *while he himself was a sheriff's deputy*, and his attempted use that status to obtain special treatment is powerful evidence of his lack of regard for legal authority.

Furthermore, according to the tipster who initially identified him, the defendant deleted his Facebook account following January 6, 2021, potentially destroying evidence of his whereabouts that day and his motivations for his actions.  The defendant's display of symbols of anti-government ideology and his very words indicate a lack of respect for the authority of the United States Government – including this court – and a disinclination to follow its mandates and directives.  He now faces a significant term of imprisonment in the face of overwhelming evidence against him.  All of this gives him a compelling incentive to destroy evidence or intimidate witnesses, or otherwise disregard the obligations imposed on him by this Court by virtue of being a defendant in a criminal case.

Consequently, the government requests review of the magistrate judge's decision to release the defendant and seeks a further stay of the order from this Court.

To the extent the Court grants this request, the government is and will be prepared to show that the factors under 3142(g) favor detention weigh in favor of the defendant's detention, to wit: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. In this case, there is no condition or combination of conditions that will reasonably assure the safety of the community if the defendant is released, and the government argues he must be held pending disposition in this matter.

For the reasons stated herein, the government prosecutes this appeal of Magistrate Judge Jeffrey S. Frensley's decision to release the defendant and seeks a stay of the order from this Court.

**WHEREFORE**, the United States respectfully prays this Honorable Court to stay the order releasing Defendant Ronald Colton McAbee, to convene a hearing to review the decision

to release Ronald Colton McAbee and to order instead that he be held without bond pending

trial.

Respectfully submitted,

Channing D. Phillips
Acting United States Attorney

 /s/ Colleen D. Kukowski
Colleen D. Kukowski
DC Bar No. 1012458
Benet J. Kearney
NY Bar No. 4774048
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2646 / (212) 637 2260
Colleen.Kukowski@usdoj.gov /
Benet.Kearney@usdoj.gov

CERTIFICATE OF SERVICE

I certify that a copy of the Government's Motion for Pretrial Detention was served on all

counsel of record via the Court's electronic filing service.

 /s/ Colleen D. Kukowski
COLLEEN D. KUKOWSKI
Assistant United States Attorney

Date:  September 8, 2021