1

1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF TENNESSEE
2                      NASHVILLE DIVISION

3    UNITED STATES OF AMERICA      )
                                   )
4    VS                            )   No. 3:21-mj-2956
                                   )
5    RONALD McABEE                 )
     _____

6

7         BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

8                      MAGISTRATE JUDGE

9         **TRANSCRIPT OF ELECTRONIC RECORDING**

10                 (via video conference)

11                 August 26, 2021 and

12                 September 8, 2021

13   _____

14   <u>APPEARANCES:</u>

15   For the Government:      JOSHUA KURTZMAN
                             U.S. Attorney's Office
16                           110 Ninth Ave S., Suite A961
                             Nashville, TN 37203

17

18   For the Defendant:      ISAIAH S. GANT
                             Federal Public Defender's
19                              Office
                             810 Broadway, Suite 200
20                           Nashville, TN 37203

21   _____
     PREPARED FROM **ELECTRONIC RECORDING** BY:
22
     **Roxann Harkins, RPR, CRR**
23   Official Court Reporter
     801 Broadway, Suite A837
24   Nashville, TN 37203
     615.403.8314
25   roxann_harkins@tnmd.uscourts.gov

2

**I N D E X**

Government witness

**MATTHEW ACKER**

Direct Examination By Mr. Kurtzman ..................7
Cross-Examination By Mr. Gant ......................31

Defense witnesses

**SARAH MCABEE**

Direct Examination By Mr. Gant .....................63
Cross-Examination By Mr. Kurtzman ..................69

**KIMBERLY GRAY**

Direct Examination By Mr. Gant .....................73

**PHILIP NELSON**

Direct Examination By Mr. Gant .....................77
Cross-Examination By Mr. Kurtzman ..................79
Redirect Examination By Mr. Gant ..................83

**DAVID DICKSON**

Direct Examination By Mr. Gant .....................85
Cross-Examination By Mr. Kurtzman ..................88
Redirect Examination By Mr. Gant ..................88

**E X H I B I T S**

Government No. B....Admitted through proffer,     60
          96 pages of texts from Defendant to Roberts –
          SEALED
Government No. C....Admitted through proffer, photo60
          from texts of knife, knuckles, etc – SEALED
Government No. D....Admitted through proffer, photo60
          from texts of knives, gloves, etc – SEALED
Government No. E....Admitted through proffer, photo60
          from texts of gloves in packaging – SEALED
Government No. F....Admitted through proffer McAbee62
          texts with Uncle Eddie – SEALED

Government No. G....Admitted through proffer photo 62
          from Eddie texts, 2 men with news – SEALED
Government No. H....Admitted through proffer photo 62
          from Eddie texts, man's head w/ cut – SEALED


Government No. 1....AW BWC clip ...................12
Government No. 2....CM body cam clip ..............19
Government No. 3....Powell_16_27_10-16 body cam ...23
          footage
Government No. 4....Sajumon_26_27_28-16 body cam ..25
          footage
Government No. 5....Storyful video ................28



Defense No. C....Character letter from Emily Gray –69
          SEALED
Defense No. E....Character letter from Austin S.  .69
          Hise – SEALED
Defense No. F....Character letter from Brittney ...69
          Hillyer – SEALED
Defense No. G....Character letter from Austin B. ..69
          Langley – SEALED
Defense No. H....Character letter from Nathan  ....69
          McMahan – SEALED
Defense No. I....Character letter from Angelo A. ..69
          Nardone, Jr. – SEALED
Defense No. J....Character letter from Det. Gregory69
          M. Sims – SEALED
Defense No. K....Character letter from Ronnie .....69
          Stockton – SEALED
Defense No. M....Character letter from Jennifer ...69
          Wright – SEALED

4

1

2          The above-styled cause came to be heard

3   on August 26, 2021 and September 8, 2021, before the

4   Hon. Jeffery S. Frensley, Magistrate Judge, when the

5   following proceedings were had to-wit.

6              **TRANSCRIPT OF ELECTRONIC RECORDING**

7                          **\*\*\***

8

9          THE COURT:  Morning, everyone.  Welcome.

10  We're here this morning in the matter of the

11  *United States of America versus Ronald McAbee*.  It's

12  Case No. 3:21-mj-2956 here in the district.

13  Mr. McAbee is appearing as a result of an indictment

14  returned in the District of Columbia.  The case number

15  in that matter is 1:21-cr-00035.

16          Mr. McAbee's present this morning by

17  video conference, along with his attorney, Mr. Gant.

18  And Mr. Kurtzman is here for the United States.

19  Mr. Murphy is on for pretrial services.  There are

20  several other folks who appear on video conference as

21  well.  I would just ask that, Mr. Kurtzman, Mr. Gant,

22  identify anyone that you have with you as well before

23  we get started.

24          I also want to let everyone know that my

25  telephone conference line is open for members of the

5

1   public who may be interested and would be available to

2   call in.  That line is muted as to them, so we won't

3   hear anything from anybody, but the line is open and

4   available and this proceeding is accessible to the

5   public in that fashion.

6            Mr. Kurtzman, could you let me know who

7   else, if anyone, is appearing on the screen for the

8   government today?

9            MR. KURTZMAN:  Your Honor, I believe the

10  two call-in icons that you see there on the screen are

11  my colleagues in the District of Columbia who are

12  handling Mr. McAbee's case, Benet Kearney and Colleen

13  Kukowski.

14            THE COURT:  Very good, thank you.  And

15  then, Mr. Gant, do you have anyone else appearing on

16  screen today?

17            MR. GANT:  I have on the screen Ms. Sarah

18  McAbee, who will be my first witness.  I do intend to

19  call two additional witnesses.

20            THE COURT:  All right, very good.  Thank

21  you.  Okay.  We had set this matter today for a

22  detention hearing.  The Court's in receipt of the

23  Pretrial Services Report which I've reviewed.  I

24  assume you've each received a copy of the report and

25  you can keep your copy at the completion of these

6

1   proceedings.

2            Before we go any further, Mr. Gant, did

3   you have a chance to speak with your client in advance

4   of these proceedings, and specifically did you-all

5   discuss proceeding today by video conference and does

6   he consent to do so?

7            MR. GANT:  We have discussed that,

8   Your Honor, and he consents to proceed by video

9   conference.

10            THE COURT:  All right, very good.  Are

11   there any announcements before we begin and is the

12   government ready, Mr. Kurtzman?

13            MR. KURTZMAN:  No announcements from

14   government, Your Honor, but we are ready to proceed.

15            THE COURT:  All right, very good.

16            Mr. Gant, any announcements and are you

17   prepared to proceed at this time?

18            MR. GANT:  No announcements, Your Honor.

19   We're ready to proceed.

20            THE COURT:  All right, very good.

21   Mr. Kurtzman, I'll hear from the government.

22            MR. KURTZMAN:  Your Honor the government

23   would like to call to the stand FBI Special Agent

24   Matthew Acker.

25            THE COURT:  Okay.  Special Agent Acker,

7

1    let me go ahead and swear you.

2                        **MATTHEW ACKER**

3    called as a witness, after having been first duly

4    sworn, testified as follows:

5                    THE COURT:  If you could state your name

6    and spell your last for the Court, please.

7                    THE WITNESS:  Matthew Acker, A-c-k-e-r.

8                    THE COURT:  All right.  Very good.  Thank

9    you.  You may ask, Mr. Kurtzman.

10                       **DIRECT EXAMINATION**

11   BY MR. KURTZMAN:

12        Q.    Agent Acker, where are you currently

13   employed?

14        A.    I'm employed as a special agent with the

15   Federal Bureau of Investigation assigned to the

16   Knoxville division.

17        Q.    And what are your duties and

18   responsibilities as a special agent?

19        A.    Investigate violations of federal

20   criminal law.

21        Q.    And in that role as a special agent, did

22   you become involved in the investigation in the events

23   that occurred at the United States Capitol on

24   January 6 of 2021?

25        A.    Yes, I did.

8

1      Q.    And how did you become involved in that

2   investigation?

3      A.    I've had a few leads that have come out

4   of Washington to identify individuals.  And as part of

5   this investigation, I became involved in late July

6   with notification from Washington field office that

7   the subject identified as 134AFO is residing in

8   Unionville, Tennessee, which is in Bedford County.

9      Q.    And once you learned -- or once you got

10  that lead from the Washington field office, what did

11  you do next in the course of your investigation?

12     A.    I conducted surveillance at that

13  residence to identify Mr. McAbee as living at that

14  residence and also to identify any potential

15  workplaces.

16     Q.    Okay.  And over the course of that

17  investigation, did you learn of any other information

18  to either confirm or deny whether Mr. McAbee was

19  present at the United States Capitol on January 6?

20     A.    I did.  Mr. McAbee's previous employment

21  was determined to be in Georgia with the Cherokee

22  County Sheriff's Office, and more recently starting in

23  November through March of this year, November of 2020

24  through March of 2021, he worked for the Williamson

25  County Sheriff's Office.  And FBI agents conducted

9

1    interviews of employees that worked with Mr. McAbee at

2    both of those locations.  They were shown photographs

3    of Mr. McAbee, and he was positively identified by

4    both employers as 134AFO coming from the US Capitol on

5    January 1 -- excuse me, January 6 of 2021.

6         Q.    And a couple things there, you said he

7    was identified as 134AFO.  Was that a way that

8    individuals caught on camera on January 6 were

9    characterized --

10        A.    Yes.

11        Q.    -- as part of the investigation?

12        A.    Yes.  He was published on the Internet

13   via the FBI US Capitol Violence as No. 134AFO.

14        Q.    Okay.  And so he was initially an unnamed

15   suspect and you, through your investigation, confirmed

16   that the unidentified suspect characterized as 134AFO

17   was, in fact, Mr. McAbee?

18        A.    Yes.

19        Q.    And you also mentioned his prior

20   employment.  So at the time of the events at the

21   Capitol on January 6, 2021, who was Mr. McAbee

22   employed by?

23        A.    He was employed by the Williamson County

24   Sheriff's Office.

25        Q.    Okay.  Agent Acker, over the course of

10

1    your investigation, did you review body camera footage

2    of events that occurred in what's known as the archway

3    of the United States Capitol?

4         A.    Yes, I did.

5         Q.    And were you just given clips of that or

6    were you given sort of the full body cam footage from

7    certain officers to assist in your investigation?

8         A.    I was able to download what I believe to

9    be the full body cam footage starting with the

10   officers before they made their way to the archway.

11        Q.    And then in preparation for this hearing

12   today, did you and I review particular clips of those

13   body camera -- of that body camera footage for

14   particular officers?

15        A.    Yes, we have.

16        Q.    Did those clips appear to accurately

17   represent what you saw on the unedited or unclipped

18   footage of that body camera?

19        A.    Yes, they do.

20        Q.    Getting a little more specific, did you

21   review the body camera footage of a law enforcement

22   officer identified by his initials as AW?

23        A.    Yes, I have.

24        Q.    And that body camera footage, more

25   specifically the approximately two-minute clip, does

1   that appear to be consistent with AW's full body

2   camera footage that you've reviewed?

3        A.   Yes.

4        Q.   And in the course of your investigation

5   outside of just the body camera footage, have you

6   learned what happened to AW in the vicinity of the

7   archway on January 6 at around 4:28 in the afternoon?

8        A.   I've reviewed interview 302s of

9   Officer AW.

10       Q.   And in those 302s did Officer AW describe

11   what occurred to him as the crowd pushed into the

12   archway somewhere between 4:25 and 4:32?

13       A.   Yes, he did.

14       Q.   And what did he describe as happening to

15   him during that period?

16       A.   He was physically struck and knocked to

17   the ground.  I believe he said his helmet was removed

18   from his head, and he was eventually pulled down the

19   stairways in front of the archway of the US Capitol.

20       Q.   And other items of equipment were taken

21   from him during that assault; is that right?

22       A.   That's correct.  I believe his baton and

23   his cell phone and his gas mask.

24            MR. KURTZMAN:  Your Honor, at this time

25   based on the testimony of Agent Acker, I'd move to

12

1   admit the video footage provided to defense and the

2   Court entitled AW BWC clip.  We'd move to admit that

3   video footage as Exhibit 1 and then play it for the

4   witness.

5                THE COURT:  All right.  It will be

6   admitted and you may play it.

7                (Government Exhibit No. 1 was admitted.)

8   BY MR. KURTZMAN:

9        Q.    And, Agent Acker, are you able to see the

10  beginning of that video?

11       A.    Yes, I am.

12       Q.    Agent Acker, I'm going to pause and ask a

13  question as we look at this.  At this point in the

14  video, can you tell AW's position in the archway, i.e.

15  is he standing or is he on the ground?

16       A.    He appears to be on the ground.

17       Q.    Okay.  So from the body camera footage,

18  he's on his back with his body camera which is more

19  than likely chest mounted and pointed up?

20       A.    Correct, it would be pointed up at the

21  archway and the sky.

22       Q.    And then, Agent Acker, an individual with

23  a red hat and sunglasses just appeared on the left

24  side of the screen.  Have you been able to determine

25  who that individual is?

13

1       A.     Yes.  That is Mr. McAbee.

2       Q.     And based on your review of the video,

3  can you tell what he's doing right at this moment?

4       A.     At this time in the video, it appears

5  that he is reaching down towards the ground.

6       Q.     And -- I'll hold that question.  I'll

7  play the video a little further.

8            Agent Acker, what does it appear that

9  Mr. McAbee comes up from the ground with?

10       A.     As he stands back up, it appears he has a

11  black baton in his right hand.

12       Q.     And do you believe when he was leaning

13  down to the ground it was to pick up that black

14  baton?

15            MR. GANT:  Objection.  What he believes

16  as opposed to what he saw, two different things.  It's

17  supposed to be a factual determination.  Did he see it

18  or he didn't.

19            THE COURT:  Mr. Kurtzman.

20            MR. KURTZMAN:  Your Honor, I can ask it

21  differently.

22  BY MR. KURTZMAN:

23       Q.     Agent Acker, in what you reviewed on the

24  video, did Mr. McAbee have that baton before he knelt

25  down to the ground?

1    A.    I did not see it in his hand before he
2  knelt down to the ground.
3    Q.    When he came up from the ground, did you
4  see the baton in his hand?
5    A.    Yes.  The baton is in his right hand as
6  he stands back upright.
7    Q.    And, Agent Acker, just to provide context
8  of the video, the individual we see standing above
9  AW's body worn camera right now pointing at the police
10  officers, is that Mr. McAbee still?
11    A.    Yes, it is.
12    Q.    And, Agent Acker, did your investigation
13  determine the individual immediately over AW's
14  body camera at this moment?
15    A.    Yes, it has.  That is the body armor worn
16  by Mr. McAbee on January 6.
17    Q.    Okay.  So a tactical -- when you say body
18  armor, a tactical vest likely with plates worn by law
19  enforcement and the military?
20    A.    Correct, yes.
21    Q.    And those -- those neon what appear to be
22  sleeves pushing up on Mr. McAbee, do you know what
23  that is?
24    MR. GANT:  Judge, I object to that.
25  There's no indication, no motion to suggest that he's

1    pushing up anything.

2              THE COURT:  Mr. Kurtzman, restate your

3    question.

4    BY MR. KURTZMAN:

5         Q.    Agent Acker, what is the yellow or neon

6    figure we see on the screen right now?

7         A.    Those are the sleeves on the left and

8    right arm of Officer AW.

9         Q.    Who is currently on his back in this

10   portion of the video; is that right?

11        A.    That is correct.

12        Q.    Agent Acker, can you identify the patches

13   that are on Mr. McAbee's tactical vest?

14        A.    Yes.  The patch appearing on the left

15   side of the screen is commonly referred to as a

16   3 percent patch, which is three Roman numerals circled

17   by 13 stars, and the patch on the right side of the

18   screen reads Sheriff.

19        Q.    And are you aware of any meaning or

20   significance behind that 3 percent patch you described

21   on the left?

22        A.    The meaning behind the 3 percent patch

23   goes back to the Revolutionary War era and is, in

24   essence, a description of 3 percent of US people at

25   that time fought against the British government for

16

1   independence.

2        Q.    Agent Acker, do you see that coming out

3   of the -- the neon figures on the screen right now,

4   are those still AW's arms?

5             MR. GANT:  Judge, again, excuse me,

6   objection.  The question is real simple.  Whether or

7   not he knows what those neon jacket or arms are.  By

8   asking him are these the arms of AW suggests the

9   answer.  I object to the leading nature of the

10  question.

11            THE COURT:  Overruled.  I'll allow that.

12  BY MR. KURTZMAN:

13       Q.    Agent Acker, I'll ask you again, what do

14  you see on the screen in front of you right now?

15       A.    In this picture, Mr. McAbee is still on

16  top of Officer AW.  You can see Officer AW's right

17  hand and his right arm and his left hand and left arm.

18  At least that's the body armor worn by Mr. McAbee.

19       Q.    So the right hand is on the right side of

20  the screen there near Mr. McAbee's chest or shoulder?

21       A.    Correct.

22       Q.    And where is the left hand on the screen?

23       A.    The left hand is in the center of

24  Mr. McAbee's (indiscernible) and arm and in the center

25  of the screen.

17

1        Q.    I apologize, the video started to replay.

2   Agent Acker, in -- were you able to review the photos

3   that were placed in the detention motion in this

4   matter?

5        A.    I have, yes.

6        Q.    And on page 8 there's two photos, one

7   that we've looked at in the video and another shot

8   from a different vantage point.  Do you know what

9   the -- and the one shot from a different vantage point

10  has a red circle on it.  Can you describe based on

11  your investigation what's happening in that photo?

12             MR. GANT:  Objection.  Objection.

13             THE COURT:  Go ahead, Mr. Gant.

14             MR. GANT:  Counsel is making reference, I

15  assume, to Docket Entry No. 6.

16             THE COURT:  I think that's correct.

17             MR. GANT:  And maybe I heard him wrong,

18  maybe I wasn't listening, but he said something about

19  this document being used at the detention hearing?

20  Did I mishear him?

21             THE COURT:  I think so, Mr. Gant.  I

22  think he's just asking him to make some

23  identifications of the photographs that are in that

24  document at page 6.  Is that right, Mr. Kurtzman?

25             MR. KURTZMAN:  That's correct,

1    Your Honor.  It's page 8, I believe.

2                THE COURT:  I'm sorry, page 8.

3                MR. GANT:  Very well.

4                THE COURT:  You can ask.

5    BY MR. KURTZMAN:

6         Q.    Agent Acker, I think before I brought

7    your attention to page 8 and the photograph with the

8    red circle on it that's a different vantage point from

9    the video we just observed in Exhibit 1.  Based on

10   your investigation, what's happening in that picture?

11        A.    That is a still picture from a video

12   taken at the same time as the body worn camera video

13   that we just watched.  At that point in time

14   Officer AW has been pulled down the stairs and

15   Mr. McAbee is on top of him.

16        Q.    Agent Acker, in the course of your

17   investigation, did you review body camera footage from

18   a law enforcement officer going by the initials of CM?

19        A.    Yes, I have.

20        Q.    And, again, did you get the entirety of

21   that officer's body camera from January 6?

22        A.    I did.

23        Q.    And did you review the approximately

24   two-minute clip that counsel shared with the Court and

25   the defense counsel of CM's body worn camera footage?

19

1          A.     Yes, I have.

2          Q.     And does that clip appear to be

3    consistent with the full version of the body camera

4    footage?

5          A.     Yes, it does.

6          Q.     And does it provide an accurate

7    representation of the events that occurred in the

8    vicinity of the archway of the United States Capitol

9    on January 6?

10         A.     Yes, it does.

11              MR. KURTZMAN:  Your Honor, at this time

12   the government would move to admit Exhibit 2 and play

13   it for the witness, at least a portion of it.

14              THE COURT:  And that's the portion of the

15   CM body cam clip?

16              MR. KURTZMAN:  That's correct,

17   Your Honor.  At approximately the 1:07 mark the body

18   camera footage is -- I don't -- there's nothing

19   visible in the body cam footage after the 1:07 mark.

20              THE COURT:  All right.  It will be

21   admitted and you may play it.

22              (Government Exhibit No. 2 was admitted.)

23   BY MR. KURTZMAN:

24         Q.     Agent Acker, in the video there is an

25   individual wearing what appears to be a neon jacket.

1    In your investigation, can you determine who that is?

2              THE COURT:  Mr. Kurtzman, are you sharing

3    your screen at this time or are you just asking

4    generally?

5              MR. KURTZMAN:  I apologize, Your Honor.

6    I was not.  I can go back and I will replay it.

7    BY MR. KURTZMAN:

8         Q.    Agent Acker, are you able to see the

9    video now?

10        A.    Yes, I am.  At 16:26:50.

11        Q.    Agent Acker, in the center of the screen

12   that's an individual with a gas mask, gloves and a

13   neon jacket.  Have you been able to identify who that

14   individual is during the course of your investigation?

15        A.    Yes.  That is Officer AW on his back at

16   the archway.

17        Q.    And, Agent Acker, can you identify the

18   individual standing on the screen right now on the

19   left with what appears to be a vest that says

20   Different Generation on it?

21        A.    Yes.  That is Mr. McAbee.

22        Q.    And can you see Mr. McAbee's hands at the

23   moment?

24        A.    I can.  His left hand, which is in a

25   black glove with a metal knuckle is near his face,

21

1  potentially holding his hat, and his right hand, same
2  type of a glove on, is holding a black baton.
3      Q.    And so you're familiar with the type of
4  gloves he's wearing?
5      A.    Yes, I am.
6      Q.    Can you describe those for us again, what
7  they are?
8      A.    They're black leather gloves with -- they
9  have metal on the knuckles.
10     Q.    I want to go back in this exhibit for...
11 This is the 16:27:35 mark.
12     A.    Yes.
13     Q.    Agent Acker, what is Mr. McAbee doing at
14 the moment in this video?
15     A.    He is reaching down and grabbing the left
16 leg of Officer AW.
17     Q.    And in your review of this video and
18 other videos, did you determine what he -- what he's
19 about to do?
20          MR. GANT:  Objection as to what it is
21 he's about to do.  How on earth would he know that?
22          THE COURT:  Sustained.  You can ask what
23 happened or what happened next, but what he's about to
24 do --
25          MR. KURTZMAN:  (indiscernible).

1    BY MR. KURTZMAN:

2          Q.    What happens next?

3          A.    At this point in the video, Mr. McAbee

4    reaches down, grabs Officer AW's left leg and pulls

5    him away from the other officers inside the archway.

6    As the video plays before and after, you can see other

7    uniformed officers trying to pull Officer AW back into

8    the archway with the other officers.

9          Q.    Agent Acker, have you during the course

10   of your investigation received body camera footage

11   from a law enforcement officer by the last name of

12   Powell?

13         A.    Yes.

14         Q.    And did you receive just a clip of that

15   or did you receive all of that officer's body camera

16   footage?

17         A.    I received both the original download and

18   then the video that we've reviewed.

19         Q.    Okay.  And does the approximately

20   one-minute clip of the body camera footage we

21   reviewed, is that consistent with what you saw on the

22   full recording from the body camera?

23         A.    Yes, it is.

24         Q.    And is it an accurate representation

25   based on your review of the full camera footage of the

23

1    events that occurred on the archway of the

2    United States Capitol around 4:27 in the afternoon on

3    January 6?

4         A.    Yes, it is.

5               MR. KURTZMAN:  Your Honor, the government

6    would move to admit the body camera footage which has

7    been shared to the Court and defense counsel that is

8    labeled Powell_16_27_10-16 and then play that for the

9    witness.

10              THE COURT:  All right.  It will be

11   admitted and you can share it.

12              (Government Exhibit No. 3 was admitted.)

13   BY MR. KURTZMAN:

14        Q.    Agent Acker, is Mr. McAbee on the screen

15   at the moment?

16        A.    I'm not able to see the video at the

17   moment.

18        Q.    I apologize.  Let me try that again.

19   Agent Acker, are you able to see the video now?

20        A.    Yes, I'm able to see the video at the

21   16:27:09 mark.

22        Q.    Agent Acker, just for context, there's an

23   individual that appears to be on the ground with their

24   legs and feet visible in the center of the screen.

25   Based on your investigation, do you know who that is?

1      A.      Yes, at the center bottom portion of the

2  screen, that individual's Officer AW laying on his

3  back.

4      Q.      And, Agent Acker, can you identify the

5  defendant on the screen at the moment?

6      A.      Yes, I can.  He's in the left side of the

7  screen wearing a red hat, black shirt, and you can see

8  his left hand has the black leather glove with the

9  metal knuckles on it and blue jeans.

10     Q.      And, Agent Acker, during the course of

11 your investigation did you receive body camera footage

12 from a law enforcement officer by the last name of

13 Sajumon?

14     A.      Yes, I have.

15     Q.      And did you receive both the full

16 body camera and then a clip that you and I reviewed

17 together?

18     A.      Yes, I did.

19     Q.      Does the clip that you and I reviewed, is

20 that consistent with the full recording of Officer

21 Sajumon's body camera footage from January 6?

22     A.      Yes, it is.

23          MR. KURTZMAN:  Your Honor, the government

24 would move to admit the video labeled

25 Sajumon_26_27_28-16 as Exhibit 4 and play it for the

25

1    witness.

2              THE COURT:  All right.  It will be

3    admitted and you can share that.

4              (Government Exhibit No. 4 was admitted.)

5    BY MR. KURTZMAN:

6        Q.    Agent Acker, are you able to see the

7    video?

8        A.    Yes, I am.

9        Q.    And just for context, Agent Acker, based

10   on your review of the full body camera footage, were

11   you able to determine approximately where Officer

12   Sajumon was positioned on January 6 at approximately

13   16:27?

14       A.    From this image in the video, Officer

15   Sajumon appears to be positioned inside the archway at

16   the US Capitol.  Looking outward, he would be on the

17   left side of the archway.

18       Q.    And, Agent Acker, can you identify the

19   defendant on the video right now?

20       A.    Yes.  Mr. McAbee is in the center of the

21   screen wearing a red (indiscernible) Brave hat,

22   sunglasses, black shirt and a black vest.

23       Q.    And, Agent Acker, in your review of the

24   video, both this vantage point and other vantage

25   points, what just occurred?

26

1          A.    Mr. McAbee engaged in a altercation with

2     an officer that included him shoving the officer

3     backwards.

4          Q.    And, Agent Acker, what happened to that

5     officer after this physical altercation with the

6     defendant?

7          A.    Which officer?  The one standing in front

8     of us now?

9          Q.    Yes.

10         A.    Another individual is seen assaulting

11    this officer.

12         Q.    And that came directly on the -- directly

13    following the defendant, Mr. McAbee's, engagement with

14    that officer?

15         A.    That is correct.

16              MR. GANT:  Excuse me, objection.

17    Leading.  Move that that answer be stricken.

18              THE COURT:  Overruled.  I'll let you --

19    I'll let him answer it.

20              THE WITNESS:  Yes, from the position of

21    the video, Mr. McAbee is engaged with this officer,

22    and then the other -- the other individual is a white

23    male with a beard.  He also begins assaulting the same

24    officer.

25

27

1    BY MR. KURTZMAN:

2         Q.    Agent Acker, in your preparation for the

3    hearing today, did you review a video footage taken

4    from a different angle of the archway on January 6?

5         A.    Yes, I have.

6         Q.    And based on your review of the body worn

7    camera footage in other -- other portions of your

8    investigation, does that -- what has been labeled as

9    the Storyful video, is that consistent with the body

10   worn camera footage video from that day?

11        A.    It's consistent in the time period.  The

12   vantage point of the video is facing -- it's from the

13   outside of the US Capitol from where the crowd is

14   facing the archway where the officers are standing.

15        Q.    Is it consistent with respect to the

16   events it depicts?

17        A.    That's correct.  It is, yes.

18        Q.    Would it be fair to say that it's just a

19   different vantage point of the same events?

20        A.    Yes.

21        MR. KURTZMAN:  Your Honor, at this time

22   the government would move to admit the video provided

23   to defense counsel and the Court which is labeled

24   Storyful video and then play it for the witness.

25        THE COURT:  All right.  It will be

28

1    admitted and you can share it.

2              (Government Exhibit No. 5 was admitted.)

3    BY MR. KURTZMAN:

4         Q.    Agent Acker, are you able to see the

5    video?

6         A.    Yes, I am.

7         Q.    And can you identify for the Court what

8    you've previously described as the archway?

9         A.    The archway is in the center of the

10   screen.  You can see on the top of the screen there

11   are people with their legs over the railing of the

12   archway.  To the left of the archway is a individual

13   standing up.  It appears he's got a knit hat on.

14        Q.    And for perspective, the body worn camera

15   footage admitted as Exhibits 1 through 4, where was

16   that taken from?

17        A.    It is taken from the general vicinity of

18   the officer that you can see standing in the middle of

19   the screen with riot gear on.

20        Q.    Agent Acker, in the still portion of the

21   video that's displayed right now, are you able to

22   identify where the defendant, Mr. McAbee, is?

23        A.    Yes, I am.  He is on the right side of

24   the screen bent over, you can see his left glove

25   holding the railing, the top of his hat is shown below

29

1    the railing.  Exact -- right to the right of the

2    entrance to the archway.

3         Q.    Agent Acker, what did the defendant just

4    to?

5         A.    The defendant just stood up, and it

6    appeared that he was hit in the head with some item.

7    And in -- from the other video we have seen at the

8    same time, he has a black baton in his right hand.

9         Q.    Agent Acker, we'll call it the center

10   left of the screen, there's an individual pulling on

11   someone by the foot.  Do you know who that foot and

12   leg belongs to?

13        A.    Yes, I do.  That is the right leg of

14   Officer AW.

15        Q.    And, Agent Acker, can you identify the

16   defendant in the video at the moment?

17        A.    Yes.  The defendant is standing in the

18   center of the archway facing inwards at the officer

19   wearing a red hat, black tactical vest, long-sleeved

20   black shirt and blue jeans.

21        Q.    And in your review of the video, what

22   happens next?

23        A.    As the video continues to play, the white

24   male, unidentified white male that is in the center of

25   the screen down the railing is still holding onto the

30

1    right leg of Officer AW.  He is then joined by two or

2    three other individuals who also appear to grab ahold

3    of the legs of Officer AW, and Officer AW is then

4    dragged down the stairway with the defendant,

5    Mr. McAbee, on top of him.

6              Q.    And, Agent Acker, following the

7    defendant's arrest in this matter, did you participate

8    in the interview of him?

9              A.    Yes, I did.

10             Q.    And did he identify himself as the

11   individual that you've identified as Mr. McAbee

12   throughout Exhibits 1 through 5?

13             A.    Yes, he did.  I showed him a variety of

14   images of that same individual with the red hat,

15   sunglasses, black tactical vest, long-sleeved black

16   shirt and blue jeans, and he advised verbally that was

17   him and he initialed and dated the images stating that

18   that also was him.

19             Q.    And did Mr. McAbee indicate whether or

20   not the officer -- one of the -- I believe Officer AW

21   would have felt that he was assaulted that day by

22   Mr. McAbee?

23             A.    During the course of the interview he

24   said that that officer that was on the ground probably

25   would have felt like he was holding him down as they

31

1   went down the stairwell.  And he also advised and

2   said, yes, he did strike the other officers in the

3   face, that he pushed and double pushed them.

4           MR. KURTZMAN:  Your Honor, those are all

5   the questions the government has at the moment.

6           THE COURT:  Okay.  Mr. Gant,

7   cross-examination.

8           MR. GANT:  Yes, Your Honor.

9                    **CROSS-EXAMINATION**

10  BY MR. GANT:

11      Q.   Mr. Acker, tell us, if you would, please,

12  where you are physically right now.

13      A.   Currently I'm at the Tullahoma office of

14  the FBI.

15      Q.   And there at the Tullahoma office of the

16  FBI, do you have a file on Mr. McAbee in front of you?

17      A.    It's not in front of me.  I have a

18  printed 302 of the interview that I wrote, and I have

19  a couple of the documents that Mr. Kurtzman prepared.

20      Q.   And the documents that you say

21  Mr. Kurtzman prepared, what documents are you

22  referring to?

23      A.   The detention hearing and just some notes

24  for the review of the videos.

25      Q.   And when you say detention hearing, I'm a

32

1    little confused.  Are you talking about the

2    government's motion for pretrial detention?

3         A.   Yes, sir, the government's motion for

4    pretrial detention.  Yes.  And I reviewed the image on

5    page 8 from that motion -- from that document earlier.

6         Q.   And I take it at some point in time

7    before today you and Mr. Kurtzman talked and prepared

8    for this hearing, did you not?

9         A.   That is correct.

10        Q.   Being the professional that you are, I

11   assume that at the time you talked with Mr. Kurtzman,

12   you provided him with all the information that you had

13   that he would (indiscernible); is that right?

14        A.   Correct.

15        Q.   And I take it you've talked extensively,

16   Mr. Acker, about these various videos, have you not?

17        A.   We have, yes.

18        Q.   And let's just -- let's take them, if we

19   can, one at a time.

20        A.   Okay.

21        Q.   The first video was the BWC video; is

22   that right?

23        A.   That's correct.

24        Q.   Now, you have said to His Honor in

25   response to questions put to you by Mr. Kurtzman that

1   this was merely a clip of a larger footage; is that

2   right?

3           A.    Correct.  The videos that were played

4   today are segments --

5           Q.    I'm talking about one particular video.

6   I'm talking about BWC, was that a clip --

7                 MR. KURTZMAN:  Your Honor -- Your Honor,

8   I'm going to object.  There's multiple videos labeled

9   BWC.  Exhibits 1 through 4 are all body worn camera,

10  so if Mr. Gant wants to talk about one video, he needs

11  to identify which video he's talking about.

12                THE COURT:  I think he did.

13                MR. KURTZMAN:  He did not, Your Honor.

14  He called it the BWC video.

15                THE COURT:  That was Exhibit 1.

16                MR. KURTZMAN:  Right.  And Exhibit 2 is a

17  BWC video and Exhibit 3 is a BWC.  BWC just stands for

18  body worn camera.  Each of the exhibits are identified

19  by the law enforcement officer wearing that body worn

20  camera.  So if he can --

21                THE COURT:  Ask your question again,

22  Mr. Gant.

23  BY MR. GANT:

24          Q.    Mr. Acker, do you understand that you and

25  I are talking about the very first video that was

34

1   shown today.  Can we understand that?

2           A.      The body worn camera of Officer AW.

3           Q.      Yes, sir.

4           A.      Yes, I understand that.

5           Q.      That's the one that I'd like to talk to

6   you about, and that's the only one I want to talk to

7   you about right now.  Do you understand that?

8           A.      I understand.

9           Q.      That video that was shown today,

10  Exhibit No. 1, was a clip from a larger footage; is

11  that right?

12          A.      Correct.

13          Q.      You have said in response to

14  Mr. Kurtzman's questions that you had reviewed the

15  other footage, the larger footage; is that right?

16          A.      That is right.

17          Q.      And after your review of that footage,

18  you then, either on your own or pursuant to some

19  direction, prepared a clip; is that right?

20          A.      No, I did not prepare the clip.  What I

21  had was a download of the officer's body worn camera.

22  What was prepared was a segment in time of that

23  officer's body worn camera where Mr. McAbee is at the

24  archway.

25          Q.      Okay.  And that portion of the body worn

35

1    camera of AW that shows Mr. McAbee, that was a small

2    portion of a larger portion or footage of AW's body

3    worn camera; is that right?

4          A.    There was video from his body worn camera

5    before Mr. McAbee was visible in the screen on the

6    recording and then there was also video after

7    Mr. McAbee is no longer in the screen.

8          Q.    Thank you, sir.  Now, you viewed the

9    entire footage of AW's body worn camera, and after

10   viewing that, there was a decision made to take that

11   portion of the footage that showed Mr. McAbee; is that

12   right?

13         A.    Yes, that's correct.

14         Q.    Thank you.  And I take it that you

15   reviewed the body worn camera or body worn footage

16   from AW's camera in your preparation to testify at the

17   hearing today; would that be fair to say?

18         A.    I did not view it in its entirety.  I

19   have in preparation for today, I have viewed it in its

20   entirety before.

21         Q.    Okay.  Somebody selected the particular

22   clip that was shown today; isn't that right?

23         A.    That video that's shown is relevant to

24   the --

25         Q.    Maybe you didn't hear my question.

36

1   Somebody decided that the particular clip that was

2   shown today was the clip to be taken out of the entire

3   footage of Mr. AW's body worn camera; isn't that

4   right?

5            MR. KURTZMAN:  Your Honor, I'm going to

6   object.  We are nowhere near anything relevant towards

7   the matter of detention.  We've gone on I think now

8   five minutes on the full footage or the clip.  And I

9   don't see it approaching relevancy.

10           THE COURT:  Overruled.

11           MR. GANT:  (indiscernible).

12           THE COURT:  Overruled.  You can answer

13   the question, but let's move on, Mr. Gant, and get to

14   the point.

15           THE WITNESS:  Could you please restate

16   the question?

17   BY MR. GANT:

18       Q.   Somebody decided out of the entire

19   footage from AW's body worn camera to take that piece

20   that showed Mr. McAbee.

21       A.   Yes, the video that was shown had

22   Mr. McAbee in it, and that is a portion of the video

23   of his entire body worn camera.

24       Q.   Who made the decision to take that piece

25   that was shown today?

37

1           MR. KURTZMAN:  Your Honor, I'm going to

2   object.  We're still nowhere near relevancy.

3           MR. GANT:  Judge, may I tell where you

4   I'm going?

5           THE COURT:  Yes, please.

6           MR. GANT:  Mr. Acker is testifying about

7   viewing footage other than the footage that was shown

8   today, three different clips or four different clips,

9   all right.  And at some point in time somebody

10  decided, well, we're going to show this piece.  If he

11  viewed the entire footage or each one of these four in

12  his preparation to testify today, I am entitled to

13  view that.  That has been used as a basis for his

14  testimony.  I'm entitled to see it.

15          THE COURT:  So I guess what you're --

16  you're trying to establish a foundation that he

17  reviewed the entire footage, and then you think you

18  ought to be able to see it before you go forward with

19  his cross-examination.

20          MR. GANT:  Yes, Judge, primarily because

21  there are portions or may well be portions of at least

22  one that I've seen already that shows some conduct of

23  Mr. McAbee after, supposedly -- for example,

24  supposedly he drug somebody down the steps.  Well,

25  there is some footage showing conduct that certainly

1    might suggest that he was doing something other than

2    hurting somebody.  But the government gets a chance to

3    cherry pick that portion of the entire footage and

4    present to you without giving me an opportunity to

5    look at the footage and determine whether or not

6    there's something in there that is at least, at least

7    supportive of an argument that Mr. McAbee didn't

8    engage in the kind of conduct that's set out in that

9    tape.

10               THE COURT:  Okay, Mr. Kurtzman.  Go

11   ahead.  I'm sorry.  Mr. Gant, go ahead.

12               MR. GANT:  Judge, if what Mr. Acker has

13   just testified about and had we not seen these clips

14   but he just gave testimony about those clips and it

15   was in the form of -- in some written form, I would be

16   entitled to see it and review it.  That's the basis,

17   Judge.  That's where I'm going.

18               THE COURT:  All right.  Mr. Kurtzman,

19   what do you say?  I think you're muted, Mr. Kurtzman,

20   I can't hear you.

21               MR. KURTZMAN:  Sorry.  Your Honor, I'm a

22   little confused as to what the point is.  Mr. Gant

23   says that there's footage that he's aware of that

24   shows what he has deemed good conduct of Mr. McAbee.

25   Well, unless he's got footage from somewhere else, I

39

1    gave him that.  And with respect to viewing the

2    entirety of the videos, I don't have those myself and

3    I've not viewed them myself.  I figured it was

4    probably more efficient for the Court, for Mr. Gant,

5    for his client if I played the portion of the videos

6    where he is present.

7                  Now, if he wants the entirety of all four

8    officers' body worn camera footage, we'll need to, I

9    think, take a break from this hearing.  I'll need to

10   get it from Agent Acker, I'll need to review the

11   entirety of all four officers' body camera footage,

12   certainly allow Mr. Gant that time to review, which it

13   sounds like he wants.  And so I would ask that we

14   recess if that is -- that is his desire.

15                  MR. GANT:  That is my desire.

16                  THE COURT:  So you-all are saying that

17   you want to recess and reset this hearing in order for

18   the defense to be provided with these additional

19   videos?

20                  MR. GANT:  (indiscernible).

21                  THE COURT:  Sorry, hang on.  Mr. Gant, go

22   ahead.

23                  MR. GANT:  Judge, that's what I'm asking.

24                  THE COURT:  All right.  Mr. Kurtzman,

25   what's the government say about that?

40

1        MR. KURTZMAN:  Your Honor, I think that's

2  a waste of all of our time, but if that's what

3  Mr. Gant wants and the Court wants to grant it to him,

4  I'm fine to proceed that way and we can -- we can all

5  look at our schedules and see when we can reconvene.

6        THE COURT:  All right.  Mr. Gant, if

7  that's what you want to do, you want to reset this

8  matter to another day and get that information?

9        MR. GANT:  Yes, sir.

10        THE COURT:  Okay.  Well, you've made the

11  request to continue the hearing.  The government has

12  indicated it doesn't oppose that request.  You've

13  requested specific video information.  The

14  government's indicated it's willing to provide that

15  information.

16        So I think by agreement of the parties,

17  I'll continue the hearing.  Let's look at another time

18  to do this.  I guess first question I have,

19  Mr. Kurtzman, is tell me what you think the timetable

20  is going to be for you to collect the full

21  information, review it and provide it to Mr. Gant.

22  Today's Thursday.

23        MR. KURTZMAN:  Your Honor, by agreement

24  of the parties, I may not have stated my position.

25        THE COURT:  Well, you don't have an

41

1    objection is what you said.  I apologize.

2                    MR. KURTZMAN:  The futility of my

3    objection might be limited to the extent I would have

4    one, but I think it's unnecessary, but I'm happy to do

5    it.

6                    THE COURT:  Okay.

7                    MR. KURTZMAN:  So how long -- I need to

8    get with Agent Acker.  I don't even have those videos,

9    so I would need to get them first.  I would need to

10   review them.  I don't even know how long they are.  I

11   would assume they're relatively lengthy being that

12   they document the entirety of those officers' days.

13                   THE COURT:  We've got Special Agent Acker

14   here, why don't we try to get a little information.

15   Is that okay?  First of all, Mr. -- Special Agent

16   Acker, do you have the full videos?

17                   THE WITNESS:  I've downloaded copies of

18   the videos that are contained by the Washington field

19   office from that date.

20                   THE COURT:  Okay.  And do you have a

21   ballpark idea --

22                   THE WITNESS:  It's quite large.  I

23   downloaded them through an Internet link that was sent

24   from the US Attorney's Office there and that should

25   not be a problem to share it locally with the

42

1    Nashville office.

2                    THE COURT:  Do you have a --

3                    THE WITNESS:  They are lengthy.  Some of

4    them are very lengthy.

5                    THE COURT:  Do you have enough any idea

6    how long -- are we talking about 10 hours, 12 hours,

7    two hours?

8                    THE WITNESS:  I believe Sajumon's video

9    is the longest.  The other ones are, from what I have

10   viewed are just a few minutes beyond -- I would say 10

11   to 20 minutes would be my best guess at the length on

12   them on the other ones.

13                   THE COURT:  All right, fair enough.

14   Okay.  Do you think you can get those to Mr. Kurtzman

15   by tomorrow?

16                   THE WITNESS:  That should not -- I can

17   probably share the link today and he can download them

18   today.

19                   THE COURT:  Okay.  And, Mr. Kurtzman, how

20   long do you think you need, a day or two?

21                   MR. KURTZMAN:  At least, Your Honor.  As

22   you know, I've got another matters as well --

23                   THE COURT:  I understand.

24                   MR. KURTZMAN:  -- that take up some time.

25   So somewhat unforecasted --

1          THE COURT:  I understand.

2          MR. KURTZMAN:  -- to review 14 hours of

3    body worn camera footage.  So it's tough to say.

4    Probably sometime early next week I can be done with

5    them and get them over to Mr. Gant.

6          THE COURT:  Okay.  Sounds like we need to

7    be looking at trying to reset this sometime toward the

8    end of next week.  I think maybe Friday.  That's the

9    3rd, Friday the 3rd.  Mr. Gant?

10         MR. GANT:  Judge, I'll make it work.

11         THE COURT:  1 o'clock.

12         MR. KURTZMAN:  Your Honor, I have a

13   pretrial conference at 1:30.  I expect that's going to

14   go away, though.

15         THE COURT:  Okay.

16         MR. KURTZMAN:  I don't expect that trial

17   to go forward, so 1 o'clock next Friday is fine with

18   the government.

19         THE COURT:  All right.  Well, that's what

20   we'll do.  And, Mr. Gant, I would encourage you to

21   have a conversation with Mr. Kurtzman.  If there is

22   anything else that you think you're entitled to and

23   you want to have in advance of the proceeding, I'd

24   rather us not go through this exercise again.  And if

25   you-all can determine any of those matters and pass

44

1    those in advance, that would be greatly appreciated,

2    and I think it would expedite the proceedings as well.

3    But I'm essentially granting the defendant's request

4    to continue and reset the detention hearing in order

5    for him to review this additional information.

6                MR. GANT:  Thank you, Your Honor.

7                THE COURT:  All right.  Mr. Kurtzman,

8    anything further from the government's standpoint we

9    need to do at this time?

10               MR. KURTZMAN:  No, Your Honor.

11               THE COURT:  Mr. Gant, anything else on

12   behalf of your client today?

13               MR. GANT:  No, Judge.  Thank you very

14   much.  Appreciate your patience.

15               THE COURT:  All right.  Thank you all.

16   We'll be in recess.

17               (Whereupon, the proceedings were

18   concluded on August 26, 2021, and resumed on

19   September 9, 2021, as follows:)

20               THE COURT:  Good morning, welcome,

21   everyone.  We're here this morning in the matter of

22   *United States of America versus Ronald McAbee*.  It's

23   Case No. 3:21-mj-2956.  This is an action from the

24   District of Columbia, and the case number there is

25   Docket No. 1:21-cr-35.  We had previously began a

45

1    preliminary hearing and detention hearing in this

2    matter.  And we had -- or, rather, I guess it was a

3    detention hearing only, maybe.  And we had continued

4    the matter in order for Mr. Gant to receive some

5    information from the government.  Mr. McAbee is

6    participating this morning by video conference.

7    Mr. Gant is on as his attorney, Mr. Kurtzman's here

8    for the United States.

9               Mr. Gant, first of all, have you had a

10   chance to speak with your client in advance of this

11   proceeding, and specifically did you-all discuss

12   proceeding by video conference today and does he

13   consent to do so?

14              MR. GANT:  I did have the opportunity to

15   speak with him, Your Honor.  And he has agreed that we

16   may proceed by video conference.

17              THE COURT:  Very good, thank you.  And

18   have you received the information that we adjourned

19   for and are you prepared to go forward at this time?

20              MR. GANT:  Your Honor, I acknowledge

21   receipt of the requested material, and we are in a

22   position to proceed this morning.

23              THE COURT:  Very good.  Thank you,

24   Mr. Gant.

25              Mr. Kurtzman, is the government ready to

46

1    go forward and do y'all have any announcements before

2    we begin?

3                    MR. KURTZMAN:  We are prepared to go

4    forward, Your Honor.  At this time I would ask -- I

5    believe when we left off Mr. Gant had begun

6    questioning Agent Acker, but really just to -- I think

7    the majority of the questions, if I recall correctly,

8    were regarding the videos, whether the clips had

9    longer versions, and it was really about that

10   information and about the sort of larger video

11   evidence that was available.

12                   As the Court knows, Mr. Gant's in receipt

13   of the same materials.  The government has additional

14   material that I think would inform the Court's

15   decision with respect to detention.  And I would ask

16   that I, for efficiency sake, have the opportunity to

17   present those exhibits and that evidence with Agent

18   Acker and then allow the defense to question Agent

19   Acker regarding both the videos and this new evidence,

20   which is the text messages we shared with the Court

21   and Mr. Gant.

22                   THE COURT:  Okay.

23                   MR. GANT:  I would (indiscernible) that,

24   Judge.

25                   THE COURT:  I'm sorry?

1          MR. GANT:  I would object to proceeding

2    in that fashion, Your Honor.  And my objection is

3    based upon this:  In light of the material that I have

4    received pursuant to my request, I have decided that I

5    have no questions for Mr. Acker.  Having no questions

6    for Mr. Acker would then, as I understand the Rules of

7    Criminal Procedure, preclude the government from any

8    redirect at all because redirect is directed at issues

9    raised on my cross.  No cross, no redirect.

10          THE COURT:  Okay.

11          MR. GANT:  Now the government --

12          THE COURT:  I'm sorry, go ahead,

13    Mr. Gant.

14          MR. GANT:  Now the government -- I'm

15    sorry, Judge, I didn't mean to interrupt you.  Now the

16    government wants to introduce evidence now that the

17    government had in its possession when they put their

18    case on initially.

19          Now Mr. Kurtzman is going to say, well,

20    no, no, I didn't have this.  Well, he, Mr. Kurtzman,

21    may not have had it, but the United States government,

22    who he represents, did have it and at that time didn't

23    introduce it.  So now they want to introduce it and I

24    would object most strenuously.

25          THE COURT:  Mr. Kurtzman, what do you

1    say?

2                    MR. KURTZMAN:  Your Honor, the Rules of

3    Criminal Procedure that Mr. Gant refers to are

4    obviously loosened in the setting which we're in,

5    first off.

6                    Second off, his statement that I had this

7    or the government had it, the government certainly had

8    Mr. McAbee's phone at the time we initiated this

9    hearing.  What I didn't have was the data from that

10   phone, which is new evidence.  I've introduced newly

11   discovered evidence in hearings like this before in

12   this very courtroom, and the idea that it should be

13   excluded because Mr. Gant doesn't want to ask Agent

14   Acker any questions I don't think is a valid

15   objection.

16                   I think it's a way to try and shield the

17   Court from having all the information rather than an

18   open evaluation of the facts and circumstances here.

19                   THE COURT:  Well, I think -- yeah, go

20   ahead, Mr. Gant, I'll hear from you.

21                   MR. GANT:  Just a brief response,

22   Your Honor.  Again, though Mr. Kurtzman individually

23   may not have had the information that he seeks to

24   introduce now, the government certainly did.  Next,

25   counsel takes the position that the Rules of Criminal

1    Procedure do not apply in these proceedings, but --

2    and I know Your Honor is aware of this, but if you

3    look at 18 USC 1342F -- c, d, e, that would be (2)(B)

4    where it says the rules concerning admissibility of

5    evidence in criminal trials do not apply to the

6    presentation and consideration of information at the

7    hearing.  We're not talking about Rules of Evidence

8    here.  We're talking about Rules of Criminal

9    Procedure.  And there's nothing in the statute that

10   says that the Rules of Criminal Procedure don't apply.

11            And I suggest most respectfully, the

12   government had the opportunity and at least had the

13   material that they seek to get in now.  They had it

14   when they put their case on and didn't introduce it.

15   And at this time I object most strenuously.

16            THE COURT:  Okay.  Well, we're still in

17   the proof phase of this proceeding.  I agree that it's

18   probably not appropriate to allow Mr. Kurtzman to have

19   a redirect examination because there's no

20   cross-examination that's been conducted.  However,

21   Mr. Kurtzman's still entitled to put whatever proof on

22   he wants to put on.  He's still, you know, in the

23   process of putting his proof on.

24            Mr. Kurtzman, if you want to -- if you

25   have additional proof you want to put on, if you have

50

1    another witness you want to call to put on or if you

2    want to put it on through proffer or if you want to

3    ask that you be allowed to recall a previous witness

4    for purposes of putting some particular proof on, I

5    think that would be procedurally the appropriate way

6    to do this.

7                But I don't think that -- this isn't a

8    situation where we had a full hearing, the hearing

9    ended and now the government's come back wanting to

10   put proof on.  We're still -- I'm still taking proof

11   in this case.  I don't think that precludes the

12   government from putting on additional proof.  The

13   question is just procedurally how that happens.  And I

14   don't think redirect examination is appropriate.  But

15   I think other options may be out there, Mr. Kurtzman,

16   if you want to make a suggestion.

17               MR. KURTZMAN:  Your Honor, I -- I don't

18   think I used the phrase redirect.  I was going to ask

19   to recall Agent Acker.  I'm happy to proceed by

20   proffer if that's easier, and then I would then ask to

21   excuse Agent Acker and I would proceed by proffer to

22   introduce the remainder of the government's evidence

23   if Mr. Gant doesn't have any questions of him.

24               THE COURT:  Well, I think it's your

25   prerogative how you want to put your proof on.  You

1    tell me what you want to do.

2                    MR. KURTZMAN:  Your Honor, could I have a

3    moment?

4                    THE COURT:  You may.  I'm going to take

5    just a very short recess here for just a second.  If

6    you-all bear with me for just a second, please.

7                    (Whereupon, a break was taken.)

8                    THE COURT:  Okay.  I'm back on.  Thank

9    you all.  Appreciate your patience.

10                   Mr. Kurtzman, are you back yet?  Yeah, I

11   see you.

12                   MR. KURTZMAN:  Yes, Your Honor.

13   Your Honor, if we're all back on, I think for

14   efficiency sake since Mr. Gant doesn't have any

15   questions for Agent Acker, with respect to the

16   additional exhibits I provided Mr. Gant and the Court,

17   I'll proceed by proffer and introducing those and then

18   we can go to Mr. Gant's witnesses.

19                   THE COURT:  Okay.

20                   MR. GANT:  I object to that.  May I --

21   and again, I know Your Honor knows this statute better

22   than most folks, but if you go to 18 USC

23   3142(f)(2)(B), it says:  At the hearing such person

24   has the right to be represented by counsel and, if

25   financially unable to obtain adequate representation,

52

1    to have counsel appointed.  The person shall be

2    afforded an opportunity to testify, to present

3    witnesses, to cross-examine witnesses who appear at

4    the hearing and to present information by proffer or

5    otherwise.  It says the person.  Not the government.

6              And if Your Honor -- again, same

7    paragraph, 18 USC 3142(f)(2).  It uses the phrase the

8    attorney for the government -- pardon me.  Hearing

9    shall be held immediately upon the person's first

10   appearance before the judicial officer unless that

11   person or the attorney for the government seeks a

12   continuance.  Two paragraphs -- pardon me, two

13   sentences further down, it speaks of the attorney for

14   the government.  Again, one line below that, attorney

15   for the government.

16             And 3142(f)(2)(B), the term attorney for

17   the government is used four times.  And in the very

18   next paragraph where they talk about the person shall,

19   the term attorney for the government is not used.  And

20   I suggest to you most respectfully, the drafters of

21   this statute certainly knew how to use the term

22   attorney for the government.  They used it in previous

23   paragraphs.

24             But when they talk about a proffer, they

25   talk about the person.  And I suggest to you most

1   respectfully, the person is the accused, not the

2   attorney for the government.  So I would object to the

3   government proceeding by proffer.

4                THE COURT:  Very good.  Thank you,

5   Mr. Gant.  Mr. Gant, your objection's noted.  This

6   Court consistently allows the government to proceed by

7   proffer in these types of proceedings.  Again, your

8   objection's noted for the record, but I'm going to

9   allow Mr. Kurtzman to proceed by way of proffer here.

10               MR. KURTZMAN:  Your Honor, if it's

11  permissible with the Court, I'd ask -- Agent Acker is

12  here in the room in attendance with me.  I'd ask to

13  excuse him from these proceedings because it sounds

14  like he's no longer needed to testify.

15               THE COURT:  Yeah, Agent Acker, you can be

16  excused.

17               Mr. Kurtzman, I'll hear from you.

18               MR. KURTZMAN:  Yes, Your Honor, just one

19  moment, I'm pulling up the -- I'm pulling up the

20  relevant (indiscernible).

21               MR. GANT:  Judge, may I just raise one

22  other thing?

23               THE COURT:  You may.

24               MR. GANT:  And I didn't mean to be

25  obstructive.  I have an obligation to advocate on

1    behalf of my client.

2              THE COURT:  Correct.

3              MR. GANT:  I would ask that Mr. Acker not

4    be allowed to leave just yet because if the government

5    is going to put in this new evidence, that may give

6    rise for a need on my part to cross-examine him.

7              THE COURT:  Well, if they're not putting

8    it in through him, Mr. Gant, you're not entitled to

9    cross-examine him on it.  And so I'm -- respectfully,

10   again, I'll overrule your objection to Agent Acker

11   being excused.  He's provided his testimony.  And I'm

12   going to let him be excused.  The record's -- the

13   record's clear on your position, and that will be

14   noted.

15             MR. GANT:  Very well.

16             MR. KURTZMAN:  Your Honor, if it pleases

17   the Court, by way of proffer, as the Court well knows,

18   this detention hearing initially began on August 26 of

19   2021 in the morning.  It was reset before you that

20   day.

21             On August 26, 2021, at 5:16 in the

22   evening, I received from Agent Acker an email with the

23   following text that says:  I just received the image

24   of McAbee's phone this afternoon.  A forward to you

25   will take a while.  Attached is the communication via

1  text message with Michael Roberts.

2  On August 30, Agent Acker again wrote me

3  and said, attached is another chat from McAbee's phone

4  referencing actions in DC.  On 1-8-21 he sent the

5  following to a contact stored in his phone as Uncle

6  Eddie.

7  And, Your Honor, I will now proceed to

8  share my screen and introduce Exhibit B first, which

9  are Cellebrite extractions of Mr. McAbee's phone

10  detailing his communications with Mike Roberts

11  beginning on December 31 of 2020 and proceeding to

12  shortly after -- or proceeding until mid January of

13  2021.

14  Your Honor, now present on my screen is

15  Exhibit B, the extraction report as you can see from

16  the Apple iPhone which Mr. McAbee consented to the

17  search of.  And here is the extraction between he and

18  Mr. Roberts.  I will read certain communications

19  between the two men.

20  Beginning on page 1 into page 2.  For the

21  Court and for those watching, the green messages are

22  sent by Mr. McAbee to Mr. Roberts and the blue

23  messages are Mr. Roberts' response, in turn, to

24  Mr. McAbee.

25  So beginning December 31 of 2020,

1    Mr. McAbee writes Mr. Roberts and says:  Hey, buddy,

2    you going to DC on the 6th.  Mr. McAbee then says:  I

3    want to go, but only if you're going.  I'm not in

4    shape to fight right now.

5            Move to page 2 of Exhibit B.  Mr. Roberts

6    responds to Mr. McAbee:  Yes, sir, I sure am.

7    Mr. McAbee then responds that same day:  Let's link up

8    and go.  I'll slap a commie with this dead arm.  Call

9    me after work.

10            Proceeding to page 3, Mr. Roberts texts

11   Mr. McAbee a photo attachment with text accompanying

12   it says:  That's what I'll carry in my pocket.

13            I'll now share with the Court and defense

14   counsel a previously produced photo, which is marked

15   as Exhibit C, which is the photo that Mr. Roberts

16   shared with Mr. McAbee on December 31 of what he

17   planned to carry with him on January 6 when they went

18   to the United States Capitol.

19            Returning to Exhibit B on page 4, later

20   that same day still, December 31 of 2020, Mr. McAbee

21   writes Mr. Roberts -- after seeing that picture, he

22   says:  How can I get some knuckles.  Mr. Roberts

23   responds:  Amazon's quick.  To which Mr. McAbee

24   responds:  Well, I've got a tire repair kit and the T

25   handle tire puncture is a great tool.

1          Moving to page 9 of Exhibit B still on

2   December 31, McAbee writes Mr. Roberts, he said:  All

3   right.  Sarah's not too happy with me going and her

4   not but oh well.  Mr. Roberts responds:  LOL only

5   reason I told Mel no is because of Eli.  Mr. McAbee

6   then responds:  I don't think the girls should be

7   subject to violence.  It will be there.  And I'd

8   rather not worry about them.

9          Proceeding to page 14 of Exhibit B, still

10  on December 31 of 2020, Mr. Roberts writes Mr. McAbee

11  and says in text:  I had to explain to Eli last night

12  that I was going to DC and what could happen.  This is

13  my fight so he doesn't have to fight.

14          Proceed to page 15 and the conversation

15  still continuing on December 31.  Mr. McAbee responds

16  to Mr. Roberts:  I will rise or fall along side of

17  you.  This is for future generations.

18          Proceeding to page 29 of Exhibit B, still

19  on December 31, 2020, in the evening now, Mr. McAbee

20  texts Mr. Roberts:  Most likely.  You will probably

21  need to call Sarah later.  She's a little upset.

22  Which Mr. Roberts responds:  How come?  LOL.  McAbee

23  responds:  My well-being.

24          And on to the next page, Mr. Roberts

25  responds to that message by saying:  I'll always take

58

1    the first lick.  Which Mr. McAbee responds:  I'm not

2    worried about that, but I guess she is.  To which

3    Mr. Roberts responds:  Mel's furious.  I know what

4    you're dealing with.

5                On to page 31 in that same text thread,

6    Mr. McAbee responds and asks Mr. Roberts:  Why is she

7    mad.  To which Mr. Roberts responds:  Explain to your

8    kid that you might not come home, that's way worse.

9    She can't go.  To which on page 32 Mr. McAbee

10   responds:  Oh, yeah, but it's for the cause.

11               Skipping to page 48 of Exhibit B -- or,

12   excuse me, page 47, now on January 3 of 2021,

13   Mr. Roberts texts Mr. McAbee:  We gonna light these

14   bitches up.  To which Mr. McAbee responds:  Let's go

15   man, with an exclamation mark.

16               And then on page 48 Mr. Roberts on

17   January 4 texts Mr. McAbee a picture, which I will

18   introduce as Exhibit E in a moment.  Mr. Roberts texts

19   Mr. McAbee a picture and says they arrived.  And then

20   we look at Exhibit E, which is that thumbnail which is

21   in there, which is the glove with the metal reinforced

22   knuckles.

23               If I could have a moment.  I don't want

24   to skip over what I previously marked as Exhibit D,

25   which is another thumbnail picture sent by Mr. Roberts

1    to Mr. McAbee, which, to go backwards just for a

2    moment, on page 37 of Exhibit B, on January 3 of 2021,

3    Mr. Roberts texts to Mr. McAbee:  Ready to roll,

4    accompanied by a photo, a thumbnail, which has been

5    enlarged in Exhibit D, and displays what appears to be

6    two knives, a set of reinforced gloves different than

7    what was just shown on page 48, as well as metal

8    knuckles.

9            Moving forward —— moving back to

10   Exhibit B and moving forward to page 59, now January 4

11   of 2021, Mr. Roberts texts Mr. McAbee:  Just filled

12   out my papers for the PB, to which Mr. McAbee

13   responds:  You western chauvinist LOL.

14           Moving forward to page 72 of Exhibit B on

15   January 7, 2021, Mr. McAbee texts Mr. Roberts, says:

16   DC officer died from the fire extinguisher to the

17   head.  The chief resigned because of the actions they

18   took Wednesday and is complaining that we used metal

19   pipe, chemical irritants and other weapons against

20   them.  To which Mr. Roberts responded that same day:

21   They are full of shit.  To which Mr. McAbee responds

22   that same day:  We held our ground after being

23   attacked.

24           Moving forward to page 86 of Exhibit B on

25   January 10 of 2021, Mr. Roberts texts Mr. McAbee and

60

1    says:  We done nothing wrong.  To which Mr. McAbee

2    responds:  Absolutely right.  You going to the

3    inauguration?

4              Page 87 of Exhibit B, Mr. Roberts

5    responds, IDK yet, which normally means I don't know

6    yet, to which Mr. McAbee responds:  It will be bullets

7    this time there.  Currently 6200 National Guardsmen,

8    several police agencies throughout the US, snipers

9    everywhere.

10             To which Mr. Roberts responds:  I don't

11   think that will happen.  To which Mr. McAbee responds

12   later that same day on page 88 of Exhibit B:  Eh IDK

13   they shot us at the Capitol.  To which Mr. Roberts

14   responds later that same day:  Trump will be the one

15   to be inaugurated.  To which Mr. McAbee responds later

16   on January 10:  I call for secession, with an

17   exclamation point.

18             Your Honor, at this time, the government

19   would move to admit Exhibit B, C, D and E into

20   evidence.

21             THE COURT:  They'll be admitted.

22             MR. GANT:  Over my objection, Your Honor.

23             THE COURT:  Objection's noted.

24             (Government Exhibits B, C, D and E were

25   admitted.)

61

1          MR. KURTZMAN:  Your Honor, the next

2    exhibit is Exhibit F taken from the same Cellebrite

3    phone extractions of Mr. McAbee's phone.  As evidenced

4    by the page displayed right now, it's between, again,

5    Mr. McAbee and an individual saved in his phone as

6    Uncle Eddie.  As you can see on January 7 of 2021,

7    Mr. McAbee, again, with the green messages sends Uncle

8    Eddie a thumbnail photo.  Give me one moment.

9          That thumbnail photo presented -- shared

10   now with the Court as Exhibit G, which is a picture of

11   Mr. McAbee with what appears to be a shoulder sling on

12   holding up a newspaper entitled *The Newsleader* with

13   the headline of Insurrection.

14         Moving forward through Exhibit F, page 3,

15   Mr. McAbee texts the individual saved in his phone as

16   Uncle Eddie on January 8 that says, I've shed blood

17   for my country by the hands of the swamp.  I will shed

18   much more in the days to come.  I will not forget the

19   oath I swore years ago to protect the America I once

20   knew.  And there is a (indiscernible) underneath that.

21         In this same message, Mr. McAbee attaches

22   three thumbnail photos, two of which appear to be a

23   hat with blood on it, and then the third that he sends

24   along with that text I just read the government would

25   introduce as Exhibit H, which appears to be a cut

62

1    along the forehead of Mr. McAbee -- Mr. McAbee's head.

2                    And, Your Honor, at this time the

3    government would move to admit Exhibits F, G and H.

4                    MR. GANT:  Same objection.

5                    THE COURT:  All right.  They'll be

6    admitted.  Your objection's noted.

7                    (Government Exhibits F, G and H were

8    admitted.)

9                    MR. KURTZMAN:  Your Honor, that concludes

10   the proof the government has with respect to

11   detention.

12                   THE COURT:  All right, very good.

13                   Mr. Gant, do you have any proof you want

14   to put on?

15                   MR. GANT:  On the issue of detention,

16   yes, Your Honor.

17                   THE COURT:  Very good.  All right.

18                   MR. GANT:  With your permission, may I

19   call my first witness.

20                   THE COURT:  Yes, sir.

21                   MR. GANT:  Ms. Sarah McAbee.

22                   THE COURT:  All right.  Ms. McAbee, are

23   you there?

24                   THE WITNESS:  Yes, sir.

25                   THE COURT:  All right.  Very good.  If

63

1    you'd raise your right hand, please, and be sworn.

2                          **SARAH MCABEE**

3    called as a witness, after having been first duly

4    sworn, testified as follows:

5                    THE COURT:  All right, very good.  If you

6    could state your name, please, and spell your last.

7    Actually, spell both, please.

8                    THE WITNESS:  Sarah McAbee.  S-a-r-a-h,

9    last name M-c-a-b-e-e.

10                   THE COURT:  Very good.  Thank you, ma'am.

11   You may ask, Mr. Gant.

12                   MR. GANT:  Thank you, Judge.

13                   **DIRECT EXAMINATION**

14   BY MR. GANT:

15        Q.    Ms. McAbee, are you a resident of the

16   Middle District of Tennessee?

17        A.    Yes, sir.

18        Q.    How long have you been a resident of the

19   Middle District of Tennessee?

20        A.    Since November 2020.

21        Q.    Are you employed?

22        A.    Yes.

23        Q.    Tell His Honor, if you would, please, the

24   nature of your employment.

25        A.    A marketing executive.

64

1      Q.    And did you have, Ms. McAbee, regular
2  hours?
3      A.    Yes.
4      Q.    And what are those hours?
5      A.    Typically 9:00 to 5:00.
6      Q.    Do you work at home or are you assigned
7  to an office?
8      A.    No, I work from home.
9      Q.    Ms. McAbee, if His Honor, Judge Frensley,
10  was to see fit to grant your request to be a
11  third-party custodian for Mr. Ronald McAbee, would you
12  be willing to accept that responsibility?
13      A.    Yes, sir.
14      Q.    If His Honor were to see fit to grant you
15  the status as the third-party custodian for Mr. Ronald
16  McAbee, could you assure the Court that you would do
17  what you could to see to it that Mr. McAbee didn't
18  flee the jurisdiction?
19      A.    Yes, sir.
20      Q.    Would you likewise assure the Court that
21  if you were granted such status that you would do what
22  you could to assure the Court that Mr. McAbee would
23  not pose a threat to anybody in the community or the
24  community itself?
25      A.    Yes, sir.

65

1      Q.   Should His Honor see fit to grant you

2   such custody and, as a result, impose certain

3   conditions to his release, that is, Ronald's release,

4   could you assure the Court that you'd do what you

5   could to see to it that he complied with those

6   conditions?

7      A.   Yes, sir.

8      Q.   If His Honor were to see fit to grant,

9   for example, third-party custody of Mr. Ronald McAbee

10  and provide that he be monitored by way of electronic

11  monitoring, would you be willing to take on the

12  responsibility of providing whatever equipment would

13  be necessary in order for that to happen?

14     A.   Yes, sir.

15     Q.   If His Honor were to see fit to grant you

16  third-party custody of Mr. Ronald McAbee and the Judge

17  impose a condition that Mr. Ronald McAbee be subject

18  to a curfew, would you be willing to assure the Court

19  that you'd see to it as best you could that he would

20  comply with such condition?

21     A.   Yes, sir.

22     Q.   Ms. McAbee, are there any weapons, any

23  guns, firearms in your home?

24     A.   No, sir.

25     Q.   At some point in time, Ms. McAbee, did

66

1    you request of certain individuals known to both you

2    and your husband that they write letters of character

3    references on behalf of your husband?

4              A.    Yes, sir.

5              Q.    I want to hand you what has been

6    previously marked as -- we'll call it McAbee Exhibit C

7    and ask you to take a look at that document.  Have you

8    reviewed it?

9              A.    Yes.

10             Q.    Do you recognize what that is?

11             A.    Yes.

12             Q.    Tell us, if you would, please, what it

13   is.

14             A.    Character reference letter from Emily

15   Gray.

16             Q.    I'm sorry, the name?

17             A.    Emily Gray.

18             Q.    And do you know Ms. Emily Gray?

19             A.    Yes.

20             Q.    Tell His Honor, if you would, please, who

21   Ms. Gray is.

22             A.    My older sister.

23             Q.    I'm going to hand you what has been

24   marked as Exhibit E, this is McAbee Exhibit E.  Do you

25   recognize that?

1          A.     Yes, sir.

2          Q.     Tell us if you would, please, what that

3    is.

4          A.     A reference letter from Austin Hise.

5          Q.     Was Mr. Hise one of the individuals you

6    asked to submit a character reference?

7          A.     Yes, sir.

8          Q.     Thank you.  I'm going to hand you

9    Exhibit F and ask you to look at that and tell

10   His Honor, if you would, please, what that is.

11         A.     Exhibit F, character reference letter

12   from Brittney Hillyer.

13         Q.     All right.  Again, Ms. Hillyer was one of

14   the individuals that you requested a letter of

15   reference --

16         A.     Yes, sir.

17         Q.     -- character reference?

18                Exhibit G?

19         A.     A character reference from Austin

20   Langley.

21         Q.     And I pass you Exhibit H.  Tell

22   His Honor, if you would, please, what that exhibit is.

23         A.     Character reference from Nathan McMahan.

24         Q.     Another individual from whom you

25   requested a --

68

1      A.    Yes, sir.

2      Q.    -- character reference?

3            Exhibit I?

4      A.    A character reference letter that I

5 requested from Angelo Nardone.

6      Q.    And J?

7      A.    A character reference letter that I

8 requested from Gregory Sims.

9      Q.    And Exhibit K?

10      A.    A character reference letter from Ronnie

11 Stockton that I requested.

12      Q.    And finally, Exhibit M as in Mary.

13      A.    A character reference letter that I

14 requested from Jennifer Wright.

15      Q.    Thank you.

16            MR. GANT:  If the Court please, I have no

17 further questions of Mrs. Sarah McAbee.  And I'd move

18 for the admission of Exhibits C through I think it's

19 K.

20            THE COURT:  Well, let me ask you about

21 that, Mr. Gant.  Because you did not move for

22 admission of Exhibit D or L.  You didn't just ask for

23 L, but you said C through K.  I don't know if D was an

24 oversight or if you intended not to ask for it to be

25 admitted.

1          MR. GANT:  I intended not to ask for the

2    admission of those two, Judge.

3          THE COURT:  All right.  So then we'll

4    admit C through M with the exception of D and L.  I

5    think that covers it.

6          MR. GANT:  Thank you.

7          THE COURT:  Thank you, those will be

8    admitted.

9          (Defense Exhibits  C, E, F, G, H, I, J, K

10   and M were admitted.)

11         THE COURT:  Mr. Kurtzman, do you have any

12   questions?

13         MR. KURTZMAN:  Yes, Your Honor, just a

14   few.

15                    **CROSS-EXAMINATION**

16   BY MR. KURTZMAN:

17        Q.   Ma'am, you were asked about where you

18   live.  Do you live in Unionville, Tennessee?

19        A.   Yes, sir.

20        Q.   And that's actually in Bedford County;

21   right?

22        A.   Yes, sir.

23        Q.   Just a technical thing, I think that's

24   actually in the Eastern District of Tennessee, which

25   is just a -- probably stuff for the lawyers and court

70

1  to worry about, but just wanted to make sure that was

2  -- that was understood.

3          MR. GANT:  I think (indiscernible)

4  Mr. Kurtzman, and I apologize.  I think you are right.

5          MR. KURTZMAN:  And, Mr. Gant, I only know

6  that because the FBI from the Eastern District is

7  handling this case.

8  BY MR. KURTZMAN:

9          Q.    Now, ma'am, the day Mr. McAbee was

10 arrested, they executed a search warrant at your

11 house.  I believe they had a search warrant, but you

12 also gave consent to search; is that right?

13         A.    Yes, sir.

14         Q.    And when living in that house, did you

15 see an all-black American flag displayed on the front

16 of your property?

17         MR. GANT:  Judge, I'm going to object to

18 this line of questioning.  I have limited my questions

19 to this witness to those questions necessary to

20 determine whether or not she is a suitable third-party

21 custodian.  I intentionally stayed away from the

22 facts.  His questions are beyond the scope of my

23 direct examination.  I object.

24         THE COURT:  Mr. Kurtzman.

25         MR. KURTZMAN:  Your Honor, I'm allowed to

71

1    inquire as to the suitability of the proposed

2    third-party custodian.  Regardless of whether Mr. Gant

3    limited his questions, I'm allowed to ask questions

4    now that go to the suitability of his proposed

5    custodian.

6                   THE COURT:  The objection's overruled.

7    I'll give you a little room, but let's try to -- let's

8    try not to go too far, Mr. Kurtzman.

9                   MR. KURTZMAN:  Yes, Your Honor.

10   BY MR. KURTZMAN:

11        Q.    Ma'am, do you need me to repeat that

12   question?

13        A.    Yes, please.

14        Q.    So while residing at the Unionville house

15   with your husband, have you ever observed an all-black

16   American flag flying from the front of your residence?

17        A.    Yes, sir.

18        Q.    Are you familiar with the significance of

19   an all-black American flag rather than a red, white

20   and blue one?

21        A.    No, sir.

22        Q.    Did you say no?

23        A.    Yes, sir.

24                   MR. KURTZMAN:  Okay.  Those are all my

25   questions.  Thank you.

72

```
 1                THE COURT:  All right, very good.
 2    Mr. Gant.
 3                MR. GANT:  Judge --
 4                THE COURT:  I'm sorry, go ahead,
 5    Mr. Gant.
 6                MR. GANT:  With your permission, may I
 7    call the next witness?
 8                THE COURT:  You may.  Thank you,
 9    Ms. McAbee.  Appreciate your testimony.
10                 *****WITNESS EXCUSED*****
11                MR. GANT:  Call Ms. Kimberly Gray,
12    G-r-a-y.
13                THE COURT:  All right.  Ms. Gray, if
14    you'd raise your right hand, please, and be sworn.
15                     KIMBERLY GRAY
16    called as a witness, after having been first duly
17    sworn, testified as follows:
18                THE COURT:  Very good.  If you'd sit
19    down, please, and state your name.
20                THE WITNESS:  Kimberly Gray.
21                THE COURT:  All right.  Mr. Gant.
22                THE WITNESS:  G-r-a-y.
23                THE COURT:  Thank you, ma'am.
24
25
```

73

**DIRECT EXAMINATION**

1

2    BY MR. GANT:

3         Q.    Ms. Gray, do you know an individual by

4    the name of Ronald McAbee?

5         A.    Yes.

6         Q.    Speak up, please.

7         A.    Yes.

8         Q.    Tell His Honor how it is you know

9    Mr. Ronald McAbee.

10         A.    He is my son-in-law.

11         Q.    Just about how long has he been your

12    son-in-law?

13         A.    2016, five years.

14         Q.    Ms. Gray, are you a resident of the

15    Middle District of Tennessee?

16         A.    Yes, sir.

17         Q.    What county do you live in?

18         A.    Marshall.

19         Q.    Marshall County.  I think that's the

20    Middle District of Tennessee.  Ms. Gray, should

21    His Honor decide to grant your daughter the

22    third-party custody of Mr. Ronald McAbee, would you be

23    willing to assure the Court that you would likewise be

24    willing to take on the responsibility as a third-party

25    custodian, should there be some reason that your

74

1    daughter could not?

2         A.    Yes, sir.

3         Q.    If His Honor were to see fit to grant you

4    let's call it joint third-party custody, would you be

5    willing to assure the Court that you'd do what you

6    could to see to it that your son-in-law didn't flee

7    the jurisdiction?

8         A.    Yes, sir.

9         Q.    Could you assure the Court you'd do what

10    you could to see to it that your son-in-law posed no

11    threat to any individual in the community or the

12    community itself?

13         A.    Yes, sir.

14         Q.    Should His Honor see fit to grant you

15    we'll call it joint third-party custody of Mr. Ronald

16    McAbee and impose conditions to his release, would you

17    assure the Court that you'd do what you could to see

18    to it that Mr. Ronald McAbee complied with those

19    conditions?

20         A.    Yes, sir.

21         Q.    Would you at all, Ms. Gray, hesitate to

22    notify the Court of any breach of any condition that

23    the Court might impose on Mr. Ronald McAbee?

24         A.    No, sir.

25         Q.    Are you employed, ma'am?

75

1          A.     I am.

2          Q.     Tell His Honor how it is that you're

3   employed.  Please speak up.

4          A.     JRL Enterprises in Franklin.

5          Q.     What kind of business is that?

6          A.     It's a meat market and deli.

7          Q.     And how long have you been employed or

8   engaged in that business?

9          A.     Five years.

10         Q.     Ms. Gray, do you have any hesitation

11  whatsoever of taking on the responsibility either as

12  the third-party custodian or as joint third-party

13  custodian in this matter?

14         A.     Can you say that again?

15         Q.     Do you have any hesitation in taking on

16  the responsibility as a third-party custodian --

17         A.     No, sir.

18         Q.     -- for Mr. Ronald McAbee?

19         A.     Correct.  And it was four years on the

20  employment.

21         Q.     All right.

22                MR. GANT:  Did you hear that, Your Honor?

23  I'm sorry.

24                THE COURT:  I did.

25

1          MR. GANT:  Thank you, I have no further

2    questions of Ms. Gray.

3          THE COURT:  Very good.  Mr. Kurtzman, do

4    you have any questions?

5          MR. KURTZMAN:  No, Your Honor.

6          THE COURT:  All right.  Very good.  Thank

7    you, Ms. Gray.  I appreciate your testimony.

8          THE WITNESS:  Thank you.

9           *****WITNESS EXCUSED*****

10         THE COURT:  Mr. Gant, do you have any

11   other proof you want to put on?

12         MR. GANT:  I have, if Your Honor please,

13   Mr. Philip Nelson.

14         THE COURT:  All right.

15         MR. GANT:  And he is appearing,

16   Your Honor, by video.

17         THE COURT:  Okay.  Mr. Nelson, is that

18   you I see on the iPad there?

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  All right.  Very good.  Let

21   me go ahead and swear you, Mr. Nelson.

22                   **PHILIP NELSON**

23   called as a witness, after having been first duly

24   sworn, testified as follows:

25         THE COURT:  All right, very good.  You

1   can put your hand down.  Would you state your name,

2   please, for the record.

3              THE WITNESS:  Philip Nelson.  Philip with

4   one L.

5              THE COURT:  All right.  Mr. Gant, you may

6   ask.

7                     **DIRECT EXAMINATION**

8   BY MR. GANT:

9        Q.   Mr. Nelson, where do you live?

10       A.   I live in (indiscernible), Tennessee.

11             THE COURT:  Sorry, what was that?

12             THE WITNESS:  Coalfield, Tennessee.

13             THE COURT:  Okay.

14   BY MR. GANT:

15       Q.   Do you know an individual by the name of

16   Ronald McAbee?

17       A.   Yes, sir.

18       Q.   Would you tell His Honor, please, how it

19   is that you came to know Mr. Ronald McAbee.

20       A.   We both met in football city league when

21   we were four years old.

22       Q.   And have the two of you maintained a

23   relationship since then?

24       A.   Yes, sir.

25       Q.   How often would you say, Mr. Nelson, that

78

1    you have communicated with Mr. McAbee in the last

2    year, year and a half?

3         A.    I'd say quite frequently.  Possibly two

4    or three times a month, if not more.

5         Q.    Tell His Honor, if you would, please,

6    based upon the length of your relationship with

7    Mr. McAbee, your opinion about the character of

8    Mr. McAbee.

9         A.    Could you say that again?  You cut out, I

10   apologize.

11        Q.    I'm sorry.  Tell His Honor, Judge

12   Frensley, if you would, please, your opinion with

13   regard to the character of Mr. Ronald McAbee.

14        A.    Mr. McAbee's character is

15   (indiscernible).  He stands strong in what he believes

16   in.  He's a wonderful man.

17        Q.    And in your experience in the

18   relationship between the two of you, how has he shown

19   to you the nature of his character?  Are there

20   examples?

21        A.    He's continuously checking in on me and

22   my family, specifically when I was in the military.

23   He made sure that he called me constantly.  Made sure

24   my well-being was good and even more so when I came

25   home.

1      Q.   Mr. Nelson, tell His Honor, if you would,

2  please, your reaction once you heard that Ronald had

3  been charged with these offenses arising out of the

4  January 6 demonstration in DC.  What was your

5  reaction?

6      A.   My reaction, I had difficulty believing

7  such.

8      Q.   And tell us why that is.

9      A.   It doesn't -- it's not in his character

10  at all.

11      MR. GANT:  Thank you, Mr. Nelson.  I have

12  no further questions of this witness, Your Honor.

13      THE COURT:  Mr. Kurtzman, any questions

14  of Mr. Nelson?

15      MR. KURTZMAN:  Yes, Your Honor.

16                **CROSS-EXAMINATION**

17  BY MR. KURTZMAN:

18      Q.   Mr. Nelson, you're aware that

19  Mr. McAbee's charged with assaulting law enforcement

20  officers; right?

21      A.   Yes, sir.

22      Q.   And you're aware that he was, in fact,

23  himself a law enforcement officer on January 6 of

24  2021?

25      A.   Say again, sir.

80

1       Q.   Were you aware that he was actually a law

2   enforcement officer himself on January 6, 2021, when

3   he went to DC?

4       A.   Yes, sir.

5       Q.   I'm going to show you a couple pictures.

6   So, Mr. Nelson, this is from a motion filed by the

7   government.  I don't know if you were here in the

8   prior proceeding, but Mr. McAbee has admitted during a

9   postMiranda interview that the individual pictured in

10  the -- the individual's picture that's wearing the red

11  hat is him.

12       Do you see him there standing over a law

13  enforcement officer on his back, that law enforcement

14  officer on the ground?

15       A.   Yes.

16       Q.   And you don't think that's reflective of

17  his character?

18       A.   No, sir.

19       Q.   Do you see that picture of the individual

20  with his arms or his hands on the officer's legs with

21  the red hat again?

22       A.   Yes, sir.

23       Q.   That officer's on his back again?

24       A.   Yes, sir.

25       Q.   And that's Mr. McAbee pulling him along

81

1    with another individual who's in the top half of that

2    photo in the (indiscernible)?

3                MR. GANT:  I object to the reference of

4    pulling.

5                THE COURT:  Restate your question,

6    Mr. Kurtzman.

7    BY MR. KURTZMAN:

8         Q.    Mr. Nelson, you understand that the

9    individual circled in red there with the red hat is

10   Mr. McAbee with his hands on a law enforcement

11   officer's legs?

12        A.    Yes, sir.

13        Q.    And, Mr. Nelson, you said that you knew

14   that Mr. McAbee was a law enforcement officer on

15   January 6.  Do you know where he was employed back

16   then?

17        A.    No, sir.

18        Q.    Do you recall him working for the

19   Williamson County Sheriff's Office?

20        A.    No, sir.

21        Q.    Do you see the individual wearing the

22   tactical vest with the sheriff patch on it?

23        A.    Yes, sir.

24        Q.    And this stillshot is taken from an

25   officer's body camera in which he is on his back,

82

1    Mr. McAbee is on top of him.  Your contention would be

2    that is not indicative of his character?

3           A.    No, sir.

4                 MR. GANT:  I object.  Excuse me, I object

5    to the phraseology of that question.

6                 THE COURT:  Overruled.

7                 MR. GANT:  Mr. Kurtzman --

8                 THE COURT:  I'm sorry, Mr. Gant.  I

9    didn't mean to cut you off.

10                MR. GANT:  Mr. Kurtzman's suggesting that

11   that photo shows Mr. McAbee on top of the officer.

12   What the photo shows is Mr. McAbee above the officer

13   who is apparently on his back.

14                THE COURT:  Objection's overruled.  You

15   can answer the question if you understand it.

16                THE WITNESS:  I don't understand the

17   question, Your Honor.

18                MR. KURTZMAN:  Your Honor, no further

19   questions.

20                THE COURT:  All right.  Very good.  Any

21   redirect, Mr. Gant?

22                MR. GANT:  Just briefly, if Your Honor

23   please.

24                THE COURT:  Certainly.

25

83

1                         **REDIRECT EXAMINATION**

2    BY MR. GANT:

3         Q.    Mr. Nelson, the photographs that you were

4    just shown show Mr. Ronald McAbee; is that right?

5         A.    Yes, sir.

6         Q.    And in those photographs showing

7    Mr. McAbee, would it be consistent with the character

8    of this individual that you know that he would protect

9    the police officers?

10        A.    Could you rephrase the -- or repeat the

11   question, please.

12             MR. KURTZMAN:  Your Honor, I'm going to

13   object.  That calls for speculation.

14             MR. GANT:  Based upon the character that

15   Mr. Nelson knows.  His specific knowledge of the

16   character of Mr. Ronald McAbee.  That's not

17   speculation.

18             THE COURT:  No, you can ask the question.

19   Objection's overruled.  Ask the -- reask the question

20   so that Mr. Nelson can hear it and he can answer it.

21             MR. GANT:  Thank you, Your Honor.

22   BY MR. GANT:

23        Q.    Based upon your knowledge of the

24   character of Mr. Ronald McAbee, would it be consistent

25   with his character that he would be protecting a

1  police officer?

2          A.    Yes, sir.

3                MR. GANT:  I have no further questions.

4                THE COURT:  All right.  Thank you,

5  Mr. Nelson.  I appreciate your testimony today.

6  You're free to stay if you'd like to.  You can also

7  leave if you need to as well.

8                *****WITNESS EXCUSED*****

9                THE COURT:  Mr. Gant, do you have any

10  other proof you want to put on?

11                THE WITNESS:  Thank you.

12                THE COURT:  You're welcome, sir.

13                MR. GANT:  Judge, I'd like to call my

14  final witness, if I may.

15                THE COURT:  Okay.  Who is that?

16                THE WITNESS:  That's Mr. Dickson.

17                THE COURT:  Okay.  Mr. Dickson.

18                THE WITNESS:  Yes, sir.

19                THE COURT:  All right.  Mr. Dickson, sir,

20  if you'd raise your right hand, please.

21                        **DAVID DICKSON**

22  called as a witness, after having been first duly

23  sworn, testified as follows:

24                THE COURT:  All right.  If you could

25  state your name, please, and spell your last for the

85

1    record.

2              THE WITNESS:  My name is David A.

3    Dickson, D-i-c-k-s-o-n.

4              THE COURT:  All right.  Thank you,

5    Mr. Dickson.  Mr. Gant, you may ask.

6              MR. GANT:  Thank you, Judge.

7                    **DIRECT EXAMINATION**

8    BY MR. GANT:

9         Q.    Mr. Dickson, where do you live?

10        A.    In the upper peninsula of Michigan.

11        Q.    And is that where you are today as you

12   testify here by video?

13        A.    Yes, sir.

14        Q.    Mr. Dickson, do you know an individual by

15   the name of Ronald McAbee?

16        A.    Yes, sir.

17        Q.    Would you tell His Honor how it is that

18   you came to know Mr. Ronald McAbee.

19        A.    I met him through his father-in-law,

20   Mr. Gray.

21        Q.    And tell us how that happened.

22        A.    Mr. Gray worked for me in the Air Force

23   many, many, many years ago.

24        Q.    And as a result of him working with you

25   in the Air Force, did a relationship develop after

1   your service?

2          A.    Yes, sir.

3          Q.    Tell us about that, if you would, please.

4          A.    I met -- I met his future son-in-law

5   several years ago on a business slash trip down to his

6   house.

7          Q.    And, again, if you would, please,

8   Mr. Dickson, tell us the name of Ronald McAbee's

9   father-in-law.  What is his name?

10         A.    Sam.  Sam Gray.

11         Q.    All right.  And tell us if you would,

12  please, about Sam Gray.

13         A.    Sam Gray worked for me longer in the

14  Air Force.  He was one of my best troops in all the 23

15  years I spent in the Service.

16         Q.    At some point in time, you came to know

17  Ronald, the son-in-law of Sam; is that right?

18         A.    Yes, sir.

19         Q.    And tell us if you would, please,

20  Mr. Dickson, if you developed a sense of the character

21  of this future son-in-law of Sam Gray.

22         A.    He's a very good young man.

23         Q.    Tell us how it is, Mr. Dickson, it is

24  that you are in a position to say that he is a very

25  fine young man.

87

1          A.    Well, sir --

2          Q.    Tell us what you know about him.

3          A.    Well, in my almost 45 years of law

4    enforcement, I've been able to be a very good judge of

5    character.  And Col, my opinion, he's a very good

6    character -- he's a good person.

7          Q.    Tell us if you would, please -- you just

8    said some 40 some odd years of law enforcement?  Did I

9    hear you correctly?

10         A.    Yes, sir.

11         Q.    Tell us about -- tell us about that law

12   enforcement career, if you would, please.

13         A.    Well, I spent over 23 years in the

14   Air Force as an air policeman, security policeman and

15   almost 22 years working for the US Marshals up here in

16   Marquette.

17         Q.    Mr. Dickson, at some point in time you

18   learned that this young man, Ronald McAbee, had been

19   charged with activity in the January 6 demonstration

20   in Washington, did you not?

21         A.    Yes, sir.

22         Q.    And tell His Honor, if you would, please,

23   your reaction when you heard about this.

24         A.    I was very surprised.

25         Q.    And that's because of why?

88

1          A.    Because he was employed as a law

2     enforcement officer.  And he's -- I -- I just couldn't

3     believe what they were saying with him.

4          Q.    In spite of what you have heard,

5     Mr. Dickson, given your years of law enforcement

6     experience, the allegations against Mr. Ronald McAbee,

7     have they changed your opinion about the character of

8     this young man?

9          A.    No, sir.

10          MR. GANT:  Thank you, sir.  I have no

11     further questions of this witness, Your Honor.

12          THE COURT:  All right.  Mr. Kurtzman, any

13     questions?

14                     **CROSS-EXAMINATION**

15     BY MR. KURTZMAN:

16          Q.    In your experience as a law enforcement

17     officer, have you ever described another individual

18     charged with assaulting a law enforcement officer as a

19     good person?

20          A.    That's never happened, sir.

21          MR. KURTZMAN:  No further questions.

22     Thanks, sir.

23                   **REDIRECT EXAMINATION**

24     BY MR. GANT:

25          Q.    Mr. Dickson, have you any reason to

89

1    believe that Mr. Ronald McAbee assaulted any law

2    enforcement officer?

3         A.    No.

4              MR. KURTZMAN:  Your Honor, I'm going to

5    object it's beyond the --

6              MR. GANT:  No further questions.

7              MR. KURTZMAN:  Beyond the scope.  Now

8    that Mr. Gant's moved through my objection, but it's

9    an inappropriate question and I'd ask for it to be

10   stricken.  It's beyond the scope of my cross, calls

11   for speculation, and Mr. Dickson -- if Mr. Gant would

12   like me to present Mr. Dickson with evidence, I'm

13   happy to.

14             THE COURT:  The objection's sustained.

15   I'll strike the answer -- the question and response.

16             Mr. Dickson, thank you for your

17   testimony.  I appreciate you being here today.  And

18   thank you for speaking with the Court.

19             THE WITNESS:  Thank you, sir.

20              *****WITNESS EXCUSED*****

21             THE COURT:  Mr. Gant, do you have any

22   other proof you want to put on?

23             MR. GANT:  I do not, Your Honor.

24             THE COURT:  Very good.  Mr. Kurtzman, do

25   you have any rebuttal proof?

1          MR. KURTZMAN:  No, Your Honor.

2          THE COURT:  All right.  Very good.

3    Mr. Kurtzman, you want to be heard?

4          MR. KURTZMAN:  Yes, Your Honor.

5          Your Honor, as we evaluate this case

6    under Section 3142 factors, the chief judge in the

7    district court of DC has provided what he calls

8    guideposts in assessing culpability of individuals

9    charged in conjunction with the Capitol riot.

10         And the Court has indicated

11   (indiscernible) for the purposes of differentiating

12   between (indiscernible).  The first of those is we

13   look at the nature -- under the nature and

14   circumstances analysis is whether the defendant's

15   charged with felony or misdemeanor offenses.

16         Here, obviously Mr. McAbee has been

17   charged with felony offenses, otherwise the government

18   wouldn't even have a statutory basis for seeking

19   detention.  And, in fact, Mr. McAbee is charged with a

20   crime of violence, which is assaulting a federal law

21   enforcement officer during the performance of their

22   duties, which the government would contend was

23   well-proven and well-demonstrated in the course of the

24   videos, Mr. McAbee pushing, (indiscernible), grabbing,

25   on top of law enforcements officers during the course

1    of that period of time.

2              The second of those guideposts that the

3    Court in DC looks at is the extent of the defendant's

4    prior planning.  And, quote, for example, by obtaining

5    weapons and tactical gear.  In this, the text message

6    evidence introduced today showed Mr. McAbee and this

7    individual he traveled to the riot with actively

8    obtaining and cultivating weapons before they went

9    there.  Mr. McAbee asking Mr. Roberts to order him the

10   set of steel-knuckled reinforced gloves that he wore

11   and were pictured during the video.  And the

12   individual that Mr. McAbee traveled with obviously

13   collected a number of weapons which he indicated at

14   the very least he was going to take with him.

15             Third of those guideposts is whether

16   defendants used and carried dangerous weapons.  And

17   I'll concede here at this point that to the extent

18   anything beyond the metal knuckled reinforced gloves

19   as a dangerous weapon, Mr. McAbee is at one point seen

20   with a baton in his hand, but it appears he grabbed

21   that without striking an individual with it.

22             4, the fourth guidepost in the nature and

23   circumstances analysis, is the evidence of

24   coordination with other protestors before, during or

25   after the riot.  The text message evidence you've seen

1    today indicated coordination, at the very least,

2    between Mr. McAbee and the individual that he traveled

3    to Washington, DC with as they sort of openly and

4    actually planned for violence during that event.  To

5    the extent that they each expressed an understanding

6    that they either might not make it back or they

7    weren't allowing their wives to go because it was

8    going to be dangerous, which shows some coordination

9    and the understanding that what they were going to was

10    going to lead to violence.

11            THE COURT:  Can I interrupt you for just

12    a minute, Mr. Kurtzman, and ask you a question about

13    that?  Both with respect to the second guidepost

14    you're referring to as well as the fourth, does it

15    matter what the -- what the expectation was?  I mean,

16    does it matter if, say, for example, they were

17    concerned that they might be attacked by some sort of

18    counterprotestors or whomever, as opposed to they had

19    an intention of going and attacking the police?

20            MR. KURTZMAN:  Your Honor, they were

21    prepared to engage in violence.  I think the planning

22    for violence, however it sort of manifests itself, is

23    significant enough.  You know, whether they knew they

24    were going to storm the Capitol as they were prepping

25    to go, I can't say whether they knew that.

1           But I can say I think pretty definitively

2    that they were prepared to engage in violence, so much

3    so that Mr. McAbee wanted to ensure that the

4    individual he went with was going to be able to assist

5    him in either fighting (indiscernible) protestors.

6    Mr. McAbee knew the individual he was going with was

7    also going to be armed with knives and knuckles.

8    Those don't seem to be defensive weapons.

9           Mr. McAbee also -- and I failed to

10   mention as I was going through, he also made sure to

11   take his tactical vest with the sheriff emblem on it.

12   That is not a preparation for someone going to

13   vocalize their First Amendment rights, which they're

14   obviously entitled to.

15           THE COURT:  So you're saying that --

16           MR. KURTZMAN:  (indiscernible) preparing

17   for --

18           THE COURT:  You're saying those

19   considerations don't necessarily have to have a

20   relationship to the charges that he faces.

21           MR. KURTZMAN:  Your Honor, I think it

22   lends itself towards particularly an individual like

23   Mr. McAbee who is charged with a crime of violence,

24   when you prepare to engage in violence (indiscernible)

25   the government's alleged a crime of violence, I think

94

1     those things necessarily mesh with one another.

2                    I understand your -- I think your point

3     on the sort of attenuated nature between maybe their

4     conversations between the 31st and the 4th and then

5     what happened on the 6th.  And I don't think we want

6     to look at any of that in isolation.  I think you look

7     at the planning, the execution and then the aftermath.

8                    THE COURT:  Okay.  Thank you,

9     Mr. Kurtzman.  I apologize for interrupting.  I hope I

10    didn't break your train of thought.  You had just

11    talked about the fourth guidepost.

12                   MR. KURTZMAN:  Yes, Your Honor.  And I

13    think I concluded there, just talking about the

14    coordination between Mr. McAbee and Mr. Roberts.

15                   The fifth is whether the defendant played

16    a leadership role in the events of January 6, 2021,

17    which I think I'll couple that a little bit with the

18    sixth and final guidepost, which is the defendant's

19    words and movements during the riot.

20                   So whether the defendant played a

21    leadership role in the event, you know, I think we

22    need to sort of unpack the word of what leadership

23    system.  The video evidence shows the defendant's

24    positioning within that riot.

25                   THE COURT:  He was right up in there;

1    right?

2              MR. KURTZMAN:  Your Honor, he

3    (indiscernible) of the individuals attacking those

4    officers.  He is not one amongst the crowd.  He is the

5    lead element going in there.  So whether or not he had

6    some formal leadership role within the organization, I

7    don't think there's any evidence that we can say that

8    that's the case, but typically in violent

9    altercations, the leaders are those up front that are

10   sort of leading the way for that.

11             Now, could there have been more

12   individuals more violent that day?  I'm not

13   distinguishing that, but I think his positioning and

14   seeing that video shows him on the front end of that

15   advance.  And then I think when you evaluate his words

16   and movements during the riot, he is all over those

17   officers.  He is on top of them.  He pulls one of the

18   officers down the stairs and another individual pulls

19   the other way.  At one point he ends up on top of an

20   officer to the point that the chest worn body camera

21   is what captures Mr. McAbee.

22             THE COURT:  Well, let's be clear.  You

23   said he pulled one of the officers down the stairs.

24   The video evidence is inconclusive as to whether he

25   was pulling or falling down the stairs; fair?

1          MR. KURTZMAN:  Your Honor, I -- I think

2     in my view of it, what is going on is Mr. McAbee is

3     unquestionably on top of an officer.  I think we can

4     agree to that.

5          THE COURT:  Yeah.

6          MR. KURTZMAN:  The four hands -- when I

7     say pull, four hands on top of that officer, he can be

8     seen grabbing that officer's left leg, pulling him as

9     another individual is grabbing that officer's right

10    leg and pulling him.  What I think happens at a

11    certain point is that Mr. McAbee ends up on top of

12    that officer while he's still being pulled down into

13    the crowd.  And I think Mr. McAbee, for lack of a

14    better term, drug that officer down the stairs as he

15    was being pulled out in the crowd.  I'm not saying he

16    pulled him out in the crowd --

17         THE COURT:  Yeah.

18         MR. KURTZMAN:  -- he was being pulled out

19    of the crowd and Mr. McAbee was on top of him, which I

20    think is a fair review of that without sort of more

21    high definition of what was going on that day.

22         THE COURT:  I understand.  Right.

23         MR. KURTZMAN:  Your Honor, you look at

24    those videos that were introduced sort of a collective

25    Exhibit A, it's a tremendously violent scene.  You've

1    got individuals in bulletproof vests throwing objects

2    at a line of officers, which based on the

3    (indiscernible) can only be five or six across.  Those

4    officers are being pulled down, being stripped of

5    their equipment as individuals continue to throw

6    things.  And then in later portions of the video, you

7    know, individuals straight up charging into the line

8    of officers in order to access the Capitol.  So when

9    we look at the nature and circumstances of the

10   offense, I think that, based on all the factors I just

11   outlined and how (indiscernible), the nature and

12   circumstances of the offense lean toward detention.

13           When we look at the weight of the

14   evidence of dangerousness, as I mentioned a moment

15   ago, he was in the lead element trying to overcome the

16   Capitol police.  He and an individual he worked with

17   openly talked in their text messages, joining the

18   Proud Boys and their affinity for that organization.

19           To look at his quote, which was

20   introduced in the text to Uncle Eddie -- as I say, we

21   evaluate the planning, execution and the aftermath.

22   On January 8, he said:  I've shed blood for my country

23   by the hands of the swamp.  I will shed much more in

24   the days to come.  I will not forget the oath I swore

25   years ago to protect the America I once knew.

1          And that is not someone who was repentant

2    about what happened that day.  That is someone

3    actively willing to engage in the exact type of

4    behavior --

5          THE COURT:  That was January the 8th or

6    10th?  What was the date of that?

7          MR. KURTZMAN:  That was the January the

8    8th, Your Honor.  And, Your Honor, I think when we

9    look at dangerousness, I think if we look at sort of

10   the entirety of Mr. McAbee and what was going on at

11   that time, he was a Williamson County sheriff.  He

12   engaged in that violent action knowing that that

13   would, once uncovered, lead to him undoubtedly losing

14   his job.  Didn't hesitate.  He wasn't one amongst the

15   crowd.  He was in the lead element of that crowd.  And

16   I think that speaks strongly to the dangerousness.

17         Your Honor, I think the final factor as

18   we look at the indictment in which Mr. McAbee is a

19   codefendant, we've got seven other individuals.  Those

20   individuals who, like Mr. McAbee, when they were

21   arrested were charged with a crime of violence and

22   detained.  Peter Stager was detained.  As the

23   government noted in its filing of supplemental

24   authority, Jeffrey Sabol was detained.

25         Other codefendants who were not charged

1    with a crime of violence have gotten home detention

2    enforced by GPS monitoring, but I think that's the

3    distinction is those individuals were not charged with

4    a crime of violence.  They were charged under

5    18 United States Code Section 111(a); whereas,

6    Mr. McAbee is charged under (b) as well, which is what

7    turned it into a crime of violence.  And notably, as

8    you compared Mr. McAbee to Mr. Sabol who the District

9    Court in DC ordered detained, Mr. McAbee and Mr. Sabol

10   are charged together in Counts Eight, Fifteen and

11   Seventeen of the indictment; and Mr. McAbee, Counts

12   Three and Seven are the same crimes that Mr. Sabol is

13   charged with, Your Honor.

14            So the government would contend that

15   Mr. McAbee should be detained pending trial.  And that

16   if the Court would enter an order otherwise, the

17   government would ask for it to stay its order to allow

18   the United States to appeal to the District Court of

19   DC, particularly based on (indiscernible) with the

20   codefendant (indiscernible).

21            THE COURT:  So you've talked about

22   Mr. Sabol's case and I've read the case, I've read the

23   other cases as well.  I've read the DC circuit's

24   opinion in the case that I handled at this level

25   previously, the Munchel case.  You're not suggesting

1   that I shouldn't perform an individualized

2   determination of detention as to Mr. McAbee and just

3   simply make my decision based on what happened to a

4   codefendant, should I?

5             MR. KURTZMAN:  Not at all, Your Honor.

6             THE COURT:  All right.  And is it the

7   government's position that the question -- the issue

8   of whether someone should be detained should be

9   dependent upon what they're charged with and the

10  charge -- the charging decision that the United

11  States of America has made should determine whether or

12  not they are detained?  That's not your position, is

13  it?

14            MR. KURTZMAN:  No, Your Honor.  And it

15  can't be.  I mean, you know, there's certain charges

16  that aren't even eligible -- aren't even detention

17  eligible.

18            THE COURT:  Right.

19            MR. KURTZMAN:  It's not what you're

20  charged with.  I think it goes more to, you know, as

21  we talk about those factors, it's the individualized

22  assessment of those factors as they apply to this

23  defendant, all sort of also in the lens of what he's

24  charged with.  Which if he hadn't been charged with

25  the crime of violence, he wouldn't be here today.

1          So, no, I'm not arguing that just based

2     on a charging decision.  He should be detained.  I

3     think when you look at the individualized factors

4     related to the nature and circumstances of the

5     offense, when you look at those, the detention -- the

6     detention decision comes into focus, and I'd ask the

7     Court to conclude that he should be detained pending

8     trial.

9          THE COURT:  In your -- in your motion for

10    detention, you discuss that the detention is

11    appropriate because, in part, that he has a compelling

12    incentive to flee, destroy evidence or intimidate

13    witnesses.  Does the government believe that

14    Mr. McAbee's a flight risk?

15          MR. KURTZMAN:  Your Honor, I'm looking at

16    the detention motion.  Where is that portion that

17    you're referring to?

18          THE COURT:  Page 20.

19          MR. KURTZMAN:  Thank you.  Your Honor,

20    your question was do I believe he's a flight risk?

21          THE COURT:  Right.  Is flight a basis for

22    detention in this case?

23          MR. KURTZMAN:  Your Honor, to my

24    knowledge, Mr. McAbee returned following the violence

25    on January 6, he returned to his home in Tennessee,

1    which I believe his wife testified to the fact that

2    they've lived there for a number of years.

3                Now, while there is some evidence as

4    outlined in the detention motion to show that he

5    attempted to destroy some of the evidence related to

6    it, and largely electronic, in that it appears he took

7    down a lot of his social media following those events,

8    he did not, for instance, get rid of those metal

9    reinforced gloves.  Those were recovered from his

10   house during the search warrant.

11               So to say he's a traditional flight risk,

12   i.e. he's going to flee the jurisdiction and go

13   somewhere else, I don't think the evidence presented

14   during his detention hearing presents a strong case

15   for that, Your Honor.

16               THE COURT:  So the basis for detention

17   would be that he's a danger to the community; correct?

18               MR. KURTZMAN:  Yes, Your Honor.

19               THE COURT:  All right.  And you've

20   already told me that it wouldn't be appropriate to

21   detain him based on what he's charged with.  In fact,

22   the basis for detention is a preventive detention, to

23   assure that from now until the time he goes to trial,

24   the safety of the community is protected.  Is that a

25   fair interpretation of the statutory scheme?

1          MR. KURTZMAN:  Yes, Your Honor.

2          THE COURT:  All right.  What is the

3    danger that Mr. McAbee poses to the community between

4    now and the time he goes to trial in this case?

5          MR. KURTZMAN:  Your Honor, I think a

6    recurrence of the events that occurred on January 6.

7    As the Court's aware, there's a protest scheduled for

8    I believe September 18 organized by individuals

9    seeking justice for those being prosecuted for the

10   events of January 6.

11          Mr. McAbee faced a similar circumstance

12   back in late December and early January.  He only went

13   to exercise his First Amendment right, which he had

14   every right to do, but was at the front edge of a

15   violent assault of the United States Capitol, knowing

16   he was going to be fired as soon as Williamson County

17   found out about that, and not even a hesitation.

18          And so the idea that the Court could

19   impose some condition more significant than

20   employment, you know, which is how we keep a roof over

21   our head, to protect the community from similar acts,

22   I don't think can be done.  If you present someone

23   with a situation where they're going to lose their

24   livelihood if they undertake a course of action and

25   yet they still do it, I don't think there's any

104

1    condition the Court can set that would ensure the

2    safety of the community.

3                    THE COURT:  These events happened on

4    January 6.  Mr. McAbee was arrested sometime in late

5    August, if I recall correctly, almost -- what, almost

6    eight months later.  During that eight months

7    Mr. McAbee wasn't under any conditions of release.  I

8    haven't heard the government present any evidence of

9    any danger he posed to anybody during those eight

10   months.  Do you have some evidence that you didn't

11   share with me?

12                   MR. KURTZMAN:  No, Your Honor.  He wasn't

13   identified.

14                   THE COURT:  Well --

15                   MR. KURTZMAN:  (indiscernible) so I

16   don't -- I don't think there's evidence one way or the

17   other about what happened during that time.

18                   THE COURT:  Your detention motion says

19   that he was identified at the end of May of 2021.  So

20   let's talk about that, then.  How about from May of

21   2021 until his arrest in August of 2021, is there some

22   evidence of some danger he posed to the community that

23   you haven't shared with me that you're aware of?

24                   MR. KURTZMAN:  No, Your Honor.  You're

25   correct.  At the very end of May a tip was provided

1    that the individual in those Be On the Lookout photos

2    could have been Mr. McAbee.  And then it appears from

3    the end of May to the beginning of June until his

4    arrest, the investigation determined that was, indeed,

5    him.  And so I don't think there's any evidence of him

6    engaging in crimes of violence in between when he was

7    identified and now.  So, no, I can't --

8             THE COURT:  Well, okay.  I understand

9    there's -- maybe you don't have any evidence of him

10   engaging in any crimes of violence, but what, if any,

11   danger can you tell me he posed to the community

12   during that period of time?

13            MR. KURTZMAN:  Your Honor, the exact same

14   danger he posed on January 6 when he was a Williamson

15   County sheriff and before he engaged in the violent

16   assault on those officers.  Mr. McAbee obviously had

17   some very strongly-held beliefs which led him to do

18   what he essentially admitted to doing in the Capitol

19   on January 6.

20            On January 8, rather than go to -- accept

21   what might have happened, he says he's ready to do it

22   again.  He's ready to spill more blood for those --

23   for his beliefs.  And those are the same beliefs that

24   led him to attack law enforcement on January 6.  I

25   know I've said this before, but I'd just ask you to

1  believe him.  That's what he said in a private

2  conversation.  Why don't we believe him that he's

3  ready to spill more blood for those beliefs?

4             THE COURT:  I guess because he didn't.

5  I've got -- I've got almost eight months where he had

6  no conditions whatsoever and you can't tell me a

7  single thing he did that endangered the community.

8             MR. KURTZMAN:  Your Honor, I couldn't

9  have told you on December 31 that he was going to go

10  engage in an attack on the United States Capitol.  I

11  think with those strong -- with the beliefs he has

12  expressed here, which he said whatever it is that he

13  has to fight for, he's prepared to engage in violence

14  to meet the ends of those beliefs.

15             I don't see anything to have him

16  renouncing those beliefs.  I don't see anything -- he

17  didn't walk into the FBI office in Knoxville and say,

18  you know what, I was at the Capitol.  I was wrong.

19  You guys got me --

20             THE COURT:  Well, if he did, he would

21  have been turned away, wouldn't he?  You didn't have

22  any charges on him; right?  You can't surrender when

23  you're not charged with something, can you?

24             MR. KURTZMAN:  Well, he would have been

25  interviewed.  I've had individuals who were uncharged

1    (indiscernible) number of these cases.  I've had

2    individuals who were uncharged (indiscernible) by law

3    enforcement, conduct an interview and then the FBI has

4    just said, you know, once we get an arrest warrant,

5    we'll come back and you can turn yourself in.  But,

6    no, they wouldn't have turned him away.  They would

7    have interviewed him, asked him about what happened

8    and what he did, and then charged him down the line.

9              THE COURT:  Well, you're familiar with

10   the Fifth Amendment.  He didn't have an obligation to

11   go do that, did he?

12             MR. KURTZMAN:  Certainly not, Your Honor.

13             THE COURT:  And that's not what you're

14   suggesting and you're not suggesting that he should be

15   detained because he didn't go in and voluntarily

16   confess to anything; right?

17             MR. KURTZMAN:  Not at all, Your Honor.  I

18   think our discussion was about the dangerousness

19   element.  And you're saying (indiscernible) the point

20   being seven, eight months is the (indiscernible)

21   you're talking about, how do you know that -- how can

22   you say that he's still a danger to the community.

23             And my point being there is that the

24   evidence of the video and the text (indiscernible)

25   belief system, you see he's prepared for violence, we

1   see him engaged in violence, and then afterwards you

2   see him not walk back and renounce that, you see him

3   double down and say I'm ready to do it again when that

4   time arises.  I don't think the Court or I can predict

5   when that time is going to arise.  I couldn't have

6   predicted that January 6 would have arisen for him to

7   go attack another fellow law enforcement officer.  I

8   couldn't have that predicted that, but it happened.

9   He admitted it.  He's on video.  And I don't think I

10  could predict it now.

11              THE COURT:  You admit that if I were to

12  impose conditions on his release that he submit to

13  home detention, electronic monitoring, that he not

14  participate in any rallies or events like the one you

15  referenced on September the 18th, that those

16  conditions, if followed, would protect the safety of

17  the community.  You just don't think he would follow

18  those conditions because when his job was on the line,

19  he did what he did.

20              MR. KURTZMAN:  Absolutely, Your Honor.

21              THE COURT:  Okay.

22              MR. KURTZMAN:  He -- I believe a sworn

23  law enforcement officer takes an oath, and a certain

24  part of that oath involves not breaking the law.  I

25  would expect (indiscernible) assault another law

1    enforcement officer.  So the idea that he would abide

2    by your conditions rather than the oath he swore to

3    become a law enforcement officer I don't think is

4    reasonable.

5              THE COURT:  Okay.  Thank you,

6    Mr. Kurtzman.

7              Mr. Gant.

8              MR. GANT:  May it please the Court.

9    (indiscernible).  It has appeared to me for a long

10   time that the real issue here is not flight but

11   danger.  And in light of that, I want to focus my

12   comments in that regard.

13             First of all, one of the arguments that

14   Mr. Kurtzman makes in support of his position that

15   there are no conditions or combinations of conditions

16   that will assure the safety of the community or any

17   member of the community is that Mr. McAbee engaged in

18   conduct and he knew that while engaging in that

19   conduct he would lose his job.

20             Now, I'm old, but I don't remember any

21   testimony at this hearing in that regard.  Now, maybe

22   what my friend Mr. Kurtzman is arguing is that there

23   is an inference that if a law enforcement officer

24   engages in certain kind of conduct, then there's a

25   likelihood that he or she may lose his job.

110

1        But in terms of evidence in the record in

2   this hearing, I haven't heard any evidence to suggest

3   that Mr. McAbee was on the verge of losing his job

4   because of his conduct in Washington, DC.

5        More importantly, Judge -- and, again, I

6   don't want to give Your Honor the idea that I'm just,

7   you know, glossing over the question of flight.  I

8   think clearly that any view of the evidence that's

9   been presented thus far, there's a reasonable

10  suggestion that he does not pose a risk of running

11  off.

12        I mean, again, just like Your Honor's

13  pointed out, he had several months to do that.  I

14  mean, if he wanted -- if he wanted to take off, and he

15  knew that there was reason to do so, he certainly had

16  time and the opportunity to do that.

17        But in terms of danger, again, looking

18  back at what the government has alleged in their

19  motion to detain, the motion suggests that Mr. McAbee

20  was the guy who was there wielding, you know, baseball

21  bats and throwing rocks and that kind of thing.

22        One of the things that Your Honor -- and

23  I'm sure you'd rather not do it, but if you go back

24  and you look at AW body worn cam and it's at 0.0032

25  where you see Mr. McAbee reach over and he picks up

1   this item, it looks like a baton, I think we all

2   concede that he did pick up the baton.  But not one

3   time did you see him use it.

4                  Now, again, Mr. McAbee is clearly up in

5   the front right there in the mouth of the tunnel and

6   he's involved in the pushing and shoving.  There's no

7   question about that.  But if Your Honor would look,

8   again, the AW body worn camera you will hear at 001 --

9   01:23 I think it is, You will hear the word no, quit

10  it.  I'm trying to help you, man.

11                 And if Your Honor will listen to that and

12  compare the voice of that individual with the voice

13  that you hear that we know is Mr. McAbee, I'd suggest

14  to you most respectfully, it sounds just like him.  It

15  sounds just like McAbee saying I'm trying to help you,

16  man.

17                 Counsel made a comment earlier, counsel

18  for the government, that I think it was that

19  photograph where you have Mr. McAbee leaning over the

20  officer and you see the vest and the sheriff and it

21  looks to me like it's him, but at one point it was

22  suggested by counsel for the government that

23  Mr. McAbee was on, leaning on the individual.

24  Certainly he wasn't because you couldn't get the

25  photograph -- the kind of photograph that you got

1   wouldn't have been possible if he'd been laying on

2   him.

3            But if Your Honor will go back and,

4   again, when you view AW body worn camera, what happens

5   is you get like three or four clips in one, but in the

6   third clip at 00:31, you will see that he's not

7   pulling the officer.  He's got his hand on the leg,

8   but there is no action to suggest that he is pulling

9   the officer.  Just before that particular portion of

10  the clip, you will see, again, 00:49 through 52, you

11  see clearly Mr. McAbee reaching over that -- excuse

12  me, that officer who's on the ground, reaching over

13  him, and then all of a sudden he wobbles back and they

14  slide down the stairs.  But, again, all of this goes

15  to the question of whether or not he's a danger.

16            The thing that has troubled me, Judge,

17  about this whole episode, the government wants to say,

18  look, when you read these text messages and you look

19  at Mr. McAbee when he went to Washington, he went

20  there prepared to fight.  And, again, I don't think

21  that it is, you know, too far of a stretch for anybody

22  to believe, look, if you're going to a Trump rally,

23  especially back in December and January, if you're

24  going to a Trump rally, there's probably going to be a

25  counter rally.  And invariably there are fisticuffs.

1   Okay.  So it would not be unusual for an individual to

2   go to such a rally knowing that there might be

3   fisticuffs and go prepared.  I'm not saying he should

4   have, but it's not uncommon.

5              Next, there is this subliminal kind of

6   suggestion here, Judge, that, one, because some other

7   judge detained some of the other accused, you ought to

8   do that too.  The more subliminal message is, look,

9   this guy, McAbee, he goes to Washington and he goes

10  there because of his beliefs.  And as counsel said a

11  few moments ago, he has very heavily, strong -- pardon

12  me, very heavily-held strong beliefs.  Well, that's

13  probably true.  But you can't lock him up, you can't

14  hold him because of his beliefs.

15             Now, when you look at, again, these

16  videos that the government so heavily relies upon and

17  video CM body worn camera at 0.00:52, again -- and

18  it's just a repeat of 00:49 on the second clip of AW,

19  but it's a repeat.  You can clearly see that it is

20  Mr. McAbee who is leaning over the police officer

21  before they slide down the steps.

22             One more significant video I'd ask

23  Your Honor to look at.  And it's that last -- it's

24  S-a-j-u-m-o-n, I don't know how you pronounce it.  But

25  at 0.00:17, you hear, hey, we got an officer down,

1    man.  We got an officer down.

2              Again, if Your Honor listens to comments

3    and the voice of Mr. McAbee and compare that, hey,

4    man, we got an officer down, I suggest to you most

5    respectfully, sounds a great deal like it is

6    Mr. McAbee who's saying that.

7              Finally, at the end of that very same

8    clip, you see a Metropolitan police officer,

9    Metropolitan DC police officer and you've got

10   Mr. McAbee and he's trying to get into the tunnel.

11   And that's the clip where you see him point to his

12   vest and the word sheriff.

13             But what you do hear is -- and this is

14   right after you see Mr. McAbee go over and do the

15   assessment on this woman who is apparently in dire

16   need.  But what you hear a Metro officer say to

17   Mr. McAbee, hey, man, thank you.  We appreciate you.

18   01:19.  Thank you, man.  We appreciate you.

19             Excuse me, Judge, there's a little noise

20   out here.  We're going to take care of it.

21             THE COURT:  Thank you.

22             MR. GANT:  Judge, next.  There was a

23   comment made by my colleague, Mr. Kurtzman -- and

24   maybe I misunderstood him.  But it had to do with the

25   crowd noise.  Now, you know, when you hear the name

115

1    Proud Boys, there's kind of a flinch, kind of a

2    reaction.  But if Your Honor goes and you look at the

3    text messages that make reference to PUS -- I think

4    it's PBUS, you'll note that in one of those text

5    messages.  And it's Proud Boys US.  And there's some

6    conversation between Mr. Michael Roberts and -- I'm

7    sorry, Judge.

8              THE COURT:  That's all right.  I can hear

9    you all right, Mr. Gant.

10             MR. GANT:  There was some text messages

11   between Michael Roberts and Mr. McAbee.  And you will

12   see Mr. McAbee spurns, he says, wait a minute, that

13   Proud Boys stuff, no, no, no, I went online and I

14   looked at it and it was some kind of antigovernment

15   organization.  He rebuffs it.  He rebuffs it.

16             Finally, Judge, couple things that I want

17   to say about what Your Honor has seen on these video

18   clips and what we know about the character of this

19   young man insofar as the people who have spoken about

20   his character.

21             Again, Your Honor goes back and you hear

22   that comment, I'm trying to help you, man.  If you go

23   back and you look at that video where supposedly

24   Mr. McAbee is pulling the leg of the officer, if you

25   go back, Judge, and you look at that portion where

116

1    he's down doing the chest pumps to the woman, and if

2    you go back and you see and you hear, hey, we got an

3    officer down, man, those kinds of comments suggest

4    that this young man has the kind of character that you

5    heard these people talk about.  He was trying to help.

6    He was there to help.

7               Now, (indiscernible) guideposts that are

8    suggested in Judge Sullivan's Sabol, I believe that's

9    how you pronounce it, Sabol opinion, what we know

10   about Sabol is that it's not Ronald McAbee case.

11   Sabol is a guy who prepared, bought tickets to

12   Switzerland and, you know, a number of things clearly

13   suggesting that he was gone.

14               Given we're not talking so much about

15   flight here as we are about danger to the community.

16   The one thing we do know, Judge, about this danger to

17   the community, the case law says very clearly that it

18   can't be just some suggested danger to the community.

19   It has to be a significant danger to the community.

20               And I suggest to you most respectfully,

21   what we know about Mr. McAbee from the time he got

22   back from Washington up to and including the time he

23   got arrested in this case, there was nothing, nothing

24   that he has done that would suggest that he is a

25   danger to the community.  There is nothing that he has

1    done that suggests that he poses any danger to any

2    individual in the community.

3            And most importantly, counsel said, well,

4    look, Judge, he poses a danger because he could do in

5    September what he did back in January.  Of course.  He

6    could not do that.  Again, just as counsel has said,

7    we don't know.  We don't know.  You don't know.  But

8    the one thing we do know is this:  We can't just lock

9    him up because, hmm, there's a possibility that he

10   might do this.

11           You could do that, Judge, only if there

12   are no conditions or combination of conditions that

13   would militate against that.  You have available to

14   you some conditions that will militate against that.

15   And Your Honor's already identified them.

16           I've gone on much too long.  But, Judge,

17   you have, having known Your Honor for some time, I

18   know you know you have an independent responsibility

19   to determine whether based on what you have heard thus

20   far warrants that drastic kind of action of pretrial

21   detention.  And I suggest to Your Honor, you do have

22   available to you conditions, combinations of

23   conditions that I suggest to you most respectfully

24   will guarantee that this young man will not pose a

25   danger to the community or anyone else.

1          THE COURT:  Mr. Gant, you addressed at

2     the outset Mr. Kurtzman's argument that I should not

3     believe that your client would follow any conditions I

4     might impose because he went to DC and engaged in the

5     conduct he allegedly engaged in there with an

6     understanding that he would lose his job.  And if his

7     job wasn't enough to keep -- to keep him in line, so

8     to speak, that why could I -- why should I believe he

9     would follow any conditions.  What's your argument as

10    to why I should be confident that he would comply with

11    any conditions I imposed?

12          MR. GANT:  Well, one thing we know for

13    sure, Judge, is given his law enforcement experience,

14    there is some suggestion that he worked in corporate,

15    he knows the consequences of his failure to comply

16    with the conditions that you impose.

17          Unlike the hypothetical possibility of

18    him losing his job or engaging in the kind of conduct

19    he's alleged to have engaged in, he didn't know that.

20    He wouldn't -- there's no suggestion that he knew

21    that.  But there is one suggestion for sure here.  If

22    you impose conditions and he violates them, he knows

23    what's going to happen.  He knows right now that if

24    for any reason he were to violate a condition, he's

25    going to be locked up.  Unlike this hypothetical

1    situation where he might have lost his job because he

2    engaged in the kind of conduct they allege he engaged

3    in.

4                (Indiscernible) Judge, he knows now that

5    if you release him and he violates the conditions, he

6    knows the consequences.  He didn't have that kind of

7    situation when he was supposedly engaging in the

8    conduct in DC.

9                THE COURT:  All right.  Thank you,

10   Mr. Gant.

11               Mr. Kurtzman, I'll give you the last word

12   if you want it since it's the government's burden.  I

13   don't know if you're talking right now, Mr. Kurtzman,

14   but you're muted.

15               MR. KURTZMAN:  Thank you, Your Honor.

16               THE COURT:  Thank you.

17               MR. KURTZMAN:  Yes, Your Honor, just

18   briefly.  Just a couple points to counter I think what

19   may be a generous reading or inaccurate.  Exhibit B

20   which we presented on page 36, Mr. McAbee asks what's

21   the password to the PBUSA, Proud Boy.  Roberts's

22   response:  I don't know, LOL.  The next page on

23   page 37 of Exhibit B, that's Mr. McAbee saying:  Oh, I

24   thought you were involved.  So that's not him

25   renouncing it.  I don't know where that reading comes

1    from.

2            The other mention of the Proud Boys comes

3    later in that outline where on page 59 of Exhibit B,

4    Mr. Roberts just says filled out papers -- or just

5    filled my papers out for PB, assume that means Proud

6    Boys based on the response of Mr. McAbee, which says:

7    You western chauvinist, LOL.

8            Your Honor, we then -- as we talked about

9    sort of the repercussions and the prospect for future

10   danger, page 7 in Exhibit B, where Mr. McAbee

11   discusses the DC police officer died from a fire

12   extinguisher to the head, at least that was his

13   understanding.  Chief resigned because of the actions

14   they took Wednesday and complaining that we used metal

15   pipes, chemical irritants and other weapons against

16   them.  Mr. Roberts responds there:  Full of shit.  To

17   which Mr. McAbee says:  We held our ground after being

18   attacked.

19           So those videos entered as evidence are

20   Mr. McAbee's impression of him being attacked as he's

21   on the leading edge of that element.

22           THE COURT:  You know, he pushed a police

23   officer, but he pushed that police officer after the

24   police officer pushed him; right?

25           MR. KURTZMAN:  Your Honor, he's at the

1   lead edge of an element that's violently assaulting

2   and throwing stuff.  The officer I don't think was

3   expecting to shake his hand at that moment.

4              THE COURT:  Fair enough, but can you

5   answer my question?

6              MR. KURTZMAN:  Which is he pushed the

7   officer after --

8              THE COURT:  The officer pushed him,

9   right?

10              MR. KURTZMAN:  After the officer -- after

11   the officer attempted to prevent him from entering the

12   Capitol illegally at the front of --

13              THE COURT:  It's not that hard to say

14   yes, Mr. Kurtzman, is it?  And the video of him over

15   the other officer, he never strikes the officer, does

16   he?

17              MR. KURTZMAN:  Fair enough.

18              THE COURT:  Never headbutts him.  He

19   never took any offensive action against those

20   officers, did he?  You've already talked about the

21   baton that he threw down.  He didn't use the baton.

22   Even though he had that weapon in his hand, he didn't

23   use it against any of the officers, did he?

24              MR. KURTZMAN:  Did he use the baton

25   against the officer, no.  I think, Your Honor, if we

1    asked the law enforcement officer if someone in a

2    violent mob being on top of them and they were on

3    their back on the ground was concerning, I think they

4    would all agree that it was.

5              THE COURT:  And I'm not suggesting it's

6    not concerning.  I think there's so much about this

7    that's concerning.  But there's a difference between

8    being concerning and being egregious, and I want to

9    make sure that we talk about the facts, and that's

10   what I'm asking you about.  You can go ahead and

11   continue.

12             MR. KURTZMAN:  Fair enough, Judge.

13             Your Honor, I think the photo on our

14   screen right now shows -- as we talk about those

15   beliefs and what he's willing to do, that's Mr. McAbee

16   the day after, posing, it appears to be proudly, next

17   to a newspaper that says Insurrection before a few

18   days later saying he shed blood for his country by the

19   hands of the swamp.  And I'll shed more in the days to

20   come.

21             The idea that everything back home didn't

22   prevent Mr. McAbee from engaging in the conduct he

23   did, that somehow any conditions here would I think is

24   incorrect and would ask the Court to keep him detained

25   pending trial.

123

1          THE COURT:  Is that it, Mr. Kurtzman?

2          MR. KURTZMAN:  I'm sorry, yes,

3   Your Honor.

4          THE COURT:  The Court's heard the proof

5   in this matter.  It's before the Court on the

6   government's motion for detention pending trial in

7   this case.  First of all, I want to thank the lawyers.

8   Appreciate your efforts, as always.  You both did an

9   outstanding job representing your perspectives in the

10   case, and that is very important to the Court.

11          Also want to thank everyone for your

12   patience with the delays associated with completing

13   this hearing.  And so thank you all for working

14   together to make sure that happened.

15          Also want to take a minute to acknowledge

16   Sarah McAbee, Ms. Gray, Mr. Nelson and Mr. Dickson for

17   your presence and appearance here today.  And also the

18   number of character letters that the Court received.

19   I've reviewed all of those letters.  Mr. Gant, just so

20   you know, I've also -- prior to today's hearing, I

21   went back and looked at the videos again and reviewed

22   those as well.

23          To those witnesses who provided

24   testimony, I want to thank you for your patience and

25   your participation here.  I'm sure there's just about

1   anywhere you'd rather be than federal court, and so I

2   appreciate you being here.  And thank you for your

3   testimony.  Thank you for your willingness to serve

4   the Court in the capacities that you discussed in your

5   testimony.

6                I want to acknowledge that there are a

7   lot of people who come before this Court who don't

8   have anyone who shows up to support them or stand

9   behind them, and it means a lot to me that you-all

10  have been here and I want you to know that it's

11  recognized and not unnoticed.  So thank you all for

12  that.

13               The Bail Reform Act ordinarily requires

14  that a defendant be released pending trial unless

15  there are no conditions that will reasonably assure

16  the appearance of the person at future court

17  proceedings and the safety of the community.  The

18  Court, as the government notes, is to consider a

19  number of factors, including the nature and

20  circumstances of the offense charged, the weight of

21  the evidence against the defendant, the history and

22  characteristics of the defendant, and the nature and

23  seriousness of the danger posed by the defendant's

24  release.

25               In our society, liberty is the norm and

1    detention prior to trial or without trial is the

2    carefully limited exception.  The Court's mindful of

3    the tension between the Bail Reform Act and the

4    presumption of innocence that applies to Mr. McAbee

5    and all individuals accused of criminal offenses.

6              I want to address first the issue of

7    flight.  The government in its motion for detention

8    suggests that Mr. McAbee is a flight risk and that

9    detention would be appropriate for those reasons, as

10   he has this added incentive to flee, as the brief

11   notes -- or compelling incentive, rather, to flee,

12   destroy evidence or intimidate witnesses as noted on

13   page 20 of the government's motion.

14             I don't find that Mr. McAbee poses a

15   significant flight risk in this case.  These events

16   occurred on January the 6th of 2021.  Mr. McAbee

17   apparently came back home to his residence in

18   Tennessee over in Bedford County.  There's no evidence

19   before the Court that he's been anywhere else or tried

20   to fly under cover of night or hide out or stay in a

21   hotel or otherwise avoid law enforcement or anyone

22   else.  It appears he went back to his life as it was

23   before January the 6th and went about living there.

24             Likewise, the evidence suggests that

25   Mr. McAbee was -- continued in the employment of the

1  Williamson County Sheriff's Department until sometime

2  in March of 2021.  So he went back to the same

3  residence, the same employer, the same family members,

4  and there's just no evidence to suggest that he made

5  any action to flee or that he would pose any risk of

6  flight or nonappearance in these court proceedings.

7          Furthermore, the Court believes that

8  there are conditions of release that would reasonably

9  assure his appearance at future court proceedings and

10  that those conditions could be imposed and would

11  adequately assure his presence at future proceedings.

12          Mr. McAbee has been indicted in this case

13  in the District of Columbia, and so probable cause is

14  not at issue.

15          With respect to the issue of

16  dangerousness as a basis for detention, this is a

17  difficult question, no doubt about it.  The videos

18  that the Court has been provided and reviewed in the

19  context of these proceedings are -- there just really

20  aren't enough words to describe how troubling and

21  concerning they are.  And those are just probably mild

22  terms for them.  I think horrific and just -- just

23  awful when you review those.  And it's -- it's

24  certainly understandable to see how that would

25  engender a degree of emotion in not only this decision

1    but any other decisions related to anything that has

2    to do with the events of January 6 at the Capitol.

3               But what I think is really important to

4    make clear for the record here is that the decision

5    that I have to make today is not a decision about

6    whether or not Mr. McAbee engaged in the conduct

7    that's alleged in the indictment or whether or not

8    Mr. McAbee is guilty of the conduct alleged in the

9    indictment or whether or not he should be punished for

10   the conduct that he allegedly engaged in as set forth

11   in the indictment or what punishment he should receive

12   for the conduct he allegedly engaged in as set forth

13   in the indictment.

14               The question I have to decide today is a

15   very narrow and specific question, and that is whether

16   or not there are conditions that will reasonably

17   assure the safety of the community if Mr. McAbee were

18   to be released in this case pending trial.

19               The government's acknowledged, rightfully

20   so, that it would be inappropriate for me to detain

21   Mr. McAbee based solely on his beliefs, to detain him

22   based solely upon the charges that have been brought

23   against him in the indictment or to detain him based

24   upon a belief that he engaged in the conduct that was

25   asserted in the indictment alone.

1          While that conduct is certainly a factor

2     and a consideration, I don't want to overstate the

3     government's position, detaining him simply because I

4     believe he did what he's charged with is not a

5     sufficient basis to order detention in this case.

6          Instead, the justification for detention

7     is what's known as preventative detention.  In other

8     words, if I decide to detain him, it's because I

9     belief that he poses a danger to the community between

10    now and the time his case is resolved, and detention

11    is the only way to prevent that danger from occurring.

12          And that's extremely important because it

13    goes not only to the construction of the statute

14    itself, but it also goes to the fundamental

15    constitutional aspects of which our basis and our

16    system of justice is predicated.

17          We have a system that presumes innocence,

18    and for me to make a decision where I become judge,

19    jury and executioner all in the same role without

20    affording him the rights he's entitled to under the

21    constitution is inappropriate.  And that's the

22    important distinction between the bond decision and

23    the decision on guilt that will follow at a trial.

24          It's important to note that in order for

25    a defendant to be preventively detained, the Court

1  must identify an articulable threat posed by the

2  defendant to an individual or to the community.  Now,

3  that threat doesn't have to be physical violence

4  alone.  It could extend to nonphysical harms, but it

5  must be a clearly identified threat.  And the threat

6  must also be considered in context.

7           The determination has to be individually

8  made and, in the final analysis, must be based on

9  evidence before the Court regarding a particular

10  defendant.  And it follows that whether a defendant

11  poses a particular threat depends on the nature of the

12  threat identified and the resources and capabilities

13  of the defendant.

14           That's extremely important because,

15  again, if I were to make this decision based solely on

16  emotion and looking at those videotapes and what's

17  alleged to have occurred, then I would be overstepping

18  the responsibility that I have to make an

19  individualized determination.

20           Similarly, if I were to make a decision

21  based upon what some other judge did for some other

22  defendant based on their individual circumstances, I

23  would be acting contrary to the law.  I have to make

24  an individual decision to determine whether or not

25  Mr. McAbee poses a danger to the community and whether

1    there are any conditions that will reasonably assure

2    the safety of the community if he were to be released,

3    keeping in mind the Supreme Court's admonition that

4    detention is the exception and liberty is the norm.

5              So it's against that backdrop -- and

6    that's a very, very important backdrop.  It's a

7    backdrop that's lost on many people.  Many people see

8    those videos and they say, gosh, I see exactly what he

9    did, he needs to be thrown in jail.  But that's just

10   not the decision that I have to make.  That's a

11   decision for another day in another forum before

12   another fact finder.  My decision today must be

13   whether or not he's a danger to the community and

14   whether or not there are conditions that will

15   reasonably assure the safety of the community.

16             The government's discussed the factors

17   that I have to consider.  And I've considered those

18   factors.  The Court finds the previous court rulings

19   that the government's referenced to be instructive and

20   helpful to those.

21             With regard to the nature and

22   circumstances of the offense charged, the Court must

23   find that the nature and circumstances of the offense

24   charged are serious and would generally warrant

25   detention in a case like this.  Mr. McAbee was front

131

1   and center.  He wasn't a person way back in the crowd

2   or somebody who showed up at the scene after all the

3   damage was done and then just went about his business

4   of whatever it was at the time.

5           But there's also contrary evidence that I

6   have to consider.  There are the statements that

7   Mr. Gant alluded to that suggests that Mr. McAbee

8   wasn't present with an intention to do harm to the

9   officers; rather, he was there to provide aid and

10  assistance to individuals he saw who were in peril.

11  And certainly the video evidence of him providing life

12  support to an individual on the ground would

13  corroborate or substantiate Mr. Gant's position.

14          Likewise, I think it's relevant that,

15  again, without condoning or approving of Mr. McAbee's

16  conduct, the government's presented no evidence of any

17  offensive -- offensive actions on the part of

18  Mr. McAbee here.  Mr. McAbee at one point has a baton,

19  he had a weapon he could use.  He chose not to use

20  that weapon.  There's no evidence that he ever did use

21  it.

22          He had the gloves that he wore, that's

23  the only sort of weapon that the government refers to

24  of him having in the midst of all of this.  But

25  there's no evidence that I saw of him using those

1    knuckles to strike anyone.  What I saw was him push a
2    police officer after the police officer pushed him.
3    Again, not to condone that conduct, but there's a
4    difference in context and degree between Mr. McAbee
5    responding to being pushed, reacting to being pushed
6    as opposed to being the instigator and initiator of
7    the pushing.
8            Similarly, there's the evidence of him
9    over another police officer.  The Court's heard
10   conflicting information about what was happening
11   there.  It's certainly a matter of interpretation, but
12   what I do know is that I never saw him strike that
13   officer or head butt that officer or do anything else
14   that would be an offensive maneuver against that
15   officer apart from being over him.
16           And, again, I'm not saying that him being
17   over him is okay.  I'm saying in context and degree
18   it's something that becomes important to consider in
19   this case, where we're talking about these fine
20   details and points.
21           There's also some suggestion about him
22   using his status as a law enforcement officer to gain
23   entry.  Again, respectfully, I believe that's a bit
24   overstated in the government's motion.  It appears
25   that Mr. McAbee used his law enforcement position to

1    try to gain entry because he was injured and he was

2    trying to get out of the fray, not as a way to get in

3    to cause violence or danger or harm to anyone inside

4    the Capitol.  And I've not been presented with any

5    evidence to the contrary of that.

6                With respect to the weight of the

7    evidence against the defendant, again, it's important

8    to know that this goes to the weight of the evidence

9    of dangerousness, not the evidence of guilt.  And I

10   think the analysis is essentially the same as that

11   element as it is for the nature and circumstances of

12   the offense charged.

13               There's also the history and

14   characteristics of the defendant.  And here, according

15   to the bond report, he has no prior record that I

16   would be aware of.  He was in law enforcement, one

17   would suggest -- one would expect that he wouldn't

18   have any prior criminal record or anything of that

19   nature.  The government's presented me with no

20   evidence of any prior dangerousness or violence from

21   his past or history.

22               He has strong ties to the community.

23   He's married, he has in-laws.  He has the number of

24   folks that I mentioned who came here today to support

25   him and stand for him.  And also provided a

1    significant number of letters that speak to his

2    character and the quality of his character.  So I

3    think the history and characteristics of this

4    defendant weigh in favor of release.

5           I will note that his conduct as a law

6    enforcement officer, even just being there and being

7    in the midst of this is, again, concerning.  But I

8    don't think it tips the scales in favor of detention

9    on this particular issue.

10          And then there's the ultimate question,

11   which is the nature and seriousness of the danger

12   posed by the defendant's release.  I think that that

13   determination has to be made in concert between the

14   consideration of the factors, as well as conditions of

15   release that the Court could impose.

16          The government says that the danger that

17   I'm trying to prevent is the danger that Mr. McAbee

18   would engage in this behavior or similar behavior in

19   the future.  They say that because he engaged in the

20   behavior on January the 6th with a belief, knowledge

21   or understanding that it would cost him his job, that

22   that's evidence that he wouldn't comply with my

23   orders.

24          To paraphrase Winston Churchill, the true

25   measure of a civilized society is how it treats those

1    accused of a crime.  And as I mentioned at the outset,

2    it would be extremely easy and certainly

3    understandable for one to want to make a decision

4    about detention based on emotion, based upon what was

5    in those videos and a belief that that deserves to be

6    punished and that he deserves to be detained for

7    those -- those actions.  But that's simply not what I

8    can do and not what the law requires me to do.

9              Notwithstanding my findings with regard

10   to the factors in this particular case, I do not

11   believe that Mr. McAbee poses a future danger to the

12   community if he were to be released between now and

13   the time that he resolves this case.

14             That's based upon the discussion I've

15   already had, and it's also based upon the fact that

16   Mr. McAbee has been effectively in the community with

17   no conditions whatsoever with the same conduct that

18   the government's pointing to now, with the same

19   alleged ideas and motivations that the government

20   points to now for almost eight months.

21             And the government, despite my request

22   that they provide me any evidence that he's presented

23   any sort of a danger to the community, have been able

24   to point to absolutely nothing beyond the events

25   around and during January the 6th.

136

1          And while those events, there will be a

2   reckoning for that and there will be a time at which

3   he is held to account for those and stands trial for

4   those, that's simply not the issue I have to decide

5   today.  And I think that given the fact that he was in

6   the community for the period of time that he's been in

7   the community, that the government's been able to

8   point to absolutely no danger that he's created or

9   caused in the community and the Court's not aware of

10  any and he's done that all with absolutely no

11  conditions on him, that there's reason to believe that

12  he would not pose a danger to the community by his

13  continued release.

14          The government points out the fact that

15  he was unknown to them for a period of time, but as I

16  addressed in the government's motion, on or about

17  May 26, 2021, the FBI was provided information about

18  Mr. McAbee of Roane County, Tennessee, describing

19  where he lived; provided information -- provided the

20  name of his spouse; advised that he worked as a

21  sheriff's deputy and provided the name of a law

22  enforcement agency that he worked for; that he'd

23  relocated to Tennessee; and that he deleted a Facebook

24  account.  May the 26th.  It's not until late August

25  before he's arrested by the government in this

137

1   particular case.

2              It's not to say the government's position

3   is inappropriate or incredible, but the fact that they

4   knew about him, were able to track down the tips, had

5   the level of specificity of who he was and how he

6   could be found and chose to let him stay out in the

7   community for almost 90 days, I have a hard time

8   believing that the government perceives him to be that

9   much of a threat either, leaving him out when they

10  knew about him during that period of time.

11             The government ultimately obtained an

12  indictment, but certainly there's nothing that

13  prevented them from getting an arrest warrant for him

14  by way of a criminal complaint.  They have done that

15  with other folks charged in these cases.  So I think

16  that that's a consideration and a factor as well that

17  suggests that Mr. McAbee's release does not pose a

18  danger to the community.

19             It's also important to note that while,

20  again, the text messages that I've been provided are

21  troubling and concerning, they really end in January

22  the 10th.  The government didn't provide me with

23  anything else despite having access to his phone that,

24  I would note, he voluntarily provided to them.  And

25  there's just simply nothing to support this idea that

1    he's continually affiliated with the Proud Boys or any

2    other antigovernment organization; that he otherwise

3    presents some danger to the community.  And even if

4    the government believes that, they certainly waited a

5    while to decide to go and arrest him.

6              I know those are decisions that the

7    government has to make and I'm not questioning you

8    those, but I think they're important factors and

9    considerations, and I'm giving them the weight that I

10   think that they deserve to be given in this case.

11             So having made that finding, the real

12   question is when I balance those things, those things

13   being my findings with respect to the factors and my

14   finding with respect to the danger I believe he poses

15   prospectively to the community, there are conditions

16   of release that will reasonably assure the safety of

17   the community.

18             Well, the government's identified the

19   danger that they believe is that I guess he's going to

20   participate in some sort of antigovernment overthrow

21   efforts and violence against police officers and law

22   enforcement.

23             There are ways that I can -- there are

24   conditions that I can impose that would safeguard

25   against those things happening.  Mainly, I can impose

1    the condition that he not participate in any of those

2    kinds of activities.  I can order that he submit to

3    electronic monitoring and home detention, and I can

4    provide limitations on his access to the Internet to

5    review similar things of that nature.

6               And the question then becomes, is -- will

7    he comply with those conditions.  The government says

8    he won't because he did what he allegedly did on

9    January the 6th knowing it would implicate his job.

10   Respectfully, I don't think that that's the measure.

11              And to counterbalance that speculation --

12   and as Mr. Gant notes, it's only speculation by the

13   government.  To counterbalance that, I've got all

14   these letters of reference.  I've got Ms. McAbee and

15   Ms. Gray, Mr. Dickson, Mr. Nelson talking about

16   Mr. McAbee in a way that when I balance the

17   government's speculation against the information that

18   Mr. Gant's presented by way of these character

19   witnesses suggests to me that Mr. McAbee would comply

20   with these conditions.

21              And I can impose the conditions when I

22   consider the threat and the context of the threat and

23   the manner in which this threat came to be, I can

24   reasonably assure the safety of the community.  And I

25   can do that free of emotion, without making a judgment

1    about whether he's guilty or not and whether he should

2    be punished or not.  All I have to decide is whether

3    he's a danger to the community and whether there are

4    conditions that will reasonably assure the safety of

5    the community.

6              For all the reasons that I've discussed,

7    I find that there are conditions of release that will

8    reasonably assure the safety of the community; and,

9    therefore, it will be the order of the Court that

10   Mr. McAbee be released subject to the following

11   conditions.

12             The defendant must not violate federal,

13   state or local law while on release.  The defendant

14   must advise the Court or pretrial services in writing

15   before making any change of residence or telephone

16   number.  The defendant must appear in court as

17   required and, if convicted, must surrender as directed

18   to serve a sentence that the Court may impose.

19             Additionally, the defendant will be

20   placed in the custody of Sarah McAbee at their home

21   address.  Ms. McAbee agrees to supervise the

22   defendant, to use every effort to assure his

23   appearance at court proceedings, to notify the Court

24   immediately if he violates the condition of release or

25   is no longer in her custody.  He'll also be required

1    to submit to supervision by and report for supervision

2    to pretrial services as directed.  He is to -- and

3    weekly contacts will be required.  At a minimum he's

4    to continue or actively seek employment.  He is to

5    surrender any passport that he may have to the

6    United States District Court clerk.  He's not to

7    obtain a passport or other international travel

8    documents.

9           He's to abide by the following

10   restrictions on personal association, residence or

11   travel.  It will be within the Middle District of

12   Tennessee and Eastern District of Tennessee unless

13   preapproved by pretrial services.  The defendant may

14   not travel outside of the continental United States

15   without Court approval.

16          The defendant must participate in all

17   future proceedings as directed and the defendant may

18   not go to Washington, DC unless he is appearing for

19   court, meeting with pretrial services or consulting

20   with his attorney.  He is to avoid all contact

21   directly or indirectly with any person who is or may

22   be a victim or witness in the investigation or

23   prosecution, including any codefendant.

24          He's not to possess a firearm or other

25   dangerous device or other weapon.  He's not to use

1    alcohol excessively.  He may not use or unlawfully

2    possess a narcotic drug or other controlled substance

3    defined by law unless prescribed by a licensed medical

4    practitioner.  He's to submit to testing for

5    prohibited substance if required by pretrial services

6    or the supervising officer, and that testing may be

7    used with random frequency, may include urine testing,

8    the wearing of a sweat patch, remote alcohol testing

9    system and/or any form of prohibited substance

10   screening or testing.  And he must not obstruct,

11   attempt to obstruct or tamper with the efficiency and

12   accuracy of prohibited substance screening or testing.

13            And he's to participate in a program of

14   inpatient or outpatient substance abuse therapy and

15   counseling if directed by pretrial services.  He's to

16   participate in the following location restriction

17   program, home detention, meaning he'd be restricted to

18   his residence at all times except for employment,

19   education, religious services, medical, substance

20   abuse or mental health treatment, attorney visits,

21   court appearances, Court-ordered obligations or other

22   activities approved in advance by the pretrial

23   services office or supervising officer.  He's to

24   submit to location monitoring as directed by pretrial

25   services and comply with all the program requirements.

143

1    He must pay all or part of the cost of the program

2    based on his ability to pay as determined by pretrial

3    services office or supervising officer.

4              He's to report as soon as possible,

5    within 48 hours, to the pretrial services officer

6    every contact with law enforcement personnel,

7    including arrests, questioning or traffic stops.  He's

8    to permit pretrial services to visit him at home or

9    elsewhere at any time and allow the officer to

10   confiscate any contraband in plain view.  He's also to

11   refrain from using any social media or other websites

12   related to insurrection activity.

13             Also need to advise Mr. McAbee of the

14   following penalties and sanctions:  Violating any of

15   the foregoing conditions of release may result in the

16   immediate issuance of a warrant for your arrest, a

17   revocation of your release, an order of detention and

18   a prosecution for contempt of court and could result

19   in imprisonment, a fine or both.

20             While on release if you commit a federal

21   felony offense, the punishment's an additional prison

22   term of not more than 10 years.  And for a federal

23   misdemeanor offense, the additional prison term of not

24   more than one year.  This sentence will be

25   consecutive, meaning in addition, to any other

1     sentence you receive.  It's a crime punishable by up

2     to ten years in prison, $250,000 fine or both to

3     obstruct a criminal investigation, tamper with a

4     witness, victim or informant, retaliate or attempt to

5     retaliate against a witness, victim or informant, or

6     intimidate or attempt to intimidate a witness, victim,

7     juror, informant or officer of the Court.

8                    The penalties for tampering, retaliation

9     or intimidation are significantly more serious if they

10    involve a killing or attempted killing.

11                    If after release you knowingly fail to

12    appear as the conditions of release require or

13    surrender to serve a sentence, you may be prosecuted

14    for failure to appear or surrender, and additional

15    punishment may be imposed.

16                    If you're convicted of an offense

17    punishable by a term of imprisonment of 15 years or

18    more, you'd be fined not more than $250,000,

19    imprisoned not more than ten years or both.  For a

20    misdemeanor you'd be fined not more than $100,000,

21    imprisoned for not more than one year or both.  And

22    any term of imprisonment imposed for failure to appear

23    or surrender will be consecutive to any other sentence

24    that you receive.

25                    Ms. McAbee, are you still there?

145

1          THE DEFENDANT:  Mr. or Ms. McAbee, sir?

2          THE COURT:  Ms. McAbee.  Sarah McAbee.

3          MS. McABEE:  Yes, I am.

4          THE COURT:  Ms. McAbee, I need to ask you

5    a couple of questions.  First, did you hear the

6    conditions of release that I just reviewed?

7          MS. McABEE:  Yes, sir.

8          THE COURT:  Do you agree to supervise

9    Mr. McAbee?

10          MS. McABEE:  Yes, sir.

11          THE COURT:  To use every effort to assure

12    his appearance at all court proceedings?

13          MS. McABEE:  Yes, sir.

14          THE COURT:  And to notify the Court

15    immediately if he violates a condition of release or

16    is no longer in your custody?

17          MS. McABEE:  Yes, sir.

18          THE COURT:  All right.  Very well.  Thank

19    you.

20          Mr. Gant, if you'd have Ms. McAbee

21    execute the document at your convenience, please.

22          Mr. McAbee, I need to ask you some

23    questions as well.  Do you acknowledge you're the

24    defendant in this case and that you're aware of the

25    conditions I just reviewed with you?

146

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  You promise to obey all

3    conditions of release, to appear as directed and

4    surrender to serve any sentence that might be imposed?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  And that you're aware of the

7    penalties and sanctions set forth in the document that

8    I just reviewed?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Okay.  This will be the order

11   of the Court.  Mr. McAbee will be released subject to

12   these conditions following any processing that may be

13   required by the marshals in this matter.

14             Mr. Kurtzman, do you have a motion?

15             MR. KURTZMAN:  Yes, Your Honor.  The

16   government would move the Court to stay the entry of

17   the order you just outlined to allow the United States

18   to appeal.

19             THE COURT:  How long do you want me to

20   stay it?

21             MR. KURTZMAN:  Your Honor, we're prepared

22   to file the appeal paperwork today, and then I expect

23   the District Court in DC will pick it up shortly

24   thereafter.  So I'll file the appeal today.  I can't

25   necessarily promise when the DC court will pick it up.

1    I will note that the statute says that must be dealt

2    with promptly, so I would imagine within the next 48

3    hours, if not sooner, once our paperwork is filed on

4    the appeal that the District Court in DC will outline

5    a schedule for hearing that appeal.

6                    THE COURT:  I'll stay it until 5 o'clock

7    Friday.

8                    MR. KURTZMAN:  Thank you, Your Honor.

9                    THE COURT:  Mr. Gant, anything further

10   for Mr. McAbee?

11                   MR. GANT:  No, Your Honor.  Thank you

12   much for your patience.

13                   THE COURT:  Thank you, everyone.

14   Mr. McAbee, Mr. Gant will explain to you what's

15   happened.  I've entered my order.  But I've agreed to

16   stay my order pending the appeal to the District

17   Court, which the government has indicated they'll be

18   filing today.  And I think that does it.

19                   Mr. Kurtzman, anything further from the

20   government's standpoint we need to do today?

21                   MR. KURTZMAN:  No, sir.

22                   THE COURT:  Mr. Gant, anything else for

23   your client?

24                   MR. GANT:  No, Your Honor.  Thank you.

25                   THE COURT:  Very good.  Thank you all.

1    We'll be in recess.

2              ***END OF ELECTRONIC RECORDING***

1                 **REPORTER'S CERTIFICATE**

2

3          I, Roxann Harkins, Official Court Reporter

4 for the United States District Court for the Middle

5 District of Tennessee, in Nashville, do hereby

6 certify:

7               That I transcribed from **electronic**

8 **recording** the proceedings held via video conference on

9 August 26, 2021 and September 8, 2021, in the matter

10 of UNITED STATES OF AMERICA v. RONALD MCABEE, Case No.

11 3:21-mj-2956;

12              that said proceedings in connection with the

13 hearing were reduced to typewritten form by me; and

14 that the foregoing transcript is a true and accurate

15 transcript of said proceedings.

16

17             This is the 20th day of September, 2021.

18

19                    s/ Roxann Harkins_____

20                    ROXANN HARKINS, RPR, CRR
                     Official Court Reporter

21

22

23

24

25