# UNITED STATES DISTRICT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | Case No. 21-cr-00035-EGS |
| | **)** | |
| **RONALD COLTON McABEE,** | **)** | |
| | **)** | |
| Defendant. | **)** | |

## MOTION FOR RECONSIDERATION OF DETENTION ORDER

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

Attorney for Defendant

Defendant Ronald Colton McAbee, by and through his counsel of record, respectfully moves this Honorable Court to reconsider the Detention Order entered by this Honorable Court on October 13, 2021, followed by a written opinion dated December 21, 2021, setting forth the Court's findings and conclusions.

## INTRODUCTION

The Court's rationale for detaining Mr. McAbee pending trial is summarized by the Court near the end of its written Memorandum dated December 31, 2021, as follows:

> "[The] nature and circumstances of Mr. McAbee's offenses evince a clear disregard for the safety of others.  The government has shown that Mr. McAbee deliberately joined an ongoing attack on MPD officers…. He used physical force to pull an officer into the larger mob of angry and violent rioters. When another officer tried to stop Mr. McAbee from doing so by hitting and pushing him with a baton, Mr. McAbee stepped up to fight the officer, swinging his arms while wearing metal-studded gloves on his hands…. The government's evidence shows that Mr. McAbee took intentional and "offensive action" on January 6, 2021, that was violent and aggressive. Altogether, the evidence "suggests that [Mr. McAbee] was not a passive observer, but an active aggressor."

ECF Doc. No. 166, p.37.

All of the concerns expressed by the Court with respect to Mr. McAbee's potential for future dangerousness are traceable to three discrete events – as described by the Government from video shown to the Court.  1)  Mr. McAbee's first physical interaction with of Officer A.W.; 2) Mr. McAbee's interaction with Officer C.M; 3) Mr. McAbee's second interaction with Officer A.W.

On April 26, 2021, this Honorable Court entered the following decision on the docket of this case with respect to co-Defendant Lopatic's appeal of a detention order entered against him by an out-of-district Magistrate Judge:

> … The government relies heavily on Mr. Lopatic's violent and obstructive conduct on January 6 <u>and speculates</u> that because of the poor judgment he exhibited in those acts, he will be unable to comply with the conditions of supervision that are meant to ensure his appearance as required and the safety of the community. To be sure, the nature and circumstances of Mr. Lopatic's offenses are extremely troubling…. That his actions were apparently prompted by his willingness to believe, and act upon, falsehoods that have been spread, and continue to spread, about the legitimacy of the 2020 Presidential Election results is also unsettling. These factors weigh on the Court when considering whether Mr. Lopatic presents a danger to his community. However, the Court notes that Mr. Lopatic does not appear to have engaged in significant prior planning or coordination with other rioters; he did not take on a leadership role during the riots; he did not use or carry any weapons; and he has expressed remorse for his actions. In addition, the government has only speculated that Mr. Lopatic will be unable to comply with his conditions of release based on his actions on January 6, 2021, but the Court notes that Mr. Lopatic has no substantial criminal history, has strong community ties, is nearly 60 years old, has been married for 34 years, has lived in his current residence for 30 years, and suffers from a number of physical and mental health issues. Finally, Mr. Lopatic served in the U.S. Marine Corps and received an Honorable Discharge. Thus, the Court is persuaded that he is capable of following directions and complying with his conditions of release.

Nearly everything this Court wrote in that EO granting Mr. Lopatic's release applies to Mr. McAbee.  Yet this Court has detained Mr. McAbee after a Magistrate in the Middle District of Tennessee had ordered him released.

Mr. McAbee's current counsel has worked with his family and friends in conducting an investigation to develop the new evidence that supports the sequence of events that is described above.  This new information, including new videos made

available by the government which will be filed in support of this motion, combined with new proposed conditions of pretrial release, establishes a basis for this Court to reconsider the detention order previously entered.

## RELEVANT PROCEDURAL BACKGROUND

The Court set forth the procedure details of this case in its written ruling dated December 21, 2021.   Mr. McAbee will not recount the procedural aspect of this case here.

## LEGAL STANDARD

A. The Bail Reform Act and *Chrestman* Factors

Mr. McAbee acknowledges that the standard for reconsideration of a detention order already imposed is different than that made in the first instance. To gain reconsideration a defendant must provide new information.  Section 3142(f)(2) provides that a hearing "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." United States v. Worrell, No. 1:21-CR-00292-RCL, 2021 WL 2366934 (D.D.C. June 9, 2021), appeal dismissed, No. 21-3040, 2021 WL 4765445 (D.C. Cir. Sept. 15, 2021).

The new information proffered by Mr. McAbee are additional video evidence beyond that provided previously by the government. Some videos have been provided to the defense in discovery that was received from the Government only

4

after the detention hearing in September 2021.  Other videos have been located

through the investigation conducted by the defense. A comprehensive analysis of

each video, including a second-by-second breakdown of the relevant portions will be

included in the supplement.

On the barest of factual records, embracing numerous opportunities to

misconstrue, mischaracterize, and demonize every action of Mr. McAbee on January

6th, the government appealed a release order entered by a Magistrate Judge in the

Middle District of Tennessee.[1]  The Government employed these tactics to the end of

detaining, and thereby silencing, a former law enforcement officer who likely stands

as one of the most credible witnesses to a sequence of events involving <u>mutual</u>

combatant conduct between police and protesters at the opening of the tunnel

leading to the Lower West Terrace entrance to the Capitol.

The legislative history of the Bail Reform Act states:

> "[T]here is a small but identifiable group of <u>particularly dangerous</u>
> defendants as to whom neither the imposition of stringent release conditions
> nor the prospect of release can <u>reasonably</u> assure the safety of the community
> or other persons. It is with respect to this <u>limited group of offenders</u> that the
> courts must be given the power to deny release pending trial."

S. Rep. No. 225, 98th Cong., 1st Sess. 6-7 (1983), reprinted in 1984 U.S. Code

Cong. & Ad. News 1, 9 (Supp. 9A). (Emphasis added.)

Detention is not appropriate for all "dangerous" defendants.  If a defendant is

not "dangerous" the issue of detention is moot.  The existence of some characteristic

---

[1] As noted by this Court in its December 21, 2021 Memorandum, the government
did not seek Mr. McAbee's detention on the basis that he was a "flight risk."

of "dangerousness" is present in every instance where the issue of detention pending trial is raised, but it is only *particularly dangerous defendants*" who should be detained, and only if no condition or combination of conductions can mitigate the identified and articulated risk.

Further, "dangerousness" must be established by "clear and convincing" evidence, i.e., evidence that "provides 'a high degree of certainty' as to danger." United States v. Chimurenga, 760 F.2d 400, 405 (2nd Cir. 1985) (Emphasis added.) Since the Government did not seek detention based on risk of flight, the only standard at issue for Mr. McAbee should have been "clear and convincing" evidence. The Court's Memorandum Opinion fails to clearly address this issue.

Even "dangerous defendants" are entitled to be released when conditions to be imposed can "reasonably assure" the safety the community.  United States v. Alston, 420 F.2d 175, 178 (D.C. Cir. 1969)( "The law requires reasonable assurance but does not demand absolute certainty, which would be only a disguised way of compelling commitment in advance of judgment.")

The standard assumes that some degree of risk of dangerousness will always remain, yet the defendant should be released on appropriate conditions that are intended to minimize – not eliminate -- that danger.  Thus, "danger to the community" need not required be eliminated by the condition or combination of conditions imposed by the Court in order for release to be appropriate under the law.

The Circuit Court cautioned in <u>United States v. Munchel</u>, 991 F.3d 1273,

1279-80 (D.C.Cir. 2021):

> A defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."

This motion asks this Court to find on a now more robust record, combined

with newly proposed conditions of pretrial release that "reasonably assure" the

safety of the community, that Mr. McAbee should be released on those proposed

terms and conditions.

Presiding Judge Howell previously outlined in <u>United States v. Chrestman</u>

six specific factors to be evaluated in determining whether individual defendants

fall within the "particularly dangerous" category potentially meriting detention

with respect to the allegations of their specific involvement in the events of January

6.  Those factors are:

1. Whether the charged offenses are felonies or misdemeanors;

2. The extent of the defendant's prior planning;

3. Whether the defendant used or carried a dangerous weapon;

4. Evidence of coordination with other protesters before, during, or after the riot;

5. Whether the defendant assumed either a formal or de facto leadership role in the assault, for example, by urging rioters to advance or confronting law enforcement;

6. The defendant's "words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or

whether the defendant "injured, attempted to injure, or threatened to injure others."

Based on the factual record made by the government – a proffer and limited video evidence supplied by the government -- this Court found that four of the <u>Chrestman</u> factors weighed in favor of detention, and two weighed in favor of release.  The factors weighing in favor of detention were:

1.  Mr. McAbee is charged with serious felony offenses that are "crimes of violence";

2.  There is evidence of "prior planning" with regard to the acquisition of "weapons" and the anticipation of violence as reflected in text messages submitted by the government.

3.  Mr. McAbee did carry dangerous weapons at various points in time – the reinformed gloves and a police baton he picked up off the ground;

4.  Through his words and movements Mr. McAbee did injure, attempted to injure, and threatened to injure federal law enforcement officials who were protecting the Capitol from the protesters.

**B)  <u>Record Evidence Regarding the Chrestman Factors</u>.**

    1.   <u>Felony Offenses Charged</u>.

        a)   Count 14: Civil Disorder.

Count 14 charges with Mr. McAbee with "Civil Disorder" in violation of 18 U.S.C. § 341.  Although this is a felony, it is not a "crime of violence" as referenced in the Section 3142, and is not relevant on the issue of whether Mr. McAbee would pose a "danger to the community" if released on conditions of pretrial release pending trial.

   b) <u>Counts 9 and 12 -- Assault on Police Officers</u>.

Mr. McAbee is charged with two counts of violating 18 U.S.C. § 111(a)(1) and (b).  Those counts allege "crimes of violence" and could be a basis for distinguishing Mr. McAbee from others charged with criminal offenses on January 6 according to *Chrestman* depending on the facts.

   Also noteworthy about the Third Superseding Indictment is that Mr. McAbee is NOT charged with intending or conspiring to obstruct Congress in violation of 18 U.S.C. § 1512(c).  Both the Government and the Court make repeated references to alleged political motivations behind his actions on January 6.  But the matter of his political beliefs are not relevant based on the crimes with which he has been charged and are not in evidence before this Court.

   2. <u>Prior Planning</u>.

   Often overlooked in the analysis of the "prior planning" factor in <u>Chrestman</u> is that Presiding Judge Howell linked acts of planning – even if only by inference -- to a motive or intent to interfere with the Congressional action scheduled for January 6.  Presiding Judge Howell referenced such a link in her explanation as of the "prior planning" factor as follows:

> First, any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, <u>suggests that he</u> was not just caught up in the frenzy of the crowd, but instead <u>came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process,</u> mandated under the U.S. Constitution, of counting and certifying Electoral College votes. See U.S. Const. art. II, § 1, cl. 3.

<u>United States v. Chrestman</u>, 535 F.Supp.3d. 14, 26 (D.D.C. 2021).

As noted above, Mr. McAbee is not charged with having come to Washington DC to disrupt the political process.  There is no allegation in the Third Superseding Indictment that he conspired with Associate 1 or his co-defendants to commit such an offense.  The Third Superseding Indictment includes a substantive charge of violating Section 1512(c)(2) as Count One, but Mr. McAbee is not named in that count.

There is no evidence in this case that Mr. McAbee had any intention to do so. He traveled to Washington DC with Associate 1 to attend the "Stop The Steal" political rally, which itself was an exercise in free speech protected by the First Amendment.

This Court's Order focuses on what it claims was evidence of inculpatory "prior planning" by Mr. McAbee having ordered motorcycle riding gloves with reinformed knuckles, as well as discussions between Mr. McAbee and Associate 1 in the days leading up to their departure about other items they MIGHT take with them on their trip – none of which Mr. McAbee actually brought with him to Washington D.C.  This also distinguishes Mr. McAbee from Defendant Chrestman.

Judge Howell's opinion states that the acquisition of such items might SUGGEST an intention to "cause mayhem and disrupt the democratic process."  In the absence of any contrary evidence for the acquisition of such items, that would certainly be one reasonable conclusion that could be drawn.

But drawing that conclusion on the record evidence in this case was clearly erroneous because the uncontested evidence before the Court was that Mr. McAbee

never mentioned law enforcement or the Congress in any manner that would suggest an intention on the part of either to "cause mayhem or disrupt the democratic process" when they were discussing what items to bring, and Mr. McAbee decided to acquire the motorcycle gloves from an online retailer.

The communication between Mr. McAbee and Associate 1 about the motorcycle gloves and other items involved several exchanges and comments about how they might deal with counter-protester attacks.  Associate 1 had been to a rally in Washington DC before January 6 where counter-protesters were present, and violence did break out.

Mr. McAbee and Associate 1 discussed and agreed that members of the families – their wives and Associate 1's son – would travel with them to attend the January 6 protest because of their fear that similar violence might take place.

There is no evidence – not a single line of communication between Mr. McAbee and Associate 1 – that references or contemplates the possibility of violent engagement with law enforcement or an intention to interfere with the planned Congressional set to take place on January 6.

This is in contrast to the defendant in Chrestman, a member of the Proud Boys national organization that has engaged in violence at protests in various parts of the county.  The evidence before Judge Howell was that Chrestman responded to a call for Proud Boys members to come to Washington DC, and he came with weapons and tactical gear to cause violence and interfere with the election confirmation process.

In the weeks leading up to January 6, 2021, the Proud Boys' public communications encouraged members to travel to Washington, D.C. to attend the demonstration against the certification of the Electoral College vote.

Chrestman, 535 F.Supp.3d. at 19.

Mr. McAbee was not a member of any national organization, and he came to Washington D.C. with only one other person to attend a political protest rally.  His decision was not in response to any invitation from a national organization announced for the purpose of interfering with Congress.

Judge Howell's analysis linked the issue of "prior planning" with an anticipation of the possible need for violence against law enforcement or the Congress.

Likewise, a defendant's carrying or use during the riot of a dangerous weapon, whether a firearm, a large pipe, a wooden club, an axe handle, or other offensive-use implement, underlines at least some degree of preparation for the attack and an expectation that the need to engage in *violence against law enforcement or, indeed, the Legislative branch, might arise*. These motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole.

Id. at 26.  (Emphasis Added).

There was no evidence offered against Mr. McAbee from which any reasonable inference could be drawn that "anticipation of an attack on Congress" was any part of his motive(s) for attending, or his planning to be prepared for violence if it should happen to break out.

No reasonable inferences could be drawn from those communication with regard to "prior planning" anticipating violence against law enforcement or

Congress.  There was a factual basis for such inferences in Chrestman, but there is no such factual basis to support such inferences here. That is a key factual distinction between Mr. McAbee and Mr. Chrestman based on Judge Howell's own analysis.

        3.    <u>Carry or Use of a Dangerous Weapon</u>

The Government acknowledged and this Court agreed that the video evidence offered during the detention hearing did not show Mr. McAbee employing either the reinforced gloves or the police baton as weapons against the law enforcement officers.  But the Court wrote it was "troubled" that Mr. McAbee had armed himself at all.

This conclusion stops short of recognizing the most significant FACT involving the "dangerous weapons" being used as justification for his detention – the fact that he had multiple opportunities to employ both the gloves and the baton against the law enforcement officers had it been in his mind to do so, but never did. What better evidence could there be of a lack of such intent?

With regard to the baton, he has extensive training in how to make use of it in both an offensive and defensive manner.  He has law enforcement officers in vulnerable positions – positions where they would be hard-pressed to defend themselves from such an attack by him.

He has an angry mob at his back in numbers which greatly out numbered the Officers present.

Nevertheless, this Court reached the counterfactual conclusion that Mr. McAbee deliberately joined in an ongoing attack on law enforcement officers, and his actions were that of an aggressor.

This conclusion is counterfactual and clearly erroneous because this Court recognized that Mr. McAbee discarded the baton BEFORE supposedly joining in that attack, and never made use of the other weapon while having an abundance of opportunities to do so.

Mr. McAbee possessed the police baton for less than 4 seconds – picking it up from the ground and then tossing it down again BEFORE "joining in an ongoing attack." This incontrovertible fact is wholly inconsistent with the Government's claim -- adopted by the Court -- that Mr. McAbee entered the area in front of the tunnel to the Lower Terrace Entrance for the purpose of joining in an assault on the law enforcement officers there.

According to the Government, he disarmed himself and THEN ran into the fight where weapons were being used by law enforcement.

As for the reinformed gloves, the undisputed FACT is that Mr. McAbee did not one time use the gloves to strike or injure Officer A.W.  He stood over Officer A.W. after moving to the front of the tunnel, with Officer A.W. completely defenseless at his feet.

It is also true that Mr. McAbee never struck any blow against A.W. in their second instances of contact – when Mr. McAbee fell on top of Officer A.W. and they slid down the stairs together.  The Government acknowledged – and the Court

agreed – that Mr. McAbee did not assault Officer A.W. while on top of him for a period of 20+ seconds.

Again, had it been Mr. McAbee's intention to attack law enforcement officers in the front of the tunnel there are few, if any, that revealed such an intention on his part. That he tossed away the baton and never struck any Officer with the reinforced gloves make clearly erroneous the finding that the "use or carried weapon(s)" factor under Chrestman supported detention.

6)   Words and Movement – Injuring/Attempting to Injure Officers.

This Court made certain factual findings based on its review of the video submitted by the Government as part of its proffer.

Notwithstanding those factual findings, the following facts are also incontrovertibly true with regard to Mr. McAbee, as make the decision to detain him pending trial nevertheless clearly erroneous.

1.   Mr. McAbee was a ten-year veteran of law enforcement in Georgia and Tennessee. He was on medical leave on January 6th due to a shoulder injury suffered in an automobile accident on December 27, 2021.

2.   Mr. McAbee had not been cited a single time by any agency for unlawful use of force during his ten-year career in law enforcement.

3.   Mr. McAbee had never before attended a political rally or protest. Associate 1, who drove them to Washington D, to attend the January 6th "Stop The Steal" rally had attended earlier protests and had described to Mr. McAbee episodes of violence involving counter-protesters at those earlier events. That is the context for the various "chat" messages exchanged with Associate 1 submitted by the government and discussed in more detail herein.

4.      Mr. McAbee only "coordinated" and/or "planned" the details of his trip with Associate 1 from their respective homes – agreeing to meet at a location in the middle before going on to DC together.

5.      Mr. McAbee did not attend the protest on January 6th as part any group or organization of individuals with stated political agendas.

6.      Mr. McAbee's co-defendants are all strangers to him – he did not conspire or act in concert with any of them.

7.      Mr. McAbee did not carry any "weapons," notwithstanding the fact that the government has characterized motorcycle gloves available on Amazon as a "weapon" due to them having reinforced protection for knuckles and fingers that prevents injuries to riders from debris or objects kicked up while riding.

8.      There is no evidence – <u>it did not happen</u> – of Mr. McAbee making use of the gloves as "weapons" on January 6th even though he was in the immediate proximity of more than one law enforcement officers and could have done so of that had been his intention or desire.

9.      Mr. McAbee picked up a law enforcement baton from the ground at his feet.  After holding the baton for <u>four seconds</u>, Mr. McAbee tossed the baton to the ground out of the way BEFORE moving into the front of the tunnel. No evidence suggests or supports any inference that he considered using that baton as a weapon against anyone.

10.     Mr. McAbee did not jump or dive on top of Officer AW.  Videos show that as Mr. McAbee was standing over Officer AW, straddling Officer AW's torso  when other protesters behind Mr. McAbee grabbed Officer AW's legs and pulled him down the stairs. Mr. McAbee's feet were pulled out from under him by the movement of Officer AW's body, causing Mr. McAbee to lose his balance and fall face-first on top of Officer AW. They both slid down the stairs together. This was not a volitional action by Mr. McAbee.

11.     Mr. McAbee spoke to Officer AW while laying on top of him, telling Officer AW he – McAbee -- was going to remain in that position until Officer AW was ready to stand, and they would stand up together.  There is no evidence – <u>it did not happen as admitted by the Government</u> -- that Mr. McAbee assaulted Officer AW while Officer AW was in that vulnerable position.

16

12.     In the seconds just before Mr. McAbee was swept off his feet, he was standing over Officer AW. While Mr. McAbee's attention was to his left, Officer CM emerged from the tunnel and struck Mr. McAbee with a baton under Mr. McAbee's outstretched and injured right arm and across his ribs. Mr. McAbee <u>reacted</u> to the blow from Officer CM by pushing him away with both hands extended and palms facing forward.  Close scrutiny of the video shows Mr. McAbee never moved his feet – he never advanced on Officer CM as he retreated into the tunnel.

13.     Through the course of these events, Mr. McAbee aggravated the shoulder injury he had suffered days earlier in an automobile accident, and he was no longer able to lift his right arm.

15.     Mr. McAbee attempted to make his way to the front line of law enforcement officers he had assisted earlier in trying to separate protesters from the officers trying to assist Officer AW.

16.     As he did so another officer recognized him from their encounter minutes earlier.  <u>Officer SS thanked Mr. McAbee</u>, having recognized that McAbee was trying to assistance them by helping Off. AW. That exchange is captured on the audio of the video submitted with this motion.

The Court's factual findings are largely written in the form of conclusions, and they track – often citing directly – the proffer made by the Government.  The Court's factual findings do not exclude that most of the information set forth in 1 through 16 above is true – the findings simply ignore 1 through 16 above.

"Clear and convincing" is a standard that, as noted above, is supposed to provide "<u>a high degree of certainty</u>" as to dangerousness.  <u>United States v. Chimurenga</u>, 760 F.2d 400, 405 (2nd Cir. 1985)(Emphasis added.)

When the Court's factual findings are joined with the uncontroverted facts included in 1 through 16, the Court's determination that the government has met this high burden is clearly erroneous.

C.      Remaining Considerations Under the Bail Reform Act.

1.      Weight of the Evidence

The Court's Order reaches the following conclusion on this Bail Reform Act

factor:

> But for purposes of the Court's decision on detention, the government's
> evidence in support of the charged offenses is strong. In consideration of the
> strength of the government's evidence against Mr. McAbee, the Court finds
> that the second 18 U.S.C. § 3142(g) factor weighs in favor of his continued
> pretrial detention, although it "is the least important" factor.

This is a clearly erroneous application of the "weight of the evidence" factor.

The rationale that the Court employs to reach this conclusion is tantamount to a

pre-trial determination of Mr. McAbee's guilt.  That is expressly prohibited under

the Bail Reform Act, and has been recognized as such in this Circuit. United States

v. Alston, 420 F.2d 176, 179-80 (D.C. Cir. 1969).

This is not a matter of the video evidence proving presence or intent when

those elements are denied.  This case involves real disputes over what events are

depicted in the video.  The Court acknowledges that Mr. McAbee has presented an

alternative interpretation of all the events on the videos, and all the video is open to

more than just one interpretation.  Mr. McAbee not only has the right to offer this

alternative interpretation, he intends to testify and narrate the videos second-by-

second as the events happened.  His narration will be exactly as outlined above.

The Bail Reform Act's purpose in including this factor among the

considerations is not to predict the more likely outcome of the trial.  The reason for

its inclusion is evaluate the risk that defendant might be motivated to fail to appear for trial.[2]  This Court should take into consideration…

> "… the nature and circumstances of the offense charged [and] the weight of the evidence against the accused," but the statute neither requires <u>nor permits</u> a pretrial determination that the defendant is guilty…. If one bears in mind that <u>one is examining only the evidence against the accused, for purposes of considering prospect of flight,</u> one is more likely to guard against the impermissible course of reaching some kind of partial determination of guilt and of beginning what is in substance a mandate of punishment."

<u>United States v. Alston</u>, 420 F.2d 176, 179-80 (D.C. Cir. 1969) (Emphasis added.)

In addition, the existence of a potentially meritorious defense – as opposed to hoping on a failure of proof by the Government – weighs in favor of the defendant for purposes of the Bail Reform Act.

> "Limiting my consideration of the weight of the evidence to the likelihood that Defendant will appear in court and not endanger the community, I conclude that this factor weighs in favor of Defendant. Based on the limited record currently before me, <u>it appears that Defendant has a potentially viable defense, and that the likelihood of conviction is not so great that it presents an insurmountable obstacle to pretrial release</u>."  (Emphasis added).

<u>United States v. Bellomo</u>, 944 F.Supp. 1160, 1163 (S.D.N.Y.1996):

What makes the Government's case weak is the fact that the videos actually exonerate Mr. McAbee of the very allegations made against him, and Mr. McAbee is motivated to appear for trial, take the stand and narrate those videos for jury.

---

[2] It is worth repeating here that the Government did not seek detention based on risk of flight, so the relevance of the "weight of the evidence" factor is even further reduced – if not eliminated – for purposes of detention in this case.

The Court and the Government acknowledge that the videos do not show Mr. McAbee striking any offensive blow against any officer. He does not punch or strike Officer CM – both the Government and this Court describe Mr. McAbee's actions as "swinging his arm" at Officer CM without making contact.

The second supposed assault on Officer AW is alleged to have happened when Mr. McAbee "pinned" Officer AW to the ground.  The video evidence shows this was not a volitional act – Mr. McAbee's own feet were swept out from beneath him while he was standing over Off. AW, causing Mr. McAbee to fall on top of him.  Both the Government and this Court acknowledge that Officer AW's body worn camera video shows no assault by Mr. McAbee against Officer AW while he was laying on top of him.   The audio also captures Mr. McAbee yelling for other protesters  to not assault or injure Off. AW.

> 2.   <u>History and Characteristics of the Defendant</u>

This Court's prior decision faults Mr. McAbee for his actions on January 6 because he was a sworn law enforcement officer in the State of Tennessee.  The Court stated that Mr. McAbee's actions in that regard:

> "show that he is willing to allow his own personal beliefs to override the rule of law, which reflects poorly on his character."

> "Worse, he was willing to allow those beliefs to override his sworn duty to uphold the rule of law as a law enforcement officer and even fight against officers with whom one would expect he held a mutual respect or kinship."

> This conclusion is counterfactual.

Mr. McAbee discarded an offensive weapon he was actually trained to use – the police baton he picked up off the ground – <u>before</u> he entered the front of the tunnel.

He did not strike a single blow on Officer A.W. with the reinforced gloves he was wearing even though Officer A.W. was helpless at his feet for several seconds, and then lying underneath him for a period of more than 20 seconds after the slid down the stairs together.

The evidence – the audio from Officer A.W.'s body worn camera video – proves the exact kinship that the Court spoke to as it captured Mr. McAbee telling Officer A.W. in that moment that he was trying to help him -- "When you're ready to stand up, we'll stand up together."

The audio also captures Mr. McAbee yelling "No!" when others in the crowd were attempting to assault Officer A.W. while he was in that vulnerable position.

The Government concedes and the Court acknowledged that no assault against Officer A.W. was committed by Mr. McAbee while Officer A.W. was in that supine position.

The SINGLE volitional act taken by Mr. McAbee was his pushing Off. CM away after Off. CM "cross-checked" him against the ribs with his baton when Mr. McAbee attention was focused in a different direction.  But even then, the video shows that Mr. McAbee did not pursue Off. CM as he retreated – Mr. McAbee never moved his feet.

3.    <u>Nature and Seriousness of Risk Posed By Release</u>

The Court's analysis of this factor is clearly erroneous because it places Mr. McAbee in a "Catch 22" where there is always an available inference to draw against him regardless of how the evidence is considered.

Mr. McAbee has no criminal record.  He was a sworn law enforcement officer. Rather than accept that, the Court instead turns that virtue around, using that status as a law enforcement officer against him in finding that made him more of a risk:

> Mr. McAbee's employment as a law enforcement officer worries the Court when considering whether he would abide by conditions of release to assure the safety of the community in view of his willingness to abdicate his responsibility to uphold the law in the past.

If Mr. McAbee had past criminal activity and was accused of a crime, that would signal a willingness to break the law and he'd be a danger to the community.

Because Mr. McAbee was a police officer charged with upholding the law and is accused of a crime, that signals a willingness to "abdicate his responsibility" and break the law.

To get to that conclusion the Court first must come to the conclusion that he has committed the crimes for which he has been accused.

Drawing the alternative conclusion – that Mr. McAbee acted in an effort to aid other officers to the extent he was able at the moment and under the circumstances – there would be no concerns about Mr. McAbee's willingness to uphold his responsibilities.

Thus, the only way the Court reached the concerns it expressed was to form a conclusion that Mr. McAbee acted illegally on January 6. It improperly evaluated the proffered evidence put forth by the Government and come to the conclusion urged upon it by the Government in its motion as if they were established facts proven beyond a reasonable doubt. In doing so the Court resolved all ambiguities and inferences from the evidence against Mr. McAbee.

> As the government notes, "[t]he defendant's occupation invested him with the responsibility to uphold and enforce the law. It also required an understanding of what constitutes a violation of that law. Yet, neither prevented the defendant from engaging in the assaultive, criminal conduct" addressed here."

That is a pronouncement of Mr. McAbee's factual guilt by this Court.

> "Mr. McAbee's decisions on January 6, 2021, "show that he is willing to allow his own personal beliefs to override the rule of law, which reflects poorly on his character."

> "Worse, he was willing to allow those beliefs to override his sworn duty to uphold the rule of law as a law enforcement officer and even fight against officers with whom one would expect he held a mutual respect or kinship."

That is another pronouncement of Mr. McAbee's factual guilt by this Court.

The Court adopted this clearly erroneous conclusion in the face of uncontroverted video evidence showing that:

1) Mr. McAbee dropped a police baton BEFORE moving to the middle of the tunnel entrance where Off. AW was on the ground;

2) Mr. McAbee never struck Officer AW with his hands or any weapon while Off. AW was in a vulnerable position at his feet.

3) Mr. McAbee never took a step backwards – his feet never moved – making it physically impossible for him to have "dragged" Off. AM into the crowd of protesters behind him – another clearly erroneous determination.

4) Mr. McAbee's interactions with Officer CM came only after Off. CM struck him across the ribs with a police baton in a "cross-check" manner.  But even then Mr. McAbee's conduct did not involve a punch – he pushed Off. CM away with open hands.

5)  Mr. McAbee's own feet were swept out from underneath him which caused him to fall on top of Off. AW, leading both of them to slide down the stairs together.

6) Mr. McAbee did not engage in any assaultive conduct against Off. AW while they were laying on the ground together.  He can be heard clearly yelling at other protesters to not assault Off. AW.

When the hyperbole of the Government's proffer is stripped away, what Mr. McAbee is faulted for the most was simply having gone to the rally on the National Mall rather than stay at home in Tennessee and watch it on television.

### C. Plan for Release on Terms and Conditions of Pretrial Release

The details of Mr. McAbee's proposed conditions of supervised release will be provided to Pretrial Services shortly after this motion is filed.  Mr. McAbee intends to live with his wife in Tennessee, and she will serve as his third-party custodian. He has an employment offer from NEURO TOUR Physical Therapy, Inc, located in Marietta, Georgia.  The position is to be done remotely and will include being the lead point of contact for all of clients, building and maintaining strong, long lasting client relationships, overseeing client account management, maintaining the billing

system, generating invoices and account statements, performing account

reconciliations, producing monthly financial and management reports.  This work

can be performed from his residence and can be accomplished while under home

detention and GPS monitoring.

Dated: May 9, 2022                              Respectfully submitted,

                                                */s/ William L. Shipley*
                                                William L. Shipley, Jr., Esq.
                                                PO BOX 745
                                                Kailua, Hawaii 96734
                                                Tel: (808) 228-1341
                                                Email: 808Shipleylaw@gmail.com
                                                Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I, William L. Shipley, hereby certify that on this day, May 9, 2022, I caused a

copy of the foregoing document to be served on all counsel through the Court's

CM/ECF case filing system.


<u>/s/ *William L. Shipley*</u>
William L. Shipley, Jr., Esq.