1     **UNITED STATES DISTRICT COURT**
      **FOR THE DISTRICT OF COLUMBIA**

2     _____

3     United States of America,      ) Criminal Action
                                      ) No. 1:21-cr-00035-RC-7
4                      Plaintiff,     )
                                      ) **Jury Trial - Closing**
5     vs.                             ) **Arguments, Jury**
                                      ) **Instructions and Jury Note**
6                                     )
      Ronald Colton McAbee,           ) Washington, D.C.
7                                     ) **October 10, 2023**
                       Defendant.     ) Time:  10:00 a.m.
8     _____

9                     **Transcript of Jury Trial**
          **Closing Arguments, Jury Instructions, and Jury Note**
10                      Held Before
            The Honorable Rudolph Contreras
11             United States District Judge

12                  A P P E A R A N C E S
13
      For the Government:      **Benet J. Kearney**
14                             **Alexandra F. Foster**
                               UNITED STATES ATTORNEY'S OFFICE
15                             FOR THE DISTRICT OF COLUMBIA
                               601 D Street, Northwest
16                             Washington, D.C. 20579

17    For the Defendant:       **Benjamin M. Schiffelbein**
                               FEDERAL PUBLIC DEFENDER
18                             210 First Street, Southwest, Suite 400
                               Roanoke, Virginia 24011
19    _____

20    Stenographic Official Court Reporter:
                               Nancy J. Meyer
21                             Registered Diplomate Reporter
                               Certified Realtime Reporter
22                             333 Constitution Avenue, Northwest
                               Washington, D.C. 20001
23                             202-354-3118

24    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
25

<u>**I N D E X**</u>

<u>PAGE</u>:

**Closing Arguments**:

    Ms. Foster........................................ 5
    Mr. Schiffelbein................................. 37
    Ms. Kearney...................................... 62

<u>P R O C E E D I N G S</u>

1

2          (Proceedings held out of the presence of the jury.)

3          THE COURTROOM DEPUTY:  This is Criminal Action 21-35,

4    United States of America v. Ronald Colton McAbee.  And

5    Mr. McAbee is coming out.

6          For the United States, I have Benet Kearney and

7    Alexandra Foster.  For defense, I have Benjamin Schiffelbein.

8    Our court reporter today is Nancy Meyer.

9          All parties are present.

10         MR. SCHIFFELBEIN:  As I understand, the Court will

11   instruct after closings.  Is it -- is the Court willing to have

12   a five- or ten-minute break between the government's closing

13   and my closing?

14              THE COURT:  Sure.

15         MR. SCHIFFELBEIN:  Thank you.

16         THE COURT:  All right.  All right.  I'll start off

17   with the motion for judgment of acquittal.  I will deny that

18   motion.

19         First, the defendant alleges that no reasonable juror

20   can conclude that the reinforced gloves constitute a deadly or

21   dangerous weapon.  I don't think this is a question that can be

22   decided as a matter of law.  But, rather, it is a

23   fact-intensive inquiry that must be decided by the finder of

24   fact; that is, the jury.  And there's some question as to the

25   defendant's intent on that issue.  That's a question of

1   credibility to be made by the jury.

2         Second, with respect to the count that the defendant --

3   the count involving the injuries, the defendant argues that

4   there's no evidence that Mr. McAbee caused or assisted in any

5   of the injuries sustained by Officer Wayte.  But there is

6   testimony from Officer Wayte that he sustained beatings at each

7   stage of being dragged into the crowd and they resulted in

8   numerous cuts, bruises, and welts all over his body.  A

9   reasonable juror could conclude Mr. McAbee caused or assisted

10  in these injuries.

11        Third, with respect to the civil disorder count,

12  defendant challenges the causation element, indicating that he

13  did not cause any of the disruption to Safeway in terms of the

14  curfew, the certification, or the federal officers clearing of

15  the Capitol, or the whereabouts of Vice President Pence.  But

16  as the government aptly notes, and as reflected in the jury

17  instructions agreed to by the parties, the causation element

18  requires that the civil disorder caused a disruption, not the

19  defendant.

20        All right.  Are we ready to bring in the jury?

21        MS. KEARNEY:  Yes, Your Honor.

22        MR. SCHIFFELBEIN:  Yes, Your Honor.

23        THE COURT:  Okay.

24  Ms. Kearney, how long do you expect your closing to be?

25        MS. KEARNEY:  I will defer to Ms. Foster on that.

```
 1              THE COURT:  Okay.  Ms. Foster.
 2              MS. FOSTER:  I expect it will be about an hour,
 3     Your Honor.
 4              THE COURT:  Okay.  And Mr. Schiffelbein?
 5              MR. SCHIFFELBEIN:  About the same, Your Honor.
 6              THE COURT:  Okay.  All right.  Let's bring them in.
 7              (Proceedings held in the presence of the jury.)
 8              THE COURT:  Do we have everybody?
 9              UNIDENTIFIED JUROR:  One more.
10              THE COURT:  We're missing one.
11         Welcome back.  Go ahead.  Have a seat.  I hope everyone
12     had a nice weekend.  We're going to start with the government's
13     closing arguments.
14              MS. FOSTER:  Good morning.  This is -- I wanted to
15     start with logistics.  I just want to make sure your screens
16     says United States v. Ronald Colton McAbee.  Good.  All right.
17     If at some point what I'm saying and what you're looking at
18     don't jibe, if you would just raise your hand.
19         Ronald Colton McAbee came to the Capitol on January 6th,
20     2021, ready to fight.  Not merely to attend or to help, but to
21     fight.  How do we know that?  We know that by what he said, by
22     what he wore, and by what he did.
23         The texts are clear.  The defendant headed to
24     Washington, D.C., expecting that he would be involved in a
25     fight.  He wanted to get into that fight.  In fact, the first
```

1      thing that the defendant says when his buddy, Mike, agrees to

2      go to D.C. on January 6th with him is, "Let's link up and go.

3      I'll slap a commie with this dead arm."  Not looking forward to

4      peaceful protesting or maybe I can help the police at this

5      rally.

6           And that dead arm comment, ladies and gentlemen,

7      remember that the defendant told you he had just rolled his

8      truck and injured his shoulder.  In fact, he was on medical

9      leave from his job at the sheriff's department when he decided

10     to drive ten hours to Washington, D.C., for this rally.

11          He submitted a doctor's form telling the sheriff's

12     office that he needed to be out on medical leave until January

13     14th.  He was supposed to be recovering so he could go back to

14     his sheriff's deputy job, but that's not what he did.  Also,

15     you heard that he didn't tell the sheriff's department that he

16     was going to the January 6th rally.  He lied to them.

17          What else did the defendant say?  When Mike tells

18     him he'll carry these items, including the brass knuckles,

19     in his pocket to Washington, D.C., on January 6th, the

20     defendant responds with "How can I get some knuckles?"  The

21     defendant testifies that the gold brass knuckles was for

22     reinforcing your punch so that your punch would hurt more when

23     you hit people.

24          And on redirect, the defendant told you that when he

25     said ". . . can I get some knuckles," he meant it for hand

1    protection, something that would fit over the knuckles.  Is

2    that credible, ladies and gentlemen, when someone

3    says ". . . can I get some knuckles," that they are just

4    looking for something to cover their knuckles.

5         The defendant ultimately gets steel-reinforced gloves,

6    but the goal is to fight with those gloves, like he would with

7    those brass knuckles.  It's not for hand protection, and it's

8    not because he's going to ride his motorcycle with them on

9    January 6th.

10        What else does the defendant say?  In response to Mike's

11   texts and picture of what he will carry in his pocket to

12   January 6th, which included those brass knuckles, along with

13   the magazine, a knife, and a bullet, the defendant tells Mike

14   "So I've got a tire repair kit and the t handle tire puncture

15   is a great tool."

16        Now, the defendant conceded in his testimony to you that

17   a T-handle tire puncture is a sharp object shaped like a T with

18   a pointy end so that you could punch people with it.  He also

19   agreed with Ms. Kearney that it was a great weapon.  And that

20   he was thinking about bringing it to D.C. on January 6th, but

21   only for defense.

22        What else did he say on these texts?  "Well I don't

23   think the girls should be subject to violence.  It will be

24   there.  And I'd rather not worry about them."  Again, he knew

25   there would be violence, and he wanted to focus on that and not

1    worry about the girls.

2         Multiple witnesses -- Officer Wayte, Special Agent

3    Acker, the defendant -- they told you about this 3 percent

4    ideology and that it was all about the notion that 3 percent of

5    Americans fought against the British during the American

6    Revolution.  The defendant aligned himself with the

7    Three Percenters and congratulated Mike when he bought that

8    III percent hat.  The defendant equated himself with the

9    American revolutionaries in a war against the British, the

10   established government.

11        What else did the defendant and Mike discuss in

12   anticipation of the January 6th rally?  "What's the password to

13   the PBUSA?"  The defendant admitted to you that he was talking

14   about the Proud Boys.  To that question, Mike tells the

15   defendant that the Proud Boys have paused membership.  And the

16   defendant responds with the second text.  "Gotcha.  I noticed

17   they have a Knoxville chapter."  Knoxville, he told you, would

18   have been the local Proud Boys chapter for the defendant.

19        In his testimony, the defendant told you that he knew of

20   a Proud Boys rally back in December somewhere somebody had been

21   stabbed.  He also acknowledged that the Proud Boys are an

22   organization known for getting into a lot of brawls at rallies.

23   And he told Ms. Kearney that he was curious about them and

24   wanted to check them out.

25        What else did he tell Mike in anticipation of their trip

1    on January 6th?  "I will rise and fall along side you.  [That]

2    is for future generations."  In none of these text exchanges

3    with Mike does the defendant talk about peaceful protesting on

4    January 6th or helping the police or even defending himself

5    against other protesters.  Instead, he talks about slapping a

6    commie, buying some knuckles, bringing his T-handle tire

7    puncture, joining the Proud Boys, rising and falling with Mike

8    for future generations, and "Let's go man!" in response to

9    Mike's texts about lighting them bitches up.

10        Now let's talk about what the defendant wore:  the red

11   Make America Great Again hat, the sunglasses, the bulletproof

12   vest with that III percent patch not permanently affixed.  He

13   put that on special for his January 6th trip, the sheriff's

14   patch, even though it's not a sheriff-issued vest.  He was not

15   on duty on January 6th, and he was on medical leave.

16        The defendant covered his face with a red bandana.  He

17   told Ms. Kearney that it was for three reasons:  that red

18   bandana was to cover his face because it was cold, because he

19   didn't want to be seen, and because he couldn't go anywhere

20   around the city without a mask on.

21        So on cross, he agreed that he wasn't technically

22   worried about COVID, but he wanted to follow the rules while in

23   D.C.; though he later specified in his testimony that he was

24   only worried about following the rules in D.C. for COVID.

25        The defendant had done his research and really, really

1    wanted these steel- outdoor reinforced brass motorcycle knuckle

2    gloves.  He wanted them so badly that he prevailed upon his

3    friend, Mike, to buy these gloves for him so that they could

4    get there in time, and the defendant would pay Mike back.  He

5    needed these gloves for the "Stop the Steal" rally on

6    January 6th.

7         He also told you that he was not impressed when he

8    actually saw the gloves at Mike's house.  Why was he not

9    impressed?  Maybe he was disappointed because they weren't as

10   heavy or as scary as they looked in these Amazon pictures.  But

11   there was no time to replace them because he and Mike were

12   driving to D.C. that day.

13        Here's what else the defendant wore on January 6th:  a

14   T-shirt that reads, "Same bloodline.  Different generation."

15   You'll see that different generation over and over again in the

16   videos.  It also says, "We will not comply.  We will not

17   disarm."  And on the back, "Until my last breath."

18        The texts between the defendant and Mike reflect that

19   Mike made these shirts special for their trip to

20   Washington, D.C., and that the defendant bought one.  The

21   defendant told you in his testimony that he got rid of the

22   patch, that Three Percenter patch, on his sheriff's vest but

23   admitted that he kept the shirt.

24        The defendant told you on direct that he got rid of that

25   patch because he learned the ideology was tied to an

1    anti-government movement.  But he also told you he didn't get

2    rid of the shirt.  If you decide to distance yourself from the

3    Threepers, why not also get rid of the shirt?  Isn't it also

4    more likely that he got rid of that patch not because he didn't

5    believe in the ideology, but because there was a lookout for

6    him posted on the internet, which includes a picture of him

7    with that III percent patch on his vest?

8         Now let's talk a little bit about what the defendant did

9    on January 6th.  Actually, let's start with January 5th.  He

10   drove down on January 5th in Mike's truck, not in his

11   motorcycle.  And on January 6th he left his hotel for the

12   Ellipse at 6:00 or 7:00 a.m. and ended up at the Washington

13   Monument.  He attended that "Stop the Steal" rally.

14        The defendant testified that he knew he could be on the

15   grass at the Washington Monument because there were no

16   barricades.  He heard Trump tell everyone to go to the Capitol.

17   He also heard Trump talk about Mike Pence.  He knew that Trump

18   was talking about Pence because Vice President Pence was

19   presiding over the vote certification, and the defendant knew

20   that that certification was happening at the Capitol.

21        The defendant then walked to the Capitol, along with the

22   crowd, at around 1:30 p.m. and arrived at the Capitol Grounds

23   around 2:00-ish.  You can see him here in the image on my left

24   in the lower corner, right down here.  Let me see if I can make

25   this work.  Right down here.  And then you see him again in

1    front of the Capitol, right in front, either taking a video or

2    picture of himself.

3         So he arrives at the Capitol Grounds at around 2:00-ish.

4    And once he gets to the Capitol Grounds, he said he didn't know

5    that he was in a restricted area.  Even though the

6    Capitol Grounds, unlike the mall, had very clear barricades in

7    place.  On direct he told you that all he saw were some

8    balled-up fencing on the stairs and then bike racks and

9    officers at the scaffolding area.

10        So let's talk a little bit about that.  You've seen this

11   video before.  I'm just going to play about a minute-and-a-half

12   snippet.  Hold on just a second.

13             (An audio-visual recording was played.)

14             MS. FOSTER:  You can see the smoke of the tear gas.

15   You can hear that LRAD.  You can see the barricades.  You can

16   see the riot police.  You can hear the flash-bangs.  You can

17   even hear people say, "Let's go" and turning around and

18   leaving.  They understand that they're supposed to leave.

19        And here's the defendant right here in the lower

20   corner, a few feet away from where that individual was

21   taking that video.  The defendant told you that he was a few

22   feet from those barricades and he saw the barricades and the

23   police line.

24        He admits to hearing the flash-bangs and the LRAD.  He

25   heard the beeping, and he smelled the gas.  He knew from his

1    law enforcement training that law enforcement used tear gas for

2    crowd control.  He even told you that he and others were hit

3    with rubber bullets and conceded that it's a big deal when law

4    enforcement deploy munitions against a crowd.  He even told you

5    that when he got hit by the rubber bullet, he thought to

6    himself, I need to get out of here.

7         But he insists that he didn't know that he shouldn't be

8    there because it was loud so he couldn't hear exactly what was

9    being announced on that LRAD.  The idea that somebody could be

10   standing in this crowd feet from that riot police and not know

11   that you shouldn't be there is simply not credible.

12        The defendant testified that after getting shot by a

13   rubber bullet, he retreated to the Reflecting Pool and called

14   Mike.  It turns out Mike was off somewhere having a beer, and

15   instead of joining his friend and calling it a day, the

16   defendant waited for Mike at the Reflecting Pool at the foot of

17   the Capitol, and they returned to the West Front.

18        He walked up the steps and very intentionally headed

19   towards this very crowded, very loud lower west terrace because

20   he was curious.  At the lower west terrace, the defendant

21   concedes that the crowd was violent and it was loud.  The

22   defendant knew that he could have turned around at any time and

23   left, but he didn't.

24        Instead, he entered the crowd and worked his way, quite

25   forcefully, up to that front.  He told you that he moved

1    forward to get some space.  But he also agreed that he could

2    have turned back around and walked back to the Reflecting Pool

3    to get some space, but he didn't do that.

4        By the time he gets to the front of the tunnel, he has

5    been in this crowd for 40 minutes.  He has heard the screaming

6    and the taunting from his fellow rioters.  He's witnessed his

7    fellow rioters get shoved out of the tunnel quite forcefully.

8    He alleges that he helped a woman up there at the front of that

9    tunnel; although he also concedes that the video clearly shows

10   the man with this red face paint, who you see in this image,

11   standing up with the red baseball hat, that that was the guy

12   that picked up the lady.  And that's what the video displays.

13       He's also seen his fellow rioters step in and assault

14   officers with all sorts of weapons.  So he decides to do the

15   same.  He's going to slap a commie with his dead arm, he's

16   going to rise and fall with his fellow rioters because he sees

17   himself as a Three Percenter on the right side of history

18   fighting for future generations.

19       So by 4:27, he's here, at the front of the tunnel,

20   grabbing Officer Wayte and pulling him down the stairs.

21   Zooming in on this picture, you can see the defendant in the

22   middle of the picture.  He's standing.  He's leaning over.

23   He's not unsteady.  He's not slipping.  He's also not grabbing

24   Officer Wayte by the vest to pull him up.  He's also not trying

25   to get this other guy off of Officer Wayte's right foot.

1    Instead, he is very intentionally standing with one foot

2    on the landing and the other foot on the lower steps hooking

3    his arm right under Officer Wayte's leg, right before he very

4    intentionally pulls Officer Wayte into the riot.

5    So with that, let's talk a little bit about that first

6    charge, the assault on Officer Wayte.  The Court will provide

7    you with jury instructions.  That will give you the elements

8    for this offense.  The question really is whether the defendant

9    assaulted, resisted, opposed, impeded, intimidated, or

10   interfered with Officer Wayte.  Let's go through what happened

11   to Officer Wayte starting at 10 -- sorry -- at 4:27:08.

12   So Officer Wayte's body camera says 16:27:08.  And

13   that's when a rioter assaults Officer Wayte and pulls him to

14   the ground at the frontline.  You will see on Officer Powell's

15   body-worn camera -- and you can see right here -- Officer Wayte

16   is down on the ground.  His knees are up in the air.  And you

17   can see on Officer Powell's body-worn camera that the defendant

18   is trying to crab walk back to the police line.  And then you

19   see Officer Miller go in to try to help Officer Wayte and get

20   dragged into the crowd by his helmet.

21           (An audio-visual recording was played.)

22   MS. FOSTER:  As Officer Miller is getting pulled into

23   the crowd, this officer right here, with the gas mask, reaches

24   out to grab Officer Miller.  You can also see Officer Moore's

25   hand is right here.  He, too, is reaching out to try to get to

1    Officer Miller.

2         Amazingly, the defendant told you that he did not try to

3    stop Officer Miller from getting pulled into this crowd, even

4    though the defendant is a few feet away.  He told you that he

5    was adjusting his hat and admiring the aesthetic of the baton

6    and, therefore, he couldn't get to Officer Miller.

7         Here, you can see Officer Moore, yet again, trying to

8    reach out to get to Officer Miller, and this is at 16:27:34.

9    So you have both gas-mask officer and Officer Moore reaching

10   out for Officer Miller whose feet are clearly apparent in this

11   image.  Neither officer can reach Officer Miller.  Why is that?

12   Because the defendant, who's standing right here, comes in

13   between the officers and Officer Miller.

14        As you can see here, the defendant first puts out his

15   hand at 16:27:35, and then the defendant positions his body so

16   that he is between the officers on the line and Officer Miller

17   who's getting dragged into the crowd.

18              (A video recording was played.)

19        MS. FOSTER:  There he is.  There's his hand, and here

20   comes his body.

21        Now the defendant has his hand on Moore, to stop him

22   from moving forward to get the downed officer.  After

23   Officer Miller gets pulled down the stairs, the defendant,

24   ignoring Officer Miller, steps over to Officer Wayte.  You can

25   see Wayte here lying down on the ground with his knees up.  One

1    second later, by 16:27:37, the gas-mask officer has his hand on

2    Officer Wayte's jacket and him -- trying to pull him back to

3    the police line.

4         And what does the defendant do?  He looks up at the

5    officer -- the gas-mask officer trying to pull Wayte back to

6    the police line.  He leans down and grabs Officer Wayte's leg,

7    and he very intentionally pulls Officer Wayte away from the

8    police line.  You can see that at 16:27:38 to 16:27:40.

9              (An audio-visual recording was played.)

10             MS. FOSTER:  This image has been slowed way down,

11   which is why it sounds so weird.

12        The defendant is not grabbing Wayte's vest to pull him

13   up.  He's not pushing Wayte towards the police line.  He's not

14   doing what most people would do and just reach a hand down to

15   help Wayte up, or even just doing nothing and letting the

16   officer in the gas mask pull Wayte back.  No.  The defendant

17   pulls Wayte by his leg into the riot.

18        The defendant tells you that he was repositioning Wayte.

19   Why is he repositioning Wayte?  Why doesn't he just leave him

20   alone or, even better, reach out a hand and pull him up?  Why?

21   Because the defendant is repositioning Wayte to get him out to

22   the rioters and not back to the safety of the line.

23        Now, at 16:27:41, after Wayte has been pulled by McAbee

24   out into the crowd, the gas-mask officer reaches back out to

25   try to get Wayte back to the line.  And what does the defendant

1    do?  He gets angry.  He gets up and lashes out, first, at the

2    officer with the gas mask.  This is Officer Moore's body-worn

3    camera.  This right here in the middle of your screen is the

4    defendant reaching out towards the officer with the gas mask

5    whose hand was pulling Officer Wayte's jacket.

6         And here you can see Moore with his baton out.  And when

7    Officer Moore uses that baton and steps out to try to get the

8    defendant away from Officer Wayte and the officer with the gas

9    mask, what does the defendant do?  He turns his anger and

10   frustration toward Officer Moore, and he beats on

11   Officer Moore.  Right here you can see his hand fisted up about

12   to hit Officer Moore.

13        As you've heard repeatedly on these videos, at this

14   point the defendant is angry.  He's yelling expletives at the

15   officers.  And another rioter comes to back the defendant up.

16   You see him right here.  It's the man with that long beard

17   climbing over the railing.  And that man with the long beard

18   takes over assaulting Officer Moore, and the defendant turns

19   back to Officer Wayte.

20        Now we're going to take all those still images from

21   Moore's body-worn camera that I showed you and play a

22   slowed-down version so that you can see that sequence for

23   yourself.  It's at Exhibit 1001 that will be submitted to you

24   so that you can watch it again in chambers -- or when you are

25   deliberating.

1          (An audio-visual recording was played.)

2          MS. FOSTER:  There's the officer with the gas mask --

3    you can see him right there -- reaching out towards

4    Officer Miller.  There comes Officer Moore also reaching out

5    towards Officer Miller -- there's the defendant adjusting his

6    hat -- both of them trying to get Officer Miller as he gets

7    dragged in.  And here comes the defendant, hand out, shoving

8    Moore back, getting in between the officers and Officer Miller

9    and going to Officer Wayte.

10          There's gas-mask man with his hand on the jacket pulling

11   back.  Here comes the defendant leaning down, pulling Wayte

12   into the crowd.  And then the defendant gets up.  As you can

13   see, gas-mask officer is trying to pull Wayte back.

14          Now the defendant is angry.  He gets up, gets in the

15   face of the officer with the gas mask, and then he comes after

16   Moore because Moore just stepped off the line.  And he hits

17   Moore multiple times, screaming at him.  And here comes the

18   other man with the beard to take over the assault on

19   Officer Moore.  As Officer Moore is getting assaulted, you

20   heard him tell you his body-worn camera goes down to the

21   ground.

22          Mr. Schiffelbein has repeatedly noted that as the

23   defendant is assaulting Moore, the defendant's foot is between

24   Wayte's legs and that is stopping Wayte from going down the

25   stairs.  It does not appear from any -- any video angle, or

1   from anything that the defendant says, that the defendant is

2   intentionally trying to help Wayte.  It just happens that his

3   foot is in between Wayte's legs after he grabs Wayte and pulls

4   Wayte towards him.

5        Here's the same sequence but from a different angle,

6   from Officer Powell's video, and that's at Exhibit 1003.

7   Again, this is slow motion.

8             (An audio-visual recording was played.)

9        MS. FOSTER:  So here we see Wayte down on the ground.

10  There's a man pulling Wayte's right leg, and here comes the

11  defendant pulling his left leg.  And he gets angry, gets up,

12  and starts yelling.  Then he shoves the gas-mask officer and

13  then shoves Officer Moore.

14       Now, it may well be that the defendant was upset that

15  the officers were not helping his fellow rioter.  We've heard

16  about her, Rosanne Boyland.  She was clearly in distress on the

17  ground next to Officer Wayte, and that is -- apparently, it

18  appears -- what the defendant is pointing at, and he's still

19  clearly saddened by her death because he teared up in court

20  every time he talked about her.

21       But maybe that also explains his rage at the police.

22  The way the defendant sees it, this lady was dying and the cops

23  aren't doing anything about it.  And maybe that's what fueled

24  the defendant's rage at the police and he decided to take his

25  anger out on the gas-mask officer, on Officer Moore, and,

1  ultimately, on Officer Wayte.

2       Finally, we can see this assault from the point of view

3  of Officer Wayte.  Again, it has been slowed down, and it's at

4  Exhibit 1004.

5            (An audio-visual recording was played.)

6       MS. FOSTER:  Officer Wayte is already on the ground.

7  The defendant is over here.  The gas-mask officer is trying to

8  pull Officer Wayte back.  The defendant comes over, leans down,

9  and pulls.  And then as the officers are trying to help

10  Officer Wayte back, the defendant gets up and gets violent.  He

11  shoves the officer in the gas mask and then shoves

12  Officer Moore.  Here you can see that other bearded man come

13  in.  The defendant pushes the bearded man towards Moore and

14  then goes back to Officer Wayte.

15       Now, the defendant dragging Wayte by his leg into the

16  crowd is enough to prove that the defendant assaulted Wayte.

17  But there's more, because the defendant returns and assaults

18  Wayte again; this time by straddling him, pulling him up by

19  vest, and then skidding down the stairs on top of him.

20       On the second stage of the assault, there's not as much

21  body-worn camera because Wayte is away from the officers and

22  the officers are dealing with other assailants.  So we would

23  rely upon Officer Wayte's body-worn camera and upon some

24  third-party videos that you have seen and will have the

25  opportunity to see again when you're deliberating.  They still

1     give you an idea of what is going on.

2          Here is a slowed-down version of Officer Wayte's

3     body-worn camera for that second part where he slides down the

4     stairs with the defendant on top of him.

5               (An audio-visual recording was played.)

6          MS. FOSTER:  McAbee picks Wayte up by the vest and

7     slams him to the ground.  You can hear an audible grunt from

8     Wayte if you listen to it in real time.  And then they slide

9     down the stairs, with Wayte trying to get the defendant off of

10    him and the defendant holding Wayte down.

11         So they slide down the stairs with Wayte trying to get

12    the defendant off of him and the defendant holding Wayte down.

13    You heard from the defendant that at the time he weighed

14    approximately 300 pounds.  You heard from Wayte that they were

15    hand fighting, with Wayte trying to push McAbee off of him and

16    the defendant pinning Wayte's hands and arms down to his body

17    over and over again.  You can see that in this video.

18         Wayte told you he couldn't breathe.  He told you that he

19    was suffocating.  He told you that he thought he was going to

20    die.

21         Here's one of those third-party videos.  It's at

22    Exhibit 414.  You will see the defendant lean over, lift Wayte

23    by the vest, and then slide down the stairs.

24               (An audio-visual recording was played.)

25               MS. FOSTER:  There he is in the middle.

1          Now, the defendant told you repeatedly that he was just

2     trying to help Wayte up.  Is this how you help someone up by

3     grabbing them by the vest and lifting them up?  Officer Wayte,

4     you saw him.  He wasn't a small child.  Officer Powell

5     testified that the way you help somebody up is that you give

6     them a hand, they grab your hand, and they get up.

7          Now, this one is in real time.  It's not slowed down.

8     You can see right -- basically in the middle of the screen,

9     there's the defendant standing in front of the tunnel, and

10    watch as he moves over, leans down, lifts up Officer Wayte, and

11    then slide down the stairs.

12          (An audio-visual recording was played.)

13          MS. FOSTER:  You can see that the defendant is here,

14    still down on top of Officer Wayte.  And then, finally, after

15    over 20 seconds, you can finally see Officer Wayte weave his

16    way back up to the tunnel.  There he is.  You see the yellow

17    jacket.

18          The defendant was on top of Officer Wayte, not moving

19    for over 20 seconds.  In his closing, Mr. Schiffelbein is

20    likely to play Defendant's Exhibit 102.  That's the audio where

21    you hear somebody say something like:  I'm trying to help you,

22    man.  And maybe -- "maybe" -- that's McAbee.  Maybe during

23    those 20 seconds that he's holding Wayte down he has this

24    oh-crap realization that he is assaulting an officer in the

25    middle of a riot and decides to change course.

1          And maybe at that point he's trying to help Wayte.  But

2     Wayte will tell you that the defendant most definitely did not

3     help him.  But, really, at best, the defendant gets off of

4     Wayte and stops crushing him into the ground.  He doesn't help

5     him up.  He doesn't give him a hand.  He just stops assaulting

6     him.

7          The fact that the defendant stopped assaulting Wayte

8     does not negate the multiple times where the defendant did

9     assault both Officer Moore and Officer Wayte.  It would be like

10    me stabbing somebody and then taking them to the hospital.  The

11    fact that I took them to the hospital does not make me not

12    guilty of the stabbing.

13         Now, let's talk for a minute about Officer Wayte's

14    injuries.  This is a still image from Officer Dyer's body-worn

15    camera where Officer Wayte has just dropped to the ground.  Do

16    you remember how Dyer described watching Wayte get pulled into

17    the crowd, getting pulled down on his back, punched and kicked

18    from head to toe, getting stomped on?  And then Dyer's

19    conclusion that if an officer didn't get Wayte, Wayte would

20    surely die.

21         Do you remember Officer Dyer testifying that Wayte could

22    barely stand up and that it looked like Wayte's body had just

23    shut down from everything that had just happened to him; and

24    that Wayte physically could not keep walking and how

25    Officer Wayte told Officer Dyer that he couldn't see.

1        I'll spare you the image of Officer Wayte's blood

2    dripping off his neck; although you can see it in Exhibit 303

3    from 16:30:25 to 16:30:30, if you want to see it again.

4        But even if we accept that Officer Wayte was already

5    injured at his neck when the defendant came into contact with

6    him, Wayte told you that he suffered multiple injuries during

7    that minute period of time that he was out on his back and then

8    down the stairs and working his way back up.

9        He had the laceration at the back of his head which

10   required staples to close up.  He also had other mounds or

11   goose eggs all over his head.  He had a concussion.  He had

12   elbow pain.  He had blindness and pain in his eyes and nose

13   from the chemical irritants.  He had cuts and bruises all over

14   his body, so much so that he couldn't really move for a week,

15   is what he told you.  And that he was off work for months.

16       And he suffered those injuries by being beat, kicked,

17   gassed at the point when he went down until the point that he

18   was back at safety behind the police line.

19       The defendant dragged Wayte out into the crowd, even

20   though the defendant knew that safety was behind the police

21   line and that the crowd was violent.  How do we know that the

22   defendant knows that safety is behind the police line?  Well,

23   one, because it's common sense.  But, two, because he told you.

24   When the defendant saw Rosanne Boyland was injured, where did

25   he take her?  He took her to the police line.  When the

1    defendant was injured, where did he go?  He went to the police

2    line.

3        He went to Officer Sajumon, and Sajumon protected him

4    from the next round of rioter assaults.  And then after

5    everything the defendant has done to the police, the defendant

6    tapped on his sheriff's badge, relying on that law enforcement

7    connection to be let through into the safety behind the police

8    line.  Because as he tells Officer Sajumon, he can't go back

9    that way into that violent crowd.  The defendant knows that

10   this rioting mob is no place for an injured officer.

11       You could find the defendant guilty as the person

12   assaulting, resisting, or impeding Officer Wayte, but you can

13   also find the defendant guilty if you find beyond a reasonable

14   doubt that the assault on Officer Wayte was committed by

15   someone else and that the defendant knowingly and intentionally

16   aided and abetted that person in committing the assault on

17   Officer Wayte.

18       These are the aiding and abetting jury instructions that

19   you will get with you.  The aiding and abetting could be his

20   assistance to the man who was pulling Officer Wayte's right leg

21   while the defendant was pulling his left, or the rioters that

22   were beating on Wayte while the defendant was holding him down,

23   or on the rioter with the OC spray who sprayed Wayte while the

24   defendant was holding Wayte down.

25       If you find the defendant not guilty or are unable to

1      decide as to Count 1, we would ask you to consider the lesser

2      offense, which is also set out in the jury instructions.  The

3      difference between the elements that I read to you earlier and

4      these elements is this fifth element, which is highlighted in

5      red.

6          Under Count 1, you need to find that the defendant

7      inflicted bodily injury or aided and abetted somebody else in

8      inflicting that bodily injury on Officer Wayte.  In the lesser

9      offense, the government would have to show that the defendant

10     made physical contact with Officer Wayte, or another way that

11     the government could prove the lesser offense is if we proved

12     that the defendant acted with the intent to commit another

13     felony.  And that's the civil disorder.

14         So let's talk about Count 2, which is that civil

15     disorder.  The first element is that the defendant knowingly

16     committed or attempted to commit an act with the intended

17     purpose of obstructing, impeding, or interfering with one or

18     more law enforcement officers.  That could be when the

19     defendant blocked Moore from getting to Officer Miller, who was

20     getting dragged down the stairs, or it could be when the

21     defendant blocked the gas-mask officer from getting to Miller.

22     Or when the defendant dragged Wayte into the crowd by his leg.

23     Or when the defendant blocked the gas-mask officer and

24     Officer Moore from reaching Wayte.  Or when the defendant

25     picked Wayte up again and they slid down the stairs together.

1          But you don't even have to make those decisions because

2     the defendant admitted to civil disorder in the first minute of

3     his cross-examination.  He admitted that he pled guilty to

4     assaulting Officer Moore on January 6th, 2021, and the assault

5     happened while the riot was occurring at the United States

6     Capitol.

7          So the only remaining questions are does the riot at the

8     U.S. Capitol count as civil disorder and did the riot obstruct,

9     delay, or adversely affect commerce or the conduct of any

10    federally protected function.

11         Civil disorder is defined as any public disturbance

12    involving acts of violence by groups of three or more persons,

13    which (a) causes an immediate danger of injury to another

14    individual; (b) an immediate danger of damage to another

15    individual's property; (c) results in injury to another

16    individual; or (d) results in damage to another individual's

17    property.

18         All four are true here:  (a) and (c), you saw the

19    videos.  You heard the officer's testimony; (b) and (d), you

20    heard Captain Mendoza and saw the videos of the rioters banging

21    down the door.  If you want to see more of that, more of the

22    damage that was caused by the rioters on that day, you should

23    watch Exhibit 201.  There you can watch while the rioters bust

24    windows and demolish doors of the Capitol.

25         Note that it is not required that the defendant himself

1  cause the public disturbance, just that his acts occurred

2  during that public disturbance.

3      Commerce.  How does it define commerce?  Commerce means

4  commerce between one state, including Washington, D.C., and

5  another state, including D.C.  It also means commerce within

6  Washington, D.C.  It's very broad.  The riot adversely affected

7  commerce.  And you will see in Government's Exhibit 702 through

8  704, which you will have with you when you go back to

9  deliberate -- as you can tell, Government's Exhibit 702

10  reflects a significant drop in sales in D.C. stores on January

11  6th.

12      This is not surprising that no one was out shopping on

13  the afternoon of January 6th.  Commerce was also affected

14  because, as reflected in this part, it's a snippet of the

15  email, which is Exhibit 703, where Safeway sends out an email

16  to all of its stores saying it's closing at 4:00 p.m. owing to

17  the 6:00 p.m. curfew.

18      Or you can look at Exhibit 704.  Sorry.  It's very

19  small.  But commerce was affected because shipments to

20  Washington, D.C., from the Safeway warehouse in Lancaster,

21  Pennsylvania, dropped from 779, 373, 324, 504, and 173 cases

22  brought from Pennsylvania to D.C. on January 5th, 2021, to 2.

23  Two cases were brought from Lancaster, Pennsylvania, to

24  Washington, D.C., on January 6th, 2021.

25      Let's talk about how it adversely affected a federally

1    protected function.  I can think of three federally protected

2    functions that were adversely affected on that day.  The riot

3    adversely affected the U.S. Capitol Police's ability to police

4    the U.S. Capitol Building and Grounds.  It adversely affected

5    Secret Service's ability to ensure the safety of the

6    Vice President and his wife and daughter as they presided -- as

7    the Vice President presided over the vote certification.  And

8    it adversely affected Congress's ability to certify the vote on

9    that day.

10          Again, the government is solely required to show that

11    the public disturbance adversely affected commerce or the

12    federally protected function.  We are not required to show that

13    the defendant himself adversely affected commerce or adversely

14    affected a protected function.

15          The defendant is also charged with attempt; that the

16    defendant intended to obstruct officers during a civil disorder

17    and took a substantial step to achieve that goal.

18          Now, the last three counts have overlapping elements.

19    All three require that we show that the defendant entered and

20    remained -- entered or remained on restricted grounds and that

21    he was on those grounds with a deadly or dangerous weapon.  So

22    let's talk about those elements.

23          We're going to talk about how the defendant knew it was

24    restricted grounds but chose not only to enter, but then to

25    remain on those restricted grounds; and how the defendant

1    knowingly carried a deadly or dangerous weapon, his brass

2    knuckle gloves, onto those restricted grounds for his use for

3    serious bodily injury of others.

4         Restricted building or grounds is defined as any posted,

5    cordoned off, or otherwise restricted area of a building or

6    grounds.  Captain Mendoza told you about the cordoned off

7    perimeter and all the many things that the U.S. Capitol Police

8    had done to delineate that perimeter.  Now, Exhibit 101 is a

9    map of that restricted perimeter.  She told you about the snow

10   fencing and the rows of barricades.  She told you about the

11   signs.  She told you about the police.  But that's not all.

12        She also told you about the LRAD and the tear gas and

13   the flash-bangs.  Again, I would ask you to look at

14   Exhibit 403.  Astoundingly, after all this, the defendant

15   testified that he was disappointed in the police; that he was

16   disappointed that they didn't use better crowd control measures

17   and de-escalation techniques.  When asked how he would have

18   handled it, he replied that he would have told the rioters to

19   leave.

20        When asked about the LRAD and that order to leave,

21   he responded that although he heard the blaring tones, he

22   didn't hear the message so he didn't know that it was time to

23   leave.

24        He also felt the tear gas, saw the barricades, saw the

25   riot police but didn't think he had to leave.  On redirect, the

1    defendant explained to you that he didn't think he had to leave

2    because there were no signs.  Seriously?  The LRAD, the smoke

3    bombs, the rubber bullets, the barricades, the riot police

4    manning the barricades, the tear gas, that's not enough.  He

5    needs to see a sign.

6         The second part of the definition is where a person

7    protected by the Secret Service is or will be temporarily

8    visiting.  You heard from Special Agent Glavey of the

9    Secret Service, and she told you that the Vice President is a

10   person protected by the Secret Service and that the

11   Vice President was in the Capitol Building on January 6th,

12   2021, to certify the vote.

13        There's also Exhibit 901, which is our stipulations, and

14   at paragraph 5, the parties agree that the Vice President was

15   in the Capitol Building at the time of the riot.

16        Let's talk about the deadly or dangerous weapon.  You

17   heard Officer Moore; these gloves are dangerous because they're

18   capable of causing serious bodily injury.  In fact, they're not

19   legal in Washington, D.C.  If someone is punched with those

20   gloves, it will cause more damage than it would have with just

21   a fist and it would cause less damage to the wearer.

22        One way that the government can meet this element is to

23   prove that the gloves are inherently dangerous.  Another way is

24   for the government to prove this element by showing that the

25   defendant used the gloves to cause serious bodily injury.  But

1    the third way, and the way that the government is choosing to

2    prove its case here, is that the defendant carried the gloves

3    with the intent that they be used to cause serious bodily

4    injury.  He intended those gloves to act just like brass

5    knuckles.

6         If you are unable to reach a verdict on Count 3, we

7    would ask that you look at the lesser included offense.  All

8    that happens in the lesser included offense is that third

9    element, the deadly and dangerous weapon element, is gone.

10        On the fourth count, we've discussed the restricted

11   grounds.  We've discussed the deadly and dangerous weapon.  So

12   let's focus on disorderly and disruptive conduct and impeding

13   or disrupting the orderly conduct of government business, the

14   definition in the jury instructions.

15        And what does that mean in this case?  Obviously, you

16   can look at the defendant's assault on Officer Wayte, but you

17   don't even have to.  You can focus on what the defendant

18   already admitted to.  If you look at the stipulations in

19   Exhibit 901 -- and these are the excerpts from a stipulation in

20   Exhibit 901 -- all parties agree that Congress was attempting

21   to certify the vote -- that's government business and an

22   official function -- when the rioters, including the defendant,

23   interrupted.  And all parties agree that the defendant

24   assaulted Officer Moore during this period of time.  And that

25   is, undoubtedly, conduct that tends to disrupt the public peace

1    or undermine public safety.

2    Like for the third count, the fourth count also has a

3    lesser included offense where we take out the deadly and

4    dangerous weapon.

5    Finally, the fifth count.  The phrasing here is there's

6    an act of physical violence, and that is defined as any act

7    involving an assault or other infliction of bodily harm on an

8    individual.  It could be the assault on Officer Moore.  It

9    could be the multiple assaults on Officer Wayte.

10    And the fifth count also has that lesser included

11    offense where you take out that third element.

12    The defendant was proud of what he did.  He was proud of

13    the insurrection, and he went out of his way to find this

14    newspaper with the headline "Insurrection" and the image of law

15    enforcement officers with guns drawn.  And then he took this

16    photo of himself, and he sent it to his friend Mike and to his

17    Uncle Eddie on January 7th.

18    It wasn't about helping the police.  It wasn't about

19    helping Rosanne Boyland.  It was about holding your ground

20    after being attacked.  You can see that in his texts to Mike.

21    He was proud of his involvement in the violence that occurred

22    on January 6th.

23    He followed up this pronouncement and talked about

24    shedding blood for his country by the hands of the swamp in

25    reference to this minor abrasion that you can see on his head

1    right here.  He also promised to shed more blood in the future

2    and quoted the Latin for freedom or death.

3         The defendant admitted on cross that he saw chemical

4    irritants be sprayed at the police; that he saw rioters use

5    poles, bats, batons, hockey sticks to beat on the police.  But

6    he doesn't correct his friend Mike when Mike says that -- all

7    of that and "They're full of shit."  Instead, he tells Mike,

8    "We held our ground after being attacked," even though he

9    admitted to you that he knew that wasn't true.  They didn't

10   hold their ground.

11        The defendant came ready for a fight on January 6th, and

12   despite all of the warnings, the barricades, the smoke bombs,

13   the LRAD, the gas, the riot police, the defendant sought the

14   fight.  He shoved people out of his way to get to the front of

15   that tunnel.  He told you that he called the officers

16   motherfuckers because he was disappointed at how he was being

17   treated.

18        So he chose to fight back.  He chose to block officers

19   from saving Officer Miller.  He chose to drag Officer Wayte

20   into the crowd.  And he chose to beat back Officer Moore and

21   the officer with the gas mask when they were trying to help

22   Officer Wayte.  And he chose to do all of this so that he could

23   have his moment of glory assaulting the police officers in

24   front of this heaving crowd.

25        And for his actions on January 6th, 2021, we are asking

1    you to the find the defendant guilty on all five counts.

2         Your Honor, the request is for a five-minute break so we

3    can break down and the defendant can set up.

4         THE COURT:  Okay.  We'll take a five-minute break.

5         (Proceedings held out of the presence of the jury.)

6         THE COURT:  All right.  Set up.

7         MR. SCHIFFELBEIN:  Thank you, Judge.  I'll just have

8    one quick need to speak to the Court with the government after

9    the break.

10        (Recess taken.)

11        MR. SCHIFFELBEIN:  Can we have a moment before we

12   bring in the jury.

13        I don't know if the Court wants to conduct some sort of

14   a colloquy or not.  We intend to ask the jury to convict of the

15   lesser included, to entering and remaining on restricted

16   grounds.  He couldn't plead to that because he's not charged

17   with it stand-alone.  If the Court wants to conduct a colloquy,

18   I think now would be the time.  I don't think the Court has to,

19   but just if the Court wants to, the Court may.

20        THE COURT:  Ms. Kearney.

21        MS. KEARNEY:  I think that's appropriate, Your Honor.

22   I don't think it's necessary, but I think it's certainly

23   appropriate.

24        THE COURT:  Okay.  Can we do it after?

25        MR. SCHIFFELBEIN:  That's fine.  I didn't want anyone

1    to be surprised and then insist on doing it during the closing.

2              THE COURT:  Okay.

3              MR. SCHIFFELBEIN:  I'm ready.

4              THE COURT:  All right.  Let's bring in the jury.

5              (Proceedings held in the presence of the jury.)

6              THE COURT:  All right.  Welcome back.  We're going to

7    have the defendant's closing argument.

8              MR. SCHIFFELBEIN:  Ronald McAbee is innocent of most

9    of the charges before you today.  He's not completely innocent

10   for his conduct on January 6th.  He's already admitted and has

11   pled guilty to assaulting Officer Moore.  He did so when he

12   reacted to being pushed.  His reaction was a crime, and he

13   admits and accepts full responsibility for that conduct.

14             But he is innocent of assaulting Officer Wayte because

15   he was trying to help Officer Wayte.  He is innocent of civil

16   disorder because he never intended to cause any of the harm

17   associated with civil disorder.  He did not have the requisite

18   mental state at the time.

19             Committing a crime during a civil disorder is not

20   enough.  The government showed you the element "intended

21   purpose of" is in there.  There's an additional step the

22   prosecutor didn't ask you to consider.  He's guilty of entering

23   or remaining in a restricted area.  At some point, it was

24   obvious he shouldn't be there and that being there was against

25   the law, and he remained.  But he did not remain with a deadly

1     or dangerous weapon.  So you should convict him of that lesser

2     included count, but he wasn't there with a deadly or dangerous

3     weapon.

4          He is innocent of most of these charges.

5          Now, the government began by bringing up what Mr. McAbee

6     said, which is consistent with how they presented their case.

7     They want you to judge the evidence through a lens that

8     prejudices you against Mr. McAbee.  That's why they ended their

9     case by talking with the FBI about this Latin phrase, liberty

10    or death, because they want you to view his actions through

11    that lens and through the lens that it is almost impossible to

12    recognize, which is that everybody here lived through

13    January 6th, an almost unprecedented -- frankly, is an

14    unprecedented event in American history.

15         And when you watch these videos, from everything you've

16    seen and known, which far dwarfs what you've heard in this

17    courtroom, the narrative is that there was a riot that was

18    attacking the police.  The government wants you to use that

19    narrative and bolster it with this Three Percenter stuff.  But

20    recognize that that is the lens from which you are probably

21    automatically going to view these videos.

22         That's why the government starts with these messages

23    because not a single one of those messages, actually, is proof

24    of any assault.  They start with what?  "I'm going to slap a

25    commie with my dead arm."  That's clearly not in reference to

1    what happened on January 6th.  Nobody, not law enforcement, not

2    Mr. McAbee had any idea that there was going to be an assault

3    on the Capitol that day.

4         So why does the government bring that message up?

5    Because it makes him look bad.  That's why it's one of the

6    first things they start with, but not because it's proof that

7    he actually committed an assault.  He's clearly talking about

8    expected violence between protesters -- between protesters and

9    anti-protesters.  Not a single one of those messages before

10   January 6th mentions the police because he didn't go there

11   planning to engage in violence against the police.

12        He went there prepared for violence to happen to him,

13   but not from the police.  From other anti-protesters.  And as

14   he said at the time -- what media was he consuming?  Fox News,

15   other right-wing media.  Not reading the newspaper.  Not

16   listening to NPR.  That's the media he was consuming when he

17   was preparing to come to January 6th to see the President

18   speak, not to go to the Capitol.  And when did he go to the

19   Capitol?  When the President said to go.

20        But the video exonerates Mr. McAbee.  It does not

21   condemn him.  If you view it only in the lens the government

22   wants you to, with the assumption that anybody wearing a

23   Make America Great Again hat is committing a crime -- which is

24   a perfectly fine assumption, frankly, for the police to make

25   that day because when they are faced with a crowd, many of whom

1    are incredibly angry and violent, they don't have the luxury of

2    being able to discriminate.  They are being attacked, and what

3    they do is defend themselves.  And Mr. McAbee appears a member

4    of the crowd because chaos clouded the moment.

5           What they did, the assumptions they made were not

6    crimes.  They were perfectly understandable.  That is a fair

7    assumption for police to make in a moment of utter chaos, in a

8    prolonged moment of utter chaos.  It is not a fair assumption

9    for anyone to make in this courtroom, though, because we have

10   shown these videos time and time again -- and not just one, but

11   multiple videos -- because by comparing the camera angles, you

12   can see something on videos that you haven't seen before.

13          And even Officer Wayte testified that after viewing

14   these videos five or six times at least -- not alone, but with

15   the prosecution -- he saw things he hadn't seen before because

16   there is so much happening in such a little amount of time.

17   You can see things by viewing these videos over and over and

18   over again and listening to the videos.

19          Now, the government played a lot of slow-motion clips.

20   None of the audio of Mr. McAbee saying, "I'm trying to help

21   you, man," and not a single one of the government's witnesses

22   in this trial admitted to being able to hear that.  What does

23   that show you?  Not that they're lying.  I don't think a single

24   person got up in this courtroom, took the stand, and lied.

25   They told the truth from their perspective, which has been

1    colored by the lens of being a law enforcement officer who was

2    under assault on January 6th.

3          Maybe they're being honest when they say I can't quite

4    hear that.  Maybe it's because they've told themselves they

5    don't want to hear it, and they don't have to be lying to say

6    that.  They can be trying to tell the truth.  And just

7    recognize that bias that exists that everyone has, and that you

8    were specifically chosen because you said you could acknowledge

9    that and still be fair in this case.  Not a question asked of

10    any of the officers before they came up here and testified.

11          Now, the government's played most of these videos.  They

12    slowed them down.  I don't want to spend that much time on

13    them.  Officer Moore's video shows what, though?  Certainly it

14    shows Mr. McAbee standing on the edge of the crowd.  It shows

15    an individual dragging a police officer into the crowd.

16          And the government made a big deal about how Mr. McAbee

17    doesn't go to protect Officer Miller, who is the officer who is

18    being dragged by the helmet into the crowd.  It was done in

19    2 seconds.  And what was he seeing at the time?  It's not

20    entirely clear what he could have seen.

21          We had officers testifying that they did not see

22    Rosanne Boyland's dead body right on the ground in front of

23    them.  They're not lying about that.  They're telling the truth

24    because it was chaos, because you have -- as Mr. McAbee said,

25    you have tunnel vision.  Because at that moment you don't have

1   the ability to sit there and try to observe everything that is

2   happening.

3           (An audio-visual recording was played.)

4           MR. SCHIFFELBEIN:  And, of course, here's the part

5   where the government says Mr. McAbee is trying to pull

6   Officer Wayte into the crowd.  He is clearing touching

7   Officer Wayte.  Officer Wayte is clearly moving.

8           You cannot see from this angle very well, but there is

9   another individual who is pulling on Officer Wayte's right leg.

10  If Mr. McAbee wanted Officer Wayte to be in the crowd, why

11  would he grab over top of his leg with his right arm?  And why

12  would seconds after this he be gesturing and pointing on the

13  ground?  If he wanted Officer Wayte in the -- in the crowd,

14  don't you think this 300-pound man might have grabbed ahold of

15  either his belt or his shoe or anything and just kind of sunk

16  back pulling him with him?  He doesn't do that.  Why?  Because

17  he's not trying to be in the crowd.  Because he's not trying to

18  pull Officer Wayte down.

19          Making incidental contact with police officers in a

20  moment of chaos is not a crime.  It's not.  And it's not an

21  assault.  And from other angles, you can see that Mr. McAbee is

22  not -- as the government said today, when he lifts

23  Officer Wayte up by the vest -- the first time anybody said

24  anything about a slam happening is here in closing arguments.

25  And that's perhaps because the government recognizes that

1      Mr. McAbee is trying to lift Officer Wayte up, but he doesn't

2      slam him to the ground.  There is no slam.  You can't see that.

3      What you see is the two of them slide and, as the FBI agent

4      admitted, involuntarily down the stairs.

5                  (An audio-visual recording was played.)

6                  MR. SCHIFFELBEIN:  This is right when the government

7      said Mr. McAbee gets upset and he starts yelling at the

8      officers.  If you see in the upper left part of this tunnel,

9      right before this, an officer swings a baton down in a forceful

10     manner that either connects near Mr. McAbee's head or around

11     there, and Mr. McAbee was injured in the head that day.

12          That assault -- not assault, but that action isn't

13     captured on any body camera because these cameras aren't

14     capturing everything that's occurring.  But there is clearly an

15     officer swinging a weapon down into the crowd where there is a

16     dead body right there.  Maybe you would be upset too.  Maybe

17     anybody would be upset.  And what does Mr. McAbee do?  He does

18     not assault any of the officers.  He yells at them.  He points.

19     He's trying to get their attention.  It's only after he is

20     pushed that he reacts and commits a crime.

21          But Mr. McAbee doesn't start off by assaulting officers.

22     He reacts to being pushed by them.

23                  (An audio-visual recording was played.)

24                  MR. SCHIFFELBEIN:  And that was the involuntary

25     slide.  And the government has made a big deal about the 20 or

1    so seconds that Mr. -- that Officer Wayte is on the ground on

2    the stairs and that Mr. McAbee is on top of him.  Yes, it is a

3    long time, and it probably felt like an eternity.  If I sat

4    here and was silent for 20 seconds, it would start to get

5    awkward pretty fast.

6         But Mr. McAbee had no idea how he got from up there on

7    the level ground down 10 or 15 feet.  And he's now surrounded

8    by a crowd of people.  What is he supposed to do?  Well, as you

9    see later, he yells at who?  Not Officer Wayte.  At the

10   protesters and the rioters.  He says, "No.  Quit."  Why is he

11   saying that?  Not because he wants them to keep assaulting the

12   officer, because he's telling them to stop assaulting the

13   officer.

14        Right when he's yelling that, that's when Officer Wayte

15   testified there are people grabbing at his gas mask and ripping

16   it off his face.  And what is Mr. McAbee doing at that time?

17   He's saying, "No.  Quit," because he's not trying to assault

18   the officer.  He is, essentially, protecting him then.

19        He probably can't get up very fast because he's tired

20   too.  He weighs a lot.  There are people on top of him and

21   everywhere around him.  It's difficult for him to breathe

22   because this vest is pushing into his neck.  Officer Wayte

23   doesn't know what is going on at that time, and Mr. McAbee is

24   shielding him with his body.

25             (An audio-visual recording was played.)

1          MR. SCHIFFELBEIN:  This is another footage, which is

2     fairly short.  It's from almost an identical angle as the last

3     one.  And I play it only for the purpose of saying you can see

4     things in this video footage that you could not see in the last

5     one.  It's not because anybody is hiding anything.  It's

6     because when there is this much going on, when a scene is this

7     chaotic, you cannot just look at one video and assume that says

8     everything that is happening or shows it, because it doesn't.

9          (An audio-visual recording was played.)

10          MR. SCHIFFELBEIN:  And this video to me, the

11     involuntary slide, is clearer.  It is clear that Mr. McAbee is

12     not pulling Officer Wayte into the crowd with him.

13          Now, the government also talked about how for every

14     witness who testified about this interaction -- the defense

15     elicited that Mr. McAbee was standing between Officer Wayte's

16     legs; and that in order for Officer Wayte to get into the

17     crowd, Mr. McAbee would either have to lift up his leg or

18     somehow pull him through him.

19          Those are not the actions of somebody who is trying to

20     drag an officer into the crowd.  You would not stand over top

21     of him preventing that from happening.  You might stand over

22     top of him like that if you can't quite find where to put your

23     feet.  But if your goal is to get this officer into the crowd,

24     what he would do is step back down the stairs.  What he would

25     do is lower his center of gravity, which for Mr. McAbee was a

1    little bit above his hips, and he would use his weight and his

2    legs to pull the officer back.  But, instead, he's hunched

3    over, essentially, pointing at other officers, not at all in a

4    position where he would actually effectively pull anybody.

5         Which is why when you see Officer Wayte moving and you

6    see Mr. McAbee touching him, recognize that that is largely

7    because there is another person pulling on Officer Wayte's

8    legs.  Mr. McAbee is not in a position there, and he is not

9    grabbing Officer Wayte in a position where he could actually

10   cause that movement.

11        What you see in Officer Sajumon's body-camera footage --

12   which I'm not playing for you just because you've seen it

13   enough, and there's not much that's shown there.  But what is

14   shown is the actions of somebody who is not a part of the

15   crowd, who at that point is sort of not a part of any crowd.

16   He's not with the police.  He's not with the riot.  He is

17   utterly defeated.  Why?  Because somebody, essentially, just

18   died in front of him.

19        That would cause significant heartache to most people,

20   particularly to Mr. McAbee who was a trained first responder --

21   who is trained in lifesaving techniques.  But what you see

22   here -- and the government has made a big deal -- he touches at

23   his chest; right?  He says can I get in there, and he touches

24   the patch that says sheriff, is a half-hearted attempt at

25   special treatment.  Absolutely.

1    Who would not in this scene try to get to safety?

2    Anybody would.  Anybody would.  But he doesn't put up a fight.

3    He doesn't demand to get let through the police line.  It is

4    just that.  It is a half-hearted attempt to try to use what

5    little privilege he has at that point, which is a sheriff's

6    patch, to get to safety.  And you know that he doesn't have

7    nefarious intent because of what you can see him doing before

8    and how you see him walk away.

9    He is not assaulting police officers here.  He is

10    utterly defeated from everything that has happened to him.

11    And this is Officer Powell's body-worn camera footage.

12    It would be Defendant's 101.

13        (An audio-visual recording was played.)

14        MR. SCHIFFELBEIN:  That's Mr. McAbee walking back

15    into the crowd, being escorted.  Not proud or jubilant or happy

16    at the violence that is going around.  He doesn't have his fist

17    raised high in victory.  He's not excited about what happened.

18    He is utterly defeated from everything that has happened to him

19    and that he witnessed.

20        Because before he got to the line, he did not see all of

21    the violence that we have all come to associate with

22    January 6th.  When he saw that, he reacted.  When he saw

23    Officer Wayte on the ground, he went to -- as the government

24    admitted in its closing -- lift him up by his vest.  Now,

25    again, they think it's to slam him down.  But he went to try to

1    get him to his feet.  And when he saw Ms. Boyland's lifeless

2    body, he went to try to help her and did.

3         The barriers and barricades that the government has

4    spoken so much about were on the ground, were thrown down,

5    torn down, and entirely ignored by not just the protesters, but

6    also the police.  You'll see footage in the video montage that

7    the government put together of police officers standing

8    peacefully right next to people who are where?  In the

9    restricted area.

10        Because when you have conflicting messages, such as the

11   President of the United States saying go to the Capitol, and

12   you go to the Capitol and everybody is there and the police

13   are, essentially, for a period of time condoning your presence,

14   it's not at all clear you should go home.

15        Now, yes, at some point it does become clear.  Is it

16   when the tear gas goes off?  Is it when the flash-bangs are

17   being thrown into the crowd?  Is it when the police are using

18   rubber bullets to shoot at people?  Maybe.  But in this

19   country, the fact that tear gas is deployed by the police does

20   not necessarily mean that you should go home.

21        Sometimes it means that is exactly where you need to be

22   because the use of force by police alone does not mean to go

23   home, especially if people are protesting.  And for a period of

24   time, that is what this was.  A protest.  It, obviously, became

25   much more.

1          But when Mr. McAbee got to the Capitol, there is no
2     evidence that he saw any of this violence occur because it had
3     happened long before he got there.  So when he saw that first
4     line of police officers at the lower West Front terrace
5     entrance and he's not engaging with them, fighting with them
6     over the bike racks, it's because it wasn't at all clear he
7     wasn't allowed to be there.

8          Now, obviously, over the next two hours that he stayed
9     there, he should have left.  It was clear when the -- when the
10    riot overtook the Capitol, essentially when there were people
11    everywhere where there once were police, that he should not be
12    there.  And that is why you should convict him of that lesser
13    included count.  Because at that point, he should have gone
14    home.  But before then, it wasn't at all clear that he
15    shouldn't because he didn't see the violence happen, not by the
16    crowd, until he got to the front, which is why he's so defeated
17    here.

18         Because he was able to witness, once he's there, this
19    police line battling for their lives with the riot and people
20    dying on the ground in front of him.  Not something at all that
21    this five-foot-six person could see from lower down on the
22    ground because that tunnel is elevated and inside.  And so from
23    where he's standing outside of the tunnel at the reflecting
24    pond, there is no way he could observe any of the violence that
25    was happening within it.

1          This still image from body camera shows the chaos

2     moments before Mr. McAbee goes in to try to help Ms. Boyland

3     and Officer Wayte.  There are people everywhere, and the

4     government wants you to say that if Mr. McAbee wanted to help

5     he should have helped Officer Moore, who within a span of

6     2 seconds was pulled into the crowd.  Yes, it would have been

7     great if he could have stopped Officer Moore being pulled into

8     the crowd.

9          Is he guilty of a crime because he couldn't?  No.  Nor

10    are any of the other officers who tried to help Officer Moore

11    but could not, because things happened in an instant.

12              (An audio-visual recording was played.)

13          MR. SCHIFFELBEIN:  What does it look like when

14    somebody wants to assault the police?  This individual right

15    here who goes directly for a police officer and starts

16    assaulting him.  What does it not look like?  It does not look

17    like somebody stepping into the fray and using their hands to

18    point at people and bodies on the ground.

19              (An audio-visual recording was played.)

20          MR. SCHIFFELBEIN:  How do you know Mr. McAbee wasn't

21    trying to assault Officer Wayte?  Because when Officer Wayte is

22    on the ground, being assaulted, Mr. McAbee picks up a baton

23    because it draws his interest.  And what does he do with the

24    baton?  He drops it.  If he wanted to assault Officer Wayte and

25    drag him into the crowd, don't you think he might have used

1    that deadly or dangerous weapon to beat Officer Wayte?  He

2    didn't because he wasn't trying to assault him.  He would not

3    drop a weapon but still intend to assault these officers.  That

4    doesn't make sense because it's not what happened.

5              (An audio-visual recording was played.)

6              MR. SCHIFFELBEIN:  Now, that assault on Officer

7    Moore, the crime to which Mr. McAbee has pled guilty, because

8    he clearly assaulted Officer Moore, was done with open hands,

9    and it's not entirely clear at all from looking at this video

10   footage that he did not punch Officer Moore.  But why is it

11   important that he used open-fisted strikes?  Because that is a

12   less dangerous, less serious use of force than a closefisted

13   strike because it is less likely to cause injury, especially if

14   you're wearing gloves that have reinforced knuckles.

15         But the government's version of events is that

16   Mr. McAbee goes and essentially tries to use deadly force on

17   Officer Wayte by pulling him into a violent riot.  And then

18   what?  Uses a much less serious use of force, an open-handed

19   strike against Officer Moore?

20         Why would he de-escalate the force?  Because he's not

21   de-escalating the force.  Because what he's doing is reacting

22   to being pushed.  His training, as he said, is to create space

23   between himself and the threat.  At that point, the threat is

24   Officer Moore.  And what does he do?  He gives two quick

25   open-handed pushes -- strikes in police parlance -- to create

1    space between himself and Officer Moore.

2         What does he not do?  Continue to attack Officer Moore.

3    He doesn't advance because he's not trying to assault him.

4    He's creating space, and then he goes back.  He does yell at

5    the police officers.  Yes, he's angry at this point.  He is not

6    like some of these other people on this footage blinded by his

7    rage.  He doesn't have rage.  He has anger at what he is

8    seeing.  And then he goes and he sees and he helps

9    Officer Wayte on the ground.

10        How do we know he helped Officer Wayte?  Because he's

11   saying, "I'm trying to help you, man."  And even if, like all

12   of the government's witnesses, you can't hear Mr. McAbee say,

13   "I'm trying to help you, man," you can clearly hear

14   Officer Wayte in this sound bite that I'll play in a second,

15   saying, "Stop.  Get off of me."  And "I know.  I know.  Help me

16   up."

17        If he's being assaulted by Mr. McAbee, is he going to

18   ask for Mr. McAbee's help in helping him up?  No.  It's because

19   he knows at that time that Mr. McAbee is not assaulting him.

20   He's not one of the people ripping off his gas mask.  He's not

21   using these gloves to punch Officer Wayte.  Officer Wayte said

22   yes, at no point was there any punches or pushes -- yeah,

23   there's hands sort of wrestling, but he never was punched by

24   Mr. McAbee.  Why?  Because he wasn't trying to assault him.

25             (An audio recording was played.)

1          MR. SCHIFFELBEIN:  "I'm trying to help you, man."

2     Not fuck you, nothing like that.  "I'm trying to help you,

3     man."  Because he is trying to help Officer Wayte.  And

4     Officer Wayte at that time, before the full extent of his

5     injuries kicked in, recognized that as well.

6          Now, the government has said how seriously injured

7     Officer Wayte was.  What does that show you?  That he is not

8     the best person to testify about what happened to him.  He was

9     out of work for months based on the injuries he received,

10    including a concussion, which he admitted could cause memory

11    loss and problems perceiving what is happening.

12         And he did not see some of the stuff that was obviously

13    happening on his body-camera footage because of why?  The chaos

14    that was there.

15         Why are these pain techniques that we talked about

16    seemingly potentially irrelevant to this case?  Why do we ask

17    about them?  Because when you are being inflicted with pain,

18    the reason these techniques work, the reason police officers

19    use pepper spray is because it distracts you.  It means it's

20    harder to see what is going on and to focus on what is going

21    on.

22         Why do we talk about this dual function that the

23    Secret Service has, investigation and protection?  Because when

24    you are protecting people, you are not acting solely as a guard

25    or a lookout to try to find evidence to prosecute a crime.

1    Your first and foremost duty is protection, shown by these

2    officers either not seeing or seeing but realizing they can't

3    do anything about it, Rosanne Boyland's dead body, because what

4    they have to do first is protect.

5         How do we know that Mr. McAbee, though, used open-fisted

6    strikes?  Because if you go frame by frame in the video

7    footage, which you can -- you can do.  All you have to do is

8    open these videos in VLC media player, and you press E.  It

9    allows you to advance frame by frame.  Something you'll be able

10   to do in the deliberations.

11        But you can see -- and if you look at the body-camera

12   footage, this is all within about a second.  What you see here

13   is an extended fist, fingers out.  This -- extended hand,

14   fingers out.  This is not a fist.  This is not somebody who is

15   about to punch.  What do we think; he's using an extended hand

16   to get to here and then punch?  No.  He's pushing an

17   open-handed strike to create space, like he testified to.

18        What do you see here?  His other hand.  Albeit, yes,

19   more difficult to see.  But you can see a thumb extended.

20   Nobody throws a punch with their thumb out.  It is dangerous

21   and ineffective.

22        And what do you see here?  More fingers extended, all of

23   which -- right immediately before, in the 1 second or so this

24   assault occurs, the assault to which he's pled guilty, his

25   hands are open because he is not trying to inflict unnecessary

1    or wanton pain.  He is creating space.

2         And, yes, he did try to help people that day.  The

3    government's made a big deal about the fact that in all of the

4    video footage you don't see Mr. McAbee bending down to help

5    this poor person, who is seen -- he's got his arms around her

6    at this point.  Those are his gloves.  But, again, the video

7    footage doesn't capture everything.

8         And he testified, yes, I tried to help her up and, yes,

9    other people helped her up as well.  That's not inconsistent

10   with the evidence.  That is consistent with the evidence that

11   the video footage -- that one camera footage -- is not going to

12   capture everything that occurred, especially when people are

13   panning away.

14        Now, Mr. McAbee, again, in addition to using open-handed

15   strikes, when he makes contact with Officer Wayte -- which,

16   again, he never strikes.  But when he makes contact with

17   Officer Wayte, what are his other -- hands doing?  He is not

18   grabbing Officer Wayte's leg to try to pull him down.  Yes, at

19   some point he does touch his leg.  Not in a manner consistent

20   with wanting to pull him down the stairs.  But he does touch

21   him, and he does move him a little bit.

22        But what is his other hand doing?  It is clearly

23   pointing elsewhere because he's not trying to pull

24   Officer Wayte into the crowd.  If he was, why would he be

25   pointing?  This is all within the span of 3 or 4 seconds.  If

1    his goal is to pull Officer Wayte into the crowd, he would not

2    use his dominant hand to point to the ground.  And not just

3    once, but several times.

4         And where is he pointing?  Where Ms. Boyland's dead,

5    lifeless body was.  And the police admitted they might not have

6    seen her.  Would not have been paying attention to her.  And

7    that's not a crime.  It's understandable.  But it's also

8    understandable that that is why Mr. McAbee stepped in there and

9    tried to draw their attention.

10        And this is right before Mr. McAbee is pushed by

11   Officer Moore.  He's clearly not in a position wanting to drag

12   Officer Wayte into the crowd.  He's over top of him entirely,

13   not at all touching his legs.  If you slow the camera footage

14   down and you play it frame by frame, you can see these are not

15   the actions of somebody who is trying to drag this officer into

16   the crowd.

17        And with an open hand, why would he reach out to the

18   officers?  They're saying -- the government said in closing,

19   he's trying to push at the officers because he's mad.  This is

20   not how you react if you're trying to assault officers.  This

21   is not the body language of somebody who is about to engage in

22   an assault.

23        Now, is Mr. McAbee proud of what he did that day?  No.

24   He testified about that.  But when he saw people in trouble, he

25   tried to help.  This is him shouting no at the protesters, at

1    the rioters who are clawing at Officer Wayte while

2    Officer Wayte is defenseless, save for Mr. McAbee's shielding

3    him with his body.

4            (An audio-visual recording was played.)

5            MR. SCHIFFELBEIN:  And you can hear, though much less

6    clearer in this audio -- I understand.  You can play around

7    with the equalizer and make things more clear -- but

8    Mr. McAbee, again, saying, "I'm trying to help you, man."

9            And how do you know that he was trying to help

10   Officer Wayte and not assault him?  Because minutes later, when

11   they are -- not minutes.  Seconds later when they're walking up

12   the stairs together, Mr. McAbee is directly behind

13   Officer Wayte.  You can see Mr. McAbee's glasses and that vest

14   of Officer Wayte.  He's not assaulting Officer Wayte.

15           Now, as the government said today, it's because

16   Mr. McAbee maybe had a change of heart.  Maybe he recognized,

17   oh, man assaulting a police officer is a big deal.  Do we

18   really think that happened in the span of 30 seconds when all

19   this chaos is occurring?  What is more plausible?  That he

20   never intended to assault the officer.  This isn't somebody

21   stabbing another person and bringing them to the hospital.

22   This is somebody seeing a brawl, trying to help, engaging in

23   defensive tactics in that brawl, and then continuing to try to

24   help.

25           The government said at the beginning of its case, use

1    your common sense.  Which story makes more sense?  The

2    government's version where Mr. McAbee tries to assault and then

3    realizes it's a big deal and then tries to help?  Or the fact

4    that Mr. McAbee's story is consistent?  I was trying to help.

5    I got pushed.  I pushed back.  I went back to help.  And what

6    does he do after this?  He gives CPR to Ms. Boyland because

7    he's trying to help.

8         Now, yes, Mr. McAbee did a very stupid thing,

9    celebrating the day after, posing with a photograph.  That's

10   the photograph on the left.  That was before the full extent of

11   what happened had sank in.

12        What you did not hear in the evidence -- despite the

13   government having his phone for months afterwards, is that

14   Mr. McAbee is posting this on social media or sending this to

15   more than -- what? -- two people?  One of whom is the guy

16   pictured in that photograph.  And the other one is Uncle Eddie.

17   What do you know about your text messages with people?  That

18   sometimes you engage in puffery and bravado, especially men,

19   masculine -- wanting to be masculine men like this.  People who

20   pride themselves on being men, what do they do?  They puff each

21   other up.  That's what was happening.

22        But how do you know what Mr. McAbee was feeling the day

23   of?  By this still image on the right.  His defeated presence

24   that day, before he's had any chance to reflect on partially

25   what has happened to him.  How do you know how Mr. McAbee felt

1     that day?  Because when he's walking back, he is hunched over,

2     almost in a fetal position.

3           Now, yes, Mr. McAbee wore a vest.  It was not his duty

4     vest, and he wore it to protect himself, not because he

5     expected gunfire, but because he thought there might be people

6     hurting protesters.  Was it a good decision to wear the

7     sheriff's patch?  No.  But you did not see any insignia

8     identifying it as the Williamson County Sheriff's Department.

9     It was a generic sheriff patch.  And it's no longer on this

10    vest because he took it off when he quit law enforcement.

11          And then you have, as the government has several times

12    said, steel-reinforced gloves/brass knuckle gloves.  You've all

13    felt these, and you'll have them back in the deliberation room.

14    You might have been disappointed feeling these after hearing so

15    much, deadly or dangerous weapon, steel-reinforced gloves/brass

16    knuckles gloves.  It's not even clear these are metal.  That

17    doesn't sound like steel.  That's plastic.  These are cheap

18    gloves that are not, by the way, illegal to have in the

19    District of Columbia, as the government said.  Brass knuckles

20    sure are, yes.

21          What did Mr. McAbee not bring with him?  Brass knuckles.

22    He brought cheap motorcycle gloves that cost $17 on amazon.com.

23    These are not a deadly or dangerous weapon.  Yes, they might

24    cause much more injury if you punched with these than with your

25    knuckles, possibly.  But these are not a deadly or dangerous

1    weapon.  These are the gloves that he decided to wear to

2    protect himself if he was assaulted in the protest.

3         Why is it that every officer in the CDU unit, the civil

4    disturbance unit, has gloves with reinforced plastic parts

5    on -- on them?  It's not because, you know, they are going to

6    punch people, even though they can.  It's because these

7    officers, when you're engaged in the civil disturbance unit,

8    you arm yourself from being assaulted by civil disturbance, and

9    you protect your hands.  That's what these gloves were doing.

10        But these are not in any way -- and especially in the

11   way in which Mr. McAbee used them that day -- a deadly or

12   dangerous weapon.  Because at no point did any of the

13   reinforced parts, plastic or -- not steel -- maybe brass --

14   touch any officer.  The cloth part did.  This is not a deadly

15   or dangerous weapon.  Not at all.  This is overcharging.

16        Now, I'm going to sit down in a minute.  The government

17   is going to have a chance to respond.  It's because they have

18   the burden of proof.  It's because they're the ones who have to

19   convince you beyond a reasonable doubt that Mr. McAbee has

20   committed any of these charged offenses.  And, again, convict

21   him of entering or remaining.  Not with a deadly or dangerous

22   weapon, but entering or remaining in a restricted area.

23        And when the government finishes, it is your job as

24   jurors to evaluate what they've said, to question what they

25   have said, to think what might somebody have said in response

1  to that.  That's what the burden of proof means.  It means that

2  they alone have to convince you.  And you, a jury of people who

3  all experienced January 6th -- everyone in this city did and

4  everyone in this box did -- it would be impossible to ask you

5  to ignore your feelings about January 6th when you're deciding

6  this case.  Not at all possible.

7        But each one of you committed to being a fair juror in

8  this case; to evaluating the evidence in this case; to

9  potentially recognizing that although on the street you might

10  have an emotive response to somebody wearing a Make America

11  Great Again hat, that you can recognize why the police might

12  have had an emotive response to Mr. McAbee wearing such a hat

13  on January 6th, that in this courtroom, you can't have that

14  emotive response.

15        Yes, January 6th was unprecedented.  What is not

16  unprecedented is a jury of people, all of whom have experienced

17  a traumatic event, having to fairly evaluate whether the

18  government has proven its case.  And although we might say it's

19  Mr. McAbee on trial, it's really the government's evidence on

20  trial.

21        And juries have done that since before our country was

22  founded.  1770, John Adams defended British soldiers charged in

23  the Boston Massacre, and the hero of that story is not

24  John Adams.  It's the jury, all of whom experienced this

25  traumatic event and were on the other side of the defendants

1    politically and still recognized that the government couldn't

2    prove its case beyond a reasonable doubt and acquitted.

3           It's not because acquitting people is consistent with

4    justice.  It's because acquitting people when the government

5    can't prove its case is consistent with justice.  It's because

6    although there was a mob on January 6th, there is not mob law

7    here.  So we ask you to do your duty.  Recognize your

8    prejudices that everybody has.  Recognize that they're there

9    and evaluate the evidence and find Mr. McAbee not guilty of

10   assaulting Officer Wayte, but please do convict him of the

11   lesser included of entering or remaining.

12          Thank you.

13          THE COURT:  Ms. Kearney.

14          MS. KEARNEY:  The defendant wants you to believe that

15   he is the victim here; that he was attacked, his words -- by

16   the police when he was only trying to help.  Ladies and

17   gentlemen, you have heard from a lot of witnesses in this case,

18   and the only witness who told you that the defendant was

19   helping Officer Wayte is the defendant himself.  You have

20   absolutely no reason to believe him.

21          First, it is absurd to argue that the defendant is

22   accepting responsibility for his bad conduct on January 6th by

23   pleading guilty to assaulting Officer Moore.  It would be

24   really hard to fight that one, ladies and gentlemen.  He is on

25   multiple videos screaming obscenities at that officer before

1    striking him twice.

2         And Mr. Schiffelbein just came before you asking you to

3    convict the defendant of being in that restricted area.  But

4    you know who couldn't admit that he was?  The defendant.  He

5    couldn't even say to you that he knew he wasn't supposed to be

6    on Capitol Grounds that day.  He told you he saw that fencing

7    on the ground.  He heard the LRAD.  He saw the tear gas.  He

8    was hit with a rubber bullet.

9         Anyone would know that place was off-limits.

10   Mr. Schiffelbein admits that place was off-limits.  But the

11   defendant wouldn't.  And he wouldn't admit that he wasn't

12   allowed to be up at the foot of that tunnel an hour later.  He

13   cannot bring himself to say that to you, ladies and gentlemen.

14   And that was not truthful.

15        Do you really think that Mr. McAbee wore a bandana

16   across his face on January 6th because of COVID regulations?

17   Check the text messages between him and Mike Roberts.  Roberts

18   had COVID when they were planning this trip.  The defendant was

19   fine with it.  And his behavior on January 6th shows that he

20   was not concerned about D.C.'s municipal regulations.

21   Remember, he didn't leave when he heard that LRAD.  He went

22   farther.  He went closer to the Capitol.

23        This defendant was not candid with you, and you should

24   not credit that testimony.  The defendant also exaggerated to

25   make himself seem like more of a Good Samaritan than he was on

1    January 6th.

2         Remember the woman in the goggles that he claims to have

3    helped up?  It's not in the video.  Sure, he's near her, but

4    you have the video of someone helping her up.  It's the man in

5    the red face paint and maybe that man in the eagle outfit.

6    They're the ones who pull her up while the defendant watched.

7    So he's there.  He probably recognizes that she needed help,

8    but he's not the one who helped her.

9         So either the defendant was purposefully not being

10   truthful with you or he's rewritten what happened in his own

11   mind with himself as the hero.  Either way, you shouldn't

12   believe him.

13        And what I really want to get to here, ladies and

14   gentlemen, is the defendant's own story about helping

15   Officer Wayte.  It's at odds with everything else he is doing

16   in that archway.  Ms. Foster walked you through this earlier.

17   Before grabbing Officer Wayte's leg, the defendant watched as

18   Officer Miller was dragged out into the crowd.  He didn't

19   intervene.  He didn't try to grab Officer Miller's feet to

20   prevent him from being pulled into the mob.  He testified he

21   was busy admiring the aesthetics of the baton and adjusting his

22   hat.

23        But when the defendant starts crossing the archway, he

24   pushes Officer Moore back, preventing Officer Moore from

25   getting to Officer Wayte.  Those are not the actions of someone

1    looking to help an officer.

2         And as Officer Wayte is lying on his back, another

3    officer, the man in the gray coat, grabs Officer Wayte's right

4    leg and starts violently pulling.  The defendant saw that

5    happen.  He looked at that man as that man was pulling

6    Officer Wayte's leg.  He doesn't try to push that man away from

7    Officer Wayte.  He doesn't try to pull Wayte's leg in the other

8    direction.  He joins in.  He grabs the other leg, and he pulls

9    along with that man in the gray coat.

10        And, remember, as all of this is happening, the other

11   officers in the line are trying to get to Officer Wayte.  The

12   officer in the gas mask grabs at the back of Officer Wayte's

13   jacket, tries to pull him back into the line.  And the

14   defendant doesn't let that officer do what he's supposed to do.

15   He doesn't think, you know what, they've got this and then let

16   Wayte go and turn his attention to Ms. Boyland.  No.  He pulls

17   back against that officer.

18        None of these actions are consistent with the

19   defendant's story that he was trying to help Officer Wayte.

20        And so I ask you, ladies and gentlemen, think about all

21   the things the defendant wouldn't say.  Think about all the

22   things he didn't do, all the incredible things that he

23   testified about before you decide to believe his story.

24        Now, ladies and gentlemen, you'll get instructions from

25   the Court when we're done here, and the Court will instruct you

1    that an assault is an intentional attempt or threat to inflict

2    injury on someone else, coupled with the apparent ability to do

3    so.  And I submit to you that that is what the defendant did to

4    Officer Wayte, even up to this point.  That's an assault.

5         But you don't have to stop there.  Remember, there are

6    five other ways to be guilty of Count 1.  You can assault an

7    officer, but you can also resist, oppose, impede, intimidate,

8    or interfere with an officer.  And that's also what the

9    defendant did to Officer Wayte.

10        So even if you believe that the defendant was

11   repositioning Officer Wayte so that he could get to

12   Ms. Boyland, he's still impeding and interfering with

13   Officer Wayte.  He is preventing Officer Wayte from getting

14   back to the police line.  He is thwarting Officer Wayte's

15   efforts to keep from being dragged into the mob.  He is

16   impeding.  He is interfering.

17        And then comes that fateful slide down the stairs.  Now,

18   the defendant may not have meant to go down the steps in

19   precisely that way.  But it's clear that that is the direction

20   that he was trying to move Officer Wayte in.  When they reached

21   the bottom, the defendant doesn't jump off just to get off of

22   him.  For more than 20 seconds, he holds Officer Wayte down, as

23   the officer tries to free himself, as he's pushing his arms up

24   on the defendant.  And the defendant is pulling his arms and

25   hands away.

1    As Officer Wayte is pinned under the defendant, he is

2    unable to defend himself.  He is unable to prevent other

3    rioters from striking him, and he's unable to prevent his gas

4    mask from being ripped off his face.  And he's unable to

5    prevent another rioter from spraying him in the face with mace

6    or bear spray.

7    And let's be clear.  The defendant knew what it was

8    like to be in that mob.  He had been there for 40 minutes

9    already.  He heard the threats.  He saw them trying to break in

10   through the tunnel, and he saw them using weapons against

11   officers.  So by holding Wayte down, he's aiding the rioters'

12   efforts to assault him, and he's also continuing to impede and

13   interfere with Wayte's efforts to free himself and to get back

14   to safety.

15   Now, you heard Officer Wayte testify about the time that

16   he was being held down and how during that time he knew that it

17   was important to keep his eyes open; that it was important to

18   pay attention because of all the threats that were around him.

19   And you heard how he was focused on the defendant.  But he took

20   advantage of a brief respite to roll over and to climb back up

21   the steps to the police line in the tunnel.  No one helped him.

22   No one pulled him up.  And certainly not the defendant.

23   Now, as Ms. Foster indicated, maybe the defendant had a

24   moment of regret for what he had done to Officer Wayte and

25   stopped holding him down.  Maybe he stood up.  Maybe he thought

1    that might make things better, but that doesn't undo what he

2    had already done.

3        I want to talk about Ms. Boyland for just a moment.  The

4    defendant did try to help her.  The parties have stipulated to

5    that.  You've seen the video.  And maybe his frustration and

6    his concern and his anger about what was happening to her

7    were part of his motivation in dragging Wayte away from his

8    fellow officers and in lashing out at the other officers in the

9    line.  But anger and rage and frustration are not

10   justifications for assault, and they are not an excuse for

11   breaking the law.

12       Now, Mr. Schiffelbein talked to you about the kind of

13   violence that Mr. McAbee was preparing for.  Ladies and

14   gentlemen, no one is saying that Mr. McAbee went to the Capitol

15   in order to assault Officer Wayte.  That is not what we're

16   arguing.  But he went with the mindset that there would be

17   violence, and he was prepared for that violence.  And so when

18   he was presented with the opportunity to join in, that's what

19   he did.

20       And I also want to talk to you about Officer Wayte's

21   injuries.  Ms. Foster listed them for you.  You saw the video

22   of the laceration to his head.  You also heard Officer Wayte

23   testify about the injuries to his elbow, the bruisings and the

24   scrapes on the rest of his body, how hard it was to move, all

25   the goose eggs on his head, the concussion that he suffered.

1   And he told you that he doesn't remember the specifics of when

2   and how he received all of those injuries.

3        But after those first few minutes in the tunnel, he was

4   awaiting medical attention elsewhere in the Capitol.  So you

5   know he received those injuries when he was at the front of the

6   tunnel.  And it's clear that the defendant didn't cause every

7   single one of them.  The blood was on Wayte's jacket before the

8   defendant grabbed him.

9        But it's also clear that Officer Wayte sustained

10  injuries every step of the way.  He testified that he recalled

11  being struck while he was on his back in the archway, when

12  the defendant was pulling him towards the mob, while he was

13  sliding down the stairs, and while the defendant was holding

14  him down.  He recalls being in pain from being dragged down

15  those steps.  And he recalled the pain of being exposed to

16  chemical spray when his gas mask was ripped off.

17       Let's talk about civil disorder.  Defense counsel has

18  tried to argue to you that somehow Mr. McAbee has to have opted

19  to be part of the civil disorder; it has to have been his goal

20  to engage in the acts that affected commerce or that interfered

21  with the federally protected function.

22       That's not the law.  The civil disorder part of the

23  charge is about the context within the -- within which the

24  officers were acting, whether they were engaged in the

25  performance of their duties during a civil disorder.  And it's

1    clear that they were.  You've seen the video footage.  You've

2    heard the testimony of Captain Mendoza and of Special Agent

3    Glavey.  You've seen the records from Safeway.

4         And so in that context, all that is required is that the

5    government prove that the defendant committed an act with the

6    purpose of obstructing, impeding, or interfering with one or

7    more of those law enforcement officers.  And that's what the

8    defendant did.  He assaulted Officer Moore, and we've already

9    walked through all of the ways that he assaulted, impeded, and

10   interfered with Officer Wayte and with all the other officers

11   in that line, including the officer in the gas mask who was

12   trying to drag Officer Wayte to safety.

13        Let's talk about those gloves, ladies and gentlemen.

14   You'll have the opportunity to inspect them.  You can pass them

15   around.  You can try them on.  And, look, they're not

16   inherently dangerous in the way something like a gun would be,

17   but it's clear that they are capable of causing serious bodily

18   injury if used in the right way.

19        You've heard testimony about what brass knuckle gloves

20   are.  They're meant to protect your hands, yes.  That's why

21   some officers in CDU wear them.  But officers in the CDU are

22   holding a baton.  You saw how Officer Moore was holding his

23   baton.  They are reaching out and exposing their knuckles to a

24   violent crowd.

25        Did Mr. McAbee think he was going to get rapped on the

1   knuckles at the riot?  No.  He's wearing them because they make

2   your punch exact more damage, and that's why actual brass

3   knuckles are illegal in D.C.  And it's clear that when the

4   defendant wore those knuckles to the Capitol on January 6th, he

5   intended that they be used as a weapon.

6        First, he did -- "he did" -- use them as a weapon.  When

7   he strikes Officer Moore, you will see in Officer Moore's

8   body-worn camera one of his hands is balled in a fist.  But you

9   have multiple angles.  You can also watch Officer Wayte's

10  body-worn camera, the one facing up.  And you'll see in the

11  shadow what Mr. Schiffelbein called a thumb, which I submit,

12  ladies and gentlemen, is the tab on those gloves.

13       But for this charge, the defendant doesn't actually have

14  to have used those gloves in a way that could cause serious

15  bodily injury so long as he carried them; that is, he wore them

16  with the intent that they be used that way.

17       And the defendant made clear in his text to Mike Roberts

18  exactly why he wanted those gloves as a weapon.  So when do

19  they first come up?  After Roberts texts a picture of his

20  arsenal.  That's Government Exhibit 106A.  That's a magazine, a

21  knife, and brass knuckles.  And the defendant asks "How can I

22  get some knuckles?"  He has just received a picture of

23  offensive weapons, and he asks how he can get some knuckles.

24       And he follows it up by commenting that he has "a tire

25  repair kit and a t handle tire puncture is a great tool."  What

1   is that?  Well, he told you.  That's a weapon.  That is

2   something sharp that you can hold in your fist to stab someone.

3   So the defendant is clearly thinking about those knuckles,

4   which he ends up purchasing as weapons.  And so when he brought

5   them to the Capitol, when he wore them to the Capitol, he was

6   intending to use them that way.

7        Now, normally, ladies and gentlemen, we know the

8   defendant's intent because they use a weapon that way.  But

9   here we have those texts.  So you don't even have to speculate

10  if that's how he meant to use them.  He told you that's how he

11  meant to use them.

12       Mr. Schiffelbein talked to you about the lens through

13  which to judge the defendant.  Ladies and gentlemen, this is

14  not about his Make America Great Again hat.  This is not about

15  his political beliefs.  This is about his conduct on

16  January 6th.  You should consider that conduct carefully.  You

17  should watch all those videos.  And when you do, you will see

18  that Ronald Colton McAbee assaulted, resisted, opposed,

19  impeded, intimidated, and interfered with Officer Wayte.

20       Although the defendant wore his sheriff's patch on

21  January 6th, he didn't use it to maintain order.  He did

22  nothing to calm the crowd or to convince them to go home.  He

23  didn't engage in any of those de-escalation techniques that he

24  testified he would have if he were the Capitol Police.  He

25  didn't pull any rioters off of officers.  And he also didn't

1   leave.  He didn't turn around, make his way out of the crowd,

2   and go back and have a beer at his hotel.

3          Officer Wayte, Officer Moore, Officer Dyer,

4   Officer Powell, and Officer Sajumon, they did not choose to be

5   at the Capitol on January 6th.  They responded, putting their

6   lives at risk because it was their duty.  The defendant had a

7   choice.  He chose to fight, and that's why he was at the

8   Capitol on January 6th.

9          THE COURT:  Thank you.

10          We're going to take a five-minute break, and then I'll

11   read the instructions to you.

12          (Proceedings held out of the presence of the jury.)

13          (Recess taken.)

14          (Proceedings held in the presence of the jury.)

15          THE COURT:  All right.  Welcome back.  Have a seat,

16   please.

17          So this is the last step before you start -- have lunch

18   and then start your deliberations.  So I'm going to read you

19   the instructions that apply to the case.  You don't have to

20   take notes, and if you want a copy of the instructions, a

21   written copy, I'm happy to provide that.  I don't think I've

22   ever had a jury that didn't ask for them.  So don't be sheepish

23   about asking for them.

24          All right.  So, members of the jury, at this time it is

25   my duty and responsibility as the trial judge to give you

1    instructions as to the law that applies in this case and to the

2    evidence that has been presented.  After I conclude these

3    instructions, you will have lunch and begin your deliberations.

4         As I explained to you at the beginning of the trial, my

5    function is to conduct this trial in an orderly, fair, and

6    efficient manner, to rule on questions of law, and to instruct

7    you on the law that applies in this case.  It is your duty to

8    accept the law as I instruct you.  Again, you should consider

9    all the instructions as a whole.  You may not ignore or refuse

10   to follow any of them.

11        Your function, as the jury, is to determine what the

12   facts are in this case.  You are the sole judges of the facts.

13   While it is my responsibility to decide what is admitted as

14   evidence during the trial, you alone decide what weight, if

15   any, to give to that evidence.  You alone decide the

16   credibility or believability of the witnesses.

17        As human beings, we all have personal likes and

18   dislikes, opinions, prejudices, and biases.  Generally, we are

19   aware of these things.  You should also consider the

20   possibility that you have implicit biases; that is, biases of

21   which you may not be consciously aware.

22        Personal prejudices, preferences, or biases have no

23   place in the courtroom where our goal is to arrive at a just

24   and impartial verdict.  All people deserve fair treatment in

25   our system of justice, regardless of any personal

1    characteristic, such as race, national or ethnic origin,

2    religion, age, disability, sex, gender, identity or expression,

3    sexual orientation, education, or income level.  You should

4    determine the facts solely from a fair consideration of the

5    evidence.  You should decide this case without prejudice, fear,

6    sympathy, favoritism, or consideration of public opinion.

7         You may not take anything I may have said or done as

8    indicating how I think you should decide this case.  If you

9    believe that I have expressed or indicated any such opinion,

10   you should ignore it.  The verdict in this case is your sole

11   and exclusive responsibility.

12        If any reference by me or the attorneys to the evidence

13   is different from your own memory of the evidence, it is your

14   memory that should control during your deliberations.

15        During the trial, I have permitted those jurors who

16   wanted to do so to take notes.  You may take your notebooks

17   with you to the jury room and use them during your

18   deliberations, if you wish.  As I told you at the beginning of

19   the trial, your notes are only to be an aid to your memory.

20   They are not evidence in the case, and they should not replace

21   your own memory of the evidence.  Those jurors who have not

22   taken notes should rely on their own memory of the evidence.

23   The notes are intended to be for the notetaker's own personal

24   use.

25        Every defendant in a criminal case is presumed to be

1    innocent.  The presumption of innocence remains with the

2    defendant throughout the trial unless and until the government

3    has proven he is guilty beyond a reasonable doubt.  The burden

4    never shifts throughout the trial.  The law does not require

5    Ronald McAbee to prove his innocence or to produce any evidence

6    at all.

7         If you find that the government has proven beyond a

8    reasonable doubt every element of a particular offense with

9    which Ronald McAbee is charged, it is your duty to find him

10   guilty of that offense.  On the other hand, if you find the

11   government has failed to prove any element of a particular

12   offense beyond a reasonable doubt, it is your duty to find

13   Ronald McAbee not guilty of that offense.

14        The government has the burden of proving Ronald McAbee

15   guilty beyond a reasonable doubt.  In civil cases, it is only

16   necessary to prove that a fact is more likely true than not,

17   or, in some cases, that its truth is highly probable.  In

18   criminal cases, such as this one, the government's proof must

19   be more powerful than that.  It must be beyond a reasonable

20   doubt.

21        Reasonable doubt, as the name implies, is a doubt based

22   on reason; a doubt for which you have a reason based upon the

23   evidence or lack of evidence in the case.  If after careful,

24   honest, and impartial consideration of all the evidence you

25   cannot say that you are firmly convinced of the defendant's

1    guilt, then you have a reasonable doubt.

2         Reasonable doubt is the kind of doubt that would cause a

3    reasonable person, after careful and thoughtful reflection, to

4    hesitate to act in the graver or more important matters in

5    life.  However, it is not an imaginary doubt, nor a doubt based

6    on speculation or guesswork.  It is a doubt based on reason.

7    The government is not required to prove guilt beyond all doubt

8    or to a mathematical or scientific certainty.  Its burden is to

9    prove guilt beyond a reasonable doubt.

10        In considering this case, you must not allow the nature

11   of the charges themselves to affect your ability to reach a

12   fair and impartial verdict.  You must consider only the

13   evidence that has been presented in this case in reaching a

14   fair and impartial verdict, disregarding any personal feelings

15   you may have about the nature of the charges or Mr. McAbee's

16   political or social views.

17        This case involves alleged conduct of the defendant that

18   may be directly relevant to his political views or beliefs

19   around the time of that conduct.  As a general matter, a

20   person's political views are not a relevant consideration in

21   deciding whether the government has met its burden of proof.

22   In some cases, such as this case, political beliefs or views

23   may be relevant to a defendant's mental state.  And if so, you

24   should consider them only in this respect.  But you should not

25   hold any perceived view of a defendant's political belief or

1    views against him.

2         During your deliberations, you may consider only the

3    evidence properly admitted in this trial.  The evidence in this

4    case consists of the sworn testimony of the witnesses, the

5    exhibits that were admitted into evidence, and the facts and

6    testimony stipulated to by the parties.  During the trial, you

7    were told that the parties had stipulated -- that is, agreed --

8    to certain facts.  You should consider any stipulation of fact

9    to be undisputed evidence.

10        When you consider the evidence, you are permitted to

11   draw from the facts that you find have been proven such

12   reasonable inferences as you feel are justified in light of

13   your experience.  You should give any evidence such weight as

14   in your judgment it is fairly entitled to receive.

15        The statements and arguments of the lawyers are not

16   evidence.  They are only intended to assist you in

17   understanding the evidence.  Similarly, the questions of the

18   lawyers are not evidence.

19        A criminal indictment is merely the formal way of

20   accusing a person of a crime.  You must not consider the

21   indictment as evidence of any kind.  You may not consider it as

22   any evidence of Ronald McAbee's guilt or draw any inference of

23   guilt from it.

24        The lawyers in this case sometimes objected when the

25   other side asked a question, made an argument, or offered

1    evidence that the objecting lawyer believed was not proper.

2    You must not hold such objections against the lawyer who made

3    them or the party he or she represents.  It is the lawyers'

4    responsibility to object to evidence that they believe is not

5    admissible.

6         If during the course of the trial I sustained an

7    objection to a lawyer's question, you should ignore the

8    question, and you must not speculate as to what the answer

9    would have been.  If after a witness answered a question I

10   ruled that the answer should be stricken, you should ignore

11   both the question and the answer, and they should play no

12   part in your deliberations.  Likewise, exhibits as to which

13   I have sustained an objection or that I ordered stricken are

14   not evidence, and you must not consider them in your

15   deliberations.

16        There are two types of evidence from which you may

17   determine what the facts are in this case, direct evidence and

18   circumstantial evidence.  When a witness, such as an

19   eyewitness, asserts actual knowledge of a fact, that witness's

20   testimony is direct evidence.  On the other hand, evidence of

21   facts and circumstances from which reasonable inferences may be

22   drawn is circumstantial evidence.

23        Let me give you an example.  Assume a person looked out

24   a window and saw that snow was falling.  If he later testified

25   in court about what he had seen, his testimony would be direct

1   evidence that snow was falling at the time he saw it happen.

2   Assume, however, that he looked out a window and saw no snow on

3   the ground and went to sleep and saw snow on the ground after

4   he woke up.  His testimony about what he had seen would be

5   circumstantial evidence that it had snowed while he was asleep.

6          The law says that both direct and circumstantial

7   evidence are acceptable as a means of proving a fact.  The law

8   does not favor one form of evidence over another.  It is for

9   you to decide how much weight to give any particular evidence,

10  whether it be direct or circumstantial.  You are permitted to

11  give equal weight to both.  Circumstantial evidence does not

12  require a greater degree of certainty than direct evidence.  In

13  reaching a verdict in this case, you should consider all of the

14  evidence presented, both direct and circumstantial.

15         The weight of the evidence is not necessarily determined

16  by the number of witnesses testifying for each side.  Rather,

17  you should consider all of the facts and circumstances in

18  evidence to determine which of the witnesses you believe.  You

19  might find that testimony of a smaller number of witnesses on

20  one side is more believable than the testimony of a greater

21  number of witnesses on the other side, or you might find the

22  opposite.  In determining whether the government has proved the

23  charges against the defendant beyond a reasonable doubt, you

24  must consider the testimony of all the witnesses who have

25  testified.

1        You are the sole judges of the credibility of the

2   witnesses.  You alone determine whether to believe any witness

3   and the extent to which a witness should be believed.  Judging

4   a witness's credibility means evaluating whether the witness

5   has testified truthfully and also whether the witness

6   accurately observed, recalled, and described the matters about

7   which the witness testified.  As I instructed you at the

8   beginning of trial, and again just now, you should evaluate the

9   credibility of witnesses free from prejudices and biases.

10       You may consider anything that in your judgment affects

11  credibility of any witness.  For example, you may consider the

12  demeanor and the behavior of the witness on the witness stand;

13  the witness's manner of testifying; whether the witness

14  impresses you as a truthful person; whether the witness

15  impresses you as having an accurate memory; whether the witness

16  has any reason for not telling the truth; whether the witness

17  had a meaningful opportunity to observe the matters about which

18  he or she has testified; whether the witness has an interest in

19  the outcome of the case, stands to gain anything by testifying,

20  or has friendship or hostility toward other people concerned

21  with this case.

22       In evaluating the accuracy of a witness's memory, you

23  may consider the circumstances surrounding the event, including

24  the time that elapsed between the event and any later

25  recollections of the event, and the circumstances under which

1    the witness was asked to recall details of the event.

2         You may consider whether there are any consistencies or

3    inconsistencies in a witness's testimony or between the

4    witness's testimony and any previous statements made by the

5    witness.  You may also consider any inconsistencies or

6    consistencies between the witness's testimony and any other

7    evidence that you credit.  You may consider whether any

8    inconsistencies are the result of lapses in memory, mistake,

9    misunderstanding, intentional falsehood, or differences in

10   perception.

11        You may consider the reasonableness or unreasonableness,

12   the probability or improbability of the testimony of a witness

13   in determining whether to accept it as true and accurate.  You

14   may consider whether the witness has been contradicted or

15   supported by other evidence that you credit.

16        If you believe that any witness has shown him- or

17   herself to be biased or prejudiced for or against either side

18   in this trial or motivated by self-interest, you may consider

19   and determine whether such bias or prejudice has colored the

20   testimony of the witness so as to affect the desire and

21   capability of that witness to tell the truth.  You should give

22   the testimony of each witness such weight as in your judgment

23   it is fairly entitled to receive.

24        A police officer's -- a police officer's testimony

25   should be evaluated by you just as any other evidence in the

1    case.  In evaluating the officer's credibility, you should use

2    not -- you should use the same guidelines that you apply to the

3    testimony of any witness.  In no event should you give either

4    greater or lesser weight to the testimony of any witness merely

5    because he or she is a police officer.

6          A defendant has a right to become a witness in his own

7    behalf.  His testimony should not be disbelieved merely because

8    he is the defendant.  In evaluating his testimony, however, you

9    may consider the fact that the defendant has an interest in the

10   outcome of this trial.  As with the testimony of any other

11   witness, you should give the defendant's testimony as such

12   weight as in your judgment it deserves.

13         Someone's intent or knowledge ordinarily can't be proved

14   directly because there is no way of knowing what a person is

15   actually thinking, but you may infer someone's intent or

16   knowledge from the surrounding circumstances.  You may consider

17   any statement made or acts done or omitted by Mr. McAbee and

18   all other facts and circumstances received in evidence which

19   indicate his intent or knowledge.

20         You may infer, but are not required to infer, that a

21   person intends the natural and probable consequences of acts he

22   intentionally did or intentionally did not do.  It is entirely

23   up to you, however, to decide what facts to find from the

24   evidence received during this trial.  You should consider all

25   the circumstances in evidence that you think are relevant in

1    determining whether the government has proved beyond a

2    reasonable doubt that Mr. McAbee acted with the necessary state

3    of mind.

4         Each count of the indictment charges a separate offense.

5    You should consider each offense and the evidence which applies

6    to it separately, and you should return separate verdicts as to

7    each count.  The fact that you may find the defendant guilty or

8    not guilty on any one count of the indictment should not

9    influence your verdict with respect to any other count of the

10   indictment.

11        Before trial, Mr. McAbee pled guilty to assaulting

12   Officer Moore and engaging in physical violence on

13   Capitol Grounds.  The fact that Mr. McAbee pled guilty to one

14   assault is not itself evidence that Mr. McAbee committed the

15   charged offenses.  However, you may consider the fact that

16   Mr. McAbee pled guilty to an assault and the other actions to

17   which he admitted in assessing his mental state at the time of

18   the charged offenses.

19        The question of possible punishment of the defendant in

20   the event of a conviction for the charges before you, or for

21   the charges for which Mr. McAbee previously pled guilty, is not

22   a concern of yours and should not enter into or influence your

23   deliberations in any way.  The duty of imposing sentence in the

24   event of a conviction for the charges before you, or for the

25   charges for which Mr. McAbee previously pled guilty, rests

1      exclusively with me.  Your verdict should be based solely on

2      the evidence in this case, and you should not consider the

3      matter of punishment at all.

4           So I'm now going to give the defendant's theory of his

5      case.  Mr. McAbee has asserted a defense that when he made

6      physical contact with Officer Wayte, he was attempting to help

7      him.

8           Hold on one second.  If counsel can come to the --

9           (Bench conference on the record.)

10          THE COURT:  I think there was another --

11          MR. SCHIFFELBEIN:  There was.  I sent the email at

12     6:07 a.m. on Saturday, if that helps.

13          THE COURT:  Tanya, can you give me a copy of those?

14          MR. SCHIFFELBEIN:  I have it on my computer.

15          THE COURT:  Okay.

16          MS. FOSTER:  The version that the Court has is the

17     version that we have.

18          THE COURT:  The ones that you have are incorrect as

19     well?  They're not the latest version?

20          MS. FOSTER:  It's the version that the Court read.  I

21     don't know if that's incorrect, but that's what we have.

22          MR. SCHIFFELBEIN:  The government objected to the

23     second sentence.

24          THE COURT:  And I thought we had altered it somewhat

25     and --

1            MS. KEARNEY:  The version we received was -- I think

2      the position the Court reached was you would deliver the first

3      sentence and then add to the instruction on the assault charge

4      an explanation that physical contact with an officer is not

5      necessarily a crime and then add the general intent instruction

6      at that point.

7            MS. FOSTER:  And that has been done.

8            THE COURT:  Then I moved it to this part.  Yeah, I

9      see.  All right.

10            MS. FOSTER:  Correct.

11            THE COURT:  All right.  My memory is clear.

12            MS. KEARNEY:  Thank you.

13            (Proceedings held in open court.)

14            THE COURT:  I apologize for that confusion.  Some of

15      these things were changed up very much up to the last minute.

16            All right.  So I'll start again with that -- the

17      defendant's theory of the defense.

18            Mr. McAbee has asserted a defense that when he made

19      physical contact with Officer Wayte, he was attempting to help

20      him.

21            So now I'm going to go through the various counts and

22      these are somewhat lengthy.  And I'm going to read them all

23      through, but it's going to be much easier for you to read them

24      when they're in front of you in the instructions and take them

25      piece by piece.

1    Okay.  Count 1, which is assaulting, resisting, or

2    impeding officers.  Count 1 of the indictment charges the

3    defendant with assaulting, resisting, or impeding

4    Officer A.W. -- that's Mr. -- Officer Wayte -- a person

5    assisting officers of the United States who are engaged in the

6    performance of their official duties, which is a violation of

7    federal law.  Count 1 of the indictment additionally charges

8    that the defendant, in the commission of such acts, inflicted

9    bodily injury.  Count 1 also charges the defendant with aiding

10    and abetting others to commit that offense.

11    First, I will explain the elements of the substantive

12    offense, along with its associated definitions.  Then I will

13    explain how to determine whether the defendant aided and

14    abetted the offense.

15    Here are the elements.  To find the defendant guilty of

16    this offense, you must find that the government proved each of

17    the following elements beyond a reasonable doubt:

18    First, the defendant assaulted, resisted, opposed,

19    impeded, intimidated, or interfered with Officer A.W. -- again,

20    that's Officer Wayte -- an officer from the Metropolitan Police

21    Department.

22    Second, the defendant did such acts forcibly.

23    Third, the defendant did such acts voluntarily and

24    intentionally.

25    Fourth, Officer A.W. -- again, Officer Wayte -- was

1   assisting officers of the United States who were then engaged

2   in the performance of their official duties.

3        Fifth, in doing such acts, the defendant inflicted

4   bodily injury.

5        Here are some of the definitions that apply.

6        A person acts forcibly if he uses force, attempted to

7   use force, or threatened to use force against the officer.

8   Physical force or contact is sufficient, but actual physical

9   contact is not required.  You may also find that a person who

10  has the present ability to inflict bodily harm upon another and

11  who threatens or attempts to inflict bodily harm upon that

12  person acts forcibly.  In such case, the threat must be a

13  present one.

14       The term assault means any intentional attempt or threat

15  to inflict injury upon someone else when coupled with an

16  apparent present ability to do so.  To find that the defendant

17  committed an assault, you must find beyond a reasonable doubt

18  that the defendant intended to inflict or to threaten injury.

19  Injury means any physical injury, however small, including a

20  touching offense to a person of reasonable sensibility.

21       The terms resist, oppose, impede, intimidate, and

22  interfere with carry their everyday, ordinary meanings.

23       The term bodily injury means an injury that is painful

24  and obvious or is of a type for which medical attention

25  ordinarily would be sought.  Bodily injury includes a cut,

1    abrasion, bruise, burn, or disfigurement; physical pain;

2    illness; impairment of the function of a bodily member, organ,

3    or mental faculty; or any other injury to the body, no matter

4    how temporary.

5         It is not necessary to show that the defendant knew the

6    person being forcibly assaulted, resisted, opposed, impeded,

7    intimidated, or interfered with was at the time assisting

8    federal officers in carrying out an official duty so long as it

9    is established beyond a reasonable doubt that the officer was,

10   in fact, assisting a federal officer acting in the course of

11   his duty and that the defendant intentionally forcibly

12   assaulted, resisted, opposed, impeded, intimidated, or

13   interfered with that officer.

14        By itself, it is not a crime to come into physical

15   contact with law enforcement officers with the intent to aid

16   them.  But it violates the statute for a defendant to act,

17   regardless of the reason for the action, in such a way as to

18   assault, resist, oppose, impede, intimidate, or interfere with

19   a federal officer in the performance of his duties.  It is

20   also -- it is not also necessary for the defendant to have a

21   specific bad purpose.

22        And this is the instruction with respect to the aiding

23   and abetting allegation.  In this case, the government further

24   alleges that the defendant assaulted, resisted, or impeded an

25   officer while inflicting bodily injury as charged in Count 1 by

1    aiding and abetting others in committing this offense.  This is

2    not a separate offense but merely another way in which the

3    government alleges that the defendant committed this offense in

4    Count 1.

5         A person may be guilty of an offense if he aided and

6    abetted another person in committing the offense.  A person who

7    has aided and abetted another person in committing an offense

8    is often called an accomplice.

9         The person whom the accomplice aides and abets is the

10   known as the principal.  It is not necessary that all the

11   people who committed the crime be caught or identified.  It is

12   sufficient if you find beyond a reasonable doubt that the crime

13   was committed by someone and that the defendant knowingly and

14   intentionally aided and abetted that person in committing the

15   crime.

16        In order to find the defendant guilty of assaulting,

17   resisting, or impeding an officer while inflicting bodily

18   injury because the defendant aided and -- excuse me -- because

19   the defendant aided and abetted others in committing this

20   offense, you must find that the government proved beyond a

21   reasonable doubt the following elements:

22        First, that others assaulted, resisted, or impeded an

23   officer while inflicting bodily injury by committing each of

24   the elements of the offense charged, as I have explained above.

25        Second, that the defendant knew that assaulting,

1    resisting, or impeding an officer while inflicting bodily

2    injury was going to be committed or was being committed by

3    others.

4         Third, that the defendant performed an act or acts in

5    furtherance of the offense.

6         Fourth, that the defendant knowingly performed that act

7    or acts for the purpose of aiding, assisting, soliciting,

8    facilitating, or encouraging others in committing the offense

9    of assaulting, resisting, or impeding an officer while

10   inflicting bodily injury.

11        Fifth, that the defendant did that act or acts with the

12   intent that the others commit the offense of assaulting,

13   resisting, or impeding an officer while inflicting bodily

14   injury.

15        To show that the defendant performed an act or acts in

16   furtherance of the offense charged, the government must prove

17   some affirmative participation by the defendant which at least

18   encouraged others to commit the offense; that is, you must find

19   that the defendant's act or acts did in some way aid, assist,

20   facilitate, or encourage others to commit the offense.

21        The defendant's act or acts need not further aid,

22   assist, facilitate, or encourage every part or phase of the

23   offense charged.  It is enough if the defendant's act or acts

24   further aided, assisted, facilitated, or encouraged only one or

25   some parts or phases of the offense.  Also, the defendant's

1    acts need not themselves be against the law.

2         In deciding whether the defendant had the required

3    knowledge and intent to satisfy the fourth requirement for

4    aiding and abetting, you may consider both direct and

5    circumstantial evidence, including the defendant's words and

6    actions and other facts and circumstances.

7         However, evidence that the defendant merely associated

8    with persons involved in a criminal venture or was merely

9    present or was merely a knowing spectator during the commission

10   of the offense is not enough for you to find that the

11   defendant -- for you to find the defendant guilty as an aider

12   and abettor.

13        If the evidence shows that the defendant knew that the

14   offense was being committed or was about to be committed but

15   does not also prove beyond a reasonable doubt that it was the

16   defendant's intent and purpose to aid, assist, encourage,

17   facilitate, or otherwise associate the defendant with the

18   offense, you may not find the defendant guilty of assaulting,

19   resisting, or impeding an officer while inflicting bodily

20   injury as an aider and abettor.  The government must prove

21   beyond a reasonable doubt that the defendant in some way

22   participated in the offense committed by others as something

23   the defendant wished to bring about and to make succeed.

24        A defendant may be found guilty of the offense charged

25   in Count 1 if the defendant assaulted, resisted, or impeded an

1    officer while inflicting bodily injury or aided and abetted

2    this offense.  Each of these two ways of committing the offense

3    is described in the instructions that I have given you.

4         If you find beyond a reasonable doubt that the defendant

5    committed the offense of assaulting, resisting, or impeding an

6    officer while inflicting bodily injury in either one of these

7    two ways, you should find the defendant guilty of Count 1, and

8    you need not consider whether the defendant committed the

9    offense of assaulting, resisting, or impeding an officer while

10   inflicting bodily injury in the other way.

11        And here's a description of the lesser included offense

12   of assaulting, resisting, or impeding certain officers with

13   physical contact or the intent to commit another felony.  To

14   find the defendant guilty of the lesser offense of Count 1 --

15   that is, assaulting, resisting, or impeding certain officers --

16   you must find the following elements beyond a reasonable doubt:

17        First, that the defendant assaulted, resisted, opposed,

18   impeded, intimidated, or interfered with Officer A.W. -- that's

19   Officer Wayte -- an officer from the Metropolitan Police

20   Department.

21        Second, the defendant did such acts forcibly.

22        Third, the defendant did such acts voluntarily and

23   intentionally.

24        And fourth, Officer A.W. -- that's Officer Wayte -- was

25   assisting officers of the United States who were engaged in the

1    performance of their official duties.

2         Fifth, the defendant made physical contact with

3    Officer A.W. -- that's Officer Wayte -- or acted with the

4    intent to commit another felony.  For purposes of this element,

5    another felony refers to the offense charged in Count 2, which

6    is the civil disorder charge.

7         I am now going to instruct you as to the order in which

8    you should consider the above offenses.  You should consider,

9    first, whether the defendant is guilty of assaulting,

10   resisting, or impeding officers while inflicting bodily injury

11   or aiding and abetting others to do so.

12        If you find the defendant guilty of that offense, do not

13   go to the lesser included offense.

14        If you find the defendant not guilty, go on to consider

15   whether he is guilty of assaulting, resisting, or impeding

16   offenses with physical contact or the intent to commit another

17   felony or aiding and abetting others to do so.  And if after

18   making all reasonable efforts to reach a verdict on the first

19   charge you are not able to do so, you are allowed to consider

20   the lesser charge.

21        The order will be reflected in the verdict form that I

22   will be giving you.

23        Okay.  Here's Count 2, which is the obstructing officers

24   during a civil disorder charge.  Count 2 charges the defendant

25   with obstructing law enforcement officers during a civil

1    disorder, which is a violation of federal law.

2         Count 2 also charges the defendant with attempt to

3    commit the crime of obstructing officers during a civil

4    disorder.  First, I will explain the elements of the

5    substantive offense, along with its associated definitions.

6    Then I will explain how to determine whether the defendant

7    attempted the offense.

8         Here are the elements.  In order to find the defendant

9    guilty of this offense, you must find that the government

10   proved each of the following elements beyond a reasonable

11   doubt:

12        First, the defendant knowingly committed or attempted to

13   commit an act with the intended purpose of obstructing,

14   impeding, or interfering with one or more law enforcement

15   officers.

16        Second, at the time of the defendant's actual or

17   attempted act, the law enforcement officer or law enforcement

18   officers were engaged in the lawful performance of their

19   official duties incident to and during a civil disorder.

20        Third, the civil disorder in any way or degree objected,

21   delayed, or adversely affected commerce or the movement of any

22   article or commodity in commerce or the conduct or performance

23   of any federally protected function.

24        Here are some of the applicable definitions.  The term

25   civil disorder means any public disturbance involving acts of

1    violence by groups of three or more persons, which (a) causes

2    an immediate danger of injury to another individual; (b) causes

3    an immediate danger of damage to another individual's property;

4    (c) results in injury to another individual; or (d) results in

5    damage to another individual's property.

6         The term commerce means commerce or travel between one

7    state, including the District of Columbia, and any other state,

8    including the District of Columbia.  It also means commerce

9    wholly within the District of Columbia.

10        The term federally protected function means any

11   function, operation, or action carried out under the laws of

12   the United States by any department, agency, instrumentality of

13   the United States, or by an officer or employee thereof.

14        The term department includes one of the departments of

15   the Executive Branch, such as the Department of Homeland

16   Security, which includes the United States Secret Service, or

17   the Legislative Branch.  The term agency includes any

18   department, independent establishment, commission,

19   administration, authority, board, or bureau of the

20   United States.  The term instrumentality includes any other

21   formal entity through which the government operates, such as

22   Congress or the United States Capitol Police.

23        For the United States Capitol Police and the

24   Metropolitan Police Department on January 6th, 2021, the term

25   official duties means policing the U.S. Capitol Building and

1     Grounds and enforcing federal law and D.C. law in those areas.

2         A person acts knowingly if he realizes what he is

3     doing and is aware of the nature of his conduct and does not

4     act through ignorance, mistake, or accident.  In deciding

5     whether the defendant acted knowingly, you may consider all of

6     the evidence, including what the defendant did, said, or

7     perceived.

8         I'll give you an instruction as to the attempt portion

9     of this count.  In Count 2, the defendant is also charged with

10     attempt to commit the crime of obstructing officers during a

11     civil disorder.  An attempt to commit the crime of obstructing

12     officers during a civil disorder is a crime even if the

13     defendant did not actually complete the crime.

14         In order to find the defendant guilty of attempt to

15     commit the crime of obstructing officers during a civil

16     disorder, you must find that the government proved beyond a

17     reasonable doubt each of the following elements:

18         First, that the defendant intended to commit the crime

19     of obstructing officers during a civil disorder as I have

20     defined that offense above.

21         Second, that the defendant took a substantial step

22     toward committing the crime of obstructing officers during a

23     civil disorder which strongly corroborates or confirms that the

24     defendant intended to commit that crime.

25         With respect to the first element of attempt, you may

1    not find the defendant guilty of attempt to commit the crime of

2    obstructing officers during a civil disorder merely because the

3    defendant thought about it.  You must find that the evidence

4    proved beyond a reasonable doubt that the defendant's mental

5    state passed beyond the stage of thinking about the crime to

6    actually intending to commit it.

7         With respect to the substantial step element, you may

8    not find the defendant guilty of attempt to commit the crime

9    of obstructing officers during a civil disorder merely because

10   the defendant made some plans to or some preparation for

11   committing that crime.  Instead, you must find the defendant

12   took some firm, clear, and undeniable action to accomplish

13   his intent to commit the crime of obstructing officers during

14   a civil disorder.  However, the substantial step element

15   does not require the government to prove that the defendant

16   did everything except the last act necessary to complete the

17   crime.

18        A defendant may be found guilty of the offense charged

19   in Count 2 if the defendant committed the crime of obstructing

20   officers during a civil disorder or attempted to commit the

21   crime of obstructing officers during a civil disorder.  Each of

22   these two ways of committing the offense is described in the

23   instructions that I have given you.

24        If you find beyond a reasonable doubt that the defendant

25   committed the offense of the crime of obstructing officers

1   during a civil disorder in either one of these ways, you

2   should find the defendant guilty of Count 2, and you need not

3   consider whether the defendant committed the offense of the

4   crime of obstructing officers during a civil disorder in the

5   other way.

6       Count 3 involves entering or remaining in a restricted

7   building or grounds with a deadly or dangerous weapon.  Count 3

8   of the indictment charges the defendant with entering or

9   remaining in a restricted building or grounds with a deadly or

10  dangerous weapon, which is a violation of federal law.

11      I am going to instruct you on this charge and explain

12  the various elements that you must consider.  I will also

13  instruct you on the lesser included offense.  After I give you

14  the elements of these crimes, I will tell you in what order you

15  should consider them.

16      Here are the elements.  In order to find the defendant

17  guilty of this offense, you must find that the government

18  proved each of the following elements beyond a reasonable

19  doubt:

20      First, the defendant entered or remained in a restricted

21  building or grounds without lawful authority to do so.

22      Second, the defendant did so knowingly.

23      Third, the defendant knowingly used or carried a deadly

24  or dangerous weapon during and in relation to the offense.

25      Here are some of the applicable definitions.  The term

1      restricted building or grounds means any posted, cordoned off,

2      or restricted area of a building or grounds where a person

3      protected by the Secret Service is or will be temporarily

4      visiting.

5             The term person protected by the Secret Service includes

6      the Vice President and the immediate family of the

7      Vice President.

8             The term knowingly has the same meaning described in the

9      instructions for Count 2.

10            An object may be considered a deadly or dangerous weapon

11     for one of two reasons.  First, an object is a deadly or

12     dangerous weapon if it is inherently or obviously dangerous or

13     deadly.

14            Second, an object is a deadly or dangerous weapon if the

15     object is capable of causing serious bodily injury or death to

16     another person and the defendant carried it with the intent

17     that it be used in a manner capable of causing serious bodily

18     injury or death.  However, for purposes of this offense, the

19     defendant need not have actually used the object in that

20     manner.

21            This count also has a lesser included offense.  In order

22     to find the defendant guilty of the lesser offense of

23     Count 3 -- that is, entering or remaining in a restricted

24     building or grounds -- you must find the following elements

25     beyond a reasonable doubt:

1        First, the defendant entered or remained in a restricted

2    building or grounds without lawful authority to do so.

3        And second, the defendant did so knowingly.

4        And here's the order of how you deliberate the -- the

5    central charge and then the lesser included one.  Now I am

6    going to instruct you as to the order in which you should

7    consider the above offenses.  You should consider, first,

8    whether the defendant is guilty of entering or remaining in a

9    restricted building or grounds with a deadly or dangerous

10   weapon.  If you find the defendant guilty of that offense, do

11   not go on to the lesser included offense.

12       However, if you find the defendant not guilty, go on to

13   consider whether the defendant is guilty of entering or

14   remaining in a restricted building or grounds.  And if after

15   making all reasonable efforts to reach a verdict on the first

16   charge you are not able to do so, you are allowed to consider

17   this lesser included charge.  This order will be reflected in

18   the verdict form that I will be giving you.

19       Here's Count 4, which is the disorderly or disruptive

20   conduct in a restricted building or grounds with a deadly or

21   dangerous weapon charge.  Count 4 of the indictment charges the

22   defendant with disorderly or disruptive conduct in a restricted

23   building or grounds with a deadly or dangerous weapon, which is

24   a violation of federal law.

25       I am going to instruct you on this charge and explain

1    the various elements that you must consider.  I will also

2    instruct you on the lesser included offense.  After I give you

3    the elements of these crimes, I will tell you in what order you

4    should consider them.

5         Here are the elements.  In order to find the defendant

6    guilty of this offense, you must find that the government

7    proved each of the following elements beyond a reasonable

8    doubt:

9         First, the defendant engaged in disorderly or disruptive

10   conduct in or in proximity to any restricted building or

11   grounds.

12        Second, the defendant did so knowingly and with the

13   intent to impede or disrupt the orderly conduct of government

14   business or official functions.

15        Third, the defendant's conduct occurred when, or so

16   that, his conduct, in fact, impeded or disrupted the orderly

17   conduct of government business or official functions.

18        Fourth, the defendant knowingly used or carried a deadly

19   or dangerous weapon during or and in relation to the offense.

20        Here are the applicable definitions.  Disorderly conduct

21   is conduct that tends to disturb the public peace or undermine

22   public safety.  Disorderly conduct includes when a person acts

23   in such a manner as to cause another person to be in reasonable

24   fear that a person or property in a person's immediate

25   possession is likely to be harmed or taken, uses words likely

1    to produce violence on the part of others, or is unreasonably

2    loud and disruptive under the circumstances.

3         Disruptive conduct is a disturbance that interrupts an

4    event, activity, or the normal course of a process.

5         The terms restricted building or grounds and knowingly

6    have the same meanings described in the instructions for

7    Count 3 and 2 respectively.

8         The term deadly or dangerous weapon also has the same

9    meanings described in the instructions for Count 3.

10        And here is the instruction with respect to the lesser

11   included offense.  In order to find the defendant guilty of the

12   lesser offense of Count 4 -- that is, disorderly or disruptive

13   conduct in a restricted building or grounds -- you must find

14   the following elements beyond a reasonable doubt:

15        First, the defendant engaged in disorderly or disruptive

16   conduct in or in proximity to any restricted building or

17   grounds.

18        Second, the defendant did so knowingly and with the

19   intent to impede or disrupt the orderly conduct of government

20   business or official functions.

21        Third, the defendant's conduct occurred when, or so

22   that, his conduct, in fact, impeded or disrupted the orderly

23   conduct of government business or official functions.

24        Now I am going to instruct you as to the order in which

25   you should consider the above offenses.  You should consider

1    first whether the defendant is guilty of disorderly and

2    disruptive conduct in a restricted building or grounds with a

3    deadly or dangerous weapon.  If you find the defendant guilty

4    of that offense, do not go on to the lesser included offense.

5         However, if you find the defendant not guilty, go on to

6    consider whether the defendant is guilty of entering or

7    remaining in a restricted building or grounds.  And if after

8    making all reasonable efforts to reach a verdict on the first

9    charge you are not able to do so, you are allowed to consider

10   the lesser included charge.

11        This order will be reflected in the verdict form that I

12   will be giving you.

13        So now I will instruct you with respect to Count 5,

14   which is engaging in physical violence in a restricted building

15   or grounds with a deadly or dangerous weapon.  Count 5 of the

16   indictment charges the defendant with engaging in physical

17   violence in a restricted building or grounds with a deadly or

18   dangerous weapon, which is a violation of federal law.

19        I am going to instruct you on this charge and explain

20   the various elements that you must consider.  I will also

21   instruct you on the lesser included offense.  After I give you

22   the elements of these crimes, I will tell you in what order you

23   should consider them.

24        Here are the elements.  In order to find the defendant

25   guilty of this offense, you must find that the government

1    proved each of the following elements beyond a reasonable

2    doubt:

3         First, the defendant engaged in an act of physical

4    violence against a person in or in proximity to a restricted

5    building or grounds.

6         Second, the defendant did so knowingly.

7         Third, the defendant knowingly used or carried a deadly

8    or dangerous weapon during and in relation to the offense.

9         Here are some of the applicable definitions.  The term

10   act of physical violence means any act involving an assault or

11   other infliction of bodily harm on an individual or damage to

12   or destruction of real or personal property.

13        The restricted building and grounds and knowingly have

14   the same meanings described in the instructions for Count 3 and

15   2, respectively.  The term deadly or dangerous weapon also has

16   the same meanings described in the instructions for Count 3.

17        And here's the description of the lesser included

18   offense.  In order to find the defendant guilty of the lesser

19   offense of Count 5 -- that is, engaging in physical violence in

20   a restricted building or grounds, you must find the following

21   elements beyond a reasonable doubt.

22        First, the defendant engaged in an act of physical

23   violence against a person in or in proximity to a restricted

24   building or grounds.

25        Second, the defendant did so knowingly.

1          I'm going to instruct you as to the order in which you

2     should consider the above offenses.  You should consider first

3     whether the defendant is guilty of engaging in physical

4     violence in a restricted building or grounds and with a deadly

5     or dangerous weapon.  If you find the defendant guilty of that

6     offense, do not go on to the lesser included offense.

7          However, if you find the defendant not guilty, go on to

8     consider whether the defendant is guilty of engaging in

9     physical violence in a restricted building or grounds.

10          And if after making all reasonable efforts to reach a

11     verdict on the first charge you are not able to do so, you are

12     allowed to consider the lesser included charge.

13          This order will be reflected in the verdict form that I

14     will be giving you.

15          So those are the substantive instructions with respect

16     to the counts.  And then I'll give you now some instructions

17     just about how to conduct your deliberations.

18          When you return to the jury room, you should first

19     select a foreperson to preside over your deliberations and to

20     be your spokesperson here in court.  There are no specific

21     rules regarding how you should select a foreperson.  That is

22     up to you.  However, as you go about the task, be mindful of

23     your mission to reach a fair and just verdict based on the

24     evidence.

25          Consider selecting a foreperson who will be able to

1   facilitate your discussions, who can help you organize the

2   evidence, who will encourage civility and mutual respect among

3   all of you, who will invite each juror to speak up regarding

4   his or her views about the evidence, and who will promote a

5   full and fair consideration of that evidence.

6           A verdict must represent the considered judgment of each

7   juror, and in order to return a verdict, each juror must agree

8   on the verdict.  In other words, your verdict on each count

9   must be unanimous.

10          You're going to be provided with a verdict form for use

11  when you have concluded your deliberations.  The form is not

12  evidence in this case, and nothing in it should be taken to

13  suggest or convey any opinion by me as to what the verdict

14  should be.  Nothing in the form replaces the instructions of

15  law I have already given you, and nothing in it replaces or

16  modifies the instructions about the elements which the

17  government must prove beyond a reasonable doubt.  The form is

18  meant only to assist you in recording your verdict.

19          I'll give you instructions about communication between

20  the Court and the jury during the deliberations.  If it becomes

21  necessary during your deliberations to communicate with me, you

22  may send a note by the clerk or marshal signed by your

23  foreperson or by one or more members of the jury.  No member of

24  the jury should try to communicate with me except by such a

25  signed note, and I will never communicate with any member of

1    the jury on any matter concerning the merits in this case

2    except in writing or orally here in open court.

3        Bear in mind that you are never, under any

4    circumstances, to reveal to any person, not the clerk, the

5    marshal, or me, how jurors are voting until after you have

6    reached a unanimous verdict.  This means that you should never

7    tell in writing or in open court how the jury is divided on any

8    matter; for example, 6-6 or 7-5 or 11-1 or any other fashion,

9    whether the vote is for conviction or acquittal or on any other

10   issue in the case.

11       The attitude and conduct of jurors at the beginning of

12   their deliberations are matters of considerable importance.  It

13   may not be useful for a jury upon entering the jury room to

14   voice a strong expression of an opinion on the case or to

15   announce a determination to stand for a certain verdict.  When

16   one does that at the outset, a sense of pride may cause that

17   juror to hesitate, to back away from an unannounced position

18   after a discussion of the case.  Furthermore, many juries find

19   it useful to avoid an initial vote upon retiring to the jury

20   room.

21       Calmly reviewing and discussing the case at the

22   beginning of deliberations is often a more useful way to

23   proceed.  Remember that you are not partisans or advocates in

24   this matter, but you are judges of the facts.

25       I would like to remind you that you in some cases,

1   although not necessarily this one, there may be reports in the

2   newspaper or on the radio, internet, or television concerning

3   this case.  If there should be such media coverage in this

4   case, you may be tempted to read, listen to, or watch it.  You

5   must not read, listen to, or watch such reports because you

6   must decide this case solely on the evidence presented in this

7   courtroom.

8        If any publicity about this trial inadvertently comes to

9   your attention, do not discuss it with other jurors or anyone

10  else.  Just let me or my clerk know as soon after it happens as

11  you can, and I will then briefly discuss it with you.

12       As you retire to the jury room to deliberate, I also

13  wish to remind you of an instruction I gave you at the

14  beginning of the trial.  During deliberations, you may not

15  communicate with anyone not on the jury about this case.  This

16  includes any electronic communication, such as email or text or

17  any blogging about the case.  In addition, you may not conduct

18  any independent investigation during your deliberations.  This

19  means you may not conduct any research in person or

20  electronically via the internet or in any other way.

21       During the course of this trial, a number of exhibits

22  were admitted in evidence.  Sometimes only portions of an

23  exhibit were admitted, such as portions of a longer video, a

24  document with some words or pictures blacked out or otherwise

25  removed, or a video played without audio.  There are a variety

1    of reasons why only a portion of an exhibit is admitted,

2    including that the other portions are inadmissible or implicate

3    an individual's privacy.

4        As you examine the exhibits and you see or hear portions

5    where there appear to be omissions, you should consider only

6    the portions that were admitted.  You should not guess as to

7    what has been taken out or why.  And you should not hold it

8    against either party.  You are to decide the facts only from

9    the evidence that is before you.

10       I will be sending into the jury room with you the

11   exhibits that have been admitted into evidence.  You may

12   examine any or all of them as you consider your verdict.

13       Please keep in mind that exhibits that were only marked

14   for identification but were not admitted into evidence will not

15   be given to you to examine or to consider in reaching your

16   verdict.

17       You will also be provided with a laptop to view the

18   recordings which have been admitted into evidence.  You should

19   not use the laptop for any other purpose.

20       As I indicated, I will provide you with a copy of my

21   instructions.  During your deliberations you may, if you want,

22   refer to the instructions.  While you may refer to any

23   particular portion of the instructions, you are not to

24   consider -- you are to consider the instructions as a whole,

25   and you may not follow some and ignore others.  If you have any

1    questions about the instructions, you should feel free to send

2    me a note.  Please return your instructions to me when your

3    verdict is rendered.

4         The last thing I must do before you begin your

5    deliberations is to excuse the alternate jurors.  As I told you

6    before, the selection of the alternates was an entirely random

7    process.  It's nothing personal.  We selected two seats to be

8    the alternate seats before any of you entered the courtroom.

9    Since the rest of you have remained healthy and attentive, I

10   can now excuse those jurors in Seats 3 and 12.

11        Before you two leave, I am going to ask you to tear out

12   a page from your notebook and to write down your name and

13   daytime phone number and hand it to the clerk.  I do this

14   because it is possible, though unlikely, that we will need to

15   summon you back to join the jury in case something happens to a

16   regular juror.

17        Since that possibility exists, I am going to instruct

18   you not to discuss the case -- I'm going to instruct you not to

19   discuss the case with anyone until we call you.  My earlier

20   instruction on use of the internet still applies.  Do not

21   research this case or communicate about it on the internet.  In

22   all likelihood, we will be calling you to tell you there has

23   been a verdict and you are now free to discuss the case.  There

24   is, however, the small chance that we will need to bring you

25   back on to the jury.

1          Thank you very much for your service, and please

2     report back to the jury office to turn in your badge on your

3     way out.

4          So that's it.  You can start your deliberations once

5     you're all -- you can't discuss the case in any fashion or

6     deliberate unless all of you are in the room.  So if some

7     people are getting lunch and other people are in the room, you

8     can't start.  So the cafeteria is about to close.  So I suggest

9     you hustle down there, if you want to eat lunch from there, and

10    get lunch and then bring it back to the jury room and you can

11    eat there.

12              (Proceedings held out of the presence of the jury.)

13              THE COURT:  Anything else?

14              MR. SCHIFFELBEIN:  I think there was a scrivener's

15    error on page 24.  I believe the Court correctly read, "If the

16    evidence shows."  And then later on towards the middle of the

17    page it reads, "You may find the defendant guilty."  But I

18    believe the Court read may not.

19              THE COURT:  So you said page 24?

20              MR. SCHIFFELBEIN:  You know what.  Actually, I

21    misread it.  I think it's correct, yeah.  Thank you.

22              THE COURT:  Thank you.  All right.

23         So does the government think it's necessary that I do a

24    colloquy with Mr. McAbee about the lesser included offense?

25              MS. KEARNEY:  No, Your Honor.  We don't think it's

1    necessary.

2              THE COURT:  Okay.  So we'll go ahead and skip it.

3         I gather, Mr. McAbee, that you, in consultation with

4    your attorney, decided that was a good strategy to concede the

5    lesser included offense?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Okay.  And you did that knowingly,

8    voluntarily, and intelligently with the advice of your counsel?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  Okay.  All right.  Stay in close touch

11   with Ms. Johnson, and she'll let you know if there's a question

12   or whether there's a verdict at any point.

13             (Recess taken 1:50 p.m. to 4:51 p.m.)

14             THE COURT:  All right.  Have the parties gotten a

15   chance to look at the very thoughtful note from the jury?

16             MS. KEARNEY:  Thank you, Your Honor.  We've had some

17   chance to discuss, but I think we're still in a slight

18   disagreement about our recommendation for the definition

19   portion of the note.

20             THE COURT:  Are you in agreement as to the other

21   portion of the note?

22             MS. KEARNEY:  I believe so.

23             MR. SCHIFFELBEIN:  Well, I'm making up my mind.  I

24   think on -- the answer is yes.  But I'm concerned about things,

25   and I'll talk after the government is done.

1          THE COURT:  Okay.  So let's start with the first

2     portion, whether it makes a difference on intent, whether it

3     needs to be directed to law enforcement specifically or to

4     anyone.  For example, a counterprotester.

5          MS. KEARNEY:  The government's position is the answer

6     makes no difference.

7          MR. SCHIFFELBEIN:  I agree with the government that

8     that is a correct legal answer to the question.  My concern

9     is it raises a possible attenuation position.  And I don't

10    know a way to correct it without needlessly complicating the

11    issue.

12         But I think a short and -- I don't know.  I wrote this

13    down 2 seconds before the Court took the bench, but I don't

14    know.  This is what I propose:  No.  However, Mr. McAbee is not

15    charged with assaulting, aiding and abetting, or attempting to

16    assault any individual other than A.W.

17         And I understand this is not directed to the assault

18    charge.  However, I think it is impossible to view -- given the

19    evidence and the theories presented that -- the charges

20    separately.  And I think it would be an issue potentially,

21    either for me on a 2255, or at least on appeal, if the jury

22    could reach a verdict that Mr. McAbee potentially assaulted

23    officers and then carried a weapon to assault protesters.  So

24    that's my concern, and I don't have a good answer for it right

25    now.

1          MS. KEARNEY:  I mean, I think Mr. Schiffelbein's

2     proposal actually conflates the assault charge with the charge

3     that the jury is asking about, which is Counts 3, 4, and 5.

4     Those are entirely separate from the assault.  And, in fact,

5     you know, as the parties argued at closing, could also include

6     the assault of Officer Moore.  So it is misleading to instruct

7     the jury that he is only charged with the assault of

8     Officer Wayte.

9          THE COURT:  All right.  I think where it gets a

10    little bit confusing, at least in my mind, is the third

11    element, which is that the defendant knowingly used or carried

12    a deadly or dangerous weapon during and in relation to the

13    offense.  So then if he was carrying it to assault

14    counterprotesters, what -- how do I read in relation to the

15    offense?

16         MS. KEARNEY:  The offense would be either the

17    entering and remaining in the restricted perimeter, the

18    disorderly and disruptive conduct in a restricted perimeter, or

19    the act of physical violence within the restricted perimeter.

20    And so those are the bounds of the offense, Your Honor.

21         So he carried it in relation to him being in the

22    restricted perimeter, to his disorderly conduct in the

23    restricted perimeter, or the act of violence within the

24    restricted perimeter.  The -- the presence in the restricted

25    perimeter is unrelated to the assault.

 1          THE COURT:  No, I understand that.  But there weren't

 2    counterprotesters -- at least no evidence presented that there

 3    were counterprotesters in the restricted area.  So does that

 4    create a problem that the -- used or carrying a deadly or

 5    dangerous weapon during -- no problem with during -- but in

 6    relation to the offense?

 7          MS. KEARNEY:  No, I don't think so, Your Honor.

 8    Whether or not the circumstances existed under which Mr. McAbee

 9    would have used the weapon does not mean that he did not have

10    the intent to use the weapon.  If he shows up intending to

11    use -- let's pick a more conventional weapon, an ice pick;

12    right?  And he shows up and no one confronts him, but he

13    doesn't use it, that doesn't make a difference with respect to

14    the intent.

15          THE COURT:  But if he says as soon as this riot is

16    over I'm going to kill my wife with this ice pick and puts the

17    ice pick in his pocket and never takes it out, is it in

18    relation to the offense?

19          MS. KEARNEY:  I see.  One moment, Your Honor.

20          THE COURT:  Okay.

21          MS. KEARNEY:  So I think the government's proposal on

22    that front, Your Honor, would be to inform the jury that the

23    statute does not require that the defendant intend to use the

24    weapon against any particular person or entity but that he is

25    required to be contemplating using it in relation to the

1    offense.

2              MR. SCHIFFELBEIN:  I believe that is fine, provided

3    the jury might well return the next question, which is, okay,

4    well, what does that mean, the offense.  And I think it needs

5    to be clear it is an act of physical violence, which would only

6    be against police officers here; disorderly conduct, which

7    would only be against police officers here as well.  But I need

8    to think on how to word that better.

9              MS. KEARNEY:  I actually don't think the disorderly

10   and disruptive conduct is only directed at police officers,

11   Your Honor.  I think it's directed at the whole -- the whole

12   scene.  It's at Congress.  It's about what's happening in that

13   area.  And so, again, this is removed from the assault.

14             THE COURT:  Well, I'm okay giving the explanation

15   that it's in relation to the offense and then see if the second

16   question comes, and then we can cross that bridge if we get to

17   it.

18             In the meantime -- while I'm writing this down, in the

19   meantime, think about your positions on the other one.

20             All right.  With respect to the definition of serious

21   bodily injury.

22             MS. KEARNEY:  The government's proposal is the

23   following:  The term serious bodily injury means bodily injury

24   which involves a substantial risk of death; extreme physical

25   pain; medical intervention, such as surgery, hospitalization,

1    or physical rehabilitation; protracted and obvious

2    disfigurement; or protracted loss or impairment of the function

3    of a body member, organ, or mental faculty.

4         And that definition, Your Honor, is sourced from

5    Title 18 from a couple of code sections:  831(g)(4),

6    1864(d)(1), 1365(h)(3), as well as the guidelines provision

7    defining serious bodily injury.

8              THE COURT:  Do you have a cite to the guidelines?

9              MS. KEARNEY:  Yes.  It is 1B1.1, Application Note --

10             MR. SCHIFFELBEIN:  (L) [sic].

11             MS. KEARNEY:  1.(L) [sic].

12             THE COURT:  Okay.  So read it to me again.

13             MS. KEARNEY:  The term serious bodily injury means

14   bodily injury which involves a substantial risk of death;

15   extreme physical pain; medical intervention, such as surgery,

16   hospitalization, or physical rehabilitation; protracted and

17   obvious disfigurement or protracted loss or impairment of the

18   function of a bodily member, organ, or mental faculty.

19             THE COURT:  All right.  Mr. Schiffelbein.

20             MR. SCHIFFELBEIN:  My position, Your Honor, is just

21   the first sentence of the application note to 1.(L) should be

22   given.  I think they're very, very similar.  The wording is

23   slightly different.  The order is changed from what the

24   government is proposing and just what the guidelines suggest.

25   And I understand that it is a little bit odd to have the

1    guidelines be affecting the substantive law in a case like

2    this.  But I think it's better to cite to one thing and just

3    use that than an amalgamation of one statute.

4              THE COURT:  So how does yours read exactly?

5              MR. SCHIFFELBEIN:  Serious bodily injury means

6    injury -- instead of bodily injury, it says injury there --

7    involving extreme physical pain or the protracted impairment of

8    a function of a bodily member, organ, or mental faculty or

9    requiring medical intervention, such as surgery,

10   hospitalization, or physical rehabilitation.  I think it just

11   reads cleaner too.  So that's my proposal.

12             THE COURT:  And just of note, that's what Judge Bates

13   used in *United States v. McHugh*.

14             MR. SCHIFFELBEIN:  And I -- my recollection is that's

15   what was used in my last January 6th trial too.

16             THE COURT:  So what is the government's position as

17   to why one is better than the other?

18             MS. KEARNEY:  I mean, I think the -- our proposal

19   encompasses more and so, I think, gives the jury more guidance.

20   At the end of the day, I think either is fair.

21             THE COURT:  Okay.  Given that Judge Bates used it in

22   exactly this context, I'll go ahead and follow him, which is

23   what Mr. Schiffelbein read.

24             All right.  And for the first one, what I plan to read

25   is:  With respect to the question about deadly or dangerous

1    weapon, the statute does not require that defendant's intent

2    needs to be directed at law enforcement specifically, but the

3    third element of the charge requires that a deadly or dangerous

4    weapon be used or carried during -- quote, during and in

5    relation to the offense charged, which is entering or remaining

6    in a restricted building or grounds.

7                MR. SCHIFFELBEIN:  I -- I think that's fine.

8                MS. KEARNEY:  Yes.

9                THE COURT:  Okay.  Are we ready to bring them in?

10               MS. KEARNEY:  Yes, Your Honor.

11               MR. SCHIFFELBEIN:  Are we instructing them in the

12   courtroom?  That's fine.

13               THE COURT:  I'm sorry?

14               MR. SCHIFFELBEIN:  Of course.  I didn't know the

15   Court would instruct them in the courtroom.

16               (Proceedings held in the presence of the jury.)

17               THE COURT:  All right.  Have a seat.

18        So I got a note from the jury, as you know, very

19   thoughtful note, asking a couple of questions.

20        So here are the responses.  So the -- to the first

21   question regarding the deadly or dangerous weapon instruction,

22   the statute does not require that the defendant's intent needs

23   to be directed at law enforcement specifically.  But the third

24   element of the charge requires that the deadly or dangerous

25   weapon be used or carried, quote, during and in relation to the

1    offense, close quote, charged, and the offense charged is

2    entering and remaining in a restricted building or grounds.

3         So that's the answer to the first one.

4         To the second one, with respect to the definition of

5    serious bodily injury, the term serious bodily injury is

6    defined as injury involving extreme physical pain or the

7    protracted impairment of a function of a bodily member, organ,

8    or mental faculty or requiring medical intervention, such as

9    surgery, hospitalization, or physical rehabilitation.

10        Do you have that down, or do you need it in writing?

11            UNIDENTIFIED JUROR:  If you can put it in writing,

12   that would be great.

13            THE COURT:  Okay.  I'll go ahead and put it in

14   writing, and I'll send it back after.

15        All right.  You can continue your deliberations.  Thank

16   you.

17            (Proceedings held out of the presence of the jury.)

18            THE COURT:  All right.  Mr. Schiffelbein, given that

19   it's already 5:15, it's unlikely that they're going to be done

20   by 5:30.  So do you want me to bring them all back to the

21   courtroom or dismiss them at 5:30?

22            MR. SCHIFFELBEIN:  Because they've had repeated

23   admonitions from the Court, I think it's fine.  I would not be

24   surprised if given -- if the Court has a 5:30 hard stop, I

25   think that makes sense, but my guess is they'll reach a verdict

1    in the next 45 minutes.

2              THE COURT:  All right.  So you want to just let them

3    keep deliberating?

4              MR. SCHIFFELBEIN:  My preference.

5              THE COURTROOM DEPUTY:  Mr. Schiffelbein, your client

6    also has to go back to the jail, and we have the marshals.  So

7    we have to be mindful.

8              MR. SCHIFFELBEIN:  Right.  Exactly.  Whatever the

9    Court prefers.  It's just I would expect, given the question,

10   that we might have a verdict soon.  That's all.  So I'm more

11   than happy to break at 5:30.  I'm not asking to continue.

12             THE COURT:  I think I'll dismiss them, and you're

13   okay not bringing them back to the courtroom for that?

14             MR. SCHIFFELBEIN:  Yeah.  Yes.

15             THE COURT:  Okay.  I'll bring them back, if you want

16   me to.

17             MR. SCHIFFELBEIN:  Well, sure.  Why not.

18             THE COURT:  All right.

19             MR. SCHIFFELBEIN:  It's safer.

20             THE COURT:  Come get us at 5:30, Tanya.

21             MS. FOSTER:  Your Honor, may I ask, does the Court

22   want us here tomorrow morning?  Assuming that they don't reach

23   a verdict this evening, does the Court want us back here

24   tomorrow morning at 10:00 a.m. for when the jurors return, or

25   do you -- is your process to just have them go directly back to

1    deliberate?

2             THE COURT:  My process is to let them go directly

3    back and start deliberating, and then Ms. Johnson will contact

4    you.

5             MS. FOSTER:  Perfect.  Thank you.

6             THE COURT:  And I'm just going to type up the

7    instruction for serious bodily injury and send it to them.  Is

8    everyone okay with that?

9             MR. SCHIFFELBEIN:  Yes, Your Honor.

10            THE COURT:  All right.  Thank you.

11            (Recess taken from 5:14 p.m. to 5:35 p.m.)

12            (Proceedings held in the presence of the jury.)

13            THE COURT:  All right.  Welcome back.

14         It's 5:30.  I'm going to release you now, but I'll give

15    you the same instructions that I give you every night, which is

16    don't discuss the case with anybody, including -- in this

17    context, including any subsets of the jury.  You can't discuss

18    the case other than in the jury room with all the jurors

19    present.  So if some of you get here earlier tomorrow morning

20    and are just hanging out, you can't discuss the case with each

21    other until everyone is there.

22         Don't do any research, obviously, and -- I'm forgetting

23    one.  Research, talking to --

24            UNIDENTIFIED JUROR:  And media.

25            THE COURT:  And media.  Exactly.  Thank you.

```
 1            So you were listening, unlike my children.  So don't
 2     watch any media about this case, to the extent there is any, or
 3     about anything involving January 6th.
 4            So have a good evening and start up tomorrow at
 5     10 o'clock.
 6                 (Proceedings held out of the presence of the jury.)
 7                 THE COURT:  Anything else before we break for the
 8     evening?
 9                 MR. SCHIFFELBEIN:  No, Your Honor.
10                 MS. KEARNEY:  No, Your Honor.
11                 THE COURT:  All right.  Have a good night.
12                 (Proceedings were concluded at 5:37 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                        Dated this 17th day of November, 2023.

10

11                       /s/ Nancy J. Meyer
                         Nancy J. Meyer
12                       Official Court Reporter
                         Registered Diplomate Reporter
13                       Certified Realtime Reporter
                         333 Constitution Avenue Northwest
14                       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$17** [1] - 59:22

## 1

**1** [13] - 27:1, 27:6, 54:23, 66:6, 87:1, 87:2, 87:7, 87:9, 89:25, 90:4, 92:25, 93:7, 93:14
**1.(L** [2] - 118:11, 118:21
**10** [3] - 15:11, 44:7, 124:5
**1001** [1] - 18:23
**1003** [1] - 20:6
**1004** [1] - 21:4
**101** [2] - 31:8, 47:12
**102** [1] - 23:20
**106A** [1] - 71:20
**10:00** [1] - 122:24
**11-1** [1] - 108:8
**12** [1] - 111:10
**1365(h)(3** [1] - 118:6
**14th** [1] - 6:13
**15** [1] - 44:7
**16:27:08** [1] - 15:12
**16:27:34** [1] - 16:8
**16:27:35** [1] - 16:15
**16:27:37** [1] - 17:1
**16:27:38** [1] - 17:8
**16:27:40** [1] - 17:8
**16:27:41** [1] - 17:23
**16:30:25** [1] - 25:3
**16:30:30** [1] - 25:3
**173** [1] - 29:21
**1770** [1] - 61:22
**18** [1] - 118:5
**1864(d)(1** [1] - 118:6
**1:30** [1] - 11:22
**1:50** [1] - 113:13
**1B1.1** [1] - 118:9

## 2

**2** [15] - 27:14, 29:22, 41:19, 50:6, 94:5, 94:23, 94:24, 95:2, 97:9, 98:19, 99:2, 100:9, 103:7, 105:15, 114:13
**20** [6] - 23:15, 23:19, 23:23, 43:25, 44:4, 66:22
**201** [1] - 28:23
**2021** [7] - 5:20, 28:4, 29:22, 29:24, 32:12, 35:25, 96:24
**21-35** [1] - 3:3

**2255** [1] - 114:21
**24** [2] - 112:15, 112:19
**2:00-ish** [1] - 11:23, 12:3

## 3

**3** [13] - 8:3, 8:4, 33:6, 55:25, 99:6, 99:7, 100:23, 103:7, 103:9, 105:14, 105:16, 111:10, 115:3
**30** [1] - 57:18
**300** [1] - 22:14
**300-pound** [1] - 42:14
**303** [1] - 25:2
**324** [1] - 29:21
**373** [1] - 29:21

## 4

**4** [5] - 55:25, 101:19, 101:21, 103:12, 115:3
**40** [2] - 14:5, 67:8
**403** [1] - 31:14
**414** [1] - 22:22
**45** [1] - 122:1
**4:00** [1] - 29:16
**4:27** [1] - 14:19
**4:27:08** [1] - 15:11
**4:51** [1] - 113:13

## 5

**5** [5] - 32:14, 104:13, 104:15, 105:19, 115:3
**504** [1] - 29:21
**5:14** [1] - 123:11
**5:15** [1] - 121:19
**5:30** [6] - 121:20, 121:21, 121:24, 122:11, 122:20, 123:14
**5:35** [1] - 123:11
**5:37** [1] - 124:12
**5th** [3] - 11:9, 11:10, 29:22

## 6

**6-6** [1] - 108:8
**6:00** [2] - 11:12, 29:17
**6:07** [1] - 85:12
**6th** [48] - 5:19, 6:2, 6:16, 6:19, 7:9, 7:12, 7:20, 8:12, 9:1, 9:4, 9:13, 9:15, 10:6, 10:13, 11:9, 11:11,

28:4, 29:11, 29:13, 29:24, 32:11, 34:22, 35:11, 35:25, 37:10, 38:13, 39:1, 39:10, 39:17, 41:2, 47:22, 61:3, 61:5, 61:13, 61:15, 62:6, 62:22, 63:16, 63:19, 64:1, 71:4, 72:16, 72:21, 73:5, 73:8, 96:24, 119:15, 124:3

## 7

**7-5** [1] - 108:8
**702** [2] - 29:7, 29:9
**703** [1] - 29:15
**704** [2] - 29:8, 29:18
**779** [1] - 29:21
**7:00** [1] - 11:12
**7th** [1] - 34:17

## 8

**831(g)(4** [1] - 118:5

## 9

**901** [3] - 32:13, 33:19, 33:20

## A

**a.m** [3] - 11:12, 85:12, 122:24
**A.W** [7] - 87:4, 87:19, 87:25, 93:18, 93:24, 94:3, 114:16
**abets** [1] - 90:9
**abetted** [8] - 26:16, 27:7, 87:14, 90:6, 90:7, 90:14, 90:19, 93:1
**abetting** [9] - 26:18, 26:19, 87:10, 89:23, 90:1, 92:4, 94:11, 94:17, 114:15
**abettor** [2] - 92:12, 92:20
**ability** [8] - 30:3, 30:5, 30:8, 42:1, 66:2, 77:11, 88:10, 88:16
**able** [9] - 40:2, 40:22, 49:18, 54:9, 94:19, 101:16, 104:9, 106:11, 106:25
**abrasion** [2] - 34:25, 89:1
**absolutely** [2] - 46:25, 62:20
**absurd** [1] - 62:21

**accept** [3] - 25:4, 74:8, 82:13
**acceptable** [1] - 80:7
**accepting** [1] - 62:22
**accepts** [1] - 37:13
**accident** [1] - 97:4
**accomplice** [2] - 90:8, 90:9
**accomplish** [1] - 98:12
**accuracy** [1] - 81:22
**accurate** [2] - 81:15, 82:13
**accurately** [1] - 81:6
**accusing** [1] - 78:20
**achieve** [1] - 30:17
**Acker** [1] - 8:3
**acknowledge** [1] - 41:8
**acknowledged** [1] - 8:21
**acquittal** [2] - 3:17, 108:9
**acquitted** [1] - 62:2
**acquitting** [2] - 62:3, 62:4
**act** [25] - 27:16, 33:4, 34:6, 70:5, 77:4, 89:16, 91:4, 91:6, 91:11, 91:15, 91:19, 91:21, 91:23, 95:13, 95:17, 97:4, 98:16, 105:3, 105:10, 105:22, 115:19, 115:23, 117:5
**acted** [4] - 27:12, 84:2, 94:3, 97:5
**acting** [3] - 53:24, 69:24, 89:10
**Action** [1] - 3:3
**action** [4] - 43:12, 89:17, 96:11, 98:12
**actions** [9] - 35:25, 38:10, 45:19, 46:14, 56:15, 64:25, 65:18, 84:16, 92:6
**activity** [1] - 103:4
**acts** [24] - 28:12, 29:1, 69:20, 83:17, 83:21, 87:8, 87:22, 87:23, 88:3, 88:6, 88:12, 91:4, 91:7, 91:11, 91:15, 91:19, 91:21, 91:23, 92:1, 93:21, 93:22, 95:25, 97:2, 102:22
**actual** [4] - 71:2, 79:19, 88:8, 95:16
**Adams** [2] - 61:22, 61:24

**add** [2] - 86:3, 86:5
**addition** [2] - 55:14, 109:17
**additional** [1] - 37:21
**additionally** [1] - 87:7
**adjusting** [3] - 16:5, 19:5, 64:21
**administration** [1] - 96:19
**admiring** [2] - 16:5, 64:21
**admissible** [1] - 79:5
**admit** [2] - 63:4, 63:11
**admits** [2] - 12:24, 37:13, 63:10
**admitted** [24] - 8:13, 10:23, 28:2, 28:3, 33:18, 35:3, 35:9, 37:10, 40:22, 43:4, 47:24, 53:10, 56:5, 74:13, 78:3, 78:5, 84:17, 109:22, 109:23, 110:1, 110:6, 110:11, 110:14, 110:18
**admonitions** [1] - 121:23
**advance** [2] - 52:3, 54:9
**advantage** [1] - 67:20
**adversely** [11] - 28:9, 29:6, 29:25, 30:2, 30:3, 30:4, 30:8, 30:11, 30:13, 95:21
**advice** [1] - 113:8
**advocates** [1] - 108:23
**aesthetic** [1] - 16:5
**aesthetics** [1] - 64:21
**affect** [3] - 28:9, 77:11, 82:20
**affected** [13] - 29:6, 29:13, 29:19, 29:25, 30:2, 30:3, 30:4, 30:8, 30:11, 30:13, 30:14, 69:20, 95:21
**affecting** [1] - 119:1
**affects** [1] - 81:10
**affixed** [1] - 9:12
**afternoon** [1] - 29:13
**afterwards** [1] - 58:13
**age** [1] - 75:2
**agency** [2] - 96:12, 96:17
**Agent** [3] - 8:2, 32:8, 70:2
**agent** [1] - 43:3
**agree** [5] - 32:14, 33:20, 33:23, 107:7, 114:7
**agreed** [5] - 4:17,

7:19, 9:21, 14:1, 78:7
**agreement** [1] - 113:20
**agrees** [1] - 6:1
**ahead** [4] - 5:11, 113:2, 119:22, 121:13
**ahold** [1] - 42:14
**aid** [5] - 75:19, 89:15, 91:19, 91:21, 92:16
**aided** [10] - 26:16, 27:7, 87:13, 90:5, 90:7, 90:14, 90:18, 90:19, 91:24, 93:1
**aider** [2] - 92:11, 92:20
**aides** [1] - 90:9
**aiding** [11] - 26:18, 26:19, 67:11, 87:9, 89:22, 90:1, 91:7, 92:4, 94:11, 94:17, 114:15
**air** [1] - 15:16
**albeit** [1] - 54:18
**Alexandra** [1] - 3:7
**aligned** [1] - 8:6
**allegation** [1] - 89:23
**alleged** [1] - 77:17
**alleges** [4] - 3:19, 14:8, 89:24, 90:3
**allow** [1] - 77:10
**allowed** [6] - 49:7, 63:12, 94:19, 101:16, 104:9, 106:12
**allows** [1] - 54:9
**almost** [4] - 38:11, 38:13, 45:2, 59:2
**alone** [8] - 17:20, 36:17, 40:14, 48:22, 61:2, 74:14, 74:15, 81:2
**altered** [1] - 85:24
**alternate** [2] - 111:5, 111:8
**alternates** [1] - 111:6
**amalgamation** [1] - 119:3
**amazingly** [1] - 16:2
**Amazon** [1] - 10:10
**amazon.com** [1] - 59:22
**America** [5] - 3:4, 9:11, 39:23, 61:10, 72:14
**American** [3] - 8:5, 8:9, 38:14
**Americans** [1] - 8:5
**amount** [1] - 40:16

**anger** [5] - 18:9, 20:25, 52:7, 68:6, 68:9
**angle** [4] - 19:25, 20:5, 42:8, 45:2
**angles** [3] - 40:11, 42:21, 71:9
**angry** [6] - 18:1, 18:14, 19:14, 20:11, 40:1, 52:5
**announce** [1] - 108:15
**announced** [1] - 13:9
**answer** [8] - 79:8, 79:10, 79:11, 113:24, 114:5, 114:8, 114:24, 121:3
**answered** [1] - 79:9
**anti** [1] - 11:1, 39:9, 39:13
**anti-government** [1] - 11:1
**anti-protesters** [2] - 39:9, 39:13
**anticipation** [2] - 8:12, 8:25
**apologize** [1] - 86:14
**apparent** [3] - 16:10, 66:2, 88:16
**appeal** [1] - 114:21
**appear** [2] - 19:25, 110:5
**applicable** [4] - 95:24, 99:25, 102:20, 105:9
**Application** [1] - 118:9
**application** [1] - 118:21
**applies** [4] - 74:1, 74:7, 84:5, 111:20
**apply** [3] - 73:19, 83:2, 88:5
**appropriate** [2] - 36:21, 36:23
**aptly** [1] - 4:16
**archway** [3] - 64:16, 64:23, 69:11
**area** [10] - 12:5, 12:9, 31:5, 37:23, 48:9, 60:22, 63:3, 100:2, 116:3, 117:13
**areas** [1] - 97:1
**argue** [2] - 62:21, 69:18
**argued** [1] - 115:5
**argues** [1] - 4:3
**arguing** [1] - 68:16
**argument** [2] - 37:7, 78:25
**arguments** [3] - 5:13, 42:24, 78:15

**arm** [7] - 6:3, 6:6, 14:15, 15:3, 38:25, 42:11, 60:8
**arms** [4] - 22:16, 55:5, 66:23, 66:24
**arrive** [1] - 74:23
**arrived** [1] - 11:22
**arrives** [1] - 12:3
**arsenal** [1] - 71:20
**article** [1] - 95:22
**asleep** [1] - 80:5
**assailants** [1] - 21:22
**assault** [59] - 14:13, 15:6, 19:18, 21:2, 21:20, 24:9, 26:14, 26:16, 28:4, 33:16, 34:7, 34:8, 38:24, 39:2, 39:7, 41:2, 42:21, 43:12, 43:18, 44:17, 50:14, 50:21, 50:24, 51:2, 51:3, 51:6, 52:3, 52:24, 54:24, 56:20, 56:22, 57:10, 57:20, 58:2, 66:1, 66:4, 66:6, 67:12, 68:10, 68:15, 84:14, 84:16, 86:3, 88:14, 88:17, 89:18, 105:10, 114:16, 114:17, 114:23, 115:2, 115:4, 115:6, 115:7, 115:13, 115:25, 117:13
**assaulted** [20] - 15:9, 19:19, 21:16, 33:24, 50:22, 51:8, 52:17, 60:2, 60:8, 70:8, 70:9, 72:18, 87:18, 89:6, 89:12, 89:24, 90:22, 92:25, 93:17, 114:22
**assaulting** [35] - 18:18, 19:23, 23:24, 24:5, 24:7, 26:12, 28:4, 35:23, 37:11, 37:14, 43:21, 44:11, 44:12, 47:9, 50:16, 52:19, 57:14, 57:17, 62:10, 62:23, 84:11, 87:1, 87:3, 90:16, 90:25, 91:9, 91:12, 92:18, 93:5, 93:9, 93:12, 93:15, 94:9, 94:15, 114:15
**assaults** [4] - 15:13, 21:17, 26:4, 34:9
**asserted** [2] - 85:5, 86:18
**asserts** [1] - 79:19
**assessing** [1] - 84:17

**assist** [5] - 78:16, 91:19, 91:22, 92:16, 107:18
**assistance** [1] - 26:20
**assisted** [3] - 4:4, 4:9, 91:24
**assisting** [6] - 87:5, 88:1, 89:7, 89:10, 91:7, 93:25
**associate** [2] - 47:21, 92:17
**associated** [4] - 37:17, 87:12, 92:7, 95:5
**assume** [3] - 45:7, 79:23, 80:2
**assuming** [1] - 122:22
**assumption** [4] - 39:22, 39:24, 40:7, 40:8
**assumptions** [1] - 40:5
**astoundingly** [1] - 31:14
**attack** [1] - 52:2
**attacked** [4] - 34:20, 35:8, 40:2, 62:15
**attacking** [1] - 38:18
**attempt** [3] - 30:15, 46:24, 47:4, 66:1, 88:14, 95:2, 97:8, 97:10, 97:11, 97:14, 97:25, 98:1, 98:8
**attempted** [6] - 27:16, 88:6, 95:7, 95:12, 95:17, 98:20
**attempting** [4] - 33:20, 85:6, 86:19, 114:15
**attempts** [1] - 88:11
**attend** [1] - 5:20
**attended** [1] - 11:13
**attention** [8] - 43:19, 56:6, 56:9, 65:16, 67:18, 69:4, 88:24, 109:9
**attentive** [1] - 111:9
**attenuation** [1] - 114:9
**attitude** [1] - 108:11
**attorney** [1] - 113:4
**attorneys** [1] - 75:12
**audible** [1] - 22:7
**audio** [24] - 12:13, 15:21, 17:9, 19:1, 20:8, 21:5, 22:5, 22:24, 23:12, 23:20, 40:20, 42:3, 43:5, 43:23, 44:25, 45:9, 47:13, 50:12, 50:19, 51:5, 52:25, 57:4, 57:6, 109:25

**audio-visual** [19] - 12:13, 15:21, 17:9, 19:1, 20:8, 21:5, 22:5, 22:24, 23:12, 42:3, 43:5, 43:23, 44:25, 45:9, 47:13, 50:12, 50:19, 51:5, 57:4
**authority** [3] - 96:19, 99:21, 101:2
**automatically** [1] - 38:21
**avoid** [1] - 108:19
**awaiting** [1] - 69:4
**awakening** [1] - 74:19, 74:21, 97:3
**awkward** [1] - 44:5

## B

**bad** [3] - 39:5, 62:22, 89:21
**badge** [2] - 26:6, 112:2
**badly** [1] - 10:2
**balled** [2] - 12:8, 71:8
**balled-up** [1] - 12:8
**bandana** [3] - 9:16, 9:18, 63:15
**banging** [1] - 28:20
**bangs** [4] - 12:16, 12:24, 31:13, 48:16
**barely** [1] - 24:22
**barricades** [11] - 11:16, 12:6, 12:15, 12:22, 31:10, 31:24, 32:3, 32:4, 35:12, 48:3
**barriers** [1] - 48:3
**baseball** [1] - 14:11
**based** [7] - 53:9, 76:21, 76:22, 77:5, 77:6, 85:1, 106:23
**Bates** [2] - 119:12, 119:21
**baton** [9] - 16:5, 18:6, 18:7, 43:9, 50:22, 50:24, 64:21, 70:22, 70:23
**batons** [1] - 35:5
**bats** [1] - 35:5
**battling** [1] - 49:19
**bear** [2] - 67:6, 108:3
**beard** [3] - 18:16, 18:17, 19:18
**bearded** [2] - 21:12, 21:13
**beat** [4] - 25:16, 35:5, 35:20, 51:1
**beating** [1] - 26:22

**beatings** [1] - 4:6
**beats** [1] - 18:10
**became** [1] - 48:24
**become** [2] - 48:15, 83:6
**becomes** [1] - 107:20
**beeping** [1] - 12:25
**beer** [2] - 13:14, 73:2
**began** [1] - 38:5
**begin** [2] - 74:3, 111:4
**beginning** [7] - 57:25, 74:4, 75:18, 81:8, 108:11, 108:22, 109:14
**behalf** [1] - 83:7
**behavior** [2] - 63:19, 81:12
**behind** [5] - 25:18, 25:20, 25:22, 26:7, 57:12
**beings** [1] - 74:17
**belief** [1] - 77:25
**beliefs** [2] - 72:15, 77:18, 77:22
**believability** [1] - 74:16
**believable** [1] - 80:20
**belt** [1] - 42:15
**bench** [1] - 114:13
**Bench** [1] - 85:9
**bending** [1] - 55:4
**Benet** [1] - 3:6
**Benjamin** [1] - 3:7
**best** [2] - 24:3, 53:8
**better** [6] - 17:20, 31:16, 68:1, 117:8, 119:2, 119:17
**between** [20] - 3:12, 10:18, 16:13, 16:16, 19:8, 19:23, 20:3, 27:3, 29:4, 39:8, 45:15, 51:23, 52:1, 63:17, 81:24, 82:3, 82:6, 96:6, 107:19
**beyond** [33] - 26:13, 60:19, 62:2, 76:3, 76:7, 76:12, 76:15, 76:19, 77:7, 77:9, 80:23, 84:1, 87:17, 88:17, 89:9, 90:12, 90:20, 92:15, 92:21, 93:4, 93:16, 95:10, 97:16, 98:4, 98:5, 98:24, 99:18, 100:25, 102:7, 103:14, 105:1, 105:21, 107:17
**bias** [2] - 41:7, 82:19
**biased** [1] - 82:17
**biases** [5] - 74:18,

74:20, 74:22, 81:9
**big** [7] - 13:3, 41:16, 43:25, 46:22, 55:3, 57:17, 58:3
**bike** [2] - 12:8, 49:6
**bit** [7] - 11:8, 12:10, 15:5, 46:1, 55:21, 115:10, 118:25
**bitches** [1] - 9:9
**bite** [1] - 52:14
**blacked** [1] - 109:24
**blaring** [1] - 31:21
**blinded** [1] - 52:6
**blindness** [1] - 25:12
**block** [1] - 35:18
**blocked** [3] - 27:19, 27:21, 27:23
**blogging** [1] - 109:17
**blood** [4] - 25:1, 34:24, 35:1, 69:7
**bloodline** [1] - 10:14
**board** [1] - 96:19
**bodies** [1] - 50:18
**bodily** [44] - 27:7, 27:8, 31:3, 32:18, 32:25, 33:3, 34:7, 70:17, 71:15, 87:9, 88:4, 88:10, 88:11, 88:23, 88:25, 89:2, 89:25, 90:17, 90:23, 91:1, 91:10, 91:13, 92:19, 93:1, 93:6, 93:10, 94:10, 100:15, 100:17, 105:11, 117:21, 117:23, 118:7, 118:13, 118:14, 118:18, 119:5, 119:6, 119:8, 121:5, 121:7, 123:7
**body** [35] - 4:8, 15:12, 15:15, 15:17, 16:15, 16:20, 18:2, 18:21, 19:20, 21:21, 21:23, 22:3, 22:16, 24:14, 24:22, 25:14, 41:22, 43:13, 43:16, 44:24, 46:11, 47:11, 48:2, 50:1, 53:13, 54:3, 54:11, 56:5, 56:21, 57:3, 68:24, 71:8, 71:10, 89:3, 118:3
**body-camera** [3] - 46:11, 53:13, 54:11
**body-worn** [12] - 15:15, 15:17, 18:2, 18:21, 19:20, 21:21, 21:23, 22:3, 24:14, 47:11, 71:8, 71:10
**bolster** [1] - 38:19

**bombs** [2] - 32:3, 35:12
**Boston** [1] - 61:23
**bottom** [1] - 66:21
**bought** [2] - 8:7, 10:20
**bounds** [1] - 115:20
**box** [1] - 61:4
**Boyland** [8] - 20:16, 25:24, 34:19, 50:2, 58:6, 65:16, 66:12, 68:3
**Boyland's** [4] - 41:22, 48:1, 54:3, 56:4
**Boys** [6] - 8:14, 8:15, 8:18, 8:20, 8:21, 9:7
**Branch** [2] - 96:15, 96:17
**brass** [13] - 6:18, 6:21, 7:7, 7:12, 10:1, 31:1, 33:4, 59:19, 59:21, 60:13, 70:19, 71:2, 71:21
**bravado** [1] - 58:18
**brawl** [2] - 57:22, 57:23
**brawls** [1] - 8:22
**break** [9] - 3:12, 36:2, 36:3, 36:4, 36:9, 67:9, 73:10, 122:11, 124:7
**breaking** [1] - 68:11
**breath** [1] - 10:17
**breathe** [2] - 22:18, 44:21
**bridge** [1] - 117:16
**brief** [1] - 67:20
**briefly** [1] - 109:11
**bring** [13] - 4:20, 5:6, 36:12, 37:4, 39:4, 59:21, 63:13, 92:23, 111:24, 112:10, 120:9, 121:20, 122:15
**bringing** [5] - 7:20, 9:6, 38:5, 57:21, 122:13
**British** [3] - 8:5, 8:9, 61:22
**broad** [1] - 29:6
**brought** [4] - 29:22, 29:23, 59:22, 72:4
**bruise** [1] - 89:1
**bruises** [2] - 4:8, 25:13
**bruisings** [1] - 68:23
**buddy** [1] - 6:1
**Building** [4] - 30:4, 32:11, 32:15, 96:25
**building** [29] - 31:4, 31:5, 99:7, 99:9,

99:21, 100:1, 100:2, 100:24, 101:2, 101:9, 101:14, 101:20, 101:23, 102:10, 103:5, 103:13, 103:16, 104:2, 104:7, 104:14, 104:17, 105:5, 105:13, 105:20, 105:24, 106:4, 106:9, 120:6, 121:2
**bullet** [4] - 7:13, 13:5, 13:13, 63:8
**bulletproof** [1] - 9:11
**bullets** [3] - 13:3, 32:3, 48:18
**burden** [6] - 60:18, 61:1, 76:3, 76:14, 77:8, 77:21
**bureau** [1] - 96:19
**burn** [1] - 89:1
**business** [6] - 33:13, 33:21, 102:14, 102:17, 103:20, 103:23
**bust** [1] - 28:23
**busy** [1] - 64:21
**buy** [1] - 10:3
**buying** [1] - 9:6

# C

**cafeteria** [1] - 112:8
**calm** [1] - 72:22
**calmly** [1] - 108:21
**camera** [21] - 15:12, 15:15, 15:17, 18:3, 18:21, 19:20, 21:21, 21:23, 22:3, 24:15, 40:11, 43:13, 46:11, 47:11, 50:1, 53:13, 54:11, 55:11, 56:13, 71:8, 71:10
**cameras** [1] - 43:13
**candid** [1] - 63:23
**cannot** [4] - 42:8, 45:7, 63:13, 76:25
**capability** [1] - 82:21
**capable** [4] - 32:18, 70:17, 100:15, 100:17
**Capitol** [40] - 4:15, 5:19, 11:16, 11:20, 11:21, 11:22, 12:1, 12:3, 12:4, 12:6, 13:17, 28:6, 28:8, 28:24, 30:3, 30:4, 31:7, 32:11, 32:15, 39:3, 39:18, 39:19,

99:21, 100:1, 100:2, 100:24, 101:2, 101:9, 101:14, 101:20, 101:23, 102:10, 103:5, 103:13, 103:16, 104:2, 104:7, 104:14, 104:17, 105:5, 105:13, 105:20, 105:24, 106:4, 106:9, 120:6, 121:2
**bullet** [4] - 7:13, 13:5, 13:13, 63:8
**bulletproof** [1] - 9:11
**bullets** [3] - 13:3, 32:3, 48:18
**burden** [6] - 60:18, 61:1, 76:3, 76:14, 77:8, 77:21
**bureau** [1] - 96:19
**burn** [1] - 89:1
**business** [6] - 33:13, 33:21, 102:14, 102:17, 103:20, 103:23
**bust** [1] - 28:23
**busy** [1] - 64:21
**buy** [1] - 10:3
**buying** [1] - 9:6

**Captain** [3] - 28:20, 31:6, 70:2
**capture** [2] - 55:7, 55:12
**captured** [1] - 43:13
**capturing** [1] - 43:14
**careful** [2] - 76:23, 77:3
**carefully** [1] - 72:16
**carried** [13] - 3:11, 33:2, 71:15, 96:11, 99:23, 100:16, 102:18, 105:7, 114:23, 115:11, 115:21, 120:4, 120:25
**carry** [5] - 6:18, 7:11, 88:22
**carrying** [3] - 89:8, 115:13, 116:4
**case** [61] - 33:2, 33:15, 38:6, 38:9, 41:9, 53:16, 57:25, 61:6, 61:8, 61:18, 62:2, 62:5, 62:17, 73:19, 74:1, 74:7, 74:12, 75:5, 75:8, 75:10, 75:20, 75:25, 76:23, 77:10, 77:13, 77:17, 77:22, 78:4, 78:24, 79:17, 80:13, 81:19, 81:21, 83:1, 85:2, 85:5, 88:12, 89:23, 107:12, 108:1, 108:10, 108:14, 108:18, 108:21, 109:3, 109:4, 109:6, 109:15, 109:17, 111:15, 111:18, 111:19, 111:21, 111:23, 112:5, 119:1, 123:16, 123:18, 123:20, 124:2
**cases** [7] - 29:21, 29:23, 76:15, 76:17, 76:18, 77:22, 108:25
**caught** [1] - 90:11
**causation** [2] - 4:12, 4:17
**caused** [4] - 4:4, 4:9, 4:18, 28:22
**causes** [3] - 28:13, 96:1, 96:2

**causing** [4] - 32:18, 70:17, 100:15, 100:17
**CDU** [3] - 60:3, 70:21
**celebrating** [1] - 58:9
**center** [1] - 45:25
**central** [1] - 101:5
**certain** [4] - 78:8, 93:12, 93:15, 108:15
**certainly** [3] - 36:22, 41:13, 67:22
**certainty** [2] - 77:8, 80:12
**certification** [4] - 4:14, 11:19, 11:20, 30:7
**certify** [3] - 30:8, 32:12, 33:21
**challenges** [1] - 4:12
**chambers** [1] - 18:24
**chance** [5] - 58:24, 60:17, 111:24, 113:15, 113:17
**change** [2] - 23:25, 57:16
**changed** [2] - 86:15, 118:23
**chaos** [8] - 40:4, 40:7, 40:8, 41:24, 42:20, 50:1, 53:13, 57:19
**chaotic** [1] - 45:7
**chapter** [2] - 8:17, 8:18
**characteristic** [1] - 75:1
**charge** [24] - 15:6, 69:23, 71:13, 86:3, 94:6, 94:19, 94:20, 94:24, 99:11, 101:5, 101:16, 101:17, 101:21, 101:25, 104:9, 104:10, 104:19, 106:11, 106:12, 114:18, 115:2, 120:3, 120:24
**charged** [20] - 30:15, 36:16, 60:20, 61:22, 76:9, 84:15, 84:18, 89:25, 90:24, 91:16, 91:23, 92:24, 94:5, 97:9, 98:18, 114:15, 115:7, 120:5, 121:1
**charges** [19] - 37:9, 38:4, 77:11, 77:15, 80:23, 84:4, 84:20, 84:21, 84:24, 84:25, 87:2, 87:7, 87:9, 94:24, 95:2, 99:8, 101:21, 104:16, 114:19
**cheap** [2] - 59:17,

59:22
**check** [2] - 8:24, 63:17
**chemical** [3] - 25:13, 35:3, 69:16
**chest** [1] - 46:23
**child** [1] - 23:4
**children** [1] - 124:1
**choice** [1] - 73:7
**choose** [1] - 73:4
**choosing** [1] - 33:1
**chose** [7] - 30:24, 35:18, 35:19, 35:20, 35:22, 73:7
**chosen** [1] - 41:8
**circumstances** [11] - 79:21, 80:17, 81:23, 81:25, 83:16, 83:18, 83:25, 92:6, 103:2, 108:4, 116:8
**circumstantial** [8] - 79:18, 79:22, 80:5, 80:6, 80:10, 80:11, 80:14, 92:5
**cite** [2] - 118:8, 119:2
**city** [2] - 9:20, 61:3
**civil** [38] - 4:11, 4:18, 27:13, 27:14, 28:2, 28:8, 28:11, 30:16, 37:15, 37:17, 37:19, 60:3, 60:7, 60:8, 69:17, 69:19, 69:22, 69:25, 76:15, 94:6, 94:24, 94:25, 95:3, 95:19, 95:20, 95:25, 97:11, 97:12, 97:15, 97:19, 97:23, 98:2, 98:9, 98:14, 98:20, 98:21, 99:1, 99:4
**civility** [1] - 107:2
**claims** [1] - 64:2
**clawing** [1] - 57:1
**cleaner** [1] - 119:11
**clear** [23] - 5:23, 12:6, 41:20, 45:11, 48:14, 48:15, 49:6, 49:9, 49:14, 51:9, 57:7, 59:16, 66:19, 67:7, 69:6, 69:9, 70:1, 70:17, 71:3, 71:17, 86:11, 98:12, 117:5
**clearer** [2] - 45:11, 57:6
**clearing** [2] - 4:14, 42:6
**clearly** [13] - 14:9, 16:10, 20:16, 20:19, 38:25, 39:7, 42:7, 43:14, 51:8, 52:13, 55:22, 56:11, 72:3
**clerk** [4] - 107:22,

108:4, 109:10, 111:13
**client** [1] - 122:5
**climb** [1] - 67:20
**climbing** [1] - 18:17
**clips** [1] - 40:19
**close** [4] - 25:10, 112:8, 113:10, 121:1
**closefisted** [1] - 51:12
**closer** [1] - 63:22
**closing** [12] - 3:12, 3:13, 4:24, 5:13, 23:19, 29:16, 37:1, 37:7, 42:24, 47:24, 56:18, 115:5
**closings** [1] - 3:11
**cloth** [1] - 60:14
**clouded** [1] - 40:4
**coat** [2] - 65:3, 65:9
**code** [1] - 118:5
**cold** [1] - 9:18
**colloquy** [3] - 36:14, 36:17, 112:24
**colored** [2] - 41:1, 82:19
**Colton** [5] - 3:4, 5:16, 5:19, 72:18
**Columbia** [4] - 59:19, 96:7, 96:8, 96:9
**coming** [1] - 3:5
**comment** [1] - 6:6
**commenting** [1] - 71:24
**commerce** [17] - 28:9, 29:3, 29:4, 29:5, 29:7, 29:13, 29:19, 30:11, 30:13, 69:20, 95:21, 95:22, 96:6, 96:8
**commie** [4] - 6:3, 9:6, 14:15, 38:25
**commission** [3] - 87:8, 92:9, 96:18
**commit** [21] - 27:12, 27:16, 87:10, 91:12, 91:18, 91:20, 93:13, 94:4, 94:16, 95:3, 95:13, 97:10, 97:11, 97:15, 97:18, 97:24, 98:1, 98:6, 98:8, 98:13, 98:20
**commits** [1] - 43:20
**committed** [22] - 26:14, 27:16, 39:7, 60:20, 61:7, 70:5, 84:14, 88:17, 90:3, 90:11, 90:13, 91:2, 92:14, 92:22, 93:5, 93:8, 95:12, 98:19, 98:25, 99:3

**committing** [14] - 26:16, 37:19, 39:23, 90:1, 90:6, 90:7, 90:14, 90:19, 90:23, 91:8, 93:2, 97:22, 98:11, 98:22
**commodity** [1] - 95:22
**common** [2] - 25:23, 58:1
**communicate** [5] - 107:21, 107:24, 107:25, 109:15, 111:21
**communication** [2] - 107:19, 109:16
**comparing** [1] - 40:11
**complete** [2] - 97:13, 98:16
**completely** [1] - 37:9
**complicating** [1] - 114:10
**comply** [1] - 10:16
**computer** [1] - 85:14
**concede** [1] - 113:4
**conceded** [2] - 7:16, 13:3
**concedes** [2] - 13:21, 14:9
**concern** [4] - 68:6, 84:22, 114:8, 114:24
**concerned** [2] - 63:20, 81:20, 113:24
**concerning** [2] - 108:1, 109:2
**conclude** [3] - 3:20, 4:9, 74:2
**concluded** [2] - 107:11, 124:12
**conclusion** [1] - 24:19
**concussion** [3] - 25:11, 53:10, 68:25
**condemn** [1] - 39:21
**condoning** [1] - 48:13
**conduct** [42] - 28:9, 33:12, 33:13, 33:25, 36:13, 36:17, 37:10, 37:13, 62:22, 72:15, 72:16, 74:5, 77:17, 77:19, 95:22, 97:3, 101:20, 101:22, 102:10, 102:13, 102:15, 102:16, 102:17, 102:20, 102:21, 102:22, 103:3, 103:13, 103:16, 103:19, 103:21, 103:22, 103:23, 104:2, 106:17, 108:11, 109:17, 109:19,

115:18, 115:22, 117:6, 117:10
**conference** [1] - 85:9
**confirms** [1] - 97:23
**conflates** [1] - 115:2
**conflicting** [1] - 48:10
**confronts** [1] - 116:12
**confusing** [1] - 115:10
**confusion** [1] - 86:14
**congratulated** [1] - 8:7
**Congress** [3] - 33:20, 96:22, 117:12
**Congress's** [1] - 30:8
**connection** [1] - 26:7
**connects** [1] - 43:10
**consciously** [1] - 74:21
**consequences** [1] - 83:21
**consider** [63] - 27:1, 37:22, 72:16, 74:8, 74:19, 77:12, 77:24, 78:2, 78:8, 78:10, 78:20, 78:21, 79:14, 80:13, 80:17, 80:24, 81:10, 81:11, 81:23, 82:2, 82:5, 82:7, 82:11, 82:14, 82:18, 83:9, 83:16, 83:24, 84:5, 84:15, 85:2, 92:4, 93:8, 94:8, 94:14, 94:19, 97:5, 99:3, 99:12, 99:15, 101:7, 101:13, 101:16, 102:1, 102:4, 103:25, 104:6, 104:9, 104:20, 104:23, 106:2, 106:8, 106:12, 106:25, 110:5, 110:12, 110:15, 110:24
**considerable** [1] - 108:12
**consideration** [5] - 75:4, 75:6, 76:24, 77:20, 107:5
**considered** [2] - 100:10, 107:6
**considering** [1] - 77:10
**consistencies** [2] - 82:2, 82:6
**consistent** [7] - 38:6, 55:10, 55:19, 58:4, 62:3, 62:5, 65:18
**consists** [1] - 78:4
**constitute** [1] - 3:20
**consultation** [1] -

113:3
**consuming** [2] -
39:14, 39:16
**contact** [15] - 25:5,
27:10, 42:19, 55:15,
55:16, 85:6, 86:4,
86:19, 88:8, 88:9,
89:15, 93:13, 94:2,
94:16, 123:3
**contemplating** [1] -
116:25
**context** [4] - 69:23,
70:4, 119:22, 123:17
**continue** [3] - 52:2,
121:15, 122:11
**continuing** [2] - 57:23,
67:12
**contradicted** [1] -
82:14
**control** [3] - 13:2,
31:16, 75:14
**conventional** [1] -
116:11
**convey** [1] - 107:13
**convict** [6] - 36:14,
38:1, 49:12, 60:20,
62:10, 63:3
**conviction** [3] - 84:20,
84:24, 108:9
**convince** [3] - 60:19,
61:2, 72:22
**convinced** [1] - 76:25
**cops** [1] - 20:22
**copy** [4] - 73:20,
73:21, 85:13, 110:20
**cordoned** [3] - 31:5,
31:6, 100:1
**corner** [2] - 11:24,
12:20
**correct** [5] - 35:6,
86:10, 112:21,
114:8, 114:10
**correctly** [1] - 112:15
**corroborates** [1] -
97:23
**cost** [1] - 59:22
**counsel** [3] - 69:17,
85:8, 113:8
**Count** [35] - 27:1,
27:6, 27:14, 33:6,
66:6, 87:1, 87:2,
87:7, 87:9, 89:25,
90:4, 92:25, 93:7,
93:14, 94:5, 94:23,
94:24, 95:2, 97:9,
98:19, 99:2, 99:6,
99:7, 100:9, 100:23,
101:19, 101:21,
103:7, 103:9,
103:12, 104:13,

104:15, 105:14,
105:16, 105:19
**count** [18] - 4:2, 4:3,
4:11, 28:8, 33:10,
34:2, 34:5, 34:10,
38:2, 49:13, 84:4,
84:7, 84:8, 84:9,
97:9, 100:21, 107:8
**counterprotester** [1] -
114:4
**counterprotesters** [3]
- 115:14, 116:2,
116:3
**country** [3] - 34:24,
48:19, 61:21
**counts** [4] - 30:18,
36:1, 86:21, 106:16
**Counts** [1] - 115:3
**County** [1] - 59:8
**couple** [2] - 118:5,
120:19
**coupled** [2] - 66:2,
88:15
**course** [7] - 23:25,
42:4, 79:6, 89:10,
103:4, 109:21,
120:14
**court** [7] - 3:8, 20:19,
79:25, 86:13,
106:20, 108:2, 108:7
**Court** [24] - 3:10, 3:11,
15:6, 36:8, 36:13,
36:17, 36:18, 36:19,
65:25, 85:16, 85:20,
86:2, 107:20,
112:15, 112:18,
114:13, 120:15,
121:23, 121:24,
122:9, 122:21,
122:23
**COURT** [64] - 3:14,
3:16, 4:23, 5:1, 5:4,
5:6, 5:8, 5:10, 36:4,
36:6, 36:20, 36:24,
37:2, 37:4, 37:6,
62:13, 73:9, 73:15,
85:10, 85:13, 85:15,
85:18, 85:24, 86:8,
86:11, 86:14,
112:13, 112:19,
112:22, 113:2,
113:7, 113:10,
113:14, 113:20,
114:1, 115:9, 116:1,
116:15, 116:20,
117:14, 118:8,
118:12, 118:19,
119:14, 119:12,
119:16, 119:21,
120:9, 120:13,

120:17, 121:13,
121:18, 122:2,
122:12, 122:15,
122:18, 122:20,
123:2, 123:6,
123:10, 123:13,
123:25, 124:7,
124:11
**courtroom** [11] -
38:17, 40:9, 40:24,
61:13, 74:23, 109:7,
111:8, 120:12,
120:15, 121:21,
122:13
**COURTROOM** [2] -
3:3, 122:5
**cover** [2] - 7:4, 9:18
**coverage** [1] - 109:3
**covered** [1] - 9:16
**COVID** [4] - 9:22, 9:24,
63:16, 63:18
**CPR** [1] - 58:6
**crab** [1] - 15:18
**crap** [1] - 23:24
**create** [4] - 51:22,
51:25, 54:17, 116:4
**creating** [2] - 52:4,
55:1
**credibility** [7] - 4:1,
74:16, 81:1, 81:4,
81:9, 81:11, 83:1
**credible** [2] - 7:2,
3:11
**credit** [3] - 63:24,
82:7, 82:15
**crime** [34] - 37:12,
37:19, 39:23, 42:20,
43:20, 50:9, 51:7,
53:25, 56:7, 78:20,
86:5, 89:14, 90:11,
90:12, 90:15, 95:3,
97:10, 97:11, 97:12,
97:13, 97:15, 97:18,
97:22, 97:24, 98:1,
98:5, 98:8, 98:11,
98:13, 98:17, 98:19,
98:21, 98:25, 99:4
**crimes** [4] - 40:6,
99:14, 102:3, 104:22
**Criminal** [1] - 3:3
**criminal** [4] - 75:25,
76:18, 78:19, 92:8
**cross** [4] - 9:21, 28:3,
35:3, 117:16
**cross-examination**
- 28:3
**crossing** [1] - 64:23
**crowd** [54] - 4:7,
11:22, 13:2, 13:4,
13:10, 13:21, 13:24,

14:5, 15:20, 15:23,
16:3, 16:17, 17:24,
19:12, 21:16, 24:17,
25:19, 25:21, 26:9,
27:22, 31:16, 35:20,
35:24, 39:25, 40:4,
41:14, 41:15, 41:18,
42:6, 42:10, 42:13,
42:17, 43:15, 44:8,
45:12, 45:17, 45:20,
45:23, 46:15, 47:15,
48:17, 49:16, 50:6,
50:8, 50:25, 55:24,
56:1, 56:12, 56:16,
64:18, 70:24, 72:22,
73:1
**crowded** [1] - 13:19
**crushing** [1] - 24:4
**curfew** [2] - 4:14,
29:17
**curious** [2] - 8:23,
13:20
**cut** [1] - 88:25
**cuts** [2] - 4:8, 25:13

## D

**D.C** [19] - 5:24, 6:2,
6:10, 6:19, 7:20,
9:23, 9:24, 10:12,
10:20, 29:4, 29:5,
29:6, 29:10, 29:20,
29:22, 29:24, 32:19,
71:3, 97:1
**D.C.'s** [1] - 63:20
**damage** [9] - 28:14,
28:16, 28:22, 32:20,
32:21, 71:2, 96:3,
96:5, 105:11
**danger** [4] - 28:13,
28:14, 96:2, 96:3
**dangerous** [45] - 3:21,
30:21, 31:1, 32:16,
32:17, 32:23, 33:9,
33:11, 34:4, 38:1,
38:2, 51:1, 51:12,
54:20, 59:15, 59:23,
59:25, 60:12, 60:15,
60:21, 70:16, 99:7,
99:10, 99:24,
100:10, 100:12,
100:14, 101:9,
101:21, 101:23,
102:19, 103:8,
104:3, 104:15,
104:18, 105:8,
105:15, 106:5,
115:12, 116:5,
119:25, 120:3,
120:21, 120:24
**daughter** [1] - 30:6

**daytime** [1] - 111:13
**de** [4] - 31:17, 51:20,
51:21, 72:23
**de-escalate** [1] - 51:20
**de-escalating** [1] -
51:21
**de-escalation** [2] -
31:17, 72:23
**dead** [8] - 6:3, 6:6,
14:15, 38:25, 41:22,
43:16, 54:3, 56:4
**deadly** [41] - 3:20,
30:21, 31:1, 32:16,
33:9, 33:11, 34:3,
37:25, 38:2, 51:1,
51:16, 59:15, 59:23,
59:25, 60:11, 60:14,
60:21, 99:7, 99:9,
99:23, 100:10,
100:11, 100:13,
100:14, 101:9,
101:20, 101:23,
102:18, 103:8,
104:3, 104:15,
104:17, 105:7,
105:15, 106:4,
115:12, 116:4,
119:25, 120:3,
120:21, 120:24
**deal** [7] - 13:3, 41:16,
43:25, 46:22, 55:3,
57:17, 58:3
**dealing** [1] - 21:22
**death** [7] - 20:19,
35:2, 38:10, 100:15,
100:18, 117:24,
118:14
**December** [1] - 8:20
**decide** [12] - 11:2,
27:1, 65:23, 74:13,
74:14, 74:15, 75:5,
75:8, 80:9, 83:23,
109:6, 110:8
**decided** [6] - 3:22,
3:23, 6:9, 20:24,
60:1, 113:4
**decides** [2] - 14:14,
23:25
**deciding** [4] - 61:5,
77:21, 92:2, 97:4
**decision** [1] - 59:6
**decisions** [1] - 28:1
**defeated** [5] - 46:17,
47:10, 47:18, 49:16,
58:23
**defend** [2] - 40:3, 67:2
**defendant** [315] - 3:19,
4:2, 4:3, 4:12, 4:19,
5:23, 6:1, 6:7, 6:17,
6:20, 6:21, 6:24, 7:5,

7:10, 7:13, 7:16, 8:3, 8:6, 8:8, 8:11, 8:13, 8:15, 8:16, 8:18, 8:19, 9:3, 9:10, 9:16, 9:25, 10:4, 10:13, 10:18, 10:20, 10:21, 10:24, 11:8, 11:14, 11:19, 11:21, 12:19, 12:21, 13:12, 13:16, 13:20, 13:22, 14:21, 15:8, 15:17, 16:2, 16:4, 16:12, 16:14, 16:15, 16:21, 16:23, 17:4, 17:12, 17:16, 17:18, 17:21, 17:25, 18:4, 18:8, 18:9, 18:14, 18:15, 18:18, 19:5, 19:7, 19:11, 19:12, 19:14, 19:23, 20:1, 20:11, 20:14, 20:18, 20:22, 21:7, 21:8, 21:10, 21:13, 21:15, 21:16, 21:17, 22:4, 22:9, 22:10, 22:12, 22:13, 22:16, 22:22, 23:1, 23:9, 23:13, 23:18, 24:2, 24:3, 24:7, 24:8, 25:5, 25:19, 25:20, 25:22, 25:24, 26:1, 26:5, 26:9, 26:11, 26:13, 26:15, 26:21, 26:22, 26:24, 26:25, 27:6, 27:9, 27:12, 27:15, 27:19, 27:21, 27:22, 27:23, 27:24, 28:2, 28:25, 30:13, 30:15, 30:16, 30:19, 30:23, 30:25, 31:14, 32:1, 32:25, 33:2, 33:17, 33:22, 33:23, 34:12, 35:3, 35:11, 35:13, 36:1, 36:3, 62:14, 62:18, 62:19, 62:21, 63:3, 63:4, 63:11, 63:18, 63:23, 63:24, 64:6, 64:9, 64:17, 64:23, 65:4, 65:14, 65:21, 66:3, 66:9, 66:10, 66:18, 66:21, 66:24, 67:1, 67:7, 67:19, 67:22, 67:23, 68:4, 69:6, 69:8, 69:12, 69:13, 70:5, 70:8, 71:4, 71:13, 71:17, 71:21, 72:3, 72:13, 72:20, 73:6, 75:25, 76:2, 77:17, 80:23, 83:6, 83:8, 83:9, 84:7, 84:19, 87:3, 87:8,

87:9, 87:13, 87:15, 87:18, 87:22, 87:23, 88:3, 88:16, 88:18, 89:5, 89:11, 89:16, 89:20, 89:24, 90:3, 90:13, 90:16, 90:18, 90:19, 90:25, 91:4, 91:6, 91:11, 91:15, 91:17, 92:2, 92:7, 92:11, 92:13, 92:17, 92:18, 92:21, 92:23, 92:24, 92:25, 93:4, 93:7, 93:8, 93:14, 93:17, 93:21, 93:22, 94:2, 94:9, 94:12, 94:14, 94:24, 95:2, 95:6, 95:8, 95:12, 97:5, 97:6, 97:9, 97:13, 97:14, 97:18, 97:21, 97:24, 98:1, 98:3, 98:8, 98:10, 98:11, 98:15, 98:18, 98:19, 98:24, 99:2, 99:3, 99:8, 99:16, 99:20, 99:22, 99:23, 100:16, 100:19, 100:22, 101:1, 101:3, 101:8, 101:10, 101:12, 101:13, 101:22, 102:5, 102:9, 102:12, 102:18, 103:11, 103:15, 103:18, 104:1, 104:3, 104:5, 104:6, 104:16, 104:24, 105:3, 105:6, 105:7, 105:18, 105:22, 105:25, 106:3, 106:5, 106:7, 106:8, 112:17, 115:11, 116:23

**DEFENDANT** [2] - 113:6, 113:9
**defendant's** [26] - 3:25, 19:23, 20:24, 33:16, 37:7, 64:14, 65:19, 72:8, 76:25, 77:23, 77:25, 83:11, 85:4, 86:17, 91:19, 91:21, 91:23, 91:25, 92:5, 92:16, 95:16, 98:4, 102:15, 103:21, 120:1, 120:22
**Defendant's** [2] - 23:20, 47:12
**defendants** [1] - 61:25
**defended** [1] - 61:22
**defending** [1] - 9:4

**defense** [7] - 3:7, 7:21, 45:14, 69:17, 85:5, 86:17, 86:18
**defenseless** [1] - 57:2
**defensive** [1] - 57:23
**defer** [1] - 4:25
**define** [1] - 29:3
**defined** [5] - 28:11, 31:4, 34:6, 97:20, 121:6
**defining** [1] - 118:7
**definitely** [1] - 24:2
**definition** [6] - 32:6, 33:14, 113:18, 117:20, 118:4, 121:4
**definitions** [7] - 87:12, 88:5, 95:5, 95:24, 99:25, 102:20, 105:9
**degree** [2] - 80:12, 95:20
**delay** [1] - 28:9
**delayed** [1] - 95:21
**deliberate** [5] - 29:9, 101:4, 109:12, 112:6, 123:1
**deliberating** [4] - 18:25, 21:25, 122:3, 123:3
**deliberation** [1] - 59:13
**deliberations** [22] - 54:10, 73:18, 74:3, 75:14, 75:18, 78:2, 79:12, 79:15, 84:23, 106:17, 106:19, 107:11, 107:20, 107:21, 108:12, 108:22, 109:14, 109:18, 110:21, 111:5, 112:4, 121:15
**delineate** [1] - 31:8
**deliver** [1] - 86:2
**demand** [1] - 47:3
**demeanor** [1] - 81:12
**demolish** [1] - 28:24
**deny** [1] - 3:17
**department** [5] - 6:9, 6:15, 96:12, 96:14, 96:18
**Department** [5] - 59:8, 87:21, 93:20, 96:15, 96:24
**departments** [1] - 96:14
**deploy** [1] - 13:4
**deployed** [1] - 48:19
**DEPUTY** [2] - 3:3, 122:5
**deputy** [1] - 6:14
**described** [9] - 24:16,

81:6, 93:3, 98:22, 100:8, 103:6, 103:9, 105:14, 105:16
**description** [2] - 93:11, 105:17
**deserve** [1] - 74:24
**deserves** [1] - 83:12
**desire** [1] - 82:20
**despite** [2] - 35:12, 58:12
**destruction** [1] - 105:12
**details** [1] - 82:1
**determination** [1] - 108:15
**determine** [8] - 74:11, 75:4, 79:17, 80:18, 81:2, 82:19, 87:13, 95:6
**determined** [1] - 80:15
**determining** [3] - 80:22, 82:13, 84:1
**die** [2] - 22:20, 24:20
**died** [1] - 46:18
**difference** [4] - 27:3, 114:2, 114:6, 116:13
**differences** [1] - 82:9
**different** [5] - 10:14, 10:15, 20:5, 75:13, 118:23
**difficult** [2] - 44:21, 54:19
**direct** [10] - 10:24, 12:7, 79:17, 79:20, 79:25, 80:6, 80:10, 80:12, 80:14, 92:4
**directed** [6] - 114:3, 114:17, 117:10, 117:11, 120:2, 120:23
**direction** [2] - 65:8, 66:19
**directly** [6] - 50:15, 57:12, 77:18, 83:14, 122:25, 123:2
**disability** [1] - 75:2
**disagreement** [1] - 113:18
**disappointed** [5] - 10:9, 31:15, 31:16, 35:16, 59:14
**disarm** [1] - 10:17
**disbelieved** [1] - 83:7
**discriminate** [1] - 40:2
**discuss** [11] - 8:11, 109:9, 109:11, 111:18, 111:19, 111:23, 112:5, 113:17, 123:16, 123:17, 123:20

**discussed** [2] - 33:10, 33:11
**discussing** [1] - 108:21
**discussion** [1] - 108:18
**discussions** [1] - 107:1
**disfigurement** [3] - 89:1, 118:2, 118:17
**dislikes** [1] - 74:18
**dismiss** [2] - 121:21, 122:12
**disorder** [34] - 4:11, 4:18, 27:13, 27:15, 28:2, 28:8, 28:11, 30:16, 37:16, 37:17, 37:19, 69:17, 69:19, 69:22, 69:25, 94:6, 94:24, 95:1, 95:4, 95:19, 95:20, 95:25, 97:11, 97:12, 97:16, 97:19, 97:23, 98:2, 98:9, 98:14, 98:20, 98:21, 99:1, 99:4
**disorderly** [13] - 33:12, 101:19, 101:22, 102:9, 102:20, 102:22, 103:12, 103:15, 104:1, 115:18, 115:22, 117:6, 117:9
**displays** [1] - 14:12
**disregarding** [1] - 77:14
**disrupt** [3] - 33:25, 102:13, 103:19
**disrupted** [2] - 102:16, 103:22
**disrupting** [1] - 33:13
**disruption** [2] - 4:13, 4:18
**disruptive** [11] - 33:12, 101:19, 101:22, 102:9, 103:2, 103:3, 103:12, 103:15, 104:2, 115:18, 117:10
**distance** [1] - 11:2
**distracts** [1] - 53:19
**distress** [1] - 20:16
**District** [4] - 59:19, 96:7, 96:8, 96:9
**disturb** [1] - 102:21
**disturbance** [9] - 28:11, 29:1, 29:2, 30:11, 60:4, 60:7, 60:8, 95:25, 103:3
**divided** [1] - 108:7

**doctor's** [1] - 6:11
**document** [1] - 109:24
**dominant** [1] - 56:2
**done** [14] - 9:25, 26:5, 31:8, 41:18, 51:8, 61:21, 65:25, 67:24, 68:2, 75:7, 83:17, 86:7, 113:25, 121:19
**door** [1] - 28:21
**doors** [1] - 28:24
**doubt** [41] - 26:14, 60:19, 62:2, 76:3, 76:8, 76:12, 76:15, 76:20, 76:21, 76:22, 77:1, 77:2, 77:5, 77:6, 77:7, 77:9, 80:23, 84:2, 87:17, 88:17, 89:9, 90:12, 90:21, 92:15, 92:21, 93:4, 93:16, 95:11, 97:17, 98:4, 98:24, 99:19, 100:25, 102:8, 103:14, 105:2, 105:21, 107:17
**down** [71] - 11:10, 11:24, 11:25, 14:20, 15:16, 16:23, 16:25, 17:6, 17:10, 17:14, 18:22, 19:11, 19:20, 19:24, 20:9, 21:3, 21:8, 21:19, 22:2, 22:3, 22:9, 22:10, 22:11, 22:12, 22:16, 22:23, 23:7, 23:10, 23:11, 23:14, 23:23, 24:17, 24:23, 25:8, 25:17, 26:22, 26:24, 27:20, 27:25, 28:21, 36:3, 41:12, 42:18, 43:4, 43:9, 43:15, 44:7, 45:24, 47:25, 48:4, 48:5, 49:21, 55:4, 55:18, 55:20, 56:14, 60:16, 66:17, 66:18, 66:22, 67:11, 67:16, 67:25, 69:13, 69:14, 111:12, 112:9, 114:13, 117:18, 121:10
**downed** [1] - 16:22
**drag** [6] - 35:19, 45:20, 50:25, 56:11, 56:15, 70:12
**dragged** [11] - 4:7, 15:20, 16:17, 19:7, 25:19, 27:20, 27:22, 41:18, 64:18, 66:15, 69:14
**dragging** [3] - 21:15,

41:15, 68:7
**draw** [3] - 56:9, 78:11, 78:22
**drawn** [2] - 34:15, 79:22
**draws** [1] - 50:23
**dripping** [1] - 25:2
**drive** [1] - 6:10
**driving** [1] - 10:12
**drop** [2] - 29:10, 51:3
**dropped** [2] - 24:15, 29:21
**drops** [1] - 50:24
**drove** [1] - 11:10
**dual** [1] - 53:22
**during** [50] - 8:5, 23:22, 25:6, 29:2, 30:16, 33:24, 37:1, 37:19, 67:16, 69:25, 74:14, 75:14, 75:15, 75:17, 78:2, 78:6, 79:6, 83:24, 92:9, 94:24, 94:25, 95:3, 95:19, 97:10, 97:12, 97:15, 97:19, 97:22, 98:2, 98:9, 98:13, 98:20, 98:21, 99:1, 99:4, 99:24, 102:19, 105:8, 107:20, 107:21, 109:14, 109:18, 109:21, 110:21, 115:12, 116:5, 120:4, 120:25
**duties** [7] - 69:25, 87:6, 88:2, 89:19, 94:1, 95:19, 96:25
**duty** [12] - 9:15, 54:1, 59:3, 62:7, 73:6, 73:25, 74:7, 76:9, 76:12, 84:23, 89:8, 89:11
**dwarfs** [1] - 38:16
**Dyer** [4] - 24:16, 24:21, 24:25, 73:3
**Dyer's** [2] - 24:14, 24:18
**dying** [2] - 20:22, 49:20

# E

**eagle** [1] - 64:5
**easier** [1] - 86:23
**eat** [2] - 112:9, 112:11
**Eddie** [2] - 34:17, 58:16
**edge** [1] - 41:14
**education** [1] - 75:3
**effectively** [1] - 46:4
**efficient** [1] - 74:6

**efforts** [7] - 66:15, 67:12, 67:13, 94:18, 101:15, 104:8, 106:10
**eggs** [2] - 25:11, 68:25
**either** [15] - 12:1, 42:15, 43:10, 45:17, 54:2, 64:9, 64:11, 82:17, 83:3, 93:6, 99:1, 110:8, 114:21, 115:16, 119:20
**elapsed** [1] - 81:24
**elbow** [2] - 25:12, 68:23
**electronic** [1] - 109:16
**electronically** [1] - 109:20
**element** [19] - 4:12, 4:17, 27:4, 27:15, 32:22, 32:24, 33:9, 34:11, 37:20, 76:8, 76:11, 94:4, 97:25, 98:7, 98:14, 115:11, 120:3, 120:24
**elements** [31] - 15:7, 27:3, 27:4, 30:18, 30:22, 87:11, 87:15, 87:17, 90:21, 90:24, 93:16, 95:4, 95:8, 95:10, 97:17, 99:12, 99:14, 99:16, 99:18, 100:24, 102:1, 102:3, 102:5, 102:7, 103:14, 104:20, 104:22, 104:24, 105:1, 105:21, 107:16
**elevated** [1] - 49:22
**elicited** [1] - 45:15
**Ellipse** [1] - 11:12
**elsewhere** [2] - 55:23, 69:4
**email** [4] - 29:15, 85:11, 109:16
**emotive** [3] - 61:10, 61:12, 61:14
**employee** [1] - 96:13
**encompasses** [1] - 119:19
**encourage** [4] - 91:20, 91:22, 92:16, 107:2
**encouraged** [2] - 91:18, 91:24
**encouraging** [1] - 91:8
**end** [2] - 7:18, 119:20
**ended** [2] - 11:12, 38:8
**ends** [1] - 72:4
**enforcement** [18] -

13:1, 13:4, 26:6, 27:18, 34:15, 39:1, 41:1, 59:10, 70:7, 89:15, 94:25, 95:14, 95:17, 114:3, 120:2, 120:23
**enforcing** [1] - 97:1
**engage** [5] - 39:11, 56:21, 58:18, 69:20, 72:23
**engaged** [10] - 60:7, 69:24, 87:5, 88:1, 93:25, 95:18, 102:9, 103:15, 105:3, 105:22
**engaging** [8] - 49:5, 57:22, 84:12, 104:14, 104:16, 105:19, 106:3, 106:8
**ensure** [1] - 30:5
**enter** [2] - 30:24, 84:22
**entered** [6] - 13:24, 30:19, 30:20, 99:20, 101:1, 111:8
**entering** [15] - 36:15, 37:22, 60:21, 60:22, 62:11, 99:6, 99:8, 100:23, 101:8, 101:13, 104:6, 108:13, 115:17, 120:5, 121:2
**entirely** [7] - 41:20, 48:5, 51:9, 56:12, 83:22, 111:6, 115:4
**entitled** [2] - 78:14, 82:23
**entity** [2] - 96:21, 116:24
**entrance** [1] - 49:5
**equal** [1] - 80:11
**equalizer** [1] - 57:7
**equated** [1] - 8:8
**error** [1] - 112:15
**escalate** [1] - 51:20
**escalating** [1] - 51:21
**escalation** [2] - 31:17, 72:23
**escorted** [1] - 47:15
**especially** [5] - 48:23, 51:13, 55:12, 58:18, 60:10
**essentially** [6] - 44:18, 46:3, 46:17, 48:13, 49:10, 51:16
**established** [2] - 8:10, 89:9
**establishment** [1] - 96:18
**eternity** [1] - 44:3

**ethnic** [1] - 75:1
**evaluate** [4] - 60:24, 61:17, 62:9, 81:8
**evaluated** [1] - 82:25
**evaluating** [5] - 61:8, 81:4, 81:22, 83:1, 83:8
**evening** [3] - 122:23, 124:4, 124:8
**event** [11] - 38:14, 61:17, 61:25, 81:23, 81:24, 81:25, 82:1, 83:3, 84:20, 84:24, 103:4
**events** [1] - 51:15
**everyday** [1] - 88:22
**everywhere** [3] - 44:21, 49:11, 50:3
**evidence** [82] - 4:4, 38:7, 49:2, 53:25, 55:10, 58:12, 61:8, 61:19, 62:9, 74:2, 74:14, 74:15, 75:5, 75:12, 75:13, 75:20, 75:21, 75:22, 76:5, 76:23, 76:24, 77:13, 78:3, 78:5, 78:9, 78:10, 78:13, 78:16, 78:17, 78:18, 78:21, 78:22, 79:1, 79:4, 79:14, 79:16, 79:17, 79:18, 79:20, 79:22, 80:1, 80:5, 80:7, 80:8, 80:9, 80:11, 80:12, 80:14, 80:15, 80:18, 82:7, 82:15, 82:25, 83:18, 83:24, 83:25, 84:5, 84:14, 85:2, 92:5, 92:7, 92:13, 97:6, 98:3, 106:24, 107:2, 107:4, 107:5, 107:12, 109:6, 109:22, 110:9, 110:11, 110:14, 110:18, 112:16, 114:19, 116:2
**exact** [1] - 71:2
**exactly** [7] - 13:8, 48:21, 71:18, 119:4, 119:22, 122:8, 123:25
**exaggerated** [1] - 63:24
**examination** [1] - 28:3
**examine** [3] - 110:4, 110:12, 110:15
**example** [4] - 79:23, 81:11, 108:8, 114:4
**except** [3] - 98:16,

107:24, 108:2
**excerpts** [1] - 33:19
**exchanges** [1] - 9:2
**excited** [1] - 47:17
**exclusive** [1] - 75:11
**exclusively** [1] - 85:1
**excuse** [4] - 68:10,
90:18, 111:5, 111:10
**Executive** [1] - 96:15
**Exhibit** [17] - 18:23,
20:6, 21:4, 22:22,
23:20, 25:2, 28:23,
29:7, 29:9, 29:15,
29:18, 31:8, 31:14,
32:13, 33:19, 33:20,
71:20
**exhibit** [2] - 109:23,
110:1
**exhibits** [6] - 78:5,
79:12, 109:21,
110:4, 110:11,
110:13
**existed** [1] - 116:8
**exists** [2] - 41:7,
111:17
**exonerates** [1] - 39:20
**expect** [3] - 4:24, 5:2,
122:9
**expected** [2] - 39:8,
59:5
**expecting** [1] - 5:24
**experience** [1] - 78:13
**experienced** [3] -
61:3, 61:16, 61:24
**explain** [7] - 87:11,
87:13, 95:4, 95:6,
99:11, 101:25,
104:19
**explained** [3] - 32:1,
74:4, 90:24
**explains** [1] - 20:21
**explanation** [2] - 86:4,
117:14
**expletives** [1] - 18:14
**exposed** [1] - 69:15
**exposing** [1] - 70:23
**expressed** [1] - 75:9
**expression** [2] - 75:2,
108:14
**extended** [5] - 54:13,
54:15, 54:19, 54:22
**extent** [4] - 53:4,
58:10, 81:3, 124:2
**extreme** [4] - 117:24,
118:15, 119:7, 121:6
**eyes** [2] - 25:12, 67:17
**eyewitness** [1] - 79:19

# F

**face** [9] - 9:16, 9:18,
14:10, 19:15, 44:16,
63:16, 64:5, 67:4,
67:5
**faced** [1] - 39:25
**facilitate** [4] - 91:20,
91:22, 92:17, 107:1
**facilitated** [1] - 91:24
**facilitating** [1] - 91:8
**facing** [1] - 71:10
**fact** [22] - 3:23, 3:24,
5:25, 6:8, 24:7,
24:11, 32:18, 48:19,
55:3, 58:3, 76:16,
78:8, 79:19, 80:7,
83:9, 84:7, 84:13,
84:15, 89:10,
102:16, 103:22,
115:4
**fact-intensive** [1] -
3:23
**facts** [14] - 74:12,
75:4, 78:5, 78:8,
78:11, 79:17, 79:21,
80:17, 83:18, 83:23,
92:6, 108:24, 110:8
**faculty** [5] - 89:3,
118:3, 118:18,
119:8, 121:8
**failed** [1] - 76:11
**fair** [12] - 40:6, 40:8,
41:9, 61:7, 74:5,
74:24, 75:4, 77:12,
77:14, 106:23,
107:5, 119:20
**fairly** [4] - 45:2, 61:17,
78:14, 82:23
**fall** [2] - 9:1, 14:16
**falling** [3] - 9:7, 79:24,
80:1
**falsehood** [1] - 82:9
**family** [1] - 100:6
**far** [1] - 38:16
**fashion** [2] - 108:8,
112:5
**fast** [2] - 44:5, 44:19
**fateful** [1] - 66:17
**favor** [1] - 80:8
**favoritism** [1] - 75:6
**FBI** [2] - 38:9, 43:3
**fear** [2] - 75:5, 102:24
**federal** [10] - 4:14,
87:7, 89:8, 89:10,
89:19, 95:1, 97:1,
99:10, 101:24,
104:18
**federally** [7] - 28:10,
29:25, 30:1, 30:12,

69:21, 95:23, 96:10
**feelings** [2] - 61:5,
77:14
**feet** [9] - 12:20, 12:22,
13:10, 16:4, 16:10,
44:7, 45:23, 48:1,
64:19
**fellow** [6] - 14:6, 14:7,
14:13, 14:16, 20:15,
68:8
**felony** [5] - 27:13,
93:13, 94:4, 94:5,
94:17
**felt** [4] - 31:24, 44:3,
58:25, 59:13
**fencing** [3] - 12:8,
31:10, 63:6
**fetal** [1] - 59:2
**few** [4] - 12:20, 12:21,
16:4, 69:3
**fifth** [6] - 27:4, 34:5,
34:10, 88:3, 91:11,
94:2
**fight** [11] - 5:20, 5:21,
5:25, 7:6, 35:11,
35:14, 35:18, 47:2,
62:24, 73:7
**fighting** [3] - 14:18,
22:15, 49:5
**finally** [4] - 21:2,
23:14, 23:15, 34:5
**finder** [1] - 3:23
**fine** [7] - 36:25, 39:24,
63:19, 117:2, 120:7,
120:12, 121:23
**fingers** [3] - 54:13,
54:14, 54:22
**finishes** [1] - 60:23
**firm** [1] - 98:12
**firmly** [1] - 76:25
**first** [47] - 3:19, 5:25,
15:5, 16:14, 18:1,
27:15, 28:2, 39:6,
42:23, 46:20, 49:3,
54:1, 54:4, 62:21,
69:3, 71:6, 71:19,
86:2, 87:11, 87:18,
90:22, 93:17, 94:9,
94:18, 95:4, 95:12,
97:18, 97:25, 99:20,
100:11, 101:1,
101:7, 101:15,
102:9, 103:15,
104:1, 104:8, 105:3,
105:22, 106:2,
106:11, 106:18,
114:1, 118:21,
119:24, 120:20,
121:3
**fist** [6] - 32:21, 47:16,

54:13, 54:14, 71:8,
72:2
**fisted** [3] - 18:11,
51:11, 54:5
**fit** [1] - 7:1
**five** [8] - 3:12, 36:1,
36:2, 36:4, 40:14,
49:21, 66:6, 73:10
**five-foot-six** [1] -
49:21
**five-minute** [3] - 36:2,
36:4, 73:10
**flash** [4] - 12:16,
12:24, 31:13, 48:16
**flash-bangs** [4] -
12:16, 12:24, 31:13,
48:16
**focus** [4] - 7:25,
33:12, 33:17, 53:20
**focused** [1] - 67:19
**follow** [4] - 9:22,
74:10, 110:25,
119:22
**followed** [1] - 34:23
**following** [13] - 9:24,
87:17, 90:21, 93:16,
95:10, 97:17, 99:18,
100:24, 102:7,
103:14, 105:1,
105:20, 117:23
**follows** [1] - 71:24
**foot** [8] - 13:16, 14:25,
15:1, 15:2, 19:23,
20:3, 49:21, 63:12
**footage** [16] - 45:1,
45:4, 46:11, 47:11,
48:6, 51:10, 52:6,
53:13, 54:7, 54:12,
55:4, 55:7, 55:11,
56:13, 70:1
**force** [10] - 48:22,
51:12, 51:16, 51:18,
51:20, 51:21, 88:6,
88:7, 88:8
**forceful** [1] - 43:9
**forcefully** [2] - 13:25,
14:7
**forcibly** [6] - 87:22,
88:6, 88:12, 89:6,
89:11, 93:21
**foremost** [1] - 54:1
**foreperson** [4] -
106:19, 106:21,
106:25, 107:23
**forgetting** [1] - 123:22
**form** [10] - 6:11, 80:8,
94:21, 101:18,
104:11, 106:13,
107:10, 107:11,
107:14, 107:17

**formal** [2] - 78:19,
96:21
**forward** [3] - 6:3, 14:1,
16:22
**Foster** [1] - 3:7
**foster** [5] - 4:25, 5:1,
64:16, 67:23, 68:21
**FOSTER** [18] - 5:2,
5:14, 12:14, 15:22,
16:19, 17:10, 19:2,
20:9, 21:6, 22:6,
22:25, 23:13, 85:16,
85:20, 86:7, 86:10,
122:21, 123:5
**fought** [1] - 8:5
**founded** [1] - 61:22
**four** [1] - 28:18
**fourth** [7] - 33:10,
34:2, 87:25, 91:6,
92:3, 93:24, 102:18
**Fox** [1] - 39:14
**frame** [6] - 54:6, 54:9,
56:14
**frankly** [2] - 38:13,
39:24
**fray** [1] - 50:17
**free** [5] - 66:23, 67:13,
81:9, 111:1, 111:23
**freedom** [1] - 35:2
**friend** [4] - 10:3,
13:15, 34:16, 35:6
**friendship** [1] - 81:20
**front** [16] - 12:1,
13:25, 14:4, 14:8,
14:19, 23:9, 35:14,
35:24, 41:22, 46:18,
49:16, 49:20, 69:5,
86:24, 116:22
**Front** [2] - 13:17, 49:4
**frontline** [1] - 15:14
**frustration** [3] - 18:10,
68:5, 68:9
**fuck** [1] - 53:2
**fueled** [1] - 20:23
**full** [5] - 35:7, 37:13,
53:4, 58:10, 107:5
**function** [17] - 28:10,
30:1, 30:12, 30:14,
33:22, 53:22, 69:21,
74:5, 74:11, 89:2,
95:23, 96:10, 96:11,
118:2, 118:18,
119:8, 121:7
**functions** [5] - 30:2,
102:14, 102:17,
103:20, 103:23
**furtherance** [2] - 91:5,
91:16
**furthermore** [1] -
108:18

**future** [4] - 9:2, 9:8, 14:18, 35:1

## G

**gain** [1] - 81:19
**gas** [36] - 12:14, 12:25, 13:1, 15:23, 16:9, 17:1, 17:5, 17:16, 17:24, 18:2, 18:4, 18:8, 19:2, 19:10, 19:13, 19:15, 20:12, 20:25, 21:7, 21:11, 27:21, 27:23, 31:12, 31:24, 32:4, 35:13, 35:21, 44:15, 48:16, 48:19, 52:20, 63:7, 65:12, 67:3, 69:16, 70:11
**gas-mask** [11] - 16:9, 17:1, 17:5, 17:24, 19:10, 19:13, 20:12, 20:25, 21:7, 27:21, 27:23
**gassed** [1] - 25:17
**gather** [1] - 113:3
**gender** [1] - 75:2
**general** [2] - 77:19, 86:5
**generally** [1] - 74:18
**generation** [2] - 10:14, 10:15
**generations** [3] - 9:2, 9:8, 14:18
**generic** [1] - 59:9
**gentlemen** [13] - 6:6, 7:2, 62:17, 62:24, 63:13, 64:14, 65:20, 65:24, 68:14, 70:13, 71:12, 72:7, 72:13
**gesturing** [1] - 42:12
**girls** [2] - 7:23, 8:1
**given** [10] - 93:3, 98:23, 107:15, 110:15, 114:18, 118:22, 119:21, 121:18, 121:24, 122:9
**glasses** [1] - 57:13
**Glavey** [2] - 32:8, 70:3
**glory** [1] - 35:23
**gloves** [29] - 3:20, 7:5, 7:6, 10:2, 10:3, 10:5, 10:8, 31:2, 32:17, 32:20, 32:23, 32:25, 33:2, 33:4, 51:14, 52:21, 55:6, 59:12, 59:16, 59:18, 59:22, 60:1, 60:4, 60:9, 70:13, 70:19, 71:12,

71:14, 71:18
**gloves/brass** [2] - 59:12, 59:15
**goal** [6] - 7:6, 30:17, 45:23, 56:1, 69:19, 74:23
**goggles** [1] - 64:2
**gold** [1] - 6:21
**goose** [2] - 25:11, 68:25
**gotcha** [1] - 8:16
**government** [75] - 4:16, 8:10, 11:1, 27:9, 27:11, 30:10, 32:22, 32:24, 33:1, 33:13, 33:21, 36:8, 37:20, 38:5, 38:18, 38:22, 39:4, 39:21, 40:19, 41:16, 42:5, 42:22, 42:25, 43:6, 43:25, 45:13, 46:22, 47:23, 48:3, 48:7, 50:4, 53:6, 56:18, 57:15, 57:25, 58:13, 59:11, 59:19, 60:16, 60:23, 61:18, 62:1, 62:4, 70:5, 76:2, 76:7, 76:11, 76:14, 77:7, 77:21, 80:22, 84:1, 85:22, 87:16, 89:23, 90:3, 90:20, 91:16, 92:20, 95:9, 96:21, 97:16, 98:15, 99:17, 102:6, 102:13, 102:17, 103:19, 103:23, 104:25, 107:17, 112:23, 113:25, 114:7, 118:24
**Government** [1] - 71:20
**Government's** [2] - 29:7, 29:9
**government's** [14] - 3:12, 5:12, 40:21, 41:11, 51:15, 52:12, 55:3, 58:2, 61:19, 76:18, 114:5, 116:21, 117:22, 119:16
**grab** [4] - 15:24, 23:6, 42:11, 64:19
**grabbed** [2] - 42:14, 69:8
**grabbing** [8] - 14:20, 14:23, 17:12, 23:3, 44:15, 46:9, 55:18, 64:17
**grabs** [5] - 17:6, 20:3, 65:3, 65:8, 65:12

**grass** [1] - 11:15
**graver** [1] - 77:4
**gravity** [1] - 45:25
**gray** [2] - 65:3, 65:9
**Great** [4] - 9:11, 39:23, 61:11, 72:14
**great** [5] - 7:15, 7:19, 50:7, 71:25, 121:12
**greater** [3] - 80:12, 80:20, 83:4
**ground** [29] - 15:14, 15:16, 16:25, 19:21, 20:9, 20:17, 21:6, 22:7, 24:4, 24:15, 34:19, 35:8, 35:10, 41:22, 42:13, 43:2, 44:1, 44:7, 47:23, 48:4, 49:20, 49:22, 50:18, 50:22, 52:9, 56:2, 63:7, 80:3
**grounds** [36] - 30:20, 30:21, 30:24, 30:25, 31:2, 31:4, 31:6, 33:11, 36:16, 99:7, 99:9, 99:21, 100:1, 100:2, 100:24, 101:2, 101:9, 101:14, 101:20, 101:23, 102:11, 103:5, 103:13, 103:17, 104:2, 104:7, 104:15, 104:17, 105:5, 105:13, 105:20, 105:24, 106:4, 106:9, 120:6, 121:2
**Grounds** [8] - 11:22, 12:3, 12:4, 12:6, 30:4, 63:6, 84:13, 97:1
**groups** [2] - 28:12, 96:1
**grunt** [1] - 22:7
**guard** [1] - 53:24
**guess** [2] - 110:6, 121:25
**guesswork** [1] - 77:6
**guidance** [1] - 119:19
**guidelines** [5] - 83:2, 118:6, 118:8, 118:24, 119:1
**guilt** [5] - 77:1, 77:7, 77:9, 78:22, 78:23
**guilty** [62] - 24:12, 26:11, 26:13, 26:25, 28:3, 36:1, 37:11, 37:22, 50:9, 51:7, 54:24, 62:9, 62:23, 66:6, 76:3, 76:10, 76:13, 76:15, 84:7,

84:8, 84:11, 84:13, 84:16, 84:21, 84:25, 87:15, 90:5, 90:16, 92:11, 92:18, 92:24, 93:7, 93:14, 94:9, 94:12, 94:14, 94:15, 95:9, 97:14, 98:1, 98:8, 98:18, 99:2, 99:17, 100:22, 101:8, 101:10, 101:12, 101:13, 102:6, 103:11, 104:1, 104:3, 104:5, 104:6, 104:25, 105:18, 106:3, 106:5, 106:7, 106:8, 112:17
**gun** [1] - 70:16
**gunfire** [1] - 59:5
**guns** [1] - 34:15
**guy** [3] - 14:11, 14:25, 58:15

## H

**half** [3] - 12:11, 46:24, 47:4
**half-hearted** [2] - 46:24, 47:4
**hand** [27] - 5:18, 6:25, 7:7, 15:25, 16:15, 16:19, 16:21, 17:1, 17:14, 17:20, 18:5, 18:11, 19:7, 19:10, 22:15, 23:6, 24:5, 54:13, 54:15, 54:18, 55:22, 56:2, 56:17, 76:10, 79:20, 111:13
**handed** [4] - 51:18, 51:25, 54:17, 95:16
**handle** [4] - 7:14, 7:17, 9:6, 71:25
**handled** [1] - 31:18
**hands** [11] - 22:16, 34:24, 50:17, 51:8, 52:23, 54:25, 55:17, 60:9, 66:25, 70:20, 71:8
**hanging** [1] - 123:20
**happy** [3] - 47:15, 73:21, 122:11
**hard** [5] - 62:24, 68:24, 121:24
**harder** [1] - 53:20
**harm** [5] - 34:7, 37:16, 88:10, 88:11, 105:11
**harmed** [1] - 102:25
**hat** [10] - 8:8, 9:11, 14:11, 16:5, 19:6, 39:23, 61:11, 61:12,

64:22, 72:14
**head** [8] - 24:18, 25:9, 25:11, 34:25, 43:10, 43:11, 68:22, 68:25
**headed** [2] - 5:23, 13:18
**headline** [1] - 34:14
**healthy** [1] - 111:9
**hear** [15] - 12:15, 12:16, 12:17, 13:8, 22:7, 23:21, 31:22, 40:22, 41:4, 41:5, 52:12, 52:13, 57:5, 58:12, 110:4
**heard** [25] - 6:15, 11:16, 11:17, 12:25, 14:5, 18:13, 19:20, 20:15, 22:13, 22:14, 28:19, 28:20, 31:21, 32:8, 32:17, 38:16, 62:17, 63:7, 63:21, 67:9, 67:15, 67:19, 68:22, 70:2, 70:19
**hearing** [2] - 12:24, 59:14
**heart** [1] - 57:16
**heartache** [1] - 46:19
**hearted** [2] - 46:24, 47:4
**heaving** [1] - 35:24
**heavy** [1] - 10:10
**held** [14] - 3:2, 5:7, 35:8, 36:5, 37:5, 67:16, 73:12, 73:14, 86:13, 112:12, 120:16, 121:17, 123:12, 124:6
**helmet** [2] - 15:20, 41:18
**help** [47] - 5:20, 6:4, 15:19, 17:15, 20:2, 21:9, 23:2, 23:5, 23:21, 24:1, 24:3, 24:4, 35:21, 37:15, 40:20, 48:2, 50:2, 50:4, 50:10, 52:11, 52:13, 52:15, 52:18, 53:1, 53:2, 53:3, 55:2, 55:4, 55:8, 56:25, 57:8, 57:9, 57:22, 57:24, 58:3, 58:4, 58:5, 58:7, 62:16, 64:7, 65:1, 65:19, 68:4, 85:6, 86:19, 107:1
**helped** [7] - 14:8, 50:5, 52:10, 55:9, 64:3, 64:8, 67:21
**helping** [8] - 9:4, 20:15, 34:18, 34:19,

52:18, 62:19, 64:4, 64:14

**helps** [1] - 52:8, 85:12

**hero** [2] - 61:23, 64:11

**herself** [1] - 82:17

**hesitate** [2] - 77:4, 108:17

**hiding** [1] - 45:5

**high** [1] - 47:17

**highlighted** [1] - 27:4

**highly** [1] - 76:17

**himself** [20] - 8:6, 8:8, 9:4, 12:2, 13:6, 14:17, 28:25, 30:13, 34:16, 51:23, 52:1, 59:4, 60:2, 62:19, 63:13, 63:25, 64:11, 66:23, 67:2, 67:13

**hips** [1] - 46:1

**history** [2] - 14:17, 38:14

**hit** [5] - 6:23, 13:2, 13:5, 18:12, 63:8

**hits** [1] - 19:16

**hockey** [1] - 35:5

**hold** [7] - 12:12, 35:10, 72:2, 77:25, 79:2, 85:8, 110:7

**holding** [11] - 22:10, 22:12, 23:23, 26:22, 26:24, 34:19, 67:11, 67:25, 69:13, 70:22

**holds** [1] - 66:22

**home** [5] - 48:14, 48:20, 48:23, 49:14, 72:22

**Homeland** [1] - 96:15

**honest** [2] - 41:3, 76:24

**Honor** [20] - 4:21, 4:22, 5:3, 5:5, 36:2, 36:21, 112:25, 113:16, 115:20, 116:7, 116:19, 116:22, 117:11, 118:4, 118:20, 120:10, 122:21, 123:9, 124:9, 124:10

**hooking** [1] - 15:2

**hope** [1] - 5:11

**hospital** [3] - 24:10, 24:11, 57:21

**hospitalization** [4] - 117:25, 118:16, 119:10, 121:9

**hostility** [1] - 81:20

**hotel** [2] - 11:11, 73:2

**hour** [2] - 5:2, 63:12

**hours** [2] - 6:10, 49:8

**house** [1] - 10:8

**human** [1] - 74:17

**hunched** [2] - 46:2, 59:1

**hurt** [1] - 6:22

**hurting** [1] - 59:6

**hustle** [1] - 112:9

**I**

**ice** [3] - 116:11, 116:16, 116:17

**idea** [4] - 13:9, 22:1, 39:2, 44:6

**identical** [1] - 45:2

**identification** [1] - 110:14

**identified** [1] - 90:11

**identifying** [1] - 59:8

**identity** [1] - 75:2

**ideology** [3] - 8:4, 10:25, 11:5

**ignorance** [1] - 97:4

**ignore** [6] - 61:5, 74:9, 75:10, 79:7, 79:10, 110:25

**ignored** [1] - 48:5

**ignoring** [1] - 16:24

**Ill** [3] - 8:8, 9:12, 11:7

**illegal** [2] - 59:18, 71:3

**illness** [1] - 89:2

**image** [9] - 11:23, 14:10, 16:11, 17:10, 24:14, 25:1, 34:14, 50:1, 58:23

**images** [1] - 18:20

**imaginary** [1] - 77:5

**immediate** [6] - 28:13, 28:14, 96:2, 96:3, 100:6, 102:24

**immediately** [1] - 54:23

**impairment** [5] - 89:2, 118:2, 118:17, 119:7, 121:7

**impartial** [4] - 74:24, 76:24, 77:12, 77:14

**impede** [6] - 66:7, 67:12, 88:21, 89:18, 102:13, 103:19

**impeded** [12] - 15:9, 70:9, 72:19, 87:19, 89:6, 89:12, 89:24, 90:22, 92:25, 93:18, 102:16, 103:22

**impeding** [20] - 26:12, 27:17, 33:12, 66:12, 66:16, 70:6, 87:2, 87:3, 90:17, 91:1, 91:9, 91:13, 92:19, 93:5, 93:9, 93:12,

93:15, 94:10, 94:15, 95:14

**implicate** [1] - 110:2

**implicit** [1] - 74:20

**implies** [1] - 76:21

**importance** [1] - 108:12

**important** [4] - 51:11, 67:17, 77:4

**imposing** [1] - 84:23

**impossible** [3] - 38:11, 61:4, 114:18

**impressed** [2] - 10:7, 10:9

**impresses** [2] - 81:14, 81:15

**improbability** [1] - 82:12

**inadmissible** [1] - 110:2

**inadvertently** [1] - 109:8

**incident** [1] - 95:19

**incidental** [1] - 42:19

**include** [1] - 115:5

**included** [26] - 7:12, 33:7, 33:8, 34:3, 34:10, 36:15, 38:2, 49:13, 62:11, 93:11, 94:13, 99:13, 100:21, 101:5, 101:11, 101:17, 102:2, 103:11, 104:4, 104:10, 104:21, 105:17, 106:6, 106:12, 112:24, 113:5

**includes** [9] - 11:6, 88:25, 96:14, 96:16, 96:17, 96:20, 100:5, 102:22, 109:16

**including** [15] - 6:18, 29:4, 29:5, 33:22, 53:10, 70:11, 81:23, 88:19, 92:5, 96:7, 96:8, 97:6, 110:2, 123:16, 123:17

**income** [1] - 75:3

**inconsistencies** [3] - 82:3, 82:5, 82:8

**inconsistent** [1] - 55:9

**incorrect** [2] - 85:18, 85:21

**incredible** [1] - 65:22

**incredibly** [1] - 40:1

**independent** [2] - 96:18, 109:18

**indicate** [1] - 67:23

**indicated** [3] - 67:23, 75:9, 110:20

**indicating** [2] - 4:12, 75:8

**indictment** [10] - 78:19, 78:21, 84:4, 84:8, 84:10, 87:2, 87:7, 99:8, 101:21, 104:16

**individual** [11] - 12:20, 28:14, 28:16, 34:8, 41:15, 42:9, 50:14, 96:2, 96:4, 105:11, 114:16

**individual's** [5] - 28:15, 28:16, 96:3, 96:5, 110:3

**ineffective** [1] - 54:21

**infer** [3] - 83:15, 83:20

**inference** [1] - 78:22

**inferences** [2] - 78:12, 79:21

**inflict** [6] - 54:25, 66:1, 88:10, 88:11, 88:15, 88:18

**inflicted** [4] - 27:7, 53:17, 87:8, 88:3

**inflicting** [12] - 27:8, 89:25, 90:17, 90:23, 91:1, 91:10, 91:13, 92:19, 93:1, 93:6, 93:10, 94:10

**infliction** [2] - 34:7, 105:11

**influence** [2] - 84:9, 84:22

**inform** [1] - 116:22

**inherently** [3] - 32:23, 70:16, 100:12

**initial** [1] - 108:19

**injured** [7] - 6:8, 25:5, 25:24, 26:1, 26:10, 43:11, 53:6

**injuries** [13] - 4:3, 4:5, 4:10, 24:14, 25:6, 25:16, 53:5, 53:9, 68:21, 68:23, 69:2, 69:5, 69:10

**injury** [52] - 27:7, 27:8, 28:13, 28:15, 31:3, 32:18, 32:25, 33:4, 51:13, 59:24, 66:2, 70:18, 71:15, 87:9, 88:4, 88:15, 88:18, 88:19, 88:23, 88:25, 89:3, 89:25, 90:18, 90:23, 91:2, 91:10, 91:14, 92:20, 93:1, 93:6, 93:10, 94:10, 96:2, 96:4, 100:15, 100:18, 117:21, 117:23, 118:7,

118:13, 118:14, 119:5, 119:6, 121:5, 121:6, 123:7

**innocence** [2] - 76:1, 76:5

**innocent** [6] - 37:8, 37:9, 37:14, 37:15, 38:4, 76:1

**inquiry** [1] - 3:23

**inside** [1] - 49:22

**insignia** [1] - 59:7

**insist** [1] - 37:1

**insists** [1] - 13:7

**inspect** [1] - 70:14

**instant** [1] - 50:11

**instead** [8] - 9:5, 13:15, 13:24, 15:1, 35:7, 46:2, 98:11, 119:6

**instruct** [19] - 3:11, 65:25, 74:6, 74:8, 94:7, 99:11, 99:13, 101:6, 101:25, 102:2, 103:24, 104:13, 104:19, 104:21, 106:1, 111:17, 111:18, 115:6, 120:15

**instructed** [1] - 81:7

**instructing** [1] - 120:11

**instruction** [9] - 86:3, 86:5, 89:22, 97:8, 103:10, 109:13, 111:20, 120:21, 123:7

**instructions** [32] - 4:17, 15:7, 26:18, 27:2, 33:14, 65:24, 73:11, 73:19, 73:20, 74:1, 74:3, 74:9, 86:24, 93:3, 98:23, 100:9, 103:6, 103:9, 105:14, 105:16, 106:15, 106:16, 107:14, 107:16, 107:19, 110:21, 110:22, 110:23, 110:24, 111:1, 111:2, 123:15

**instrumentality** [2] - 96:12, 96:20

**insurrection** [1] - 34:13

**Insurrection** [1] - 34:14

**intelligently** [1] - 113:8

**intend** [3] - 36:14, 51:3, 116:23

**intended** [13] - 27:16, 30:16, 33:4, 37:16, 37:20, 57:20, 71:5, 75:23, 78:16, 88:18, 95:13, 97:18, 97:24
**intending** [3] - 72:6, 98:6, 116:10
**intends** [1] - 83:21
**intensive** [1] - 3:23
**intent** [26] - 3:25, 27:12, 33:3, 47:7, 71:16, 72:8, 83:13, 83:15, 83:19, 86:5, 89:15, 91:12, 92:3, 92:16, 93:13, 94:4, 94:16, 98:13, 100:16, 102:13, 103:19, 114:2, 116:10, 116:14, 120:1, 120:22
**intentional** [3] - 66:1, 82:9, 88:14
**intentionally** [12] - 13:18, 15:1, 15:4, 17:7, 20:2, 26:15, 83:22, 87:24, 89:11, 90:14, 93:23
**interaction** [1] - 45:14
**interest** [4] - 50:23, 81:18, 82:18, 83:9
**interfere** [4] - 66:8, 67:13, 88:22, 89:18
**interfered** [8] - 15:10, 69:20, 70:10, 72:19, 87:19, 89:7, 89:13, 93:18
**interfering** [5] - 27:17, 66:12, 66:16, 70:6, 95:14
**internet** [5] - 11:6, 109:2, 109:20, 111:20, 111:21
**interrupted** [1] - 33:23
**interrupts** [1] - 103:3
**intervene** [1] - 64:19
**intervention** [4] - 117:25, 118:15, 119:9, 121:8
**intimidate** [3] - 66:7, 88:21, 89:18
**intimidated** [6] - 15:9, 72:19, 87:19, 89:7, 89:12, 93:18
**investigation** [2] - 53:23, 109:18
**invite** [1] - 107:3
**involuntarily** [1] - 43:4
**involuntary** [2] - 43:24, 45:11
**involved** [2] - 5:24,

92:8
**involvement** [1] - 34:21
**involves** [4] - 77:17, 99:6, 117:24, 118:14
**involving** [8] - 4:3, 28:12, 34:7, 95:25, 105:10, 119:7, 121:6, 124:3
**irrelevant** [1] - 53:16
**irritants** [2] - 25:13, 35:4
**issue** [4] - 3:25, 108:10, 114:11, 114:20
**issued** [1] - 9:14
**items** [1] - 6:18
**itself** [2] - 84:14, 89:14

## J

**jacket** [6] - 17:2, 18:5, 19:10, 23:17, 65:13, 69:7
**jail** [1] - 122:6
**January** [53] - 5:19, 6:2, 6:12, 6:16, 6:19, 7:9, 7:12, 7:20, 8:12, 9:1, 9:4, 9:13, 9:15, 10:6, 10:13, 11:9, 11:10, 11:11, 28:4, 29:10, 29:13, 29:22, 29:24, 32:11, 34:17, 34:22, 35:11, 35:25, 37:10, 38:13, 39:1, 39:10, 39:17, 41:2, 47:22, 61:3, 61:5, 61:13, 61:15, 62:6, 62:22, 63:16, 63:19, 64:1, 71:4, 72:16, 72:21, 73:5, 73:8, 96:24, 119:15, 124:3
**jibe** [1] - 5:18
**job** [3] - 6:9, 6:14, 60:23
**John** [2] - 61:22, 61:24
**Johnson** [2] - 113:11, 123:3
**join** [2] - 68:18, 111:15
**joining** [2] - 9:7, 13:15
**joins** [1] - 65:8
**jubilant** [1] - 47:15
**Judge** [3] - 36:7, 119:12, 119:21
**judge** [2] - 38:7, 72:13, 73:25
**judges** [3] - 74:12, 81:1, 108:24
**judging** [1] - 81:3

**judgment** [6] - 3:17, 78:14, 81:10, 82:22, 83:12, 107:6
**jump** [1] - 66:21
**juries** [2] - 61:21, 108:18
**juror** [8] - 3:19, 4:9, 61:7, 107:3, 107:7, 108:17, 111:16
**JUROR** [3] - 5:9, 121:11, 123:24
**jurors** [10] - 60:24, 75:15, 75:21, 108:5, 108:11, 109:9, 111:5, 111:10, 122:24, 123:18
**jury** [55] - 3:2, 3:24, 4:1, 4:16, 4:20, 5:7, 15:7, 26:18, 27:2, 33:14, 36:5, 36:12, 36:14, 37:4, 37:5, 61:2, 61:16, 61:24, 73:12, 73:14, 73:22, 73:24, 74:11, 75:17, 106:18, 107:20, 107:23, 107:24, 108:1, 108:7, 108:13, 108:19, 109:12, 109:15, 110:10, 111:15, 111:25, 112:2, 112:10, 112:12, 113:15, 114:21, 115:3, 115:7, 116:22, 117:3, 119:19, 120:16, 120:18, 121:17, 123:12, 123:17, 123:18, 124:6
**justice** [3] - 62:4, 62:5, 74:25
**justifications** [1] - 68:10
**justified** [1] - 78:12

## K

**KEARNEY** [24] - 4:21, 4:25, 36:21, 62:14, 86:1, 86:12, 112:25, 113:16, 113:22, 114:5, 115:1, 115:16, 116:7, 116:19, 116:21, 117:9, 117:22, 118:9, 118:11, 118:13, 119:18, 120:8, 120:10, 124:10
**Kearney** [7] - 3:6, 4:24, 7:19, 8:23,

9:17, 36:20, 62:13
**keep** [6] - 24:24, 44:11, 66:15, 67:17, 110:13, 122:3
**kept** [1] - 10:23
**kicked** [3] - 24:17, 25:16, 53:5
**kill** [1] - 116:16
**kind** [4] - 42:15, 68:12, 77:2, 78:21
**kit** [2] - 7:14, 71:25
**knees** [2] - 15:16, 16:25
**knife** [2] - 7:13, 71:21
**knowing** [2] - 83:14, 92:9
**knowingly** [22] - 26:15, 27:15, 31:1, 90:13, 91:6, 95:12, 97:2, 97:5, 99:22, 99:23, 100:8, 101:3, 102:12, 102:18, 103:5, 103:18, 105:6, 105:7, 105:13, 105:25, 113:7, 115:11
**knowledge** [5] - 79:19, 83:13, 83:16, 83:19, 92:3
**known** [3] - 8:22, 38:16, 90:10
**knows** [3] - 25:22, 26:9, 52:19
**Knoxville** [2] - 8:17
**knuckle** [4] - 10:1, 31:2, 59:12, 70:19
**knuckles** [24] - 6:18, 6:20, 6:21, 6:25, 7:1, 7:3, 7:4, 7:7, 7:12, 9:6, 33:5, 51:14, 59:16, 59:19, 59:21, 59:25, 70:23, 71:1, 71:3, 71:4, 71:21, 71:22, 71:23, 72:3

## L

**laceration** [2] - 25:9, 68:22
**lack** [1] - 76:23
**ladies** [13] - 6:6, 7:2, 62:16, 62:24, 63:13, 64:13, 65:20, 65:24, 68:13, 70:13, 71:12, 72:7, 72:13
**lady** [2] - 14:12, 20:22
**Lancaster** [2] - 29:20, 29:23
**landing** [1] - 15:2
**language** [1] - 56:21

**lapses** [1] - 82:8
**laptop** [2] - 110:17, 110:19
**largely** [1] - 46:6
**lashes** [1] - 18:1
**lashing** [1] - 68:8
**last** [9] - 10:17, 30:18, 45:2, 45:4, 73:17, 86:15, 98:16, 111:4, 119:15
**latest** [1] - 85:19
**Latin** [2] - 35:2, 38:9
**law** [40] - 3:22, 13:1, 13:3, 26:6, 27:18, 34:14, 37:25, 39:1, 41:1, 59:10, 62:6, 68:11, 69:22, 70:7, 74:1, 74:6, 74:7, 74:8, 76:4, 80:6, 80:7, 87:7, 89:15, 92:1, 94:25, 95:1, 95:14, 95:17, 97:1, 99:10, 101:24, 104:18, 107:15, 114:3, 119:1, 120:2, 120:23
**lawful** [3] - 95:18, 99:21, 101:2
**laws** [1] - 96:11
**lawyer** [2] - 79:1, 79:2
**lawyer's** [1] - 79:7
**lawyers** [3] - 78:15, 78:18, 78:24
**lawyers'** [1] - 79:3
**lean** [1] - 22:22
**leaning** [2] - 14:22, 19:11
**leans** [3] - 17:6, 21:8, 23:10
**learned** [1] - 10:25
**least** [5] - 40:14, 91:17, 114:21, 115:10, 116:2
**leave** [13] - 6:9, 6:12, 9:15, 12:18, 17:19, 31:19, 31:20, 31:23, 31:25, 32:1, 63:21, 73:1, 111:11
**leaving** [1] - 12:18
**left** [8] - 11:11, 11:23, 13:23, 20:11, 26:21, 43:8, 49:9, 58:10
**leg** [18] - 15:3, 17:6, 17:17, 20:10, 20:11, 21:15, 26:20, 27:22, 42:9, 42:11, 45:17, 55:18, 55:19, 64:17, 65:4, 65:6, 65:7, 65:8
**legal** [2] - 32:19, 114:8

**Legislative** [1] - 96:17
**legs** [6] - 19:24, 20:3, 45:16, 46:2, 46:8, 56:13
**lengthy** [1] - 86:22
**lens** [7] - 38:7, 38:11, 38:20, 39:21, 41:1, 72:12
**less** [6] - 32:21, 51:12, 51:13, 51:18, 57:5
**lesser** [34] - 27:1, 27:8, 27:11, 33:7, 33:8, 34:3, 34:10, 36:15, 38:1, 49:12, 62:11, 83:4, 93:11, 93:14, 94:13, 94:20, 99:13, 100:21, 100:22, 101:5, 101:11, 101:17, 102:2, 103:10, 103:12, 104:4, 104:10, 104:21, 105:17, 105:18, 106:6, 106:12, 112:24, 113:5
**letting** [1] - 17:15
**level** [2] - 44:7, 75:3
**liberty** [1] - 38:9
**lied** [2] - 6:16, 40:24
**life** [1] - 77:5
**lifeless** [2] - 48:1, 56:5
**lifesaving** [1] - 46:21
**lift** [4] - 22:22, 43:1, 45:17, 47:24
**lifting** [1] - 23:3
**lifts** [2] - 23:10, 42:22
**light** [1] - 78:12
**lighting** [1] - 9:9
**likelihood** [1] - 111:22
**likely** [6] - 11:4, 23:20, 51:13, 76:16, 102:25
**likewise** [1] - 79:12
**limits** [2] - 63:9, 63:10
**line** [26] - 12:23, 15:18, 16:16, 17:3, 17:6, 17:8, 17:13, 17:22, 17:25, 19:16, 25:18, 25:21, 25:22, 25:25, 26:2, 26:8, 47:3, 47:20, 49:4, 49:19, 65:11, 65:13, 66:14, 67:21, 68:9, 70:11
**link** [1] - 6:2
**listed** [1] - 68:21
**listen** [3] - 22:8, 109:4, 109:5
**listening** [3] - 39:16, 40:18, 124:1
**lived** [1] - 38:12

**lives** [2] - 49:19, 73:6
**local** [1] - 8:18
**logistics** [1] - 5:15
**look** [13] - 29:18, 31:13, 33:7, 33:16, 33:18, 39:5, 45:7, 50:13, 50:16, 54:11, 70:15, 113:15
**looked** [5] - 10:10, 24:22, 65:5, 79:23, 80:2
**looking** [5] - 5:17, 6:3, 7:4, 51:9, 65:1
**lookout** [2] - 11:5, 53:25
**looks** [1] - 17:4
**loss** [3] - 53:11, 118:2, 118:17
**loud** [4] - 13:8, 13:19, 13:21, 103:2
**lower** [8] - 11:24, 12:19, 13:19, 13:20, 15:2, 45:25, 49:4, 49:21
**LRAD** [9] - 12:15, 12:24, 13:9, 31:12, 31:20, 32:2, 35:13, 63:7, 63:21
**lunch** [5] - 73:17, 74:3, 112:7, 112:9, 112:10
**luxury** [1] - 40:1
**lying** [5] - 16:25, 40:23, 41:5, 41:23, 65:2

## M

**mace** [1] - 67:5
**mad** [1] - 56:19
**magazine** [2] - 7:13, 71:20
**maintain** [1] - 72:21
**mall** [1] - 12:6
**man** [26] - 9:8, 14:10, 18:16, 18:17, 19:10, 19:18, 20:10, 21:12, 21:13, 23:22, 26:20, 40:21, 42:14, 52:11, 52:13, 53:1, 53:3, 57:8, 57:17, 64:4, 64:5, 65:3, 65:5, 65:6, 65:9
**manner** [7] - 43:10, 55:19, 74:6, 81:13, 100:17, 100:20, 102:23
**manning** [1] - 32:4
**map** [1] - 31:9
**marked** [1] - 110:13

**marshal** [1] - 107:22, 108:5
**marshals** [1] - 122:6
**masculine** [2] - 58:19
**mask** [27] - 9:20, 15:23, 16:9, 17:1, 17:5, 17:16, 17:24, 18:2, 18:4, 18:9, 19:2, 19:10, 19:13, 19:15, 20:12, 20:25, 21:7, 21:11, 27:21, 27:23, 35:21, 44:15, 52:20, 65:12, 67:4, 69:16, 70:11
**Massacre** [1] - 61:23
**mathematical** [1] - 77:8
**matter** [7] - 3:22, 77:19, 85:3, 89:3, 108:1, 108:8, 108:24
**matters** [4] - 77:4, 81:6, 81:17, 108:12
**McAbee** [97] - 3:4, 3:5, 4:4, 4:9, 5:16, 5:19, 17:23, 22:6, 22:15, 23:22, 37:8, 38:5, 38:8, 39:2, 39:20, 40:3, 40:20, 41:14, 41:16, 41:24, 42:5, 42:10, 42:21, 43:1, 43:7, 43:11, 43:17, 43:21, 44:2, 44:6, 44:16, 44:23, 45:11, 45:15, 45:17, 45:25, 46:6, 46:8, 46:20, 47:14, 49:1, 50:2, 50:4, 50:20, 50:22, 51:7, 51:16, 52:12, 52:17, 52:19, 52:24, 54:5, 55:4, 55:14, 56:8, 56:10, 56:23, 57:8, 57:12, 57:16, 58:2, 58:8, 58:14, 58:22, 58:25, 59:3, 59:21, 60:11, 60:19, 61:12, 61:19, 62:9, 63:15, 68:13, 68:14, 69:18, 70:25, 72:18, 76:5, 76:9, 76:13, 76:14, 83:17, 84:2, 84:11, 84:13, 84:14, 84:16, 84:21, 84:25, 85:5, 86:18, 112:24, 113:3, 114:14, 114:22, 116:8
**McAbee's** [7] - 43:10, 52:18, 57:2, 57:13, 58:4, 77:15, 78:22
**McHugh** [1] - 119:13
**mean** [7] - 33:15,

48:20, 48:22, 115:1, 116:9, 117:4, 119:18
**meaning** [1] - 100:8
**meaningful** [1] - 81:17
**meanings** [5] - 88:22, 103:6, 103:9, 105:14, 105:16
**means** [23] - 29:3, 29:5, 48:21, 53:19, 61:1, 80:7, 81:4, 88:14, 88:19, 88:23, 95:25, 96:6, 96:8, 96:10, 96:25, 100:1, 105:10, 108:6, 109:19, 117:23, 118:13, 119:5
**meant** [6] - 6:25, 66:18, 70:20, 72:10, 72:11, 107:18
**meantime** [2] - 117:18, 117:19
**measures** [1] - 31:16
**media** [9] - 39:14, 39:15, 39:16, 54:8, 58:14, 109:3, 123:24, 123:25, 124:2
**medical** [9] - 6:8, 6:12, 9:15, 69:4, 88:24, 117:25, 118:15, 119:9, 121:8
**meet** [1] - 32:22
**member** [6] - 40:3, 89:2, 107:23, 107:25, 118:3, 118:18, 119:8, 121:7
**members** [2] - 73:24, 107:23
**membership** [1] - 8:15
**memory** [10] - 53:10, 75:13, 75:14, 75:19, 75:21, 75:22, 81:15, 81:22, 82:8, 86:11
**men** [3] - 58:18, 58:19, 58:20
**Mendoza** [3] - 28:20, 31:6, 70:2
**mental** [9] - 37:18, 77:23, 84:17, 89:3, 98:4, 118:3, 118:18, 119:8, 121:8
**mentions** [1] - 39:10
**merely** [10] - 5:20, 78:19, 83:4, 83:7, 90:2, 92:7, 92:8, 92:9, 98:2, 98:9
**merits** [1] - 108:1
**message** [2] - 31:22, 39:4
**messages** [6] - 38:22,

38:23, 39:9, 48:10, 58:17, 63:17
**met** [1] - 77:21
**metal** [1] - 59:16
**Metropolitan** [3] - 87:20, 93:19, 96:24
**Meyer** [1] - 3:8
**middle** [6] - 14:22, 18:3, 22:25, 23:8, 23:25, 112:16
**might** [16] - 42:14, 45:21, 50:25, 56:5, 59:5, 59:14, 59:23, 60:25, 61:9, 61:11, 61:18, 68:1, 80:19, 80:21, 117:3, 122:10
**Mike** [25] - 6:1, 6:17, 7:13, 8:7, 8:11, 8:14, 8:25, 9:3, 9:7, 10:3, 10:4, 10:11, 10:18, 10:19, 11:17, 13:14, 13:16, 34:16, 34:20, 35:6, 35:7, 63:17, 71:17
**Mike's** [4] - 7:10, 9:9, 10:8, 11:10
**Miller** [22] - 15:19, 15:22, 15:24, 16:1, 16:3, 16:6, 16:8, 16:10, 16:11, 16:13, 16:16, 16:23, 16:24, 19:4, 19:5, 19:6, 19:8, 27:19, 27:21, 35:19, 41:17, 64:18
**Miller's** [1] - 64:19
**mind** [6] - 64:11, 84:3, 108:3, 110:13, 113:23, 115:10
**mindful** [2] - 106:22, 122:7
**mindset** [1] - 68:16
**minor** [1] - 34:25
**minute** [10] - 3:12, 12:11, 24:13, 25:7, 28:2, 36:2, 36:4, 60:16, 73:10, 86:15
**minute-and-a-half** [1] - 12:11
**minutes** [6] - 14:5, 57:10, 57:11, 67:8, 69:3, 122:1
**misleading** [1] - 115:6
**misread** [1] - 112:21
**missing** [1] - 5:10
**mission** [1] - 106:23
**mistake** [2] - 82:8, 97:4
**misunderstanding** [1] - 82:9
**mob** [7] - 26:10, 62:6,

64:20, 66:15, 67:8, 69:12
**modifies** [1] - 107:16
**moment** [10] - 35:23, 36:11, 40:4, 40:7, 40:8, 41:25, 42:20, 67:24, 68:3, 116:19
**moments** [1] - 50:2
**montage** [1] - 48:6
**months** [3] - 25:15, 53:9, 58:13
**Monument** [2] - 11:13, 11:15
**Moore** [50] - 16:7, 16:9, 16:21, 18:6, 18:7, 18:10, 18:11, 18:12, 18:18, 19:4, 19:8, 19:16, 19:17, 19:19, 19:23, 20:13, 20:25, 21:12, 21:13, 24:9, 27:19, 27:24, 28:4, 32:17, 33:24, 34:8, 35:20, 37:11, 50:5, 50:7, 50:10, 51:7, 51:8, 51:10, 51:19, 51:24, 52:1, 52:2, 56:11, 62:23, 64:24, 70:8, 70:22, 71:7, 73:3, 84:12, 115:6
**Moore's** [5] - 15:24, 18:2, 18:21, 41:13, 71:7
**morning** [4] - 5:14, 122:22, 122:24, 123:19
**most** [6] - 17:14, 24:2, 37:8, 38:4, 41:11, 46:19
**motherfuckers** [1] - 35:16
**motion** [4] - 3:17, 3:18, 20:7, 40:19
**motivated** [1] - 82:18
**motivation** [1] - 68:7
**motorcycle** [4] - 7:8, 10:1, 11:11, 59:22
**mounds** [1] - 25:10
**move** [4] - 25:14, 55:21, 66:20, 68:24
**moved** [2] - 13:25, 86:8
**movement** [3] - 11:1, 46:10, 95:21
**moves** [1] - 23:10
**moving** [4] - 16:22, 23:18, 42:7, 46:5
**multiple** [8] - 8:2, 19:17, 24:8, 25:6, 34:9, 40:11, 62:25,

71:9
**municipal** [1] - 63:20
**munitions** [1] - 13:4
**must** [38] - 3:23, 76:18, 76:19, 77:10, 77:12, 78:20, 79:2, 79:8, 79:14, 80:24, 87:16, 88:12, 88:17, 90:20, 91:16, 91:18, 92:20, 93:16, 95:9, 96:3, 98:3, 98:11, 99:12, 99:17, 100:24, 102:1, 102:6, 103:13, 104:20, 104:25, 105:20, 107:6, 107:7, 107:9, 107:17, 109:5, 109:6, 111:4
**mutual** [1] - 107:2

## N

**name** [2] - 76:21, 111:12
**Nancy** [1] - 3:8
**narrative** [2] - 38:17, 38:19
**national** [1] - 75:1
**natural** [1] - 83:21
**nature** [3] - 77:10, 77:15, 97:3
**near** [2] - 43:10, 64:3
**necessarily** [4] - 48:20, 80:15, 86:5, 109:1
**necessary** [10] - 36:22, 76:16, 84:2, 89:5, 89:20, 90:10, 98:16, 107:21, 112:23, 113:1
**neck** [3] - 25:2, 25:5, 44:22
**need** [13] - 13:6, 27:6, 36:8, 48:21, 91:21, 92:1, 93:8, 99:2, 100:19, 111:14, 111:24, 117:7, 121:10
**needed** [3] - 6:12, 10:5, 64:7
**needlessly** [1] - 114:10
**needs** [5] - 32:5, 114:3, 117:4, 120:2, 120:22
**nefarious** [1] - 47:7
**negate** [1] - 24:8
**never** [9] - 37:16, 52:23, 55:16, 57:20,

76:4, 107:25, 108:3, 108:6, 116:17
**News** [1] - 39:14
**newspaper** [3] - 34:14, 39:15, 109:2
**next** [6] - 20:17, 26:4, 48:8, 49:8, 117:3, 122:1
**nice** [1] - 5:12
**night** [2] - 123:15, 124:11
**nobody** [2] - 39:1, 54:20
**none** [3] - 9:2, 40:20, 65:18
**normal** [1] - 103:4
**normally** [1] - 72:7
**nose** [1] - 25:12
**Note** [1] - 118:9
**note** [11] - 28:25, 107:22, 107:25, 111:2, 113:15, 113:19, 113:21, 118:21, 119:12, 120:18, 120:19
**notebook** [1] - 111:12
**notebooks** [1] - 75:16
**noted** [1] - 19:22
**notes** [6] - 4:16, 73:20, 75:16, 75:19, 75:22, 75:23
**notetaker's** [1] - 75:23
**nothing** [7] - 17:15, 53:2, 72:22, 107:12, 107:14, 107:15, 111:7
**noticed** [1] - 8:16
**notion** [1] - 8:4
**NPR** [1] - 39:16
**number** [5] - 80:16, 80:19, 80:21, 109:21, 111:13
**numerous** [1] - 4:8

## O

**o'clock** [1] - 124:5
**object** [7] - 7:17, 79:4, 100:10, 100:11, 100:14, 100:15, 100:19
**objected** [3] - 78:24, 85:22, 95:20
**objecting** [1] - 79:1
**objection** [2] - 79:7, 79:13
**objections** [1] - 79:2
**obscenities** [1] - 62:25
**observe** [3] - 42:1,

49:24, 81:17
**observed** [1] - 81:6
**obstruct** [2] - 28:8, 30:16
**obstructing** [18] - 27:17, 70:6, 94:23, 94:25, 95:3, 95:13, 97:10, 97:11, 97:15, 97:19, 97:22, 98:2, 98:9, 98:13, 98:19, 98:21, 98:25, 99:4
**obvious** [4] - 37:24, 88:24, 118:1, 118:17
**obviously** [6] - 33:15, 48:24, 49:8, 53:12, 100:12, 123:22
**OC** [1] - 26:23
**occur** [1] - 49:2
**occurred** [5] - 29:1, 34:21, 55:12, 102:15, 103:21
**occurring** [3] - 28:5, 43:14, 57:19
**occurs** [1] - 54:24
**odd** [1] - 118:25
**odds** [1] - 64:15
**off-limits** [2] - 63:9, 63:10
**offense** [93] - 15:8, 27:2, 27:9, 27:11, 33:7, 33:8, 34:3, 34:11, 76:8, 76:10, 76:12, 76:13, 84:4, 84:5, 87:10, 87:12, 87:14, 87:16, 88:20, 90:1, 90:2, 90:3, 90:5, 90:6, 90:7, 90:20, 90:24, 91:5, 91:8, 91:12, 91:16, 91:18, 91:20, 91:23, 91:25, 92:10, 92:14, 92:18, 92:22, 92:24, 93:2, 93:5, 93:9, 93:11, 93:14, 94:5, 94:12, 94:13, 95:5, 95:7, 95:9, 97:20, 98:18, 98:22, 98:25, 99:3, 99:13, 99:17, 99:24, 100:18, 100:21, 100:22, 101:10, 101:11, 102:2, 102:6, 102:19, 103:11, 103:12, 104:4, 104:21, 104:25, 105:8, 105:18, 105:19, 106:6, 112:24, 113:5, 115:13, 115:15, 115:16, 115:20,

116:6, 116:18, 117:1, 117:4, 117:15, 120:5, 121:1
**offenses** [8] - 60:20, 84:15, 84:18, 94:8, 94:16, 101:7, 103:25, 106:2
**offensive** [1] - 71:23
**offered** [1] - 78:25
**office** [2] - 6:12, 112:2
**officer** [73] - 15:23, 16:9, 16:11, 16:22, 17:1, 17:5, 17:16, 17:24, 18:2, 18:4, 18:8, 19:2, 19:13, 19:15, 20:12, 20:25, 21:7, 21:11, 23:24, 24:19, 26:10, 27:21, 27:23, 35:21, 41:1, 41:15, 41:17, 43:9, 43:15, 44:12, 44:13, 44:18, 45:20, 45:23, 46:2, 50:15, 56:15, 57:17, 57:20, 60:3, 60:14, 62:25, 65:1, 65:3, 65:12, 65:14, 65:17, 66:7, 66:8, 66:23, 70:11, 83:5, 86:4, 87:20, 88:7, 89:9, 89:10, 89:13, 89:19, 89:25, 90:17, 90:23, 91:1, 91:9, 91:13, 92:19, 93:1, 93:6, 93:9, 93:19, 95:17, 96:13
**Officer** [230] - 4:5, 4:6, 8:2, 14:20, 14:24, 14:25, 15:3, 15:4, 15:6, 15:10, 15:11, 15:12, 15:13, 15:14, 15:15, 15:17, 15:19, 15:22, 15:24, 16:1, 16:3, 16:6, 16:7, 16:8, 16:9, 16:10, 16:11, 16:13, 16:16, 16:23, 16:24, 17:2, 17:6, 17:7, 18:2, 18:5, 18:7, 18:8, 18:10, 18:11, 18:12, 18:18, 18:19, 19:4, 19:5, 19:6, 19:8, 19:9, 19:19, 20:6, 20:13, 20:17, 20:25, 21:1, 21:3, 21:6, 21:8, 21:10, 21:12, 21:14, 21:23, 22:2, 22:3, 23:4, 23:10, 23:14, 23:15, 23:18, 24:9, 24:13, 24:14, 24:15, 24:21, 24:25,

25:1, 25:4, 26:3, 26:8, 26:12, 26:14, 26:17, 26:20, 27:8, 27:10, 27:19, 27:24, 28:4, 32:17, 33:16, 33:24, 34:8, 34:9, 35:19, 35:20, 35:22, 37:11, 37:14, 37:15, 40:13, 41:13, 41:17, 42:6, 42:7, 42:9, 42:10, 42:13, 42:18, 42:23, 43:1, 44:1, 44:9, 44:14, 44:22, 45:12, 45:15, 45:16, 46:5, 46:7, 46:9, 46:11, 47:11, 47:23, 50:3, 50:5, 50:7, 50:10, 50:21, 50:24, 51:1, 51:6, 51:8, 51:10, 51:17, 51:19, 51:24, 52:1, 52:2, 52:9, 52:10, 52:14, 52:21, 53:3, 53:4, 53:7, 55:15, 55:17, 55:18, 55:24, 56:1, 56:11, 56:12, 57:1, 57:2, 57:10, 57:13, 57:14, 62:10, 62:19, 62:23, 64:15, 64:17, 64:18, 64:19, 64:24, 64:25, 65:2, 65:3, 65:6, 65:7, 65:11, 65:12, 65:19, 66:4, 66:9, 66:11, 66:13, 66:14, 66:20, 66:22, 67:1, 67:15, 67:24, 68:15, 68:20, 68:22, 69:9, 70:8, 70:10, 70:12, 70:22, 71:7, 71:9, 72:19, 73:3, 73:4, 84:12, 85:6, 86:19, 87:4, 87:19, 87:20, 87:25, 93:18, 93:19, 93:24, 94:3, 115:6, 115:8

**officer's** [4] - 28:19, 82:24, 83:1

**officers** [76] - 4:14, 12:9, 14:14, 16:13, 16:16, 18:15, 19:8, 20:15, 21:9, 21:21, 21:22, 27:18, 30:16, 34:15, 35:15, 35:18, 35:23, 41:10, 41:21, 42:19, 43:8, 43:18, 43:21, 46:3, 47:9, 48:7, 49:4, 50:10, 51:3, 52:5, 53:18, 54:2, 56:18, 56:19, 56:20, 60:7, 65:11, 67:11, 68:8, 69:24,

70:7, 70:10, 70:21, 72:25, 87:2, 87:5, 88:1, 89:8, 89:15, 93:12, 93:15, 93:25, 94:10, 94:23, 94:25, 95:3, 95:15, 95:18, 97:10, 97:12, 97:15, 97:19, 97:22, 98:2, 98:9, 98:13, 98:20, 98:21, 98:25, 99:4, 114:23, 117:6, 117:7, 117:10

**official** [11] - 33:22, 87:6, 88:2, 89:8, 94:1, 95:19, 96:25, 102:14, 102:17, 103:20, 103:23

**often** [2] - 90:8, 108:22

**oh-crap** [1] - 23:24

**omissions** [1] - 110:5

**omitted** [1] - 83:17

**once** [5] - 12:4, 49:11, 49:18, 56:3, 112:4

**one** [63] - 5:9, 5:10, 10:20, 15:1, 16:25, 22:21, 23:7, 25:23, 27:17, 29:4, 29:12, 32:22, 36:8, 38:23, 39:5, 39:9, 40:10, 40:21, 45:3, 45:5, 45:7, 52:20, 55:11, 58:15, 58:16, 61:7, 62:24, 64:8, 67:21, 67:22, 68:14, 69:7, 70:6, 71:8, 71:10, 76:18, 80:8, 80:20, 84:8, 84:13, 85:8, 88:13, 91:24, 93:6, 95:14, 96:6, 96:14, 99:1, 100:11, 101:5, 107:23, 108:16, 109:1, 116:12, 116:19, 117:19, 119:2, 119:3, 119:17, 119:24, 121:3, 121:4, 123:23

**ones** [3] - 60:18, 64:6, 85:18

**open** [14] - 51:8, 51:11, 51:18, 51:25, 54:5, 54:8, 54:17, 54:25, 55:14, 56:17, 67:17, 86:13, 108:2, 108:7

**open-fisted** [2] - 51:11, 54:5

**open-handed** [4] - 51:18, 51:25, 54:17, 55:14

**operates** [1] - 96:21

**operation** [1] - 96:11

**opinion** [4] - 75:6, 75:9, 107:13, 108:14

**opinions** [1] - 74:18

**opportunity** [4] - 21:25, 68:18, 70:14, 81:17

**oppose** [3] - 66:7, 88:21, 89:18

**opposed** [6] - 15:9, 72:18, 87:18, 89:6, 89:12, 93:17

**opposite** [1] - 80:22

**opted** [1] - 69:18

**orally** [1] - 108:2

**order** [27] - 31:20, 45:16, 68:15, 72:21, 90:16, 94:7, 94:21, 95:8, 97:14, 99:14, 99:16, 100:21, 101:4, 101:6, 101:17, 102:3, 102:5, 103:11, 103:24, 104:11, 104:22, 104:24, 105:18, 106:1, 106:13, 107:7, 118:23

**ordered** [1] - 79:13

**orderly** [6] - 33:13, 74:5, 102:13, 102:16, 103:19, 103:22

**ordinarily** [2] - 83:13, 88:25

**ordinary** [1] - 88:22

**organ** [5] - 89:2, 118:3, 118:18, 119:8, 121:7

**organization** [1] - 8:22

**organize** [1] - 107:1

**orientation** [1] - 75:3

**origin** [1] - 75:1

**otherwise** [3] - 31:5, 92:17, 109:24

**outcome** [2] - 81:19, 83:10

**outdoor** [1] - 10:1

**outfit** [1] - 64:5

**outset** [1] - 108:16

**outside** [1] - 49:23

**overcharging** [1] - 60:15

**overlapping** [1] - 30:18

**overtook** [1] - 49:10

**owing** [1] - 29:16

**own** [7] - 64:10, 64:14, 75:13, 75:21, 75:22,

75:23, 83:6

**P**

**p.m** [8] - 11:22, 29:16, 29:17, 113:13, 123:11, 124:12

**page** [4] - 111:12, 112:15, 112:17, 112:19

**pain** [12] - 25:12, 53:15, 53:17, 55:1, 69:14, 69:15, 89:1, 117:25, 118:15, 119:7, 121:6

**painful** [1] - 88:23

**paint** [2] - 14:10, 64:5

**panning** [1] - 55:13

**paragraph** [1] - 32:14

**parlance** [1] - 51:25

**part** [15] - 22:3, 29:14, 32:6, 42:4, 43:8, 46:14, 46:15, 60:14, 68:7, 69:19, 69:22, 79:12, 86:8, 91:22, 103:1

**partially** [1] - 58:24

**participated** [1] - 92:22

**participation** [1] - 91:17

**particular** [5] - 76:8, 76:11, 80:9, 110:23, 116:24

**particularly** [1] - 46:20

**parties** [10] - 3:9, 4:17, 32:14, 33:20, 33:23, 68:4, 78:6, 78:7, 113:14, 115:5

**partisans** [1] - 108:23

**parts** [3] - 60:4, 60:13, 91:25

**party** [4] - 21:24, 22:21, 79:3, 110:8

**pass** [1] - 70:14

**passed** [1] - 98:5

**password** [1] - 8:12

**patch** [12] - 9:12, 9:14, 10:22, 10:25, 11:4, 11:7, 46:24, 47:6, 59:7, 59:9, 72:20

**paused** [1] - 8:15

**pay** [2] - 10:4, 67:18

**paying** [1] - 56:6

**PBUSA** [1] - 8:13

**peace** [2] - 33:25, 102:21

**peaceful** [2] - 6:4, 9:3

**peacefully** [1] - 48:8

**Pence** [4] - 4:15,

11:17, 11:18

**Pennsylvania** [3] - 29:21, 29:22, 29:23

**people** [37] - 6:23, 7:18, 12:17, 17:14, 35:14, 44:8, 44:15, 44:20, 46:19, 48:8, 48:18, 48:23, 49:10, 49:19, 50:3, 50:18, 52:6, 52:20, 53:24, 55:2, 55:9, 55:12, 56:24, 58:15, 58:17, 58:19, 59:5, 60:6, 61:2, 61:16, 62:3, 62:4, 74:24, 81:20, 90:11, 112:7

**pepper** [1] - 53:19

**perceived** [2] - 77:25, 97:7

**perceiving** [1] - 53:11

**percent** [5] - 8:3, 8:4, 8:8, 9:12, 11:7

**Percenter** [2] - 10:22, 14:17, 38:19

**Percenters** [1] - 8:7

**perception** [1] - 82:10

**perfect** [1] - 123:5

**perfectly** [2] - 39:24, 40:6

**performance** [7] - 69:25, 87:6, 88:2, 89:19, 94:1, 95:18, 95:22

**performed** [3] - 91:4, 91:6, 91:15

**perhaps** [1] - 42:25

**perimeter** [10] - 31:7, 31:8, 31:9, 115:17, 115:18, 115:19, 115:22, 115:23, 115:24, 115:25

**period** [4] - 25:7, 33:24, 48:13, 48:23

**permanently** [1] - 9:12

**permitted** [3] - 75:15, 78:10, 80:10

**person** [40] - 26:11, 26:16, 32:6, 32:10, 40:24, 46:7, 49:21, 53:8, 55:5, 57:21, 77:3, 78:20, 79:23, 81:14, 83:14, 83:21, 87:4, 88:6, 88:9, 88:12, 88:20, 89:6, 90:5, 90:6, 90:7, 90:9, 90:14, 97:2, 100:2, 100:5, 100:16, 102:22, 102:23, 102:24, 105:4, 105:23,

108:4, 109:19,
116:24
**person's** [2] - 77:20,
102:24
**personal** [7] - 74:17,
74:22, 74:25, 75:23,
77:14, 105:12, 111:7
**persons** - 28:12,
92:8, 96:1
**perspective** [1] -
40:25
**phase** [1] - 91:22
**phases** [1] - 91:25
**phone** [2] - 58:13,
111:13
**photo** [1] - 34:16
**photograph** [3] - 58:9,
58:10, 58:16
**phrase** [1] - 38:9
**phrasing** [1] - 34:5
**physical** [32] - 27:10,
34:6, 84:12, 85:6,
86:4, 86:19, 88:8,
88:19, 89:1, 89:14,
93:13, 94:2, 94:16,
104:14, 104:16,
105:3, 105:10,
105:19, 105:22,
106:3, 106:9,
115:19, 117:5,
117:24, 118:1,
118:15, 118:16,
119:7, 119:10,
121:6, 121:9
**physically** [1] - 24:24
**pick** [4] - 116:11,
116:16, 116:17
**picked** [2] - 14:12,
27:25
**picks** [2] - 22:6, 50:22
**picture** [7] - 7:11,
11:6, 12:2, 14:21,
14:22, 71:19, 71:22
**pictured** [1] - 58:16
**pictures** [2] - 10:10,
109:24
**piece** [2] - 86:25
**pinned** [1] - 67:1
**pinning** [1] - 22:16
**place** [5] - 12:7, 26:10,
63:9, 63:10, 74:23
**plan** [1] - 119:24
**planning** [2] - 39:11,
63:18
**plans** [1] - 98:10
**plastic** [3] - 59:17,
60:4, 60:13
**plausible** [1] - 57:19
**play** [8] - 12:11, 18:21,
23:20, 45:3, 52:14,

56:14, 57:6, 79:11
**played** [24] - 12:13,
15:21, 16:18, 17:9,
19:1, 20:8, 21:5,
22:5, 22:24, 23:12,
40:19, 41:11, 42:3,
43:5, 43:23, 44:25,
45:9, 47:13, 50:12,
50:19, 51:5, 52:25,
57:4, 109:25
**player** [1] - 54:8
**playing** [1] - 46:12
**plead** [1] - 36:16
**pleading** [1] - 62:23
**pled** [9] - 28:3, 37:11,
51:7, 54:24, 84:11,
84:13, 84:16, 84:21,
84:25
**pocket** [3] - 6:19,
7:11, 116:17
**point** [22] - 5:17,
18:14, 21:2, 24:1,
25:17, 37:23, 46:15,
47:5, 48:15, 49:13,
50:18, 51:23, 52:5,
52:22, 55:6, 55:19,
56:2, 60:12, 66:4,
86:6, 113:12
**pointing** [6] - 20:18,
42:12, 46:3, 55:23,
55:25, 56:4
**points** [1] - 43:18
**pointy** [1] - 7:18
**poles** [1] - 35:5
**Police** [7] - 31:7,
72:24, 87:20, 93:19,
96:22, 96:23, 96:24
**police** [66] - 6:4, 9:4,
12:16, 12:23, 13:10,
15:18, 17:3, 17:6,
17:8, 17:13, 20:21,
20:24, 25:18, 25:20,
25:22, 25:25, 26:1,
26:5, 26:7, 30:3,
31:11, 31:15, 31:25,
32:3, 34:18, 35:4,
35:5, 35:13, 35:23,
38:18, 39:10, 39:11,
39:13, 39:24, 40:7,
41:15, 42:19, 46:16,
47:3, 47:9, 48:6,
48:7, 48:12, 48:17,
48:19, 48:22, 49:4,
49:11, 49:19, 50:14,
50:15, 51:25, 52:5,
53:18, 56:5, 57:17,
61:11, 62:16, 66:14,
67:21, 82:24, 83:5,
117:6, 117:7, 117:10
**Police's** [1] - 30:3

**policing** [1] - 96:25
**political** [6] - 72:15,
77:16, 77:18, 77:20,
77:22, 77:25
**politically** [1] - 62:1
**pond** [1] - 49:24
**Pool** [3] - 13:13,
13:16, 14:2
**poor** [1] - 55:5
**portion** [6] - 97:8,
110:1, 110:23,
113:19, 113:21,
114:2
**portions** [5] - 109:22,
109:23, 110:2,
110:4, 110:6
**posing** [1] - 58:9
**position** [11] - 46:4,
46:8, 46:9, 56:11,
59:2, 86:2, 108:17,
114:5, 114:9,
118:20, 119:16
**positions** [2] - 16:15,
117:19
**possession** [1] -
102:25
**possibility** [2] - 74:20,
111:17
**possible** [4] - 61:6,
84:19, 111:14, 114:9
**possibly** [1] - 59:25
**posted** [3] - 11:6,
31:4, 100:1
**posting** [1] - 58:14
**potentially** [4] - 53:16,
61:9, 114:20, 114:22
**pounds** [1] - 22:14
**Powell** [2] - 23:4, 73:4
**Powell's** [4] - 15:14,
15:17, 20:6, 47:11
**powerful** [1] - 76:19
**precisely** [1] - 66:19
**preference** [1] - 122:4
**preferences** [1] -
74:22
**prefers** [1] - 122:9
**prejudice** [2] - 75:5,
82:19
**prejudiced** [1] - 82:17
**prejudices** [5] - 38:8,
62:8, 74:18, 74:22,
81:9
**preparation** [1] -
98:10
**prepared** [2] - 39:12,
68:17
**preparing** [2] - 39:17,
68:13
**presence** [14] - 3:2,
5:7, 36:5, 37:5,

48:13, 58:23, 73:12,
73:14, 112:12,
115:24, 120:16,
121:17, 123:12,
124:6
**present** [6] - 3:9,
88:10, 88:13, 88:16,
92:9, 123:19
**presented** [8] - 38:6,
68:18, 74:2, 77:13,
80:14, 109:6,
114:19, 116:2
**preside** [1] - 106:19
**presided** [2] - 30:6,
30:7
**President** [12] - 4:15,
11:18, 30:6, 30:7,
32:9, 32:11, 32:14,
39:17, 39:19, 48:11,
100:6, 100:7
**presiding** [1] - 11:19
**press** [1] - 54:8
**presumed** [1] - 75:25
**presumption** [1] -
76:1
**pretty** [1] - 44:5
**prevailed** [1] - 10:2
**prevent** [4] - 64:20,
67:2, 67:3, 67:5
**preventing** [3] - 45:21,
64:24, 66:13
**previous** [1] - 82:4
**previously** [2] - 84:21,
84:25
**pride** [2] - 58:20,
108:16
**principal** [1] - 90:10
**privacy** [1] - 110:3
**privilege** [1] - 47:5
**probability** [1] - 82:12
**probable** [2] - 76:17,
83:21
**problem** [2] - 116:4,
116:5
**problems** [1] - 53:11
**proceed** [1] - 108:23
**Proceedings** [13] -
3:2, 5:7, 36:5, 37:5,
73:12, 73:14, 86:13,
112:12, 120:16,
121:17, 123:12,
124:6, 124:12
**process** [4] - 103:4,
111:7, 122:25, 123:2
**produce** [2] - 76:5,
103:1
**prolonged** [1] - 40:8
**promised** [1] - 35:1
**promote** [1] - 107:4
**pronouncement** [1] -

34:23
**proof** [6] - 38:23, 39:6,
60:18, 61:1, 76:18,
77:21
**proper** [1] - 79:1
**properly** [1] - 78:3
**property** [6] - 28:15,
28:17, 96:3, 96:5,
102:24, 105:12
**proposal** [5] - 115:2,
116:21, 117:22,
119:11, 119:18
**propose** [1] - 114:14
**proposing** [1] -
118:24
**prosecute** [1] - 53:25
**prosecution** [1] -
40:15
**prosecutor** [1] - 37:22
**protect** [6] - 41:17,
54:4, 59:4, 60:2,
60:9, 70:20
**protected** [13] - 26:3,
28:10, 30:1, 30:12,
30:14, 32:7, 32:10,
69:21, 95:23, 96:10,
100:3, 100:5
**protecting** [2] - 44:18,
53:24
**protection** [4] - 7:1,
7:7, 53:23, 54:1
**protest** [2] - 48:24,
60:2
**protesters** [10] - 9:5,
39:8, 39:9, 39:13,
44:10, 48:5, 56:25,
59:6, 114:23
**protesting** [3] - 6:4,
9:3, 48:23
**protracted** [6] - 118:1,
118:2, 118:16,
118:17, 119:7, 121:7
**Proud** [6] - 8:14, 8:15,
8:18, 8:20, 8:21, 9:7
**proud** [5] - 34:12,
34:21, 47:15, 56:23
**prove** [18] - 21:16,
27:11, 32:23, 32:24,
33:2, 62:2, 62:5,
70:5, 76:5, 76:11,
76:16, 77:7, 77:9,
91:16, 92:15, 92:20,
98:15, 107:17
**proved** [12] - 27:11,
80:22, 83:13, 84:1,
87:16, 90:20, 95:10,
97:16, 98:4, 99:18,
102:7, 105:1
**proven** [4] - 61:18,
76:3, 76:7, 78:11

**provide** [3] - 15:6,
73:21, 110:20
**provided** [3] - 107:10,
110:17, 117:2
**proving** [2] - 76:14,
80:7
**provision** [1] - 118:6
**proximity** [4] - 102:10,
103:16, 105:4,
105:23
**public** [10] - 28:11,
29:1, 29:2, 30:11,
33:25, 34:1, 75:64,
95:25, 102:21,
102:22
**publicity** [1] - 109:8
**puff** [1] - 58:20
**puffery** [1] - 58:18
**pull** [21] - 14:24, 17:2,
17:5, 17:12, 17:16,
17:20, 19:13, 21:8,
42:5, 42:18, 45:18,
46:2, 46:4, 55:18,
55:20, 55:23, 56:1,
64:6, 65:7, 65:13,
72:25
**pulled** [10] - 15:22,
16:3, 16:23, 17:23,
24:16, 24:17, 50:6,
50:7, 64:20, 67:22
**pulling** [18] - 14:20,
18:5, 19:10, 19:11,
20:10, 20:11, 21:18,
26:20, 26:21, 42:9,
42:16, 45:12, 46:7,
51:17, 65:4, 65:5,
66:24, 69:12
**pulls** [8] - 15:4, 15:13,
17:7, 17:17, 20:3,
21:9, 65:8, 65:16
**punch** [10] - 6:22,
7:18, 51:10, 52:21,
54:15, 54:16, 54:20,
60:6, 71:2
**punched** [4] - 24:17,
32:19, 52:23, 59:24
**punches** [1] - 52:22
**puncture** [4] - 7:14,
7:17, 9:7, 71:25
**punishment** [2] -
84:19, 85:3
**purchasing** [1] - 72:4
**purpose** [9] - 27:17,
37:21, 45:3, 70:6,
89:21, 91:7, 92:16,
95:13, 110:19
**purposefully** [1] -
64:9
**purposes** [2] - 94:4,
100:18

**push** [3] - 22:15,
56:19, 65:6
**pushed** [3] - 37:12,
43:20, 43:22, 51:22,
56:10, 58:5
**pushes** [4] - 21:13,
51:25, 52:22, 64:24
**pushing** [4] - 17:13,
44:22, 54:16, 66:23
**puts** [2] - 16:14,
116:16
**putting** [1] - 73:5

## Q

**questions** [5] - 28:7,
74:6, 78:17, 111:1,
120:19
**quick** [2] - 36:8, 51:24
**quit** [2] - 44:10, 59:10
**Quit** [1] - 44:17
**quite** [4] - 13:24, 14:7,
41:3, 45:22
**quote** [3] - 120:4,
120:25, 121:1
**quoted** [1] - 35:2

## R

**race** [1] - 75:1
**racks** [2] - 12:8, 49:6
**radio** [1] - 109:2
**rage** [5] - 20:21,
20:24, 52:7, 68:9
**railing** [1] - 18:17
**raise** [1] - 5:18
**raised** [1] - 47:17
**raises** [1] - 114:9
**rallies** [1] - 8:22
**rally** [7] - 6:5, 6:10,
6:16, 8:12, 8:20,
10:5, 11:13
**random** [1] - 111:6
**rapped** [1] - 70:25
**rather** [3] - 3:22, 7:24,
80:16
**reach** [15] - 16:8,
16:11, 17:14, 17:20,
33:6, 56:17, 77:11,
94:18, 101:15,
104:8, 106:10,
106:23, 114:22,
121:25, 122:22
**reached** [3] - 66:20,
86:2, 108:6
**reaches** [2] - 15:23,
17:24
**reaching** [10] - 15:25,
16:9, 18:4, 19:3,
19:4, 27:24, 70:23,

77:13, 80:13, 110:15
**react** [1] - 56:20
**reacted** [2] - 37:12,
47:22
**reacting** [1] - 51:21
**reaction** [1] - 37:12
**reacts** [2] - 43:20,
43:22
**read** [15] - 27:3, 73:11,
73:18, 85:20, 86:22,
86:23, 109:4, 109:5,
112:15, 112:18,
115:14, 118:12,
119:4, 119:23,
119:24
**reading** [1] - 39:15
**reads** [3] - 10:14,
112:17, 119:11
**ready** [5] - 4:20, 5:20,
35:11, 37:3, 120:9
**real** [3] - 22:8, 23:7,
105:12
**realization** [1] - 23:24
**realizes** [2] - 58:3,
97:2
**realizing** [1] - 54:2
**really** [10] - 9:25, 15:8,
24:3, 25:14, 57:18,
61:19, 62:24, 63:15,
64:13
**reason** [8] - 53:18,
62:20, 76:22, 77:6,
81:16, 89:17
**reasonable** [45] - 3:19,
4:9, 26:13, 60:19,
62:2, 76:3, 76:8,
76:12, 76:15, 76:19,
76:21, 77:1, 77:2,
77:3, 77:9, 78:12,
79:21, 80:23, 84:2,
87:17, 88:17, 88:20,
89:9, 90:12, 90:21,
92:15, 92:21, 93:4,
93:16, 94:18, 95:10,
97:17, 98:4, 98:24,
99:18, 100:25,
101:15, 102:7,
102:23, 103:14,
104:8, 105:1,
105:21, 106:10,
107:17
**reasonableness** [1] -
82:11
**reasons** [3] - 9:17,
100:11, 110:1
**recalled** [3] - 69:10,
69:15, 81:6
**receive** [1] - 78:14,
82:23
**received** [7] - 53:9,

69:2, 69:5, 71:22,
83:18, 83:24, 86:1
**Recess** [4] - 36:10,
73:13, 113:13,
123:11
**recognize** [7] - 38:12,
38:20, 41:7, 46:6,
61:11, 62:7, 62:8
**recognized** [3] - 53:5,
57:16, 62:1
**recognizes** [2] -
42:25, 64:7
**recognizing** [1] - 61:9
**recollection** [1] -
119:14
**recollections** [1] -
81:25
**recommendation** [1] -
113:18
**record** [1] - 85:9
**recording** [22] - 12:13,
15:21, 16:18, 17:9,
19:1, 20:8, 21:5,
22:5, 22:24, 23:12,
42:3, 43:5, 43:23,
44:25, 45:9, 47:13,
50:12, 50:19, 51:5,
52:25, 57:4, 107:18
**recordings** [1] -
110:18
**records** [1] - 70:3
**recovering** [1] - 6:13
**red** [7] - 9:10, 9:16,
9:17, 14:10, 14:11,
27:5, 64:5
**redirect** [2] - 6:24,
31:25
**refer** [2] - 110:22
**reference** [3] - 34:25,
38:25, 75:12
**refers** [1] - 94:5
**reflect** [2] - 10:18,
58:24
**reflected** [6] - 4:16,
29:14, 94:21,
101:17, 104:11,
106:13
**Reflecting** [3] - 13:13,
13:16, 14:2
**reflecting** [1] - 49:23
**reflection** [1] - 77:3
**reflects** [1] - 29:10
**refuse** [1] - 74:9
**regarding** [3] -
106:21, 107:3,
120:21
**regardless** [2] - 74:25,
89:17
**regret** [1] - 67:24
**regular** [1] - 111:16

**regulations** [2] -
63:16, 63:20
**rehabilitation** [4] -
118:1, 118:16,
119:10, 121:9
**reinforced** [8] - 3:20,
7:5, 10:1, 51:14,
59:12, 59:15, 60:4,
60:13
**reinforcing** [1] - 6:22
**relation** [12] - 99:24,
102:19, 105:8,
115:12, 115:14,
115:21, 116:6,
116:18, 116:25,
117:15, 120:5,
120:25
**release** [1] - 123:14
**relevant** [4] - 77:18,
77:20, 77:23, 83:25
**religion** [1] - 75:2
**rely** [2] - 21:23, 75:22
**relying** [1] - 26:6
**remain** [2] - 30:25,
37:25
**remained** [6] - 30:20,
37:25, 99:20, 101:1,
111:9
**remaining** [15] - 28:7,
36:15, 37:23, 60:21,
60:22, 62:11, 99:6,
99:9, 100:23, 101:8,
101:14, 104:7,
115:17, 120:5, 121:2
**remains** [1] - 76:1
**remember** [9] - 6:7,
24:16, 24:21, 63:21,
64:2, 65:10, 66:5,
69:1, 108:23
**remind** [2] - 108:25,
109:13
**removed** [2] - 109:25,
117:13
**rendered** [1] - 111:3
**repair** [2] - 7:14, 71:25
**repeated** [1] - 121:22
**repeatedly** [3] - 18:13,
19:22, 23:1
**replace** [2] - 10:11,
75:20
**replaces** [2] - 107:14,
107:15
**replied** [1] - 31:18
**report** [1] - 112:2
**reporter** [1] - 3:8
**reports** [2] - 109:1,
109:5
**repositioning** [4] -
17:18, 17:19, 17:21,
66:11

**represent** [1] - 107:6
**represents** [1] - 79:3
**request** [1] - 36:2
**require** [7] - 30:19,
76:4, 80:12, 98:15,
116:23, 120:1,
120:22
**required** [10] - 25:10,
28:25, 30:10, 30:12,
70:4, 77:7, 83:20,
88:9, 92:2, 116:25
**requirement** [1] - 92:3
**requires** [3] - 4:18,
120:3, 120:24
**requiring** [2] - 119:9,
121:8
**requisite** [1] - 37:17
**research** [5] - 9:25,
109:19, 111:21,
123:22, 123:23
**resist** [3] - 66:7,
88:21, 89:18
**resisted** [9] - 15:9,
72:18, 87:18, 89:6,
89:12, 89:24, 90:22,
92:25, 93:17
**resisting** [14] - 26:12,
87:1, 87:3, 90:17,
91:1, 91:9, 91:13,
92:19, 93:5, 93:9,
93:12, 93:15, 94:10,
94:15
**respect** [15] - 4:2,
4:11, 77:24, 84:9,
89:22, 97:25, 98:7,
103:10, 104:13,
106:15, 107:2,
116:13, 117:20,
119:25, 121:4
**respectively** [2] -
103:7, 105:15
**respite** [1] - 67:20
**respond** [1] - 60:17
**responded** [2] - 31:21,
73:5
**responder** [1] - 46:20
**responds** [2] - 6:20,
8:16
**response** [6] - 7:10,
9:8, 60:25, 61:10,
61:12, 61:14
**responses** [1] -
120:20
**responsibility** [6] -
37:13, 62:22, 73:25,
74:13, 75:11, 79:4
**rest** [2] - 68:24, 111:9
**restricted** [49] - 12:5,
30:20, 30:24, 30:25,
31:2, 31:4, 31:5,

31:9, 33:10, 36:15,
37:23, 48:9, 60:22,
63:3, 99:6, 99:9,
99:20, 100:1, 100:2,
100:23, 101:1,
101:9, 101:14,
101:20, 101:22,
102:10, 103:5,
103:13, 103:16,
104:2, 104:7,
104:14, 104:17,
105:4, 105:13,
105:20, 105:23,
106:4, 106:9,
115:17, 115:18,
115:19, 115:22,
115:23, 115:24,
116:3, 120:6, 121:2
**rests** [1] - 84:25
**result** [1] - 82:8
**resulted** [1] - 4:7
**results** [4] - 28:15,
28:16, 96:4
**retire** [1] - 109:12
**retiring** [1] - 108:19
**retreated** [1] - 13:13
**return** [6] - 84:6,
106:18, 107:7,
111:2, 117:3, 122:24
**returned** [1] - 13:17
**returns** [1] - 21:17
**reveal** [1] - 108:4
**reviewing** [1] - 108:21
**Revolution** [1] - 8:6
**revolutionaries** [1] -
8:9
**rewritten** [1] - 64:10
**rid** [5] - 10:21, 10:24,
11:2, 11:3, 11:4
**ride** [1] - 7:8
**right-wing** [1] - 39:15
**riot** [21] - 12:16, 13:10,
15:4, 17:17, 23:25,
28:5, 28:7, 28:8,
29:6, 30:2, 31:25,
32:3, 32:15, 35:13,
38:17, 46:16, 49:10,
49:19, 51:17, 71:1,
116:15
**rioter** [6] - 15:13,
18:15, 20:15, 26:4,
26:23, 67:5
**rioters** [16] - 14:6,
14:7, 14:13, 14:16,
17:22, 26:21, 28:20,
28:22, 28:23, 31:18,
33:22, 35:4, 44:10,
57:1, 67:3, 72:25
**rioters'** [1] - 67:11
**rioting** [1] - 26:10

**ripped** [2] - 67:4,
69:16
**ripping** [2] - 44:15,
52:20
**rise** [2] - 9:1, 14:16
**rising** [1] - 9:7
**risk** [3] - 73:6, 117:24,
118:14
**Roberts** [4] - 63:17,
71:17, 71:19
**roll** [1] - 67:20
**rolled** [1] - 6:7
**Ronald** [10] - 3:4,
5:16, 5:19, 37:8,
72:18, 76:5, 76:9,
76:13, 76:14, 78:22
**room** [11] - 59:13,
75:17, 106:18,
108:13, 108:20,
109:12, 110:10,
112:6, 112:7,
112:10, 123:18
**Rosanne** [5] - 20:16,
25:24, 34:19, 41:22,
54:3
**round** [1] - 26:4
**rows** [1] - 31:10
**rubber** [6] - 13:3, 13:5,
13:13, 32:3, 48:18,
63:8
**rule** [1] - 74:6
**ruled** [1] - 79:10
**rules** [3] - 9:22, 9:24,
106:21

## S

**saddened** [1] - 20:19
**safer** [1] - 122:19
**safety** [12] - 17:22,
25:18, 25:20, 25:22,
26:7, 30:5, 34:1,
47:1, 47:6, 67:14,
70:12, 102:22
**Safeway** [4] - 4:13,
29:15, 29:20, 70:3
**Sajumon** [4] - 26:3,
26:8, 73:4
**Sajumon's** [1] - 46:11
**sales** [1] - 29:10
**Samaritan** [1] - 63:25
**sank** [1] - 58:11
**sat** [1] - 44:3
**satisfy** [1] - 92:3
**Saturday** [1] - 85:12
**save** [1] - 57:2
**saving** [1] - 35:19
**saw** [29] - 10:8, 12:7,
12:22, 23:4, 25:24,
28:18, 28:20, 31:24,

35:3, 35:4, 40:15,
47:22, 48:1, 49:2,
49:3, 56:24, 63:6,
63:7, 65:4, 67:9,
67:10, 68:21, 70:22,
79:24, 80:1, 80:2,
80:3
**scaffolding** [1] - 12:9
**scary** [1] - 10:10
**scene** [3] - 45:6, 47:1,
117:12
**Schiffelbein** [13] - 3:7,
5:4, 19:22, 23:19,
63:2, 63:10, 68:12,
71:11, 72:12,
118:19, 119:23,
121:18, 122:5
**SCHIFFELBEIN** [43] -
3:10, 3:15, 4:22, 5:5,
36:7, 36:11, 36:25,
37:3, 37:8, 42:4,
43:6, 43:24, 45:1,
45:10, 47:14, 50:13,
50:20, 51:6, 53:1,
57:5, 85:11, 85:14,
85:22, 112:14,
112:20, 113:23,
114:7, 117:2,
118:10, 118:20,
119:5, 119:14,
120:7, 120:11,
120:14, 121:22,
122:4, 122:8,
122:14, 122:17,
122:19, 123:9, 124:9
**Schiffelbein's** [1] -
115:1
**scientific** [1] - 77:8
**scrapes** [1] - 68:24
**screaming** [3] - 14:5,
19:17, 62:25
**screen** [2] - 18:3, 23:8
**screens** [1] - 5:15
**scrivener's** [1] -
112:14
**seat** [3] - 5:11, 73:15,
120:17
**seats** [2] - 111:7,
111:8
**Seats** [1] - 111:10
**second** [26] - 4:2,
8:16, 12:12, 17:1,
21:20, 22:3, 32:6,
52:14, 54:12, 54:23,
85:8, 85:23, 87:22,
90:25, 93:21, 95:16,
97:21, 99:22,
100:14, 101:3,
102:12, 103:18,
105:6, 105:25,

117:15, 121:4
**seconds** [13] - 23:15,
23:19, 23:23, 41:19,
42:12, 44:1, 44:4,
50:6, 55:25, 57:11,
57:18, 66:22, 114:13
**Secret** [8] - 30:5, 32:7,
32:9, 32:10, 53:23,
96:16, 100:3, 100:5
**sections** [1] - 118:5
**Security** [1] - 96:16
**see** [83] - 10:15, 11:23,
11:24, 11:25, 12:14,
12:15, 12:16, 14:10,
14:21, 15:14, 15:15,
15:17, 15:19, 15:24,
16:7, 16:14, 16:25,
17:8, 18:6, 18:11,
18:16, 18:22, 19:3,
19:13, 20:9, 21:2,
21:12, 21:25, 22:17,
22:22, 23:8, 23:13,
23:15, 23:16, 24:25,
25:2, 25:3, 28:21,
29:7, 32:5, 34:20,
34:25, 39:17, 40:12,
40:17, 41:21, 42:8,
42:21, 43:2, 43:3,
43:8, 44:9, 45:3,
45:4, 46:5, 46:6,
46:11, 46:21, 47:7,
47:8, 47:20, 48:6,
49:15, 49:21, 53:12,
53:20, 54:11, 54:12,
54:18, 54:19, 54:22,
55:4, 56:14, 57:13,
59:7, 71:7, 71:10,
72:17, 86:9, 110:4,
116:19, 117:15
**seeing** [5] - 41:19,
52:8, 54:2, 57:22
**seem** [1] - 63:25
**seemingly** [1] - 53:16
**sees** [3] - 14:16,
20:22, 52:8
**select** [2] - 106:19,
106:21
**selected** [1] - 111:7
**selecting** [1] - 106:25
**selection** [1] - 111:6
**self** [1] - 82:18
**self-interest** [1] -
82:18
**send** [4] - 107:22,
111:1, 121:14, 123:7
**sending** [2] - 58:14,
110:10
**sends** [1] - 29:15
**sense** [6] - 25:23,
51:4, 58:1, 108:16,

121:25
**sensibility** [1] - 88:20
**sent** [2] - 34:16, 85:11
**sentence** [4] - 84:23, 85:23, 86:3, 118:21
**separate** [4] - 84:4, 84:6, 90:2, 115:4
**separately** [2] - 84:6, 114:20
**sequence** [2] - 18:22, 20:5
**serious** [18] - 31:3, 32:18, 32:25, 33:3, 51:12, 51:18, 70:17, 71:14, 100:15, 100:17, 117:20, 117:23, 118:7, 118:13, 119:5, 121:5, 123:7
**seriously** [2] - 32:2, 53:6
**service** [1] - 112:1
**Service** [7] - 32:7, 32:9, 32:10, 53:23, 96:16, 100:3, 100:5
**Service's** [1] - 30:5
**set** [3] - 27:2, 36:3, 36:6
**several** [2] - 56:3, 59:11
**sex** [1] - 75:2
**sexual** [1] - 75:3
**shadow** [1] - 71:11
**shaped** [1] - 7:17
**sharp** [2] - 7:17, 72:2
**shed** [1] - 35:1
**shedding** [1] - 34:24
**sheepish** [1] - 73:22
**sheriff** [3] - 9:14, 46:24, 59:9
**sheriff's** [10] - 6:9, 6:11, 6:14, 6:15, 9:13, 10:22, 26:6, 47:5, 59:7, 72:20
**Sheriff's** [1] - 59:8
**sheriff-issued** [1] - 9:14
**shielding** [2] - 44:24, 57:2
**shifts** [1] - 76:4
**shipments** [1] - 29:19
**shirt** [4] - 10:14, 10:23, 11:2, 11:3
**shirts** [1] - 10:19
**shit** [1] - 35:7
**shoe** [1] - 42:15
**shoot** [1] - 48:18
**shopping** [1] - 29:12
**short** [2] - 45:2, 114:12

**shot** [1] - 13:12
**shoulder** [1] - 6:8
**shouting** [1] - 56:25
**shoved** [2] - 14:7, 35:14
**shoves** [4] - 20:12, 20:13, 21:11
**shoving** [1] - 19:7
**show** [8] - 27:9, 30:10, 30:12, 30:19, 40:23, 53:7, 89:5, 91:15
**showed** [2] - 18:21, 37:20
**showing** [1] - 32:24
**shown** [5] - 40:10, 46:13, 46:14, 54:1, 82:16
**shows** [11] - 14:9, 41:13, 41:14, 45:8, 50:1, 63:19, 92:13, 112:16, 116:10, 116:12
**shut** [1] - 24:23
**sic]** [2] - 118:10, 118:11
**side** [8] - 9:1, 14:17, 61:25, 78:25, 80:16, 80:20, 80:21, 82:17
**sign** [1] - 32:5
**signed** [2] - 107:22, 107:25
**significant** [2] - 29:10, 46:19
**signs** [2] - 31:11, 32:2
**silent** [1] - 44:4
**similar** [1] - 118:22
**similarly** [1] - 78:17
**simply** [1] - 13:11
**single** [5] - 38:23, 39:9, 40:21, 40:23, 69:7
**sit** [2] - 42:1, 60:16
**six** [2] - 40:14, 49:21
**skidding** [1] - 21:19
**skip** [1] - 113:2
**slam** [4] - 42:24, 43:2, 47:25
**slams** [1] - 22:7
**slap** [3] - 6:3, 14:15, 38:24
**slapping** [1] - 9:5
**sleep** [1] - 80:3
**slid** [1] - 27:25
**slide** [8] - 22:8, 22:11, 22:23, 23:11, 43:3, 43:25, 45:11, 66:17
**slides** [1] - 22:3
**sliding** [1] - 69:13
**slight** [1] - 113:17
**slightly** [1] - 118:23

**slipping** [1] - 14:23
**slow** [3] - 20:7, 40:19, 56:13
**slow-motion** [1] - 40:19
**slowed** [6] - 17:10, 18:22, 21:3, 22:2, 23:7, 41:12
**slowed-down** [2] - 18:22, 22:2
**small** [4] - 23:4, 29:19, 88:19, 111:24
**smaller** [1] - 80:19
**smelled** [1] - 12:25
**smoke** [3] - 12:14, 32:2, 35:12
**snippet** [2] - 12:12, 29:14
**snow** [5] - 31:9, 79:24, 80:1, 80:2, 80:3
**snowed** [1] - 80:2
**social** [2] - 58:14, 77:16
**soldiers** [1] - 61:22
**sole** [3] - 74:12, 75:10, 81:1
**solely** [5] - 30:10, 53:24, 75:4, 85:1, 109:6
**soliciting** [1] - 91:7
**someone** [10] - 7:2, 23:2, 26:15, 32:19, 64:4, 64:25, 66:2, 72:2, 88:15, 90:13
**sometimes** [4] - 48:21, 58:18, 78:24, 109:22
**somewhat** [2] - 85:24, 86:22
**somewhere** [2] - 8:20, 13:14
**soon** [3] - 109:10, 116:15, 122:10
**sorry** [3] - 15:11, 29:18, 120:13
**sort** [3] - 36:13, 46:15, 52:23
**sorts** [1] - 14:14
**sought** [2] - 35:13, 88:25
**sound** [2] - 52:14, 59:17
**sounds** [1] - 17:11
**sourced** [1] - 118:4
**space** [7] - 14:1, 14:3, 51:22, 52:1, 52:4, 54:17, 55:1
**span** [3] - 50:5, 55:25, 57:18
**spare** [1] - 25:1

**special** [3] - 9:13, 10:19, 46:25
**Special** [3] - 8:2, 32:8, 70:2
**specific** [2] - 89:21, 106:20
**specifically** [4] - 41:8, 114:3, 120:2, 120:23
**specifics** [1] - 69:1
**specified** [1] - 9:23
**spectator** [1] - 92:9
**speculate** [2] - 72:9, 79:8
**speculation** [1] - 77:6
**spend** [1] - 41:12
**spoken** [1] - 48:4
**spokesperson** [1] - 106:20
**spray** [4] - 26:23, 53:19, 67:6, 69:16
**sprayed** [2] - 26:23, 35:4
**spraying** [1] - 67:5
**stab** [1] - 72:2
**stabbed** [1] - 8:21
**stabbing** [3] - 24:10, 24:12, 57:21
**stage** [3] - 4:7, 21:20, 98:5
**stairs** [20] - 12:8, 14:20, 16:23, 19:25, 21:19, 22:4, 22:9, 22:11, 22:23, 23:11, 25:8, 27:20, 27:25, 43:4, 44:2, 45:24, 55:20, 57:12, 66:17, 69:13
**stand** [7] - 24:22, 36:17, 40:24, 45:20, 45:21, 81:12, 108:15
**stand-alone** [1] - 36:17
**standing** [10] - 13:10, 14:11, 14:22, 15:1, 16:12, 23:9, 41:14, 45:15, 48:7, 49:23
**stands** [1] - 81:19
**staples** [1] - 25:10
**start** [16] - 3:16, 5:12, 5:15, 11:9, 38:24, 39:6, 43:21, 44:4, 73:17, 73:18, 86:16, 112:4, 112:8, 114:1, 123:3, 124:4
**starting** [1] - 15:11
**starts** [6] - 20:12, 38:22, 43:7, 50:15, 64:23, 65:4
**state** [9] - 29:4, 29:5, 37:18, 77:23, 84:2,

84:17, 96:7, 98:5
**statement** [1] - 83:17
**statements** [2] - 78:15, 82:4
**States** [15] - 3:4, 3:6, 5:16, 28:5, 48:11, 87:5, 88:1, 93:25, 96:12, 96:13, 96:16, 96:20, 96:22, 96:23, 119:13
**statute** [5] - 89:16, 116:23, 119:3, 120:1, 120:22
**stay** [1] - 113:10
**stayed** [1] - 49:8
**Steal** [2] - 10:5, 11:13
**steel** [6] - 7:5, 10:1, 59:12, 59:15, 59:17, 60:13
**steel-reinforced** [3] - 7:5, 59:12, 59:15
**step** [9] - 14:13, 30:17, 37:21, 45:24, 69:10, 73:17, 97:21, 98:7, 98:14
**stepped** [2] - 19:16, 56:8
**stepping** [1] - 50:17
**steps** [7] - 13:18, 15:2, 16:24, 18:7, 66:18, 67:21, 69:15
**sticks** [1] - 35:5
**still** [13] - 18:20, 20:18, 21:25, 23:14, 24:14, 41:9, 50:1, 51:3, 58:23, 62:1, 66:12, 111:20, 113:17
**stipulated** [3] - 68:4, 78:6, 78:7
**stipulation** [2] - 33:19, 78:8
**stipulations** [2] - 32:13, 33:18
**stomped** [1] - 24:18
**stood** [1] - 67:25
**stop** [5] - 16:3, 16:21, 44:12, 66:5, 121:24
**Stop** [1] - 10:5, 11:13, 52:15
**stopped** [3] - 24:7, 50:7, 67:25
**stopping** [1] - 19:24
**stops** [2] - 24:4, 24:5
**stores** [2] - 29:10, 29:16
**story** [6] - 58:1, 58:4, 61:23, 64:14, 65:19, 65:23
**straddling** [1] - 21:18

**strategy** [1] - 113:4
**street** [1] - 61:9
**stricken** [2] - 79:10, 79:13
**strike** [3] - 51:13, 51:19, 54:17
**strikes** [6] - 51:11, 51:25, 54:6, 55:15, 55:16, 71:7
**striking** [2] - 63:1, 67:3
**strong** [1] - 108:14
**strongly** [1] - 97:23
**struck** [1] - 69:11
**stuff** [2] - 38:19, 53:12
**stupid** [1] - 58:8
**subject** [1] - 7:23
**submit** [2] - 66:3, 71:11
**submitted** [2] - 6:11, 18:23
**subsets** [1] - 123:17
**substantial** [6] - 30:17, 97:21, 98:7, 98:14, 117:24, 118:14
**substantive** [4] - 87:11, 95:5, 106:15, 119:1
**succeed** [1] - 92:23
**suffered** [3] - 25:6, 25:16, 68:25
**sufficient** [2] - 88:8, 90:12
**suffocating** [1] - 22:19
**suggest** [3] - 107:13, 112:8, 118:24
**summon** [1] - 111:15
**sunglasses** [1] - 9:11
**sunk** [1] - 42:15
**supported** [1] - 82:15
**supposed** [5] - 6:13, 12:18, 44:8, 63:5, 65:14
**surely** [1] - 24:20
**surgery** [4] - 117:25, 118:15, 119:9, 121:9
**surprised** [2] - 37:1, 121:24
**surprising** [1] - 29:12
**surrounded** [1] - 44:7
**surrounding** [2] - 81:23, 83:16
**sustained** [5] - 4:5, 4:6, 69:9, 79:6, 79:13
**swamp** [1] - 34:24
**swinging** [1] - 43:15
**swings** [1] - 43:9
**sworn** [1] - 78:4

**sympathy** [1] - 75:6
**system** [1] - 74:25

## T

**T-handle** [2] - 7:17, 9:6
**T-shirt** [1] - 10:14
**tab** [1] - 71:12
**tactics** [1] - 57:23
**talks** [1] - 9:5
**Tanya** [2] - 85:13, 122:20
**tapped** [1] - 26:6
**task** [1] - 106:22
**taunting** [1] - 14:6
**tear** [9] - 12:14, 13:1, 31:12, 31:24, 32:4, 48:16, 48:19, 63:7, 111:11
**teared** [1] - 20:19
**technically** [1] - 9:21
**techniques** [5] - 31:17, 46:21, 53:15, 53:18, 72:23
**television** [1] - 109:2
**temporarily** [2] - 32:7, 100:3
**temporary** [1] - 89:4
**tempted** [1] - 109:4
**ten** [2] - 3:12, 6:10
**ten-minute** [1] - 3:12
**tends** [2] - 33:25, 102:21
**term** [18] - 88:14, 88:23, 95:24, 96:6, 96:10, 96:14, 96:17, 96:20, 96:24, 99:25, 100:5, 100:8, 103:8, 105:9, 105:15, 117:23, 118:13, 121:5
**terms** [3] - 4:13, 88:21, 103:5
**terrace** [3] - 13:19, 13:20, 49:4
**testified** [20] - 11:14, 13:12, 23:5, 31:15, 40:13, 41:10, 44:15, 45:14, 54:17, 55:8, 56:24, 64:20, 65:23, 69:10, 72:24, 79:24, 80:25, 81:5, 81:7, 81:18
**testifies** [1] - 6:21
**testify** [3] - 53:8, 67:15, 68:23
**testifying** [5] - 24:21, 41:21, 80:16, 81:13, 81:19

**testimony** [30] - 4:6, 7:16, 8:19, 9:23, 10:21, 28:19, 63:24, 70:2, 70:19, 78:4, 78:6, 79:20, 79:25, 80:4, 80:19, 80:20, 80:24, 82:3, 82:4, 82:6, 82:12, 82:20, 82:22, 82:24, 83:3, 83:4, 83:7, 83:8, 83:10, 83:11
**text** [6] - 8:16, 9:2, 58:17, 63:17, 71:17, 109:16
**texts** [8] - 5:23, 7:11, 7:22, 9:9, 10:18, 34:20, 71:19, 72:9
**themselves** [5] - 40:3, 41:4, 58:20, 77:11, 92:1
**theories** [1] - 114:19
**theory** [2] - 85:4, 86:17
**therefore** [1] - 16:6
**thereof** [1] - 96:13
**they've** [4] - 41:4, 60:24, 65:15, 121:22
**thinking** [4] - 7:20, 72:3, 83:15, 98:5
**third** [18] - 4:11, 21:24, 22:21, 33:1, 33:8, 34:2, 34:11, 87:23, 91:4, 93:22, 95:20, 99:23, 102:15, 103:21, 105:7, 115:10, 120:3, 120:23
**third-party** [2] - 21:24, 22:21
**thoughtful** [3] - 77:3, 113:15, 120:19
**threat** [5] - 51:23, 66:1, 88:12, 88:14
**threaten** [1] - 88:18
**threatened** [1] - 88:7
**threatens** [1] - 88:11
**threats** [2] - 67:9, 67:18
**three** [6] - 9:17, 28:12, 30:1, 30:18, 30:19, 96:1
**Three** [4] - 8:7, 10:22, 14:17, 38:19
**Threepers** [1] - 11:3
**throughout** [2] - 76:2, 76:4
**thrown** [2] - 48:4, 48:17
**throws** [1] - 54:20
**thumb** [3] - 54:19,

54:20, 71:11
**thwarting** [1] - 66:14
**tied** [1] - 10:25
**tire** [6] - 7:14, 7:17, 9:6, 71:24, 71:25
**tired** [1] - 44:19
**Title** [1] - 118:5
**today** [4] - 3:8, 37:9, 42:22, 57:15
**toe** [1] - 24:18
**together** [3] - 27:25, 48:7, 57:12
**tomorrow** [4] - 122:22, 122:24, 123:19, 124:4
**tones** [1] - 31:21
**took** [10] - 24:11, 25:25, 30:17, 34:15, 40:24, 59:10, 67:19, 97:21, 98:12, 114:13
**tool** [2] - 7:15, 71:25
**top** [10] - 21:19, 22:4, 23:14, 23:18, 42:11, 44:2, 44:20, 45:20, 45:22, 56:12
**torn** [1] - 48:5
**touch** [1] - 55:19, 55:20, 60:14, 113:10
**touches** [2] - 46:22, 46:23
**touching** [4] - 42:6, 46:6, 56:13, 88:20
**toward** [3] - 18:10, 81:20, 97:22
**towards** [9] - 13:19, 17:13, 18:4, 19:3, 19:5, 20:4, 21:13, 69:12, 112:16
**trained** [2] - 46:20, 46:21
**training** [2] - 13:1, 51:22
**traumatic** [2] - 61:17, 61:25
**travel** [1] - 96:6
**treated** [1] - 35:17
**treatment** [2] - 46:25, 74:24
**trial** [23] - 40:22, 61:19, 61:20, 73:25, 74:4, 74:5, 74:14, 75:15, 75:19, 76:2, 76:4, 78:3, 78:6, 79:6, 81:8, 82:18, 83:10, 83:24, 84:11, 109:8, 109:14, 109:21, 119:15
**tried** [5] - 50:10, 55:8, 56:9, 56:25, 69:18
**tries** [5] - 51:16, 58:2,

58:3, 65:13, 66:23
**trip** [4] - 8:25, 9:13, 10:19, 63:18
**trouble** [1] - 56:24
**truck** [2] - 6:8, 11:10
**true** [4] - 28:18, 35:9, 76:16, 82:13
**Trump** [3] - 11:16, 11:17
**truth** [6] - 40:25, 41:6, 41:23, 76:17, 81:16, 82:21
**truthful** [3] - 63:14, 64:10, 81:14
**truthfully** [1] - 81:5
**try** [21] - 15:19, 15:25, 16:2, 17:25, 18:7, 42:1, 47:1, 47:4, 47:25, 48:2, 50:2, 53:25, 55:2, 55:18, 57:23, 64:19, 65:6, 65:7, 68:4, 70:15, 107:24
**trying** [52] - 14:24, 15:18, 16:7, 17:2, 17:5, 19:6, 19:13, 20:2, 21:7, 21:9, 22:9, 22:11, 22:15, 23:2, 23:21, 24:1, 35:21, 37:15, 40:20, 41:6, 42:5, 42:17, 43:1, 43:19, 44:17, 45:19, 50:21, 51:2, 52:3, 52:11, 52:13, 52:24, 53:1, 53:2, 53:3, 54:25, 55:23, 56:15, 56:19, 56:20, 57:8, 57:9, 57:22, 58:4, 58:7, 62:16, 65:11, 65:19, 66:20, 67:9, 70:12
**tunnel** [16] - 14:4, 14:7, 14:9, 14:19, 23:9, 23:16, 35:15, 41:25, 43:8, 49:22, 49:23, 63:12, 67:10, 67:21, 69:3, 69:6
**turn** [5] - 65:16, 73:1, 112:2
**turned** [2] - 13:22, 14:2
**turning** [1] - 12:17
**turns** [3] - 13:14, 18:9, 18:18
**twice** [1] - 63:1
**two** [13] - 25:23, 29:23, 43:3, 49:8, 51:24, 58:15, 79:16, 93:2, 93:7, 98:22, 100:11, 111:7,

111:11
**type** [2] - 88:24, 123:6
**types** [1] - 79:16

## U

**U.S** [5] - 28:8, 30:3, 30:4, 31:7, 96:25
**ultimately** [2] - 7:5, 21:1
**unable** [6] - 26:25, 33:6, 67:2, 67:3, 67:4
**unanimous** [2] - 107:9, 108:6
**unannounced** [1] - 108:17
**Uncle** [2] - 34:17, 58:16
**undeniable** [1] - 98:12
**under** [9] - 15:3, 27:6, 41:2, 67:1, 81:25, 96:11, 103:2, 108:3, 116:8
**undermine** [2] - 34:1, 102:21
**understandable** [3] - 40:6, 56:7, 56:8
**undisputed** [1] - 78:9
**undo** [1] - 68:1
**undoubtedly** [1] - 33:25
**UNIDENTIFIED** [3] - 5:9, 121:11, 123:24
**unit** [3] - 60:3, 60:4, 60:7
**United** [15] - 3:4, 3:6, 5:16, 28:5, 48:11, 87:5, 88:1, 93:25, 96:12, 96:13, 96:16, 96:20, 96:22, 96:23, 119:13
**unless** [2] - 76:2, 112:6
**unlike** [2] - 12:6, 124:1
**unlikely** [2] - 111:14, 121:19
**unnecessary** [1] - 54:25
**unprecedented** [4] - 38:13, 38:14, 61:15, 61:16
**unreasonableness** [1] - 82:11
**unreasonably** [1] - 103:1
**unrelated** [1] - 115:25
**unsteady** [1] - 14:23
**up** [83] - 6:2, 9:9, 11:12, 12:8, 13:18,

13:25, 14:8, 14:11, 14:12, 14:24, 15:16, 16:25, 17:4, 17:13, 17:15, 17:20, 18:1, 18:11, 18:15, 19:12, 19:14, 20:11, 20:19, 21:10, 21:18, 22:6, 23:2, 23:3, 23:5, 23:6, 23:10, 23:16, 24:5, 24:22, 25:8, 25:10, 27:25, 34:23, 36:3, 36:6, 38:5, 39:4, 40:24, 41:10, 42:23, 43:1, 44:6, 44:19, 45:17, 47:2, 47:24, 50:22, 52:16, 52:18, 55:8, 55:9, 57:11, 58:21, 63:12, 64:3, 64:4, 64:6, 66:4, 66:23, 67:20, 67:22, 67:25, 71:10, 71:19, 71:24, 72:4, 80:4, 83:23, 86:15, 106:22, 107:3, 113:23, 116:10, 116:12, 123:6, 124:4
**upper** [1] - 43:8
**upset** [4] - 20:14, 43:7, 43:16, 43:17
**useful** [3] - 108:13, 108:19, 108:22
**uses** [4] - 18:7, 51:18, 88:6, 102:25
**utter** [2] - 40:7, 40:8
**utterly** [3] - 46:17, 47:10, 47:18

## V

**variety** [1] - 109:25
**various** [4] - 86:21, 99:12, 102:1, 104:20
**venture** [1] - 92:8
**verdict** [35] - 33:6, 74:24, 75:10, 77:12, 77:14, 80:13, 84:9, 85:1, 94:18, 94:21, 101:15, 101:18, 104:8, 104:11, 106:11, 106:13, 106:23, 107:6, 107:7, 107:8, 107:10, 107:13, 107:18, 108:6, 108:15, 110:12, 110:16, 111:3, 111:23, 113:12, 114:22, 121:25, 122:10, 122:23
**verdicts** [1] - 84:6
**version** [9] - 18:22,

22:2, 51:15, 58:2, 85:16, 85:17, 85:19, 85:20, 86:1
**vest** [17] - 9:12, 9:14, 10:22, 11:7, 14:24, 17:12, 21:19, 22:6, 22:23, 23:3, 42:23, 44:22, 47:24, 57:13, 59:3, 59:4, 59:10
**via** [1] - 109:20
**Vice** [9] - 4:15, 11:18, 30:6, 30:7, 32:9, 32:11, 32:14, 100:6, 100:7
**victim** [1] - 62:15
**victory** [1] - 47:17
**video** [27] - 12:1, 12:11, 12:21, 14:9, 14:12, 16:18, 19:25, 20:6, 22:17, 39:20, 41:13, 45:4, 45:7, 45:10, 48:6, 51:9, 54:6, 55:4, 55:6, 55:11, 64:3, 64:4, 68:5, 68:21, 70:1, 109:23, 109:25
**videos** [18] - 10:16, 18:13, 21:24, 22:21, 28:19, 28:20, 38:15, 38:21, 40:10, 40:11, 40:12, 40:14, 40:17, 40:18, 41:11, 54:8, 62:25, 72:17
**view** [7] - 21:2, 38:10, 38:21, 39:21, 77:25, 110:17, 114:18
**viewing** [2] - 40:13, 40:17
**views** [6] - 77:16, 77:18, 77:20, 77:22, 78:1, 107:4
**violates** [1] - 89:16
**violation** [5] - 87:6, 95:1, 99:10, 101:24, 104:18
**violence** [30] - 7:23, 7:25, 28:12, 34:6, 34:21, 39:8, 39:11, 39:12, 47:16, 47:21, 49:2, 49:15, 49:24, 68:13, 68:17, 84:12, 96:1, 103:1, 104:14, 104:17, 105:4, 105:10, 105:19, 105:23, 106:4, 106:9, 115:19, 115:23, 117:5
**violent** [7] - 13:21, 21:10, 25:21, 26:9, 40:1, 51:17, 70:24

**violently** [1] - 65:4
**vision** [1] - 41:25
**visiting** [2] - 32:8, 100:4
**visual** [19] - 12:13, 15:21, 17:9, 19:1, 20:8, 21:5, 22:5, 22:24, 23:12, 42:3, 43:5, 43:23, 44:25, 45:9, 47:13, 50:12, 50:19, 51:5, 57:4
**VLC** [1] - 54:8
**voice** [1] - 108:14
**voluntarily** [3] - 87:23, 93:22, 113:8
**vote** [7] - 11:19, 30:7, 30:8, 32:12, 33:21, 108:9, 108:19
**voting** [1] - 108:5

## W

**waited** [1] - 13:16
**walk** [2] - 15:18, 47:8
**walked** [5] - 11:21, 13:18, 14:2, 64:16, 70:9
**walking** [4] - 24:24, 47:14, 57:11, 59:1
**wanton** [1] - 55:1
**wants** [9] - 36:13, 36:17, 36:19, 38:18, 39:22, 44:11, 50:4, 50:14, 62:14
**war** [1] - 8:9
**warehouse** [1] - 29:20
**warnings** [1] - 35:12
**Washington** [11] - 5:24, 6:10, 6:19, 10:20, 11:12, 11:15, 29:4, 29:6, 29:20, 29:24, 32:19
**watch** [10] - 18:24, 23:10, 28:23, 38:15, 71:9, 72:17, 109:4, 109:5, 124:2
**watched** [2] - 64:6, 64:17
**watching** [1] - 24:16
**ways** [6] - 66:6, 70:9, 93:2, 93:7, 98:22, 99:1
**Wayte** [175] - 4:5, 4:6, 8:2, 14:20, 14:24, 15:4, 15:6, 15:10, 15:11, 15:13, 15:15, 15:19, 16:24, 16:25, 17:5, 17:7, 17:13, 17:15, 17:16, 17:17, 17:18, 17:19, 17:21,

17:23, 17:25, 18:8, 18:19, 19:9, 19:11, 19:13, 19:24, 20:2, 20:3, 20:4, 20:9, 20:17, 21:1, 21:3, 21:6, 21:8, 21:10, 21:14, 21:15, 21:16, 21:18, 21:21, 22:6, 22:8, 22:9, 22:10, 22:11, 22:12, 22:14, 22:15, 22:18, 22:22, 23:2, 23:3, 23:10, 23:14, 23:15, 23:18, 23:23, 24:1, 24:2, 24:4, 24:7, 24:9, 24:15, 24:16, 24:19, 24:21, 24:24, 24:25, 25:4, 25:6, 25:19, 26:12, 26:14, 26:17, 26:22, 26:23, 26:24, 27:8, 27:10, 27:22, 27:24, 27:25, 33:16, 34:9, 35:19, 35:22, 37:14, 37:15, 40:13, 42:6, 42:7, 42:10, 42:13, 42:18, 42:23, 43:1, 44:1, 44:9, 44:14, 44:22, 45:12, 45:16, 46:5, 46:9, 47:23, 50:3, 50:21, 50:24, 51:1, 51:17, 52:9, 52:10, 52:14, 52:21, 53:3, 53:4, 53:7, 55:15, 55:17, 55:24, 56:1, 56:12, 57:1, 57:2, 57:10, 57:13, 57:14, 62:10, 62:19, 64:15, 64:25, 65:2, 65:7, 65:11, 65:16, 65:19, 66:4, 66:9, 66:11, 66:13, 66:20, 66:22, 67:1, 67:11, 67:15, 67:24, 68:7, 68:15, 68:22, 69:9, 70:10, 70:12, 72:19, 73:3, 85:6, 86:19, 87:4, 87:20, 87:25, 93:19, 93:24, 94:3, 115:8
**Wayte's** [31] - 14:25, 15:3, 15:12, 17:2, 17:6, 17:12, 18:5, 19:24, 20:3, 20:10, 21:23, 22:2, 22:16, 24:13, 24:22, 25:1, 26:20, 42:9, 45:15, 46:7, 55:18, 64:17, 65:3, 65:6, 65:7, 65:12, 66:14, 67:13, 68:20, 69:7, 71:9
**weapon** [52] - 3:21,

7:19, 30:21, 31:1,
32:16, 33:9, 33:11,
34:4, 38:1, 38:3,
43:15, 51:1, 51:3,
59:15, 59:23, 60:1,
60:12, 60:15, 60:22,
71:5, 71:6, 71:18,
72:1, 72:8, 99:7,
99:10, 99:24,
100:10, 100:12,
100:14, 101:10,
101:21, 101:23,
102:19, 103:8,
104:3, 104:15,
104:18, 105:8,
105:15, 106:5,
114:23, 115:12,
116:5, 116:9,
116:10, 116:11,
116:24, 120:1,
120:4, 120:21,
120:25
**weapons** [4] - 14:14,
67:10, 71:23, 72:4
**wear** [3] - 59:6, 60:1,
70:21
**wearer** [1] - 32:21
**wearing** [5] - 39:22,
51:14, 61:10, 61:12,
71:1
**weave** [1] - 23:15
**week** [1] - 25:14
**weekend** [1] - 5:12
**weighed** [1] - 22:13
**weighs** [1] - 44:20
**weight** [9] - 46:1,
74:14, 78:13, 80:9,
80:11, 80:15, 82:22,
83:4, 83:12
**weird** [1] - 17:11
**welcome** [4] - 5:11,
37:6, 73:15, 123:13
**welts** [1] - 4:8
**West** [2] - 13:17, 49:4
**west** [2] - 13:19, 13:20
**whereabouts** [1] -
4:15
**whole** [4] - 74:9,
110:24, 117:11
**wholly** [1] - 96:9
**wife** [2] - 30:6, 116:16
**Williamson** [1] - 59:8
**willing** [1] - 3:11
**window** [2] - 79:24,
80:2
**windows** [1] - 28:24
**wing** [1] - 39:15
**wish** [2] - 75:18,
109:13
**wished** [1] - 92:23

**witness** [30] - 45:14,
49:18, 62:18, 79:9,
79:18, 81:2, 81:3,
81:4, 81:5, 81:7,
81:11, 81:12, 81:13,
81:14, 81:15, 81:16,
81:18, 82:1, 82:5,
82:12, 82:14, 82:16,
82:20, 82:21, 82:22,
83:3, 83:4, 83:6,
83:11
**witness's** [7] - 79:19,
81:4, 81:13, 81:22,
82:3, 82:4, 82:6
**witnessed** [2] - 14:6,
47:19
**witnesses** [13] - 8:2,
40:21, 52:12, 62:17,
74:16, 78:4, 80:16,
80:18, 80:19, 80:21,
80:24, 81:2, 81:9
**woke** [1] - 80:4
**woman** [2] - 14:8, 64:2
**word** [1] - 117:8
**wording** [1] - 118:22
**words** [5] - 62:15,
92:5, 102:25, 107:8,
109:24
**wore** [10] - 5:22, 9:10,
10:13, 59:3, 59:4,
63:15, 71:4, 71:15,
72:5, 72:20
**worn** [12] - 15:15,
15:17, 18:2, 18:21,
19:20, 21:21, 21:23,
22:3, 24:14, 47:11,
71:8, 71:10
**worried** [2] - 9:22,
9:24
**worry** [2] - 7:24, 8:1
**wrestling** [1] - 52:23
**write** [1] - 111:12
**writing** [6] - 108:2,
108:7, 117:18,
121:10, 121:11,
121:14
**written** [1] - 73:21
**wrote** [1] - 114:12

## Y

**yell** [1] - 52:4
**yelling** [4] - 18:14,
20:12, 43:7, 44:14
**yellow** [1] - 23:16
**yells** [2] - 43:18, 44:9
**yourself** [3] - 11:2,
18:23, 60:8

## Z

**zooming** [1] - 14:21