## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **RONALD COLTON McABEE,** | |
| **Defendant.** | REDACTED |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ronald Colton McAbee to a term of incarceration of 151 months (a sentence at the low-end of the Guidelines range as calculated by the government), three years of supervised release, $32,165.65 in restitution, and the mandatory $610 special assessment for the seven counts of conviction.

### I.     INTRODUCTION

The defendant, Ronald Colton McAbee, violently participated in the January 6, 2021 attack on the United States Capitol—an attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers – including two officers who McAbee himself assaulted - and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

McAbee, at the time a sheriff's deputy in Williamson County, Tennessee, seized the opportunity to join a prolonged multi-assailant attack on police officers on the Lower West Terrace ("LWT") of the United States Capitol building.   After watching other rioters brutally assault officers, including by knocking one to the ground and dragging another head first into the mob, McAbee maneuvered to the center of the action, approached the officer lying on his back on the ground, grabbed the officer's leg, and pulled him away from his fellow officers and towards the mob.  When other officers attempted to assist their fallen colleagues, McAbee interfered with their efforts, cursing at them and striking one of them.   McAbee then returned to the officer on the ground, lifted his torso, and the two slid down a set of steps.  McAbee stayed on top of the officer, pinning him down as he struggled to free himself, for more than 25 seconds.  During that time, the officer was struck by other rioters; his mask was ripped off; and he was sprayed in the face with a substance similar to mace.  The next day, McAbee posed for a photograph with a friend, smiling and holding a newspaper with the headline "INSURRECTION."

The government recommends that the Court sentence McAbee to 151 months of incarceration. Such a sentence reflects the gravity of McAbee's preparation for the assaults on January 6th, his violent acts on January 6, his pride for his and others' assaults on police, and his failure to accept responsibility for his horrific conduct.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Government's Emergency Motion to Stay and for Review and Appeal of Release order, ECF 108, and the parties' stipulation at trial for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. *See* ECF 108 at 3-4; Government Trial Exhibit ("GX") 901 ¶¶ 1-9.

> ### Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building
>
> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.
>
> *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the most violent confrontations on January 6, 2021 occurred near an entrance to the Capitol Building in the LWT. The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel"). That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the Tunnel is framed by a stone archway (the "Archway") that is a visual focal point at the center of the West

Front of the Capitol Building, as circled in red below.



*Image 1*[2]

On January 6, 2021, when rioters arrived at the doors behind this Archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza of the Capitol building just below.

At approximately 2:42 p.m. the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the

---

[2] Image 1 is taken from "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

second set of doors, physically engaging police with batons, poles, chemical spray, bottles, and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

The violent battle for control over the LWT entrance in the Tunnel and doorway area continued for more than two hours, during which time rioters repeatedly threatened, pushed, and assaulted police officers, engaging them in intense hand-to-hand combat.   Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

**B.      Ronald Colton McAbee's Role in the January 6, 2021 Attack on the Capitol**

*McAbee's Preparations for January 6, 2021*

In the days prior to January 6, 2021, McAbee texted with a friend, Mike Roberts, about their plans to travel to Washington, D.C., including bringing weapons and other gear with them:

|  |  |
|---|---|
| **McAbee:** | Hey buddy.  You going to DC on the 6th? |
| **McAbee:** | I want to go but only if you're going  I'm not in shape to fight right now.[3] |
| **Roberts:** | Yes sir I sure am! |
| **McAbee:** | Let's link up and go.  I'll slap a commie with this dead arm. |
| **McAbee:** | Call me after work. |

---

[3] At the time, McAbee was on medical leave from his employment as a sheriff's deputy due to a car accident in which he injured his shoulder.

| | |
|---|---|
| **Roberts:** | Sounds good to me. |
| **Roberts:** | That's what I'll carry in my pocket. |



| | |
|---|---|
| **McAbee:** | How can I get some knuckles |
| **Roberts:** | Amazon is quick. |
| **McAbee:** | So I've got a tire repair kit and the t handle tire puncture is a great tool |
| **Roberts:** | Lol this is true! |

Roberts sent McAbee a link for "Steel Outdoor Reinforced Brass Knuckle Motorcycle Motorbike Powersports Racing Textile Safety Gloves" that he had just purchased.  McAbee asked Roberts to order a pair for him, as well.  McAbee also bought a shirt that Roberts had designed, with the words "SAME BLOODLINE DIFFERENT GENERATION" and "WE WILL NOT COMPLY WE WILL NOT DISARM," and a "Three Percent" [4] emblem -- a Roman numeral three (III) surrounded by thirteen stars -- on the front and the words "UNTIL MY LAST BREATH" on

---

[4] The term "three percenters" ("III%ers" or "threepers") is based on the myth that only three percent of American colonists took up arms against the British during the American Revolution. Some III%ers regard the present-day United States Government as analogous to British authorities during the American Revolution in terms of infringements on civil liberties. While many independent or multi-state militia groups incorporate III% in their unit names, the term is less indicative of membership in a single overarching group than it is representative of a common belief in the notion that a small force with a just cause can overthrow the government if armed and prepared.

the back.  GX 601 at 1-5, 13 GX 601A; GX 601B; GX 601C; 601D.

One of the reasons that McAbee wanted to be sure to have a weapon with him was his expectation that he would encounter and participate in violence in Washington, D.C.  As he told Roberts, "I don't think the girls should be subject to violence.  It will be there.  And I'd rather not worry about them."  GX 601 at 9.  In response to Roberts's statement that "[t]his is my fight so [my son] doesn't have to fight," McAbee assured him "I will rise and fall along side you.  This is for future generations."  *Id.* at 14-15.

### McAbee's Approach to the Capitol

On January 5, 2021, McAbee and Roberts drove to Washington, D.C. from Tennessee and met up with a third individual.[5]  On the morning on January 6, 2021, the three men attended the "Stop the Steal" rally at the Ellipse.  McAbee dressed for battle.  He put on the reinforced brass knuckle gloves that Roberts had ordered for him and a bullet proof vest with two patches.  One patch announced his position as a law enforcement officer; it read "SHERIFF."  The other bore the Three Percenter insignia, a "III" circled with thirteen stars.  He also wore the shirt he had purchased from Roberts, a red "Make America Great Again" baseball cap, white sunglasses with reflective lenses, and a red bandana.[6]

---

[5] Michael Roberts and the third individual, Richard Markey, are charged together in *United States v. Markey, et al.*, 23 Cr. 417 (APM)

[6] The FBI recovered the vest, gloves, shirt, and sunglasses during a search of McAbee's residence. GX 503, 501, 502, 504.  The ballistic panel for the vest bore tags indicating that it was manufactured in Mexico and was a "Threat Level" "IIIA," meaning that it is intended to protect against gunfire.  Trial Tr. Oct. 5, 2023 at 481;-*see also* Government Sentencing Exhibit ("Sent. Ex.") 1.



*GX 603*

By shortly after 2:00 p.m., McAbee was on the West Plaza of the Capitol, where police officers in riot gear had erected barricades composed of linked metal bicycle racks and were attempting to disperse the gathering mob.  The officers used various tools to deter the mob, including the barricades, crowd-control spray, non-lethal munitions, and a long-range acoustic device ("LRAD") that played blaring tones followed by a recorded announcement telling rioters to leave the area.  McAbee watched and filmed the scene on his phone as rioters chanted and shoved against the barricades.  GX 403, 404.  McAbee ultimately left the area.

### McAbee Ascends to the Lower West Terrace

Instead of walking away from the riot, McAbee chose to return.  By approximately 3:50 p.m., McAbee was on the LWT of the Capitol building, among a dense crowd that had gathered

by the Archway and, as described above, was battling with police officers in the Tunnel. McAbee initially was not close to the Archway, but over the course of the next half hour, he worked his way towards the Archway and eventually positioned himself directly south of it.



*GX 408 at 00:29 (approximately 3:50 p.m.)*
*McAbee, circled in yellow, on the LWT*



*GX 408 at 27:07 (approximately 4:17 p.m.)*
*McAbee, circled in yellow, moves closer to the Archway*



*GX 408 at 29:54 (approximately 4:20 p.m.)*
*McAbee, circled in yellow, at the Archway*

### *McAbee Assaults Officers Wayte and Moore*

Meanwhile, police officers in the Tunnel worked to expel rioters, pushing the crowd out of the Tunnel onto the LWT.  At trial, this Court heard the testimony of five officers who were in the Tunnel during this time period.  The scene was violent, dangerous, and chaotic.  Many individuals in the crowd were throwing and/or swinging various makeshift weapons at the police officers, including bottles, cans, crutches, bricks, poles, batons, and pieces of scaffolding.  Trial Tr. Oct. 5, 2023 at 277, 326-27, 372  There was chemical spray – deployed by both police officers and rioters – in the air.  *Id.* at 282, 327.  Rioters threatened and cursed at the officers.  *Id.* at 326, 373.

At approximately 4:27 p.m., MPD Officer Andrew Wayte was near the opening of the Archway.  Co-defendant Justin Jersey leapt at Officer Wayte, grabbing at his face and knocking him to the ground.  While Officer Wayte lay supine on the ground attempting to defend himself, another co-defendant, Jeffrey Sabol, grabbed Officer Wayte's baton and ripped it out of his hands.  At approximately the same time, co-defendant Jack Wade Whitton began striking at another MPD officer, Officer B.M., with a crutch.  Whitton then grabbed Officer B.M., first by the officer's baton, then by the helmet and neck of the officer's ballistic vest, pulling B.M. down over Officer Wayte, and draggin B.M. down a set of steps headfirst in a prone position.  Co-defendants Sabol and Logan Barnhart assisted Whitton, then other rioters in the crowd, including co-defendants Peter Stager and Mason Courson, beat Officer B.M. with weapons, including a flagpole and a police baton.

From his location on the south side of the Archway, McAbee saw these assaults.  *See* ECF 362 ¶ 2; GX 901 ¶ 18.  Officer B.M. passed only few feet in front of McAbee as he was dragged into the crowd:



*GX 430*
*McAbee (circled in yellow) watches as Whitton (circled in orange), Barnhart
(circled in purple), and Sabol (circled in gray) drag Officer B.M. from the
Archway into the crowd on the LWT.  Officer Wayte's feet are circled in white.
(Stager is circled in dark blue, Courson is circled in red, Jersey is circled in
green, and Mullins is circled in light blue.)*

Then, McAbee joined the attack.  He crossed to the center of the Archway, pushing back

another officer in the line (MPD Officer Carter Moore), who was attempting to prevent Officer

B.M. from being dragged further down the steps.



*GX 413 at 01:27*
*McAbee (circled in yellow) uses his right hand to push Officer Moore*
*(circled in white) back into the Tunnel[7]*



*GX 304 at 07:07*
*Still image from Officer Moore's BWC, showing McAbee pushing Officer Moore*
*back as Officer B.M. is dragged down the steps*

---

[7] Based on a comparison of the position of Jersey's hand (circled in green) in GX 413 to GX 430, this frame occurs less than a second after the moment captured in GX 430.

13

As Officer Wayte lay vulnerable in the center of the Archway, co-defendant Clayton Ray Mullins grabbed the officer's right leg and pulled him towards the armed mob. Whenw another police officer —referred to at trial as the "officer in the gas mask" —grabbed the collar of Officer Wayte's jacket and attempted to pull him back to the police line, McAbee bent over, grabbed Officer Wayte's left thigh, and dragged the officer away from the police line.



*GX 304 at 07:09*
*McAbee (circled in yellow) approaches Officer Wayte as Mullins (circled in blue)*
*reaches for the officer's leg and another police officer (hand circled in white)*
*pulls the collar of Officer Wayte's jacket.*



*GX 304 at 07:11*
*McAbee (hands circled in yellow) grabs Officer Wayte's leg*
*and pulls him away from the police line*



*GX 305 at 04:46*
*McAbee (hands circled in yellow) grabs Officer Wayte's leg*
*and pulls him away from the police line*

In response, the officer in the gas mask grabbed hold of Officer Wayte's upper arms to pull

him back towards the line, and Officer Moore stepped off of the police line to assist Officer Wayte.

15

*See* GX 304 at 07:12-07:16; GX 305 at 04:48-04:55.  Holding his baton horizontally, Officer

Moore used it to push McAbee away from Officer Wayte.  McAbee reacted by standing upright,

yelling obscenities at the officers, then striking at Moore's face twice with his hands.



*GX 305 at 04:56*
*McAbee strikes Officer Moore's face*

McAbee then turned his attention back to Officer Wayte, grabbed his torso, and lifted him

up.  Officer Wayte's cry of pain is audible in his BWC footage as McAbee lifts him.  GX 303 at

05:55-06:00; Trial Tr. Oct. 4, 2023 at 171:24-172:9.

16



*GX 303 at 05:58*
*Still image from Officer Wayte's BWC as McAbee lifts Wayte's torso off of the ground*

McAbee remained on top of Officer Wayte as the two of them slid down the steps.  Officer Wayte struggled to push McAbee off of him, but McAbee engaged in "hand fighting" — a wrestling term that Officer Wayte used to describe how McAbee was shoving Wayte's arms and hands away as he tried to push up against McAbee.  Trial Tr. Oct. 4, 2023 at 173-74.  *See also* GX 303 at 05:55-06:25.  During the approximately 25 seconds McAbee was on top of Officer Wayte, other rioters struck Wayte with objects and fired chemical spray at his face.

17



*GX 412 at 02:01*
*Rioters, including Mullins (circled in light blue), Stager (circled in dark blue),*
*and Courson (circled in red), amongst others, loom over Officer Wayte (not*
*visible) as McAbee (not visible) holds him down*



*GX 303 at 06:03*
*Officer Wayte's perspective of the same moment,*
*as he struggled to push McAbee off of him*
*(Courson indicated in red, Stager circled in dark blue,*
*Mullins circled in light blue)*

In particular, while McAbee was holding Officer Wayte down and Wayte was vulnerable to attack, another rioter ripped off Wayte's gas mask and Wayte was sprayed in the face with a chemical irritant that felt similar to mace or OC spray. Eventually, Officer Wayte was able to roll over and make his way back to the police line.

### McAbee Renders Aid to Another Rioter

At approximately the same time as the assaults on Officers B.M. and Wayte commenced, a woman was lying unconscious near the north side of the Archway. At approximately 4:28 p.m., individuals in the crowd on the LWT dragged the woman's body away from the Archway and into the crowd. Several, including McAbee, attempted to render assistance, including by performing CPR. At approximately 4:30 p.m., several individuals, including McAbee, carried the woman's body to the police line in the Archway. Officers brought her into the Tunnel and performed CPR, but were unable to revive her. GX 901 ¶ 20.

McAbee remained on the south side of the Archway, bent over, apparently in pain from his recent shoulder injury. As rioters continued to throw objects at the police line and the officers sprayed crowd control spray at the crowd, McAbee gestured towards the Tunnel behind the officers, indicating that he wanted to enter. GX 306 at 09:20-10:00.

Shortly thereafter, the mob surged towards the Tunnel, slamming into the police line and crushing McAbee into the side of the Archway. *Id.* at 10:00-10:30. Then, McAbee sought camaraderie and favor from the officers whose colleagues he had assaulted minutes earlier. "Can I get in?" he asked, and tapped his Sheriff's patch. "I can't go back that way, man," he said. *Id.* at 10:30-10:45.

### *Officer Wayte's Injuries*

At trial, Officer Wayte identified the injuries he suffered during this attack, which included a laceration to his head that required staples to close, contusions to his elbow, a concussion and "goose eggs" on his head, bruising and scrapes on his body, and extreme pain from being sprayed in the face by chemical irritant.  Trial Tr. Oct. 4, 2023 at 175-76, 192-93.  Other than the exposure to what he believed was mace, which occurred when his gas mask was ripped off, Officer Wayte was not able to pinpoint the timing of his injuries, but recalled being struck, consistent with his injuries, both when McAbee was pulling him towards the mob on the landing in front of the Archway and after they slid down the stairs.  *Id.* at 194-95.  He described the sensation of being sprayed with chemical irritant as "blinding," "painful," a "searing hot sensation," and what he imagined asthma felt like.  *Id.* at 175-76.  Officer Wayte was unable to return to work until May 2021.  At that time, he returned to limited duty; he did not return to full duty until approximately July 2021.

### *McAbee's Post-January 6 Statements*

In the days that followed January 6th, McAbee expressed pride in his participation in the riot.  On January 7, 2021, McAbee and Roberts took a photograph posing with a newspaper headline that read "INSURRECTION" and featured a photograph of the standoff between law enforcement officers and rioters at the House Chamber.  McAbee was smiling.  GX 601 at 71, 601I.  He texted that photograph, to another contact, along with pictures of an injury he sustained on January 6 – a cut on his head -- stating "I've shed blood for my country.  By the hands of the swamp.  I will shed much more in the days to come.  But I will not forget the Oath I swore years ago to protect the America I once knew. / necisque libertas [liberty or death]."  GX 602, 602A-D.

20

On January 8, 2021, McAbee refuted claims that rioters had used weapons and chemical irritants against police, stating that he and his fellow rioters "held our ground after being attacked."  GX 601 at 72.

## III.    THE CHARGES, PLEA, AND VERDICT

On November 17, 2021, a federal grand jury returned a superseding indictment (ECF 145) charging McAbee with seven counts:

- Count Nine: Assaulting, Resisting, or Impeding Certain Officers, Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b) and 2 (Assault on Officer Wayte);

- Count Twelve: Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) (Assault on Officer Moore);

- Count Fourteen: Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count Eighteen: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- Count Nineteen: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(12) and (b)(1)(A);

- Count Twenty: Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A)

- Count Twenty-Four: Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F).

On September 25, 2023, McAbee pled guilty without a plea agreement to Count Twelve and Count Twenty-Four.  On October 11, 2023, a jury convicted McAbee of the remaining counts.

## IV.    STATUTORY PENALTIES

McAbee now faces sentencing on all seven counts.  The applicable penalties are described in the Presentence Report ("PSR").  PSR ¶¶ 165-69 (imprisonment), ¶¶ 175-77 (supervised release), ¶¶ 194-95 (fines), ¶¶ 196-97 (special assessments).

21

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  The government agrees with the Sentencing Guidelines calculations for Count Nine (assault of Wayte), Count Twelve (assault of Moore) set forth in the PSR.  *See* PSR ¶¶ 93-101, 102-107.  However, the government disagrees with the grouping analysis conducted by the Probation Office, *see id.* ¶¶ 88-93, and the total offense level, *see id.* ¶ 114.

#### A.  Offense Level Calculations for Each Count of Conviction

##### 1.  Count Nine (18 U.S.C. § 111(a) and (b)) – Assault of Officer Wayte

The total offense level for Count Nine is **33**, calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | **+3** |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; Application of Chapter 2, Part A of U.S.S.G. | **+6** |
| U.S.S.G. § 3A1.3 | Restraint of Victim | **+2** |
| U.S.S.G. § 3B1.5 | Use of Body Armor During the Commission of a Crime of Violence | **+4** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2**[9] |
| | **Total Offense Level:** | **33** |

---

[8] §2A2.2 applies here because McAbee's conduct involved aggravated assault.  *See* U.S.S.G. §2A2.4(c)(1).

[9] The basis for this enhancement is McAbee's false and misleading trial testimony, addressed below.

### 2.   Count Twelve (18 U.S.C. § 111(a)(1)) --Assault of Officer Moore

The total offense level for Count Twelve is **24**, calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. §2A2.2(b)(2)(B) | Use of a Dangerous Weapon | **+4**[10] |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; Application of Chapter 2, Part A of U.S.S.G. | **+6** |
| | **Total Offense Level:** | **24** |

### 3.   Count Fourteen (18 U.S.C. § 231(a)(3))

The offense level for Count Fourteen is **27**, calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | **+3** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; Application of Chapter 2, Part A of U.S.S.G. | **+6** |
| U.S.S.G. § 3A1.3 | Restraint of Victim | **+2** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2** |
| | **Total Offense Level:** | **27** |

### 4.   Count Eighteen (18 U.S.C. § 1752(a)(1) and (b)(1)(A))

The total offense level for Count Eighteen is **16**, calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | **4** |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Trespass on a Restricted Building or Grounds | **+2** |
| U.S.S.G. §2B2.3(b)(2) | Possession of a Dangerous Weapon | **+2** |
| U.S.S.G. §2B2.3(c)(1) | Cross reference to Count Fourteen | |
| U.S.S.G. §2A2.2(a) | Base Offense Level with | **14** |

---

[10] As addressed below, McAbee's use of reinforced brass knuckle gloves to strike at Officer Moore is the basis for this enhancement.

|                          | Specific Offense Characteristics (Count 14) |        |
| ------------------------ | ------------------------------------------- | ------ |
| U.S.S.G. §3C1.1          | Obstruction of Justice                      | **+2** |
|                          | **Total Offense Level**                     | **16** |

### 5.  Count Nineteen (18 U.S.C. § 1752(a)(2) and (b)(1)(A))

The total offense level for Count Nineteen is **26**, calculated as follows:

|                           |                                                                               |        |
| ------------------------- | ----------------------------------------------------------------------------- | ------ |
| U.S.S.G. §2A2.4(a)        | Base Offense Level                                                            | **10** |
| U.S.S.G. §2A2.4(b)(1)(A)  | Physical contact or Possession of a Dangerous Weapon                          | **+3** |
| U.S.S.G. §2A2.4(c)        | Cross reference to §2A2.2                                                     |        |
| U.S.S.G. §2A2.2(a)        | Base Offense Level                                                            | **14** |
| U.S.S.G. §2A2.2(b)(2)(B)  | Use of Dangerous Weapon                                                       | **+4** |
| U.S.S.G. § 3A1.2(c)       | Government Official Victim; Assault Creating Significant Risk of Serious Bodily Injury | **+6** |
| U.S.S.G. §3C1.1           | Obstruction of Justice                                                        | **+2** |
|                           | **Total Offense Level**                                                       | **26** |

### 6.  Count Twenty (18 U.S.C. § 1752(a)(4) and (b)(1)(A))

The total offense level for Count Twenty is **31**, calculated as follows:

|                            |                                                                      |        |
| -------------------------- | -------------------------------------------------------------------- | ------ |
| U.S.S.G. § 2A2.2(a)        | Base Offense Level                                                   | **14** |
| U.S.S.G. § 2A2.2(b)(3)(A)  | Bodily Injury                                                        | **+3** |
| U.S.S.G. § 3A1.2(a)-(b)    | Government Official Victim; Application of Chapter 2, Part A of U.S.S.G. | **+6** |
| U.S.S.G. § 3A1.3           | Restraint of Victim                                                 | **+2** |
| U.S.S.G. § 3B1.5           | Use of Body Armor During the Commission of a Crime of Violence       | **+4** |
| U.S.S.G. § 3C1.1           | Obstruction of Justice                                              | **+2** |
|                            | **Total Offense Level:**                                            | **31** |

### 7.  Count Twenty-Four (40 U.S.C. § 5104(e)(2)(F))

Because this offense is a Class B misdemeanor, the Guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### B.  Grouping Analysis

Under U.S.S.G. §3D1.2, "closely related counts" group.  McAbee's seven counts of conviction form three groups:[11]

Group One – Counts Nine, Fourteen, and Twenty are grouped together because they include the same victim, Officer Wayte, and because Count Nine embodies conduct —Officer Wayte's injuries —that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to Count Fourteen.  U.S.S.G. § 3D1.2(a), (c).  The highest offense level for this group is **33**.

Group Two – Count Twelve is its own group because it involves a separate victim, Officer Moore.  U.S.S.G. § 3D1.2(a).  The highest offense level for this group is **24**.

Group Three – Counts Eighteen and Nineteen are grouped together because they involve the same victim: Congress.  U.S.S.G. § 3D1.2(a).  The highest offense level for this group is **26**.

Count Twenty-Four is not grouped because the Guidelines do not apply to it.

_____

[11] The PSR sorts the counts into two groups: (1) Count Nine, and (2) Counts Twelve, Fourteen, Eighteen, Nineteen, and Twenty. PSR ¶¶ 88-92.  This grouping is erroneous on two fronts. *First*, Counts Eighteen, Nineteen, and Twenty do not involve the same victim; the victims of Count Twenty are the victims of the acts of physical violence McAbee committed -- Officer Wayte and Officer Moore – while the victim of Counts Eighteen and Nineteen is the "disrupted" entity -- Congress.  *See* PSR ¶ 89. *Second*, the PSR erroneously groups Counts Eighteen and Nineteen with Counts Twelve and Fourteen on the theory that "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."  PSR ¶ 90; U.S.S.G. § 3D1.2(c).  Presumably, this is a reference to the cross references under U.S.S.G. § 2B3.3(c)(1) (Count Eighteen) and U.S.S.G. § 2A2.4(c) (Count Nineteen).  However, the application notes make clear that a "cross reference to another offense guideline does not constitute 'a specific offense characteristic . . . or other adjustment' within the meaning of subsection (c)."  U.S.S.G. § 3D1.2(c) n. 5.

The offense level for Group Three is seven levels less serious than that of Group One.  The offense level for Group Two is more than eight level less serious than that of Group One.  Group Three therefore counts as one half unit pursuant to U.S.S.G. § 3D1.4(b) and Group Two does not factor into the grouping analysis.  This results in an increase of one offense level, resulting in a Combined Offense Level of **34**.

### C.  McAbee's Objections

McAbee makes several objections to the Guidelines calculation in the PSR.  For the reasons set forth below, those objections should be denied.

### 1.  U.S.S.G. § 2A2.2(b)(2)(b) – Use of a Dangerous Weapon to Assault Officer Moore (+4) (PSR ¶¶ 51, 103)

McAbee cannot dispute that the reinforced brass knuckle gloves he wore on January 6, 2021 were a deadly or dangerous weapon – that is, that they were "capable of causing serious bodily injury or death to another person and he carried [or wore them] with the intent that [they] be used in a manner capable of causing serious bodily injury or death.  *See* ECF 376 at 34.  The jury, which was given the opportunity to examine the gloves, found that they were a deadly or dangerous weapon beyond a reasonable doubt.  Instead, McAbee disputes that he actually used the dangerous portion of the gloves – the knuckles -- to assault Officer Moore, and argues that both times he struck at Officer Moore, he did so with an open hand.  *See* PSR at 36, 38.

That was not Officer Moore's testimony.  *See* Trial Tr. Oct. 5, 2023 at 418 (describing the first strike as "an open hand" and the second strike as a "closed-handed punch").  Further, the video evidence admitted at trial establishes that McAbee used a closed fist to strike at Officer Moore, only opening his right hand to catch himself on the side of the Archway.



*GX 414 at 01:48*



*GX 303 at 07:22*                    *GX 416 at 01:33*
*McAbee's right hand forms a fist as he swings at Officer Moore*

### 2.   U.S.S.G. § 2A2.2(b)(3)(A) – Bodily Injury to Officer Wayte (+3) (PSR ¶¶ 52, 95)

McAbee asserts that there is no evidence that Officer Wayte sustained his injuries during the time period when McAbee was assaulting him.  To the contrary, as discussed above, Officer Wayte sustained multiple injuries over the course of the group assault.  Of particular relevance to McAbee, Officer Wayte recalled being maced when another rioter ripped off his gas mask while McAbee was on top of him holding him down, and described the sensation of being sprayed as "blinding," "painful," a "searing hot sensation," and what he imagined asthma felt like.  Trial Tr. Oct. 4, 2023 at 175-76.  Officer Wayte also testified that he was struck with objects, consistent with the bruising he experienced, while McAbee was dragging him away from the police line, and after McAbee dragged him down the stairs.  While there is no doubt that Officer Wayte sustained

28

certain of his injuries prior to McAbee's participation in the assault,[12] there is ample evidence that he sustained "bodily injury" – *i.e.*, "an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought," U.S.S.G. § 1B1.13 n. 1(B) -- both during and as a result of McAbee's assault.

### 3.   U.S.S.G. § 3A1.2(a) and (b) – Official Victim (+6) (PSR ¶¶ 97, 104)

McAbee also claims that his assaults of Officers Wayte and Moore were not motivated by their official status and therefore the 6-level enhancement under Section 3A1.2(a) and (b) should not apply.  That assertion is inconsistent with the facts of this case.

Officers Wayte and Moore were each wearing official MPD uniforms, gear, and insignia. On January 6, 2021, the MPD officers' job was to protect the Capitol, clear the Tunnel, and prevent rioters from entering the building.  It is clear that McAbee's assault of the officers was motivated by their status and their performance of their duties, in opposition to the goals of the rioters. McAbee only assaulted or interfered with police officers.  He did not attempt to move any other rioters, stop them from engaging in assaults, or lash out at them when they came into contact.

Alternatively, a 6-level adjustment applies because McAbee assaulted Officers Wayte and Moore, knowing or having reasonable cause to believe that each was a law enforcement officer, during the course of the offense "in a manner creating a substantial risk of serious bodily injury." U.S.S.G. §3A1.2(c)(1) "[N]either the text of nor the commentary to §3A1.2(c)(1) suggests an intent requirement;" it "requires only that the defendant's conduct 'creat[e] a substantial risk of

---

[12] Blood is visible on the collar of Officer Wayte's jacket as McAbee approaches the center of the Archway, likely from injuries sustained when Jersey knocked the officer to the ground. *See* GX 303 at 07:09.  It is also likely that the laceration to the back of Officer Wayte's head was exacerbated by sliding down stone stairs on his back without a helmet on.

serious bodily injury' to people that he knew or should have known were law enforcement officers." *United States v. Coleman*, 664 F.3d 1047, 1051 (6th Cir. 2012).  As discussed above, Officers Wayte and Moore were obviously law enforcement officers.  McAbee's conduct – striking at Officer Moore's head, dragging Officer Wayte towards a violent mob and pinning him down – certainly created a substantial risk of serious bodily injury.  *See United States v. Alexander*, 712 F.3d 977, 979 (7th Cir. 2013) ("district court did not clearly err by applying the [§3A1.2(c)] adjustment in this case, in which an adult [defendant] threw two punches aimed at a police officer's head.").

### 4. U.S.S.G. § 3A1.3 – Restraint of Victim (+2) (PSR ¶ 98)

The Guidelines provide for a two-level, victim-related upward adjustment "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3.  "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(L). "[T]he use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1… indicates that the illustrations of physical restraint are listed by way of example rather than limitation.").  *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) (quoting *United States v. Anglin*, 169 F.3d 154, 163 (2d Cir. 1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Ninth, and D.C. Circuits).

The Federal Courts of Appeals have adopted varying approaches to determining whether the victim was "physically restrained" for purposes of Section 3A1.3. *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh, and Ninth Circuits). The Third Circuit developed an approach incorporating various considerations adopted by other Courts of Appeals, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here"). The five factors identified by the Third Circuit in *Bell* are: (1) use of physical force; (2) exerting control over the victim; (3) providing the victim with no alternative but compliance; (4) focusing on the victim for some period of time; and (5) placement in a confined space. *Id.*[13] These factors should be balanced, and no single factor is dispositive. *Id.*

Here, McAbee's assault of Officer Wayte meets all five factors:

Physical Force -- "[P]hysical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *Drew*, 200 F.3d at 880. Here,

---

[13] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see Bell*, 947 F.3d at 54–55), *Bell* and similar cases help interpret the meaning of "physically restrained."

McAbee restrained Officer Wayte through bodily contact: He grabbed the officer's leg, lifted him by the torso, and ultimately pinned him down.

     <u>Exertion of Control</u> -- To restrain, a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner. *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted).  Dragging a victim from one location to another, while they struggle to break free and escape, forcibly denies the victim such freedom of movement. *See, e.g., Plenty*, 335 F.3d at 736 (defendant "exercise[ed] control over [the victim] that prevented her freedom of movement when he dragged [her] off the bed and through the house").  Here, McAbee restricted Officer Wayte's freedom of movement by pinning him down and engaging in "hand fighting" to prevent the officer from breaking free.  *See* Trial Tr. Oct. 4, 2023 at 173 (McAbee had Officer Wayte "pinned to the ground," which felt "like a planet . . .the heaviest thing."); *id.* at 173-74 (hand fighting is a "wrestling or grappling term" to describe "trying to get control and position on somebody").  *See United States v. Young*, 21-CR-291 (ABJ), Sent. Tr. at 8-11 (applying § 3A1.3 enhancement to a January 6 defendant who "used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm. . . .  The fact that he was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio.")

     <u>No Alternative but Compliance</u> -- In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of a Chapter 2 enhancement for the use of physical restraint in a robbery where the defendant stood on his victim's throat (pinning him to the ground

by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." *Id.* at 320-21 (internal citations omitted).  Here, although Officer Wayte tried to do something about his situation, pushing up on McAbee, he was unable to free himself, because McAbee remained positioned on top of him working to thwart the officer's efforts.

<u>Focus on the Victim For Some Period of Time</u> – All told, McAbee spent approximately 40 seconds dragging Officer Wayte, standing over him, and pinning him down.  *See* GX 303 at 05:39-06:23, GX 304 at 07:00-07:48.   Even when lashing out at Officer Moore, McAbee continued to straddle one of Officer Wayte's legs, maintaining a position over him.  And McAbee held Officer Wayte down for approximately 25 seconds.  Compared to some forms of restraint, this period of time is relatively brief, but context matters.  Not only did McAbee grab Officer Wayte and move him to a more dangerous location, but this restraint occurred in the middle of a riot—McAbee's dragging and holding of Officer Wayte left the officer vulnerable to additional assaults by the surrounding rioters.   The time period of the restraint should not preclude application of the enhancement.  *See United States v. Checora*, 175 F.3d 782, 791 ("[W]e conclude that a physical restraint occurred, within the meaning of section 3A1.3, when [two defendants] tackled [the victim] to the ground to prevent his escape… The fact the restraint of [the victim] was brief does not alter our conclusion."); *Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

This is particularly true here, given the nature of the restraint.  Although the Court previously declined to apply this enhancement to co-defendant Mullins, it noted in that ruling that "[Mullins] did not pin [Wayte] down, and [Wayte]'s restraint did not seem to be the defendant's focus."  *United States v. Mullins*, 21-cr-35 (RC), Sent. Tr. (Jan. 30, 2024) at 4.  In contrast to Mullins, McAbee *did* pin Wayte down and, for at least 25 seconds, that was McAbee's focus.

Placement in a Confined Space -- The final consideration is whether "the perpetrator's act… enclose[es] or confin[es] the victim in a space or with a barrier, actual or threatened." *Bell*, 947 F.3d at 60 (internal quotation marks and citations omitted).  In addition to moving Officer Wayte towards a seething mob – itself a confined space and ever-encroaching barrier – McAbee used his own body to confine Officer Wayte, holding him down so that he could not break free.

### 5.   U.S.S.G. § 3B1.5 – Use of Body Armor During the Commission of a Crime of Violence (+4) (PSR ¶ 99)

McAbee does not deny that the bullet-proof vest he wore on January 6, 2021 meets the definition of "body armor" under Section 3B1.5 n.1 or that he committed a crime of violence in assaulting Officer Wayte.  He instead contends that he did not "use" the body armor by wearing it for protection.  But a defendant "uses" body armor when he wears it as protection against gunfire, regardless of whether gunfire is actually directed at the defendant.  *United States v. Johnson*, 913 F.3d 793, 803 (9th Cir.) (enhancement properly applied where defendant was wearing body armor during a traffic stop while he possessed drugs; although mere possession is insufficient, "[t]here is no reasonable way to construe this language that would exclude wearing body armor from the definition of 'use.'"), *cert. granted, judgment vacated on other grounds*, 140 S. Ct. 440 (2019).

At trial, McAbee professed to be wearing the vest *only* as protection against stabbing.  Trial Tr. Oct. 6, 2023 at 642.  This Court need not and should not credit McAbee's self-serving

testimony.  This vest was not intended to protect against sharp or pointed instruments.  Trial Tr. Oct. 5, 2023 at 481-82; Sent. Ex. A.  McAbee took several deliberate steps to "gear up" for violence in advance of the riot.  It stands to reason that an active sheriff's deputy would anticipate the possibility of gunfire.  *See United States v. Webster*, Sent. Tr. at 12-16 (applying enhancement to former New York City Police Department officer who wore body armor while assaulting an MPD officer on January 6, 2021).

While the vest *could* potentially provide some protection against stabbing (or punching), in the same way that any extra layer could, protection from gunfire does not need to be the wearer's sole motivation for the enhancement to apply.  *See United States v. Barrett,* 552 F.3d 724, 728 (8th Cir. 2009) ("The ability of body armor to serve dual purposes does not make § 3B1.5 inapplicable where the facts show one purpose could be to protect the wearer from gunfire."); *see also Johnson*, 913 F.3d at 803 ("Wearing body armor is the precise means by which a person 'employ[s] [the body armor] in a manner to protect the person from gunfire.'"); *United States v. Haynes*, 582 F.3d 686, 712 (7th Cir. 2009) (finding, in the context of a police officer involved in "rip offs" of narcotics trafficker who claimed that he wore his bulletproof vest in order to indicate to victims that he was a law enforcement officer, that "[t]he [sentencing] court drew the reasonable inference that the body armor was being used for its primary purpose—for protection"), *abrogated on other grounds, by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012).

### 6.  U.S.S.G. § 3C1.1 – Obstruction of Justice (+2) (PSR ¶¶ 55-57, 72, 100)

McAbee testified at trial on October 6, 2023.  His testimony included many misrepresentations, exaggerations, minimizations, and untruths, none of which are consistent with the videos admitted at trial, common sense and, ultimately, the jury's verdict.

McAbee's most prominent materially false testimony was his claim that he did not assault Officer Wayte, but rather was attempting to help him get up. Trial Tr. Oct. 6, 2023 at 625. McAbee testified that he had no intention of pulling Officer Wayte towards the crowd of rioters, and in fact did not want Officer Wayte to end up in the crowd, *id.* at 688, but was "repositioning" the officer to help him get up, *id.* at 689. This testimony was contradicted by the video evidence at trial and by common sense. The video exhibits showed that (a) McAbee made no effort to help or protect any other police officer, including Officer B.M., who was pulled off the police line just feet in front of McAbee; (b) McAbee made no effort to stop or work against any of the other rioters who were assaulting Officer Wayte, including Mullins, who was pulling on Officer Wayte's other leg; and (c) McAbee actively worked against police officers who were attempting to pull Officers B.M. and Wayte away from the mob, back towards the police line, including Officer Moore and the officer with the gas mask. McAbee's contention that he was trying to help Officer Wayte to his feet by pulling on his vest is simply implausible. As Officer Powell testified, if you want to help someone up, you offer a hand, rather than pick the person up by his legs or vest. Trial Tr. Oct. 5, 2023 at 343. In its finding of guilt on the assault charge, the jury found McAbee's testimony on this point not credible.

McAbee testified falsely in additional respects. First, he admitted that he observed the efforts the police were making to prevent the crowd from advancing on the Capitol—such as erecting bike rack barricades, wearing riot gear, firing tear gas, employing other crowd control mechanisms, and playing audio warnings—all of which were clear from the video exhibits and would have been impossible to refute. Trial Tr. Oct. 6, 2023 at 725-29. He even testified that he himself had been hit with a rubber bullet. *Id.* at 673. Nevertheless, he incredibly maintained

throughout his testimony that he was unaware that the Capitol grounds were off-limits or that he should not advance any further.

McAbee also claimed that, once on the LWT, he went closer to the entrance to the Tunnel–where rioters and the police were clashing—because it was hard to breathe in the crowd and he needed more space.  Trial Tr. Oct. 6, 2023 at 681 ("I'm really thinking it's too crowded, for me to go back."), 683 (McAbee climbed over a railing near the Archway "[t]o separate myself so I can get some breathing room").  He then claimed that he helped a woman who was trapped at the entrance to the Tunnel.  Trial Tr. Oct. 6, 2023 at 684-85 ("[T]here's actually a lady trapped at the mouth of the tunnel. . . . Myself and some other people attempt to pull her up. . . I had a hurt shoulder, so I didn't really get to pull her up as much.  So the other guys kind of helped out.").  The video evidence showed, however, that, McAbee moved towards the crowd of rioters, not towards the open spaces away from the Tunnel (as other rioters who seemingly wanted to extract themselves from the crowd did).  *See, e.g.*, GX 407 at 01:14-01:20 (showing McAbee himself helping to clear space for a rioter to go *down* the steps, away from the Tunnel).  Moreover, though McAbee saw a woman in distress, he made no effort to help her; it was actually another rioter—a man in red face paint—who helped her stand.  *See* GX 412.

### D.  U.S.S.G. 4C1.1

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case – and McAbee does not assert that it does – because McAbee "use[d] violence or credible threats of violence in connection with the offense," that is, he assaulted Officers Wayte

and Moore, and because he possessed a dangerous weapon in connection with the offense, the reinforced brass knuckle gloves.  U.S.S.G. § 4C1.1(a)(3) and (7).

### E.  Guidelines Range

The U.S. Probation Office calculated McAbee's criminal history as category I, which is not disputed. PSR ¶ 117. Accordingly, based on the government's calculation of McAbee's total adjusted offense level of **34**, McAbee's Guidelines imprisonment range is 151-188 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, McAbee's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  Having planned for violence, McAbee eagerly joined a prolonged, multi-assailant brawl, attacking two police officers and interfering with other officers' efforts to bring their colleagues to safety.  His actions added to Officer Wayte's injuries and rendered him and other officers in the police line vulnerable to attack.

The nature and circumstances of McAbee's actions on January 6, 2021 were of the utmost seriousness, and fully support the government's recommended sentence of 151 months.

### B.  The History and Characteristics of the Defendant

McAbee has no criminal history, which is to be expected from someone who himself has

served in law enforcement.  However, McAbee's actions on January 6, his testimony at trial, and his subsequent conduct while incarcerated, described in the PSR and below, paint a picture of an individual who believes that he can choose which rules apply to him.

As discussed above, McAbee aggravated a shoulder injury on January 6, 2021 and was stranded at the entrance to the Tunnel as rioters clashed with police.  At that moment, he called upon his status as a law enforcement officer, tapping his "SHERIFF" patch in an effort to get police officers to let him behind the police line – the very safety he had denied Officer Wayte minutes earlier.  McAbee knew that safety was not with the rioters; it was behind the police line.

At trial, McAbee acknowledged all of the obvious efforts the police were making to repel rioters from the Capitol.  Trial Tr. Oct. 6, 2023 at 725-29.  Yet he advanced to the LWT anyway, because he was "curious."  *Id.* at 677, 728-29.

And while incarcerated, McAbee had an altercation with jail personnel after he refused to comply with instructions to return to his cell to put a mask on.[14]  He pushed past an officer, making contact, and disregarded her instructions to return to his cell, instead stating that he was going to get medication.  After being sprayed with a chemical agent, he "became irate and began yelling obscenities at the officer," refused to be restrained, and "began yelling and screaming in [another] officer's face in an aggressive manner."  When a third officer attempted to restrain him, McAbee kicked at the officer.  PSR ¶ 34.  Just as he did with Officer Moore, when McAbee was (rightfully)

---

[14] *Compare with* Trial Tr. Oct. 6, 2023 at 724 (Q: "Why did you cover your face?" A: ". . . One you can't go anywhere around the city or inside without a mask on. . . ." Q: "So you were worried about COVID?" A: "I wasn't technically worried about COVID.  But it is the rules of the city at that point in time."  Q: "So you were concerned about following the rules in D.C. on January 6th, 2021?" A: "Yes, ma'am.").

challenged by someone in a position of authority, he became angry and violently lashed out.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of significant incarceration.  McAbee assaulted multiple officers in the midst of a riot and attack on the U.S. Capitol Building and grounds.  His actions on January 6, 2021 were the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").  Those actions are made even more shocking by McAbee's employment as a law enforcement officer.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to McAbee also weighs heavily in favor of a lengthy term of incarceration.  This Court has previously expressed concern about the

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

dangers posed by those who assault police officers.  Those concerns are all the more pronounced when the assailant himself is a member of law enforcement.  Moreover, while McAbee claims to have great remorse for his actions, in the days that followed he expressed pride (GX 601 I, GX 602) and deflected blame (GX 601 at 72 ("We held our ground after being attacked."), Trial Tr. Oct. 6, 2023 ("I thought there could have been better crowd-control measures, more de-escalation techniques used.").

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines."); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.").

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

McAbee's co-defendants are the most ready comparators, as they participated in the same assaults on Officers Wayte, Moore, and B.M.:

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.").

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*United States v. Justin Jersey*, 21-cr-35 (RC). Jersey charged at and attacked the police line in the Archway, igniting the attack. Jersey viciously assaulted Officer Wayte by grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters (like McAbee himself), and causing him to sustain serious bodily injury, including the laceration to his head. Jersey eventually obtained a police baton and used it to strike at the other officers in the line. After retreating back into the crowd, Jersey remained in the area and collected Wayte's helmet as a trophy. For Jersey, the Court determined that the defendant's total offense level was 24 and criminal history category was I, resulting in a Guidelines range of 51 to 63 months' imprisonment. The Court imposed a Guidelines range sentence of 51 months' incarceration.

*United States v. Logan Barnhart*, 21-cr-35 (RC). Barnhart grabbed Officer B.M.'s neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs into the violent mob, where the officer was further attacked with weapons, including a flagpole and a baton, and sustained physical injuries. Minutes later, Barnhart returned to the police line in the Archway, where other rioters were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them. Barnhart joined these rioters in charging against the police line. Barnhart then approached the line of officers wielding a flagpole and used it to strike the officers. For Barnhart, the Court determined that the defendant's total offense level was 22 and a criminal history category was I, resulting in a Guideline range of 41 to 51 months' imprisonment. [18] The Court ultimately sentenced Barnhart to 36 months of incarceration, explaining that it was varying downward significantly owing to medical issues that

---

[18] The Government sought, but the Court did not apply, an additional 2-point enhancement pursuant to U.S.S.G. § 3A1.3, which would have increased Barnhart's Guidelines range to 51 to 63 months.

Barnhart suffered after he was arrested in this case and which Barnhart attributed to the GPS monitor that he wore as a condition of release.

*United States v. Mason Courson*, 21-cr-35 (RC).  Courson joined the assault on Officer B.M., striking him with a police baton, then, as the officer attempted to stand up and rejoin the police line, pushing him towards the mob of rioters.  Courson then grabbed at Officer Wayte as he was still lying on the ground.  *See* GX 303 at 06:05-06:15, discussed on pp. 18-19 *supra*. Approximately one hour earlier, Courson and other rioters forced their way through the line of police officers guarding the Tunnel.  As officers expelled rioters, Courson grabbed at their equipment.  For Courson, the Court calculated a total offense level of 26 and a criminal history category of II, resulting in a Guideline range of 78 to 87 months' imprisonment.  This Court imposed a below-guidelines sentence of 57 months' incarceration.

*United States v. Peter Stager*, 21-cr-35 (RC).  Like Courson, Stager joined the assault on Officer B.M. and struck him with a flagpole, then stood over Officer Wayte and yelled "Fuck you! Fucking traitor!" *See* GX 303 at 06:00-06:08, discussed on pp. 18-19 *supra*.  Later in the day, Stager was filmed pointing to the U.S. Capitol and saying "Everybody in there is a disgrace.  That entire building is filled with treasonous traitors.  Death is the only remedy for what's in that building. . . [E]verybody in there is a treasonous traitor.  Every single one of those Capitol law enforcement officers, death is the remedy, that is the only remedy they get."  For Stager, the Court calculated a total offense level of 26 and a criminal history category of I, resulting in a Guideline range of 63 to 78 months' imprisonment.  This Court imposed a below-guidelines sentence of 52 months' incarceration, citing, in part, Stager's incredibly difficult childhood.

*United States v. Clayton Ray Mullins*, 21-cr-35 (RC).  Mullins and McAbee worked in concert to drag Officer Wayte out of the Archway and into the mob.  After that, as Officer B.M. attempted to return to the Archway after being assaulted, Mullins pushed Officer B.M.'s head and the officer stumbled back down the steps.  Prior to the assaults of Wayte and B.M. on the LWT, Mullins was on the front line of rioters attempting to breach the police line on the West Plaza, he encouraged other rioters to ascend to the LWT, and he assisted in shoving against the police line in the Tunnel from 4:16 to 4:21 p.m.  For Mullins, the Court calculated a total offense level of 20 and a criminal history category of I, resulting in a Guideline range of 33 to 41 months' imprisonment.  This Court imposed a below-guidelines sentence of 30 months' incarceration and a $49,764 fine.

McAbee is differently situated from his co-defendants, however.  *First*, rather than accepting responsibility, he went to trial and testified falsely.  *Second*, McAbee engaged in more extensive preparations to engage with violence than these co-defendants, purchasing reinforced brass knuckle gloves and wearing his bullet-proof vest.  *Third*, McAbee's status as a law enforcement officer makes his participation in the January 6 riot and his assaults of MPD officers all the more abhorrent.  He took an oath to uphold and abide by the law.  He should have been working to quell the mob (or at least declined to join their criminal activity), not assaulting officers and impeding efforts to assist them.  *Finally*, McAbee's assault of Officer Wayte took on a more direct and personal cast than many of the other assaults of police officers that occurred on January 6, 2021.  After dragging Officer Wayte towards the mob, McAbee was on top of him for at least 25 seconds.  As Officer Wayte testified at trial, McAbee "was the individual who . . . was . . . the

centerpiece in my mind, in my memory. . . . [T]hat was the person who was in my face keeping me down.  I remember that one."  Trial Tr. Oct. 5, 2023 at 268.

Indeed, *United States v. Webster*, 21-cr-208 (APM) is a more appropriate comparator. Webster, a former United States Marine and retired New York City Police Department officer, brought a bulletproof vest, a firearm, and food provisions with him to Washington, D.C. on January 5, 2021.  On January 6, 2021, he wore the bulletproof vest and carried a metal flagpole to the Capitol grounds.  On the West Plaza, he elbowed his way through the crowd until he got to the front of the mob and began yelling at an officer stationed behind a metal barricade.  When the officer tried to swat Webster's hand away, Webster continued to yell, then pushed against the barricade, prompting the officer to shove him back.  Webster than brought the flagpole down repeatedly on the barricade in front of the officer, causing it to break, then charged the officer, tackled him to the ground, and attempted to rip off his gas mask.  At trial, Webster was convicted of six counts: violations of 18 U.S.C. §§ 111(a) and (b), 231(a)(3), 1752(a)(1) and (b)(1)(A), 1752(a)(2) and (b)(1)(A), 1754(a)(4) and (b)(1)(A) and 40 U.S.C. § 5104(e)(2)(G) – the same offenses as McAbee (who has an additional Section 111(a) conviction).

Like McAbee, Webster was a (former) law enforcement officer and wore body armor to the Capitol.  Like McAbee, Webster testified falsely at trial, although Webster also attempted to delete evidence from his phone.  In that case, the Court determined that the defendant's total offense level was 37 and criminal history category was I, resulting in a Guidelines range of 210 to 240 months' imprisonment. [19]  The Government recommended a sentence of 210 months' imprisonment.  The Court imposed a 120-month sentence.

---

[19] Webster's range of 210-262 months was capped by the 20-year statutory maximum sentence for

## VII.    RESTITUTION

The Court should (A) order McAbee to pay $2,000 in restitution to the Architect of the Capitol and (B) find McAbee jointly and severally liable for $30,165.65 to MPD, the costs of Officer Wayte's medical treatment and time off work due to his injuries that MPD incurred on his behalf.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because McAbee was convicted of offenses under Title 18 (Counts Nine, Twelve, Fourteen, Eighteen, Nineteen, and

---

a violation of 18 U.S.C. § 111(a) and (b).

Twenty), the VWPA applies.  And because McAbee was convicted of offenses "in which an identifiable victim or victims has suffered a physical injury" and a "crime of violence" (Counts Nine, Fourteen, and Twenty), the MVRA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[20]

---

[20] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

### A.  The Court Should Order McAbee to Pay Restitution to MPD

As reflected in Government Sentencing Exhibit 2, the MPD incurred a total of $30,165.65 on Officer Wayte's behalf[21] that is attributable, at least in part, to McAbee's criminal conduct.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

Officer Wayte may have sustained some of his injuries – primarily the laceration to his head – before McAbee assaulted him. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ As discussed above, Officer Wayte did not return to work until May 2021 because, as he described it, he "was in no shape to do [his] job" "[p]hysically [or] mentally" after being assaulted on January 6, 2021.  Trial Tr., Oct. 4, 2023 at 195. ████████████████████████████████████

███████████████████████████████████████████████████

McAbee – who was one of the individuals responsible for placing Officer Wayte in this traumatic and violent situation – should be held responsible for his share of the damages caused.

Two of McAbee's co-defendants – Justin Jersey and Clayton Ray Mullins – have also been convicted of assaulting Officer Wayte. The Court should impose liability jointly and severally to

---

[21] Under 18 U.S.C. § 3664(j)(i), "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation."

all three.  *See* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."); *United States v. Monzel*, 641 F.3d 528, 538–39 (D.C. Cir. 2011) ("Joint and several liability may also be appropriate under § 3664(h) where there is more than one defendant and each has contributed to the victim's injury.")

### B. The Court Should Order McAbee to Pay Restitution to the Architect of the Capitol

Because McAbee engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").  *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require McAbee to pay $2,000 in restitution for his convictions under Title 18, each of which are a proper predicate for restitution under the VWPA.

51

This amount fairly reflects McAbee's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

McAbee's convictions under Sections 111, 231, and 1752 subject him to a statutory maximum fine of $250,000; his conviction under 40 USC § 5104 subjects him to a maximum fine of $5,000. *See* 18 U.S.C. § 3571(b)(3).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).  In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.  As the PSR notes, McAbee, via his wife,[22] has raised, as of February 7, 2024, $84,050 in an online campaign with the header "The Sheriff of J6." PSR ¶ 160; Sent. Ex. C-1.  While McAbee was previously represented by retained counsel, as of May 2023, he has been represented by the Federal Public Defender Service of the Western District of Virginia.  And he has raised more than $18,500 since then.  Sent. Ex. C-2.  McAbee should not

---

[22] Sarah McAbee also administers a separate fundraising campaign on behalf of "The Real J6, LLC" with the stated goal of raising funds to permit incarcerated defendants' families to travel to visit them.  *See* https://www.givesendgo.com/lovewins .

be able to "capitalize" on his participation in the Capitol breach in this way, particularly when his legal expenses are being covered by the Court.

**IX.     CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 151 months' imprisonment, three years of supervised release, $32,165.65 in restitution, and the mandatory $610 special assessment for the seven counts of conviction..

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

Benet J. Kearney
N.Y. Bar No. 4774048
Alexandra F. Foster
D.C. Bar No. 470096
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
Benet.Kearney@usdoj.gov / (212) 637 2260
Alexandra. Foster@usdoj.gov / (619) 546-6735