IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America

v.                                                    Case No. 1:21-cr-35-RC-7

Ronald Colton McAbee

**Defendant's Sentencing Memorandum**

Mr. McAbee requests the court sentence him to 30 months of incarceration followed by two years of supervised release. Though a substantial variance from the recommended guideline range calculated by probation, such a sentence is consistent with Mr. McAbee's calculation of the guidelines, which largely omits enhancements that more than double his offense level. More importantly, such a sentence is fair and sufficient, but not greater than necessary considering all of the factors under 18 U.S.C. 3553(a).

Mr. McAbee does not excuse his presence on the Capitol grounds on January 6. He, like thousands of others, heeded the call of the sitting president to voice his concerns about perceived (and much repeated) issues with the 2020 election. Once there, he, like thousands of others, followed the President's demands that they go to the Capitol. When he arrived, barriers and barricades had already been torn down. He spent much of his time on the West Terrace not at the front of the crowd and not engaging with officers. He did, regrettably, spend about thirty minutes in the crowd approaching the Tunnel. Once there, he stood to the side and helped another protestor who had fallen to the ground amidst the chaos. And when he saw the lifeless body of Roseanne Boyland, he went to try to help. He briefly moved Officer Wayte and pointed at Ms. Boyland and tried to call the attention of the officers to her body— to no avail. When struck by an officer, he reacted: he quickly flailed his arms in response landing two shallow blows that neither caused injury nor had any meaningful effect on the officer. And then he went to lift Officer Wayte when the two of them were dragged down the

stairs. While on top of him, Mr. McAbee did not assault him or shout at him: he tried to catch his breath and shouted at rioters to stop. He told Officer Wayte, "I'm trying to help you, man," and Officer Wayte responded, "I know." These actions impeded or opposed officers, but they are not deserving of a sentence anywhere near the government's request. Indeed, they are deserving of a sentence less severe than his co-defendants who directly assaulted Officer Wayte and dragged him and other officers into the crowd. Mr. McAbee placed himself in an impossible situation: stand and watch as a woman lay dying in front of officers who did not notice her, or to try to help her. Mr. McAbee chose to act, and he accepts responsibility for his actions that day and understands the need for the court to sentence him. Those actions call for a sentence of thirty months.

## I.     Mr. McAbee has lived a life of which any would be proud.

Mr. McAbee's life demonstrates his good character; that good character demonstrates why a lengthy sentence is not necessary to further the goals of sentencing. Apart from his involvement in the January 6 attack, Mr. McAbee has led an admirable life. He pursued a career in law enforcement because he learned from an early age that he had a tendency to protect others. His wife puts it bluntly in the letter she wrote to the Court: "[Colton] had to grow up at a young age when his mother left him and his younger siblings with an abusive father. The oldest child in the household . . . has an enormous choice as to whether to be a defender and protector of his siblings[ ] or to identify with the power and terror of an abuser . . . ." Mr. McAbee chose to become a protector, and that led directly to his career in law enforcement.

Even the type of law enforcement work Mr. McAbee pursued was focused on protection rather than arresting others. He worked largely as a correctional officer or in courthouses: he was never a patrol officer or worked a beat. Many people, including those in law enforcement, believe those positions are less prestigious, but they are what Mr. McAbee

sought out because they matched with his motivations for the work: helping others. That innate desire to help others helped him to act quickly when people needed medical help: three times he tried saved someone's life, and twice he succeeded. Those instincts are why on January 6 he leapt into action when he saw Roseanne Boyland's body lying on the ground in front of a police line that apparently could not or would not notice her.

Mr. McAbee's early life, apart from the abuse he witnessed and experienced from his father, was relatively modest. He recognizes that it was "not that great" and had a substantial amount of "turmoil," but he did not let that prevent him from making the most of it. Though he occasionally went without food or material goods, he did not want for much as a child. More important than what he was provided was what he made with it: he devoted himself to sports, academics, and extra-curricular activities. He was captain of two sports teams and received an award for excelling in athletics and academics. He enrolled in college following graduation from high school, but he was unable to afford tuition and stopped pursuing a four-year degree. He did obtain an Associates, though, and is proud of the fact that he put himself through school by working.

Mr. McAbee has a steady history of employment—he began his career by working as a correctional officer, followed by employment as a deputy sheriff in several police agencies. He resigned shortly after January 6, but obtained a new job and was steadily employed until his arrest in this case. He is also a skilled leather worker, and he hopes to be able to continue his trade when released from imprisonment.

In short, Mr. McAbee's history and characteristics demonstrate that he is not someone who needs a lengthy prison sentence to accomplish the purposes of punishment. Indeed, as he requested, he ought to qualify for a departure given the aberrant nature of his conduct on January 6. *See* U.S.S.G. §5K2.20. For that departure to apply, the court need only find the following three factors which are present in this case: 1) Mr. McAbee committed a single

criminal occurrence that did not involve significant planning; 2) was of limited duration; and 3) represents a marked deviation from an otherwise law-abiding life. *See id.* Of course, that section is not applicable if the court finds that Mr. McAbee used a dangerous weapon. However, as he argues, the jury verdict finding that he carried a dangerous weapon does not necessarily amount to a finding that he used a dangerous weapon in either of his assault charges.

## II.   Mr. McAbee's limited actions on January 6 do not warrant a sentence significantly above the average for those convicted of assaults.

Most defendants convicted of assaultive conduct following jury trials receive a sentence around 51 months. *See* Michael Kunzelman, *To plead or not to plead? That is the question for hundreds of Capitol riot defendants*, AP, January 6, 2024, available at https://apnews.com/article/capitol-riot-anniversary-sentencing-data-c0a60a2ba68a70645bd5f9e5bcc45324. Mr. McAbee's conduct is largely less serious than many of those convicted of assault. Unlike many, he did not use pepper spray or bludgeoning weapons to assault officers. He did not strike police officers who had fallen or use their weapons against them. He did not attempt to break through a police line. He did not enter the Capitol. He did not personally damage any property on the Capitol, nor did he break through any barriers or tear any down. And the conduct of which he was convicted was brief and largely reactive.

Mr. McAbee acknowledges that the jury convicted him of each of the charged offenses. But the indictment was charged so broadly that the Court should not conclude that the convictions mean that the jury agreed with the government's theory of the case. Instead, the Court should make its own findings based on the evidence and use those findings to determine what the appropriate sentence should be and the relevant recommended guideline range. For example, Mr. McAbee's charged assault against Officer Wayte alleged both

attempt liability as well as aiding and abetting liability. And the indictment alleged, and the jury was instructed that they could find, any of the following: that Mr. McAbee "assault[ed], resist[ed], oppose[d], imped[d], interfere[d] with" Officer Wayte. Simply standing in the way of officers and briefly touching them could be sufficient for the jury to have convicted Mr. McAbee as an aider and abettor in violation of 18 U.S.C. 111(b).

The government and Mr. McAbee largely disagree about his intentions on January 6. And the jury's verdict does not help to shed light on which version of events is best supported by the evidence. When Mr. McAbee arrived at the entrance to the tunnel, he did not join the assault on the police line. Instead, he hopped over a small fence and stood for a few moments before helping another member of the crowd to her feet. Mr. McAbee's actions were captured at a distance on a video entitled LWT video.mp4. This video was provided both to the government and to Probation, and Mr. McAbee may play at sentencing the video between 5:30 and 5:38 to establish this fact.

After Mr. McAbee helped this person to her feet, he waited near the side of the tunnel. He absolutely should have turned around and left—and the fact that he did not has directly led to his incarceration for the past thirty-one months. He does not attempt to justify his decision to stay at the scene of chaos and violence: nor, though, does that decision warrant excessive punishment. While standing, he noticed Ms. Boyland's lifeless body in front of officers. Mr. McAbee went directly to her and attempted to get the attention of the officers by pointing at her body. For approximately one or two seconds, he touched Officer Wayte's leg to reposition him before moving to Ms. Boyland. Unlike a rioter who grabbed ahold of Officer Wayte's foot, Mr. McAbee never positioned his body so that he could pull Officer Wayte into the crowd. Indeed, he did not do so. If he meant to pull Officer Wayte down the steps, he would have. Instead, he simply moved Officer Wayte while attempting to draw attention to Ms. Boyland. His actions were demonstrated by Officer Moore's body camera where his

fingers (circled in red) are clearly seen as pointing at Ms. Boyland's body (circled in yellow) just a split second or two after he touched Officer Wayte.



Seconds later, he can be seen again clearly attempting to get the attention of the officers:



For the next five seconds, he can be seen attempting to get the officers' attention: he is not focused on Officer Wayte at all—but rather the lifeless body of the woman who later died. These are not the actions of someone intending to assault an officer—though they very well could be the actions of a person who was convicted of "impeding" officers. Indeed, even before he was struck by Officer Moore, Mr. McAbee was standing, trying to draw attention to Ms. Boyland, and not fighting with officers.



Indeed, moments before Officer Moore strikes him, Mr. McAbee can be seen again pointing at Ms. Boyland's body. He was pointing because he wanted the officers to see what they did not in the heat of chaos: that a woman was dying in front of them. Of course, the violence hindered their ability to notice her or to give her help. But that did not remove Mr. McAbee's belief that he had a duty to act: to try to find some way to get a woman help when she was clearly in need of aid just feet away from him—even if in the middle of a riot.



What happens next is still in dispute, despite Mr. McAbee's plea of guilty. He assaulted Officer Moore. The government contends that he did so with a closed fist, and points to a few still images from cameras that demonstrate he pulled his fist back while it was balled up. But immediately before he struck Officer Moore, he relaxed his hands. The following still clip shows his right hand beginning to flex rather than form a fist, shown by the space between his fingers and his palm.



Officer Wayte's body camera shows that the fist the government believed was closed is open before it strikes Officer Moore.



As was his other hand.



From about 16:28:00 to 16:28:25 on Officer Wayte's body camera, Mr. McAbee is clearly on top of him surrounded by other protestors. But during this time, Mr. McAbee did not assault Officer Wayte in any way. He did not pummel him, smother him, or even shout at him. To the contrary, he shouted "No!" at other members of the mob. And as Officer Wayte was able to roll over, Mr. McAbee can be heard clearly saying, "I'm trying to help you man." It may be that, contrary to Officer Wayte's body camera, he sustained several assaults during this time. His mask was clearly removed. But to the extent he received additional injuries, there is not evidence that Mr. McAbee was responsible. In fact, were Mr. McAbee not covering Officer Wayte's body and shouting at the mob, Officer Wayte may have sustained additional injuries.

As Officer Wayte was able to stand, Mr. McAbee did not pursue him. He did not pursue him because he did not intend to harm him. Instead, he went to where Ms. Boyland was lying helpless and he attempted to render aid. Later, he and other members of the crowd brought Ms. Boyland's lifeless body to the police line and begged them to take her back. Officer Sajumon's body camera shows him attempting to perform CPR just before the officers finally brought her back—about three minutes after Mr. McAbee tried to first get her help.



About four minutes after the government alleges that Mr. McAbee engaged in conduct that warrants 151 months in prison, his body language showed his true feelings about what just happened: utter defeat.



The government chose to allege broad theories of liability that obscure any meaningful ability for the Court to determine what facts the jury found beyond a reasonable doubt. But Mr. McAbee's testimony and defense was entirely consistent with a possible theory of liability that led to his conviction. The government cannot on the one hand allege myriad possible ways to assign guilt and contemporaneously claim the certainty that Mr. McAbee was found to have assaulted officers using a dangerous or deadly weapon.

### III.  The PSR incorrectly applies myriad guideline enhancements.

Mr. McAbee's adjusted offense level, as calculated in the PSR, is 33. This is the same offense level as conspiracy to commit murder (§2A1.5) and attempted murder (§2A2.1). It is four-points higher than voluntary manslaughter (§2A1.3). It is one-point higher than kidnapping (§2A4.1). And it is that high only because of incidental aspects of Mr. McAbee's

conduct that did not directly contribute to the harm his actions caused that day. Mr. McAbee argues that most of these enhancements ought not to apply based on the factual record created at trial. Even if the Court disagrees, Mr. McAbee argues that they so artificially inflate his recommended range that the court should vary downward in significant respect to ensure that the punishment he receives is consistent with his conduct that day.

### A. Mr. McAbee's actions did not constitute an "aggravated assault" and the jury verdict does not compel that finding.

Ordinarily, violations of 18 U.S.C. 111 are covered by §2A2.4. *See* U.S.S.G. Appendix A. The Guidelines refer violations of § 111 that constitute aggravated assault to U.S.S.G. §2A2.2. Aggravated assault is defined in Application Note 1 to Section 2A2.2 as

> a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.* not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.

As an initial matter, Mr. McAbee does not dispute that the Court can appropriately apply sentencing enhancements if it finds that the evidence presented at trial or at sentencing establishes the factors by a preponderance of the evidence. However, Mr. McAbee argues that the jury's verdict does not automatically render his conduct an aggravated assault. Count 9 of the indictment did not allege that the offense involved a weapon or that it resulted in *serious* bodily injury. It did allege that Mr. McAbee may have intended to commit another felony, but that is merely one possible way in which the jury could have convicted him. It is possible that the jury did not find that he intended to commit another felony, but merely that his actions resulted in physical contact with the victim—permitting the jury to find sufficient evidence for a conviction, but without finding that his actions constituted an aggravated assault.

Of course, the jury returned guilty verdicts on other counts that alleged Mr. McAbee possessed a dangerous weapon. However, the jury asked a question indicating that the jury

reasonably could have concluded that Mr. McAbee possessed a dangerous weapon on Capitol grounds with the intent to use it in such a manner against Antifa, but not against police. *See* Dkt. 365. That question specifically referenced the non-assault charges Mr. McAbee faced—not the 111(b) count against Officer Wayte. Thus, the verdict does not automatically make these convictions aggravated assaults.

The Court should likewise not conclude that Mr. McAbee's actions constituted an aggravated assault. The commentary to the guidelines makes clear the purpose of defining aggravated assault in such a way is to punish more severely assaults that involve aggravating factors. Here, Mr. McAbee's conduct was minimal compared to most assaults—indeed, especially compared to other assaults committed on officers that day. For example, Mr. McAbee touched Officer Wayte's leg for only a few seconds while he was trying to point out to police that a protestor appeared to be lying lifeless in front of them, unnoticed amongst the chaos. Alternatively, the jury could have found that Mr. McAbee's conduct moments later when he was on top of Officer Wayte was an assault. But he did not otherwise assault him then. Instead, he shouted "no" at other protestors and can be heard telling Officer Wayte, "I'm trying to help you, man." These actions, considering other assaults that day and in general, are not among the "more serious" that should constitute aggravated assaults. Even compared to other assaults generally, the momentary touching of an officer should not become an "aggravated assault." The appropriate base offense level ought to be 10, not 14.

**B. The Court should not employ the six-point enhancement for official victims under §3B1.5.**

Generally, this subsection does not apply to individuals convicted of violating 18 U.S.C. § 111 because the guideline already contemplates that the victim has official status. *See* U.S.S.G. § 3A1.2 Application Note 2. If the Court finds, as argued above, that the correct guideline ought to be §2A2.4, then the court cannot apply this enhancement. Even if the

Court finds that Mr. McAbee's actions constituted an aggravated assault, the court should

still decline to impose the six-point enhancement. This enhancement was added in 2004 after

Congress directed the commission to consider the following factors:

> (A) any expression of congressional intent regarding the appropriate penalties for the offense;
> B) the range of conduct covered by the offense;
> (C) the existing sentences for the offense;
> (D) the extent to which sentencing enhancements within the Federal sentencing guidelines and the authority of the court to impose a sentence in excess of the applicable guideline range are adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by the offense;
> (E) the extent to which the Federal sentencing guideline sentences for the offense have been constrained by statutory maximum penalties;
> (F) the extent to which the Federal sentencing guidelines for the offense adequately achieve the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;
> (G) the relationship of the Federal sentencing guidelines for the offense to the Federal sentencing guidelines for other offenses of comparable seriousness; and
> (H) any other factors that the Commission considers to be appropriate.

This guideline plainly was the result of Congress wishing for Courts to impose higher

sentences. Congress has done this in many cases, and Courts have often disagreed with the

commission on policy grounds and departed from the guidelines. *See generally Spears v.*

*United States*, 555 U.S. 261 (2009) (permitting district courts to disagree with the guidelines

on policy grounds and depart lower).  This case presents one such example. This enhancement

effectively doubles Mr. McAbee's guideline range. Removing only this enhancement would

result in a recommended range of 70 − 87 months. It is not needed in this case because this

conduct was not among the "most egregious conduct covered by the offense." Indeed, it was

some of the most minor conduct that constitutes a felony assault (in terms of Mr. McAbee's

actions): quickly swatting an officer clad in protective riot gear and moving or lying on top of

an officer while unable to get up, and then attempting to help the officer to his feet. Some of

the assaults that occurred on January 6 are certainly among the most serious and may

deserve this enhancement. But for Mr. McAbee, the court should disagree with its application to his case.

Finally, the Court should decline to impose this enhancement because Mr. McAbee's conduct was not motivated by the officers' official status. Mr. McAbee's first possibly-criminal conduct (the indictment did not make clear which conduct toward Officer Wayte resulted in the jury's verdict) was in briefly touching Officer Wayte (possibly moving him, but still standing over him and in the way of him being pulled into the crowd). His actions immediately after demonstrate his intent: pointing at Ms. Boyland's lifeless body which apparently went unnoticed by officer amidst the chaos. His second possibly-criminal act toward Officer Wayte was in attempting to lift him to his feet and not being able to get off him for several moments in an incredibly chaotic environment. And Mr. McAbee can be clearly heard saying, "I'm trying to help you, man," as Officer Wayte is finally able to get up. Mr. McAbee's only other assault was on Officer Moore—an assault that he plead guilty to, but one which was clearly a reaction to having just been shoved with a police baton. A reaction is, by its nature, not motivated by the status of the actor, but by the action. Finally, Mr. McAbee was at the time a law enforcement officer. He did not harbor any motivations to attack police: he simply reacted amid chaos. Because his actions were not motivated by the officers official status, the court should decline to impose a six-point increase to his offense level.

**C. Mr. McAbee did not "use" body armor during the commission of an offense.**

Though Mr. McAbee wore body armor while at the Capitol, that alone does not warrant a four-point increase in his recommended guidelines. First, the commentary to the guideline is clear that merely possessing the armor is not enough. It defines *use* as "active employment in a manner to protect the person from gunfire." *See* U.S.S.G. §3B1.4. This definition does not apply simply to donning body armor, especially in the context of January

6. First, Mr. McAbee wore the vest long before the assault on the capitol began. Photographs and video demonstrate that he wore it even at the rally that occurred earlier in the morning. And his text messages make clear that he was not wearing the body armor to protect against gunfire. He expected violence from counter protesters; he had no intention of quarrelling with officers. And the protestors he was worried about, Antifa, are not commonly thought to use firearms. They often use makeshift bludgeoning weapons or throwing weapons. Indeed, a common trope among conservatives was that Antifa was throwing cans of soup. *See* Sarah Midkiff, *Apparently, Trump is very scared of Antifa's new secret weapon: soup*, Refinery 29, September 2, 2020 available at https://www.refinery29.com/en-us/2020/09/10001730/trump-cans-bags-of-soup-antifa-protestors. Wearing body armor to protect oneself from incidental physical blows from thrown or stabbing objects—not from gunfire—does not constitute "use" within the definition provided by the guidelines.

Indeed, MPD officers donned riot gear not because they were entirely concerned about gunfire, but because of the makeshift bludgeoning weapons used by the crowd. Mr. McAbee used the body armor to protect from perceived threats. The secondary effect (even though a primary purpose) of minimizing gunshot damage was accidental, not intentional.

Few cases interpret this provision of the guidelines, but the most applicable is likely *United States v. Barrett*, 552 F.3d 724 (8th Cir. 2009). There the defendant wore body armor on an evening when he also happened to commit several crimes. *See id.* at 727 – 28. The defendant claimed that he merely wore body armor as a "party gag" and not in a drug transaction. *Id.* at 727. But the defendant also wore the vest when he "threatened his 'friends' with a gun," and when he "shot one of his 'friends.'" *See id*. The court specifically held the District Court properly applied the enhancement where "the facts show one purpose could be to protect the wearer from gunfire" simply because the defendant did not face any "return fire." *See id*. at 728.

Unlike *Barrett*, Mr. McAbee did not possess any other weapons that day. And he did not wear the vest to an event where he expected gunfire. He wore it to protect himself from counter protestors. And the general belief was not that the counter protestors would use firearms, but rather makeshift weapons. Had any evidence at trial established that Mr. McAbee intended to infiltrate the Capitol and perhaps place himself in a position where he might be targeted by officers, the enhancement would be appropriate. For example, had Mr. McAbee armed himself with a handgun and zip ties, those actions may have demonstrated an intent to wear body armor to protect oneself from gunfire expected from police. Those facts were present in *United States v. Reffitt*, where the defendant did not receive a body armor enhancement despite convictions under 18 U.S.C. § 1512. *See* 1:21-CR-32-DLF. Reffitt did not receive any enhancement for wearing body armor because he was not convicted of a crime of violence, even those his actions arguably were more culpable and more likely to cause harm than Mr. McAbee's.

The legislative history behind this section illustrates that incidental protection from firearms was not meant to result in the application of this guideline. First, the guideline is a result of a Congressional directive following the Chris McCurley Body Armor Act of 2002. Pub L. 107-273 § 1109(d). Congress specifically noted a confrontation between police and two "heavily armored suspects, outfitted in body armor" that led to a shootout with police and the murder of a San Francisco Police Officer. Congress noted another case involving the murder of an Alabama officer killed by a drug dealer wearing body armor. The purpose was to further penalize people who wore body armor intending to subvert police response, and generally those who intended to use firearms in the commission of an offense. None of this reasoning supports applying the enhancement in this case.

One can imagine where the application of this standard would be absurd, in remarkably similar circumstances. Imagine a police officer who uses unjustified force in

making an arrest. The officer was fired and disciplined, and later charged. If he were convicted of the offense, would it be fair to apply this enhancement to him merely because he wore body armor that in no way contributed to his conduct? Likely not. And the same logic ought to apply here. Because Mr. McAbee did not use body armor to protect against gunfire, this enhancement should not apply.

**D. Mr. McAbee did not use a deadly or dangerous weapon.**

As argued above, the jury verdict does not require the court to find that Mr. McAbee used a deadly or dangerous weapon during the assault. The government has repeatedly referred to Mr. McAbee's motorcycle gloves as "brass knuckle gloves" or "reinforced steel gloves." They are neither. The items are manufactured out of cheap plastic and are commercially available for around $20. They are not prohibited weapons nor are they inherently dangerous. Of course, nearly any object can become a deadly weapon depending on how it is used. But Mr. McAbee did not use the gloves in a manner likely to cause death or serious bodily injury. And the Jury's question makes clear that their finding of sufficient evidence for guilt on the remaining counts does not necessarily mean that Mr. McAbee used a dangerous weapon in the commission of his violations of 18 U.S.C. 111 against Officer Wayte. Mr. McAbee may have worn those gloves intending possibly to use them in a dangerous manner against Antifa, but not against the police. And because these are not inherently dangerous, the court must look to the context in which they were used to make this determination.

**E. Mr. McAbee did not obstruct justice by testifying.**

As argued above, the simple fact that Mr. McAbee was convicted after testifying does not mean that the jury found him to have lied. Of course, that decision is left to the Court— but the government and Probation do not account for the fact that Mr. McAbee's testimony was consistent with the jury's verdict and the evidence. Instead, Probation merely recites

that his testimony was "contradicted by the video evidence at trial." But at no point was Mr. McAbee seen doing something on video that he did not otherwise admit to or account for in his testimony. And differences in testimony and video do not require the Court to find that the testimony was false. For example, Officer Wayte testified to sustaining numerous assaults and being sprayed with chemical irritants while he was on the steps beneath Mr. McAbee. Yet no video evidence supports this claim. Does this mean he was lying? No—rather, that years after a chaotic event, people's memories may have morphed and changed. Finally, the Court should consider Mr. McAbee's decision to plead guilty and admit guilt during trial to charges of which he was clearly guilty. Had there been a mechanism for Mr. McAbee to plead guilty to the lesser-included crimes of entering or remaining in a restricted area (not with a deadly or dangerous weapon), that charge would never have been before the jury. To the extent that the PSR premises the obstruction enhancement only on Mr. McAbee's testimony that he did not initially know he was not supposed to be on the Capitol grounds, this enhancement ought not to apply to each of his guideline calculations.

## IV.    Restitution for Officer Wayte should be apportioned, and Mr. McAbee should not be required to pay restitution to the Architect of the Capitol.

Mr. McAbee understands that, following a conviction against Officer Wayte, restitution is appropriate. However, that restitution ought to be apportioned rather than ordered joint and several. Justin Juersy and Clayton Ray Mullins were both also convicted of assaulting Officer Wayte, and their actions were clearly more injurious than Mr. McAbee's. Mr. McAbee did not strike Officer Wayte once, nor did he knock him down or remove his protective equipment. He tried to help Officer Wayte to his feet, and then lay on top of him after sliding down several feet into a throng of angry rioters. While on top of him, he attempted to get other rioters to leave Officer Wayte alone by shouting at them, "no!" The Court has the authority to order restitution either joint and several or apportioned based on

the "level of contribution to the victim's loss and economic circumstances of each defendant." *See* 18 U.S.C. § 3664(h). Because Mr. McAbee's conduct was significantly less culpable with respect to Officer Wayte, his required restitution ought to be less.

Moreover, the government is requesting restitution that is largely a result of MPD paying Officer Wayte not to work. Paid time off does not reimburse "the victim for incoe lost by such victim as a result of such offense." *See* 18 U.S.C. § 3663A(b)(2)(C). Nor does it qualify as any other mandatory cost under that statute. *See United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008) (permitting restitution for a victim's use of annual leave where victim would have a right to receive payment for those days upon leaving job). Here, no evidence has been presented that Officer Wayte was out any amount of money as a result of his injuries, and the MPD is not a victim under the 3663A.

The government has not identified how Mr. McAbee's conduct was a "proximate cause" or a "cause in fact" of any damage to the Capitol. Mr. McAbee's few seconds of criminal conduct toward Officers Moore and Wayte had no appreciable affect of the damage to the Capitol largely caused by rioters who stormed its doors and damaged property. Nor was Mr. McAbee's presence on the Capitol grounds a proximate cause of that damage. His presence there and his criminal conduct, though a small part of the larger mob, was entirely devoid of property damage. Unless the government can identify how his actions caused the damage, ordering restitution would be inappropriate.

## V.     Mr. McAbee should not be required to pay a fine.

Mr. McAbee is indigent and has been incarcerated for thirty months. He has no ability to pay a fine. Although money was raised through online contributions on his behalf, that money is insignificant compared to the amount of time he has been out of work and unable to support his family or himself. More importantly, Mr. McAbee previously retained an attorney and has considered retaining an attorney for a possible appeal (the undersigned will

happily remain as counsel on appeal should Mr. McAbee decided to pursue an appeal and desire for counsel to remain). More importantly, Mr. McAbee has not raised any money because of his actions on January 6. He has never once claimed that he should receive money because he was present on the Capitol grounds nor because he assaulted or impeded officers. His fundraising was simply related to policy disagreements with the largest criminal prosecution brought in the history of this country. Indeed, had he not been incarcerated for more than two years prior to trial, it is unlikely he would have raised any money. He has not, as the government argues, "capitalize[d]" on a crime.

## VI.    The purposes of punishment are satisfied by a sentence of thirty months.

January 6 was in many ways unprecedented, and criminal actions that contributed to its consequences are indisputably serious. But that alone does not mean that every action, even every assault on January 6, is of the "utmost seriousness." *See* Government's Sentencing Memorandum at 38. Indeed, the Government has not accounted for the fact that thousands of people engaged in similar behavior on January 6. Why?—not because thousands decided to break the law on a whim. But because various aspects of this nation's history helped lead directly to the events of January 6. The sitting president assembled the mob, directed it to the Capitol, and told them to "fight like hell." The government has acknowledged that person's role in the offense:

> So for more than two months following election day . . . [former President Trump] spread lies that there had been outcome-determinative fraud in the election and that he had actually won. These claims were false, and [former President Trump] knew that they were false. But [he] repeated and widely disseminated them anyway—to make his knowing false claims appear legitimate, create an intense national atmosphere of **mistrust** and **anger**, and erode public faith in the administration of the election. *United States v. Trump*, 1:23-CR-277-TSC, Dkt. 1 at 1-2 (D. D.C. 2023).

### A. A sentence of 30 months meets the purposes of 18 U.S.C. 3553(a)(2)(A).

One cannot consider the seriousness of the actions of the mob on January 6 without considering that each of those people was there because several of our nation's leaders told them to be there. And not just President Trump. Eight Senators and 139 representatives voted to sustain one or both objections to the certification of the 2020 election. *See Karen Yourish* et al., *The 147 Republicans Who Voted to Overturn Election Results*, N.Y. Times, January 7, 2021, available at https://www.nytimes.com/interactive/2021/01/07/us/elections/electoral-college-biden-objectors.html. Indeed, Congress was able to resume session at 8:00 pm on January 6. Congress did not certify the election until shortly after 3:30 am on January 7. It took Congress longer to resolve baseless objections based on rank lies than it was delayed by the actions of the mob on January 6. What is the real threat to democracy: A riot, or an attempted coup disguised as legitimate political arguments?

It is simple to say that violence has no place in politics: but such a statement ignores this nation's history of glorifying violence. None of this suggests that Mr. McAbee's conduct was justified (or the conduct of any other person found criminally responsible for their actions on January 6), but it helps to explain why people might feel compelled to act, even criminally, when confronting issues central to the nation's legitimacy. Mr. McAbee wore a shirt depicting the symbol ascribed to the Three Percenter movement. That movement is a result of the myth that only three percent of colonists rebelled against England in the Revolution. It praises the actions of a few who sought to protect liberty against tyranny. But that belief, however wrong it may be, is inherently American. We all but require children to pledge their allegiance to a flag before they can understand the meaning of those words. We glorify the violent birth of our nation every July by shooting off explosives into the air and reveling in the colors and

sounds produced by gunpowder. We sing about a war before every sporting event. To be American is to have grown up in a culture that celebrates violence in pursuit of freedom. Why should we be surprised when the sitting president asks people to be violent in defense of democracy—however baseless his request may have been.

Mr. McAbee did not travel to Washington on January 6 to attempt to violently stop Congress from certifying the electoral vote. He came to his first political rally because he could, and because he felt compelled by various circumstances that compelled thousands of others to attend. The aggravating aspects of January 6 also have mitigating components— and this Court cannot ignore the various factors that led scores of people to commit similar actions in the (wrong) belief that they were supporting democracy, not undermining it.

**B. A sentence of 30 months is sufficient to afford adequate deterrence to criminal conduct and to protect the public from any potential future crimes.**

Mr. McAbee's long history of abiding by the law demonstrates that he does not need to be specifically deterred from committing additional crimes. This Court can feel confident that he is unlikely to engage in similar behavior. Indeed, following January 6—apart from a privately shared photograph the day after—Mr. McAbee did not celebrate his conduct or the events of January 6 generally. He retired from law enforcement. He quietly moved into a new career to support his family. He deleted his social media accounts. He did not commit any other crimes. Specific deterrence has already been accomplished.

General deterrence will likewise not be hampered by a sentence of thirty months. The government has initiated the largest criminal prosecution in history, and one that does not show signs of slowing, as a result of the actions of people on January 6. A sentence of thirty months is slightly lower than the average felony assault sentence (following a jury trial) in January 6 cases, but only slightly. The general impact of these sentences has already been felt. A sentence within the guidelines would be far outside the norm for most January 6 cases.

Given the number of prosecutions, convictions, and sentences, a sentence of thirty months will have little effect on the aggregate effect of January 6 sentences.

**C. A sentence of thirty months is necessary to avoid unwarranted sentencing disparities.**

Mr. McAbee's actions are most similar to those of his codefendants who also were convicted of assaulting Officer Wayte. Those individuals received substantially lower sentences than the government is requesting in this case, and Mr. McAbee engaged in less injurious conduct. Unlike Justin Jersey, Mr. McAbee did not cause Officer Wayte to fall to the ground, helpless, and vulnerable to attack. He did not violently strike at his face and likely cause him to suffer a concussion. He did not strike other officers with a police baton. And Mr. Jersey received a sentence of 51 months.

Unlike Mr. Barnhart, Mr. McAbee did not pull an officer into the crowd (the government seemed to concede at trial that Mr. McAbee slid down the steps along with Officer Wayte while they were pulled by other rioters). He did not, like Mr. Barnhart, wield a flagpole and strike at the police line. He did not throw objects at them or slam into the line of riot shields. And Mr. Barnhart received a sentence of 36 months. He did not, like Mr. Courson, strike at officers with a police baton. And Mr. Courson received a sentence of 57 months. He did not, like Mr. Stager, strike Officer Wayte with a flagpole while he was on the ground. And Mr. Stager received a sentence of 52 months. He did not, like Mr. Mullins, pull on Officer Wayte's foot to drag him into the crowd. He did not attempt to breach the police line on the Lower West Terrace. And Mr. Mullins received a sentence of 30 months. A sentence anywhere above 52 months would place Mr. McAbee's conduct far above that of his co-defendants. It would mean that Mr. McAbee's conduct was far more culpable, injurious, and deserving of imprisonment than his co-defendants. And that would be contrary to the evidence: that for a few minutes, Mr. McAbee engaged in conduct found to be criminal, while only briefly swatting at an officer and lying atop another, while immediately after attempting to save the life of a dying woman neglected by the police.

**Conclusion**

Mr. McAbee has largely lived a life worthy of admiration. He overcame a difficult childhood and pursued a career focused on helping others. He enjoyed modest success and happiness. And in a moment of political turmoil, he joined thousands of others and heeded the president's call to come to Washington. Amidst mob mentality, he followed others to the Capitol. And while there, he tried to save a woman's life. In so doing, he engaged in conduct

that resulted in him being convicted of several federal felonies. But in context, his actions are deserving of a sentence similar to those this Court has given to his co-defendants. Such a sentence is sufficient, but not greater than necessary, to accomplish the purposes of punishment. Mr. McAbee suggests that sentence is thirty months.

Respectfully submitted,

/s/ Benjamin Schiffelbein

210 First Street SW, Ste 400

Roanoke, VA 24011

Benjamin_Schiffelbein@fd.org

540 777 0880